## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ARGELIA SOLITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case 1:23-cv-03438-MLB |
| | ) | |
| SAM'S EAST, INC., JOHN DOE 1- | ) | |
| 2, ABC CORP., and XYZ CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Sam's East, Inc. ("Sam's" or "Defendant" herein) and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of this Court's Local Rules, hereby files this Brief in Support of its Motion for Summary Judgment, showing this Honorable Court as follows:

## I.  INTRODUCTION

This case arises from a slip-and-fall that occurred on August 5, 2021 at Sam's Club Store No. 6409 in Tucker, Georgia ("the store"). (*See generally*, Complaint). Plaintiff claims that on the day of the subject incident, she was walking through the bakery section of the store when she slipped and fell in "oil spillage." (Compl., ¶¶ 13-15). The surveillance footage of the subject incident (a true and accurate copy of which is being mailed to the Court via FedEx on a USB drive as **Exhibit "A"**) shows

that approximately eleven minutes prior to Plaintiff's fall, a group of customers entered the area of the incident with a leaking package of chafing fuel in one of their shopping carts. The customers continued to stand in front of the spill until Plaintiff walked into the area and slipped approximately eleven minutes later. (Exhibit A, 12:14:45 PM to 12:25:11 PM).

Plaintiff filed the lawsuit against Sam's seeking damages for the personal injuries she allegedly sustained in the fall. Plaintiff asserts claims of premises liability, negligent maintenance, vicarious liability, negligent training and supervision, and negligence per se against Sam's. (*See generally*, Compl.). However, Plaintiff cannot prove that Sam's had actual or constructive knowledge of the oil spill, and therefore cannot succeed on her negligence claims against Sam's. Since the remaining allegations in Plaintiff's Complaint are derivative in nature, summary judgment as to all claims is proper as a matter of law.

## II.  STATEMENT OF FACTS

### A.  *The Subject Incident*

On August 5, 2021, Plaintiff Argelia Solito went shopping at Sam's Club Store No. 6409 in Tucker, Georgia. (*See generally*, Compl.). Prior to this date, Plaintiff shopped at Sam's Club every one to two weeks. (Deposition of Plaintiff

Argelia Solito, p. 29:21-25, a true and accurate excerpt[1] of which is attached hereto

as **Exhibit "B"**). Plaintiff was shopping alone, and believes she was in the store for

approximately half an hour prior to the subject incident. (Plaintiff's Deposition, p.

30:17-25). Based on the surveillance footage, Plaintiff's fall occurred at 12:25:11

PM. (Ex. A). Thus, Plaintiff likely arrived at the store at approximately 11:55AM.

The surveillance footage from the day of the incident shows that at 12:14 PM, as

Plaintiff shopped in another part of the store, a group of shoppers entered the bakery

area:



The group consisted of four customers (a man in a red shirt, and three women

in pink, blue, and gray shirts) with three shopping carts. They remained in the area

for approximately twelve minutes. (Exhibit A, 12:14:45 PM to 12:26:51 PM).

---

[1] Pursuant to the Court's Standing Order, Plaintiff's entire Deposition Transcript is filed separately under a Notice of Filing Original Deposition Transcript, filed concurrently herewith.

At 12:17:11 PM, the man in the red shirt begins to rearrange the items in the group's three shopping carts, transferring items from one cart to another. At 12:20:12 PM, the woman in the pink shirt points to something in one of the carts.



The man in the red shirt goes over to the cart and inspects the contents, eventually pulling out a rectangular package.



The rectangular package was later identified by Sam's Club Store No. 6409 General Manager Cody Speck as a package of Member's Mark 6-Hour Safe Heat

Chafing Fuel with PowerPad[2] (or another similar chafing fuel product). (Declaration of Cody Speck ¶¶ 6-8, a true and accurate copy of which is attached hereto as **Exhibit "C"**). The product had leaked out of the package and onto the floor. (Speck Declaration, ¶¶ 6-7).

The man in the red shirt walks around the area of Plaintiff's fall with the package, inspecting the package and looking toward the floor as he does so, before eventually walking to the back of the store where the chaffing fuel is kept. (Exhibit A, 12:20:28 PM to 12:21:03 PM). Three minutes later, the man returns to the area with another (presumably different and not leaking) package of chafing fuel and places it in one of the shopping carts. (Speck Declaration, ¶ 8).



---

[2] This product can be found at the following link: https://www.samsclub.com/p/members-mark-6-hour-safe-heat-chafing-fuel-with-powerpad-12ct/173308. Chafing fuel is a type of fuel used to heat food in a chafing dish, which is commonly seen in buffet setups and catering services.

At 12:24:49, Plaintiff enters the frame.



After looking at the merchandise displayed in the bakery section for approximately 15 seconds, Plaintiff leaves her shopping cart and begins to walk behind the group of customers into the main aisle. At her deposition, Plaintiff explained that she needed to get bread that was on the other side of the display and had to leave her cart because she could not get by the group of customers. (Plaintiff's Deposition, pp. 31:10-22; 42:2-7). At 12:25:11 PM, Plaintiff slips and falls.



Plaintiff testified that she first saw the fuel when she was already on the floor. (Plaintiff's Deposition, p. 34:10-12). Plaintiff admitted there was nothing preventing her from seeing the floor as she walked other than the group of customers standing close to where the fuel was spilled. (Plaintiff's Deposition, p. 32:11-23). Plaintiff could not tell the source of the fuel, how long the fuel had been on the floor, or if the fuel was clear or had a color. (Plaintiff's Deposition, pp. 35:11-12; 85:13-15; 93:3-5). Plaintiff described the fuel as "spread out," but could not describe the dimensions of the spill in greater detail. (Plaintiff's Deposition, p. 34:13-16). Importantly, Plaintiff also did not recall seeing any tracks in the fuel from other people previously traversing through it. (Plaintiff's Deposition, p. 35:1-3).

At 12:25:28 PM, General Manager Cody Speck enters the frame with (former) Market Manager Anthony Morreale, and they assist Plaintiff, along with Crossmark employee Elizabeth Billingsley, who had been handing out samples in the area. (Speck Declaration, ¶¶ 5-6). Mr. Speck is seen in the red circle, Mr. Morreale is seen in the blue circle, and Ms. Billingsley is seen in the green circle, below.



The group of four customers leave the scene shortly thereafter. Plaintiff remains on the floor until 12:30:44 PM, when Mr. Speck and Mr. Morreale help Plaintiff into a wheelchair. When she got up from the floor after her fall, Plaintiff did not look to see whether the fuel was visible from a standing position. (Plaintiff's Deposition, p. 35:4-10). Former Front-End Manager Keira Saffold arrives on the scene to fill out the Customer Incident Report, and can be seen at 12:32:38 PM taking photographs of the area on her phone before wheeling Plaintiff out of frame at 12:34:56 PM. (Speck Declaration, ¶ 9) (True and accurate copies of the photographs taken by Ms. Saffold are attached hereto as **Exhibit "D"**).



Plaintiff was shown the photos at her deposition and asked whether she recognized the substance causing her fall. (Plaintiff's Deposition, pp. 37-38:9-10; Exhibit "2" to Plaintiff's Deposition). Upon review of the photos, Plaintiff testified that she could not identify anything. (Plaintiff's Deposition, pp. 38-39:9-19).

B. *Sam's Inspection Procedures*

All employees of Sam East, Inc. employees inspect and monitor the store for potential hazards as they walk through the store and identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. (Speck Declaration, ¶ 10) (A true and accurate copy of Sam's East, Inc.'s Slip, Trip, and Fall Guidelines are attached hereto as **Exhibit "E"**; a true and accurate copy of Sam's East, Inc.'s Spill Clean Up Procedures are attached hereto as **Exhibit "F"**). Employees are expected to be alert, look for hazards, and

correct the hazards quickly. (Exhibit E). Sam's employs a "clean as-you-go" method and emphasizes the importance of immediate hazard clean up by enforcing the "Towel in Pocket Program," which requires that every employee put a paper towel or pocket pad in their pocket prior to starting their shift in order to provide an easy way to immediately clean up a small spill. (Exhibit E; Exhibit F). If an employee notices any hazard on the floor, the employee immediately blocks off the spill, calls for assistance, and monitors the spill until it is cleaned up in order to prevent a customer or another employee from coming in contact with the spill or tracking it through the store. (Exhibit F).

In this case, an employee walked through the area of the subject incident at 11:46:00 AM, 11:46:10 AM, 11:47:26 AM, and 12:24:25 PM (less than one minute prior to Plaintiff's fall). None of these employees saw any spill or were informed of the presence of any spill by a customer or anyone else.





### III.  STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1073 (11th Cir. 2003). A fact is not material if a dispute over that fact will not affect the outcome of the legal issue before the court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

Once the moving party has discharged its burden of demonstrating that there is an absence of evidence to support the essential elements of the non-moving party's case, the non-moving party must present evidence to establish a genuine issue of material fact. In so doing, he must go beyond the pleadings and submit evidence sufficient to demonstrate that a jury could reasonably find by a preponderance of the evidence that he is entitled to a verdict in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson*, 477 U.S. at 248. [W]hile it is true that all reasonable inferences must be drawn in the non-moving party's favor, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Shotz v. City of Plantation*, 344 F.3d 1161, 1184 (11th Cir. 2003) (internal citations omitted). Indeed, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find . . . by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* (Citation omitted).

## IV.  ARGUMENT AND CITATION TO AUTHORITY

*A.     Plaintiff Cannot Establish the Essential Elements of Negligence.*

"To state a cause of action for negligence in Georgia, it is necessary to establish the essential elements of duty, breach of that duty, and proximate causation, as well as damages, as a basis for liability for the injuries of another." *Robertson v. Metro. Atlanta Rapid Transit Auth.*, 199 Ga. App. 681, 681 (1991). Though issues of negligence, contributory negligence, and lack of ordinary care for one's own safety are not usually susceptible to summary adjudication, the trial court can conclude as a matter of law that the facts do not show negligence on the part of the defendant where the evidence is plain, palpable, and undisputable. *Robinson v. Kroger Co.*, 268 Ga. 735, 739 (1997). Here, Plaintiff alleges both premises liability and negligent maintenance against Sam's.

### 1.     Premises Liability

Pursuant to O.C.G.A. § 51-3-1, an owner or occupier of land who invites "others to come upon his premises for any lawful purpose, ... is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." "Mere proof of an injury, however, does not establish liability." *Ingles Markets, Inc. v. Rhodes*, 340 Ga. App. 769, 770 (2017). "The true basis for liability is the superior knowledge of the proprietor of the

existence of a condition that may subject the invitee to an unreasonable risk of harm." *Id.* (Citation and punctuation omitted). "To demonstrate negligence in a foreign substance slip and fall case, a plaintiff must show that the defendant had knowledge, actual or constructive, of the substance *and* that she was without such knowledge." *Roberson v. Winn-Dixie Atlanta, Inc.*, 247 Ga. App. 825, 825 (2001) (Emphasis added). As the evidence in this case clearly shows, Sam's had neither actual nor constructive knowledge of the spilled chaffing fuel.

## I.   Actual Knowledge

Though Plaintiff alleged in her Complaint that Defendant had actual knowledge of the spill (Compl., Count I ¶ 2 [*sic*][3]), the record is entirely devoid of any evidence demonstrating that Defendant had actual knowledge of the chaffing fuel at any time prior to Plaintiff's fall. The only deposition taken thus far in this case is the deposition of the Plaintiff, and she made no averments that Sam's had any knowledge of the fuel in which she slipped. (*See generally*, Plaintiff's Deposition).

Further, during discovery, Plaintiff was specifically asked to "[s]tate the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident;

---

[3] Plaintiff's Complaint restarts numbering following Paragraph 17.

identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts." (Plaintiff's Response to Defendant's First Interrogatories ("Interrogatories"), Interrogatory No. 19, a true and correct redacted[4] copy of which is attached hereto as **Exhibit "G"**). In response, Plaintiff stated: "Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence." (Plaintiff's Response to Interrogatory No. 19). Despite the ten months that have elapsed since Plaintiff's Responses, Plaintiff has neither supplemented her Interrogatory Responses nor requested to depose Defendant or any of its employees. Thus, there is no evidence that Defendant had actual knowledge of the spill; therefore, the inquiry must focus on Defendant's constructive knowledge.

## II.   Constructive Knowledge

To establish constructive knowledge, Plaintiff is "required to show either that (1) a [Sam's] employee was in the immediate area of the hazard and could have

---

[4] In an effort to preserve Plaintiff's Privacy, Defendant is only attaching the Interrogatory Responses as relevant to the instant motion. However, should this Court require an unredacted version, Defendant will promptly provide it.

easily seen the substance or (2) the alleged hazard remained on the floor long enough that ordinary diligence by [Sam's] employees should have discovered it." *Brown v. Host/Taco Joint Venture*, 305 Ga. App. 248, 250 (2010).

In this case, Plaintiff admitted she does not know the length of time the fuel had been on the floor. (Plaintiff's Deposition, p. 85:13-15). However, the surveillance footage shows that the shopping cart containing the leaking package of chaffing fuel entered the area where Plaintiff fell at 12:14:45 PM – less than eleven minutes before Plaintiff fell at 12:25:11 PM. (Exhibit A). Though an employee walked by the general area of the fall at 12:24:25 PM, the employee's view was clearly blocked by the other patrons in the area. Georgia law holds that "showing that an employee was merely working in the immediate area of a foreign substance is not enough; the employee must have been in a position to have easily seen the substance and removed it." *Brown*, 305 Ga. App. at 250 (Citation omitted).

During discovery, Plaintiff was specifically asked to "describe, in detail, the substance which you contend caused your fall, including but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance. Please identify the source of the substance at issue, where it came from, and where it was located when you fell." (Interrogatory No. 8). In response, Plaintiff stated, "Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of

the source of the substance and where it came from. It was located near the bread isle [*sic*]." (Plaintiff's Response to Interrogatory No. 8). Additionally, Plaintiff admitted that she did not see the spill until she had already fallen, she did not look to see whether the spill was visible from a standing position, did not see whether the fuel was clear or had a color, and that the group of customers obstructed her view. (Plaintiff's Deposition, pp. 32:11-23; 34-35:10-12). Thus, Plaintiff confirms that the patrons in the area blocked the view of the spill.

There is no evidence in the record establishing that the spill could have been easily seen and removed by an employee. A long line of cases supports the grant of summary judgment in factually similar situations. *See, e.g., Brown*, 305 Ga. App. at 250-51 (plaintiff admitted that grease spot on floor was not easily visible and therefore failed to establish that defendant could have easily seen and removed grease prior to fall); *Bolton v. Wal Mart Stores, Inc.*, 257 Ga. App. 198, 198 (2002) (customer who slipped on clear liquid substance in store failed to establish store's constructive knowledge despite employees being in the area at the time of the fall where customer testified that the color of the floor and lighting conditions made substance undetectable, and employee had been in the exact area ten to fifteen minutes earlier, at which time the floor was clear of any foreign substance); *Chastain v. CF Georgia N. Dekalb L.P.*, 256 Ga. App. 802, 803–04 (2002) (no evidence

reasonable inspection would have discovered a "two and a half foot line of dribbled water" where plaintiff testified that the water was not "easily visible"); *Lindsey v. Georgia Bldg. Auth.*, 235 Ga. App. 718, 719 (1998) (no inference of constructive knowledge where plaintiff testified that single raised brick on the edge of the landing "was extremely difficult to see" and was unable to identify the brick in photographs shown to him during his deposition[5]).

Plaintiff is unable to prove that Defendant had knowledge (actual or constructive) of the spilled chaffing fuel. Therefore, her premises liability claim fails as a matter of law.

### 2. <u>Negligent Maintenance</u>

Plaintiff claims that Defendant was "negligent in failing to properly maintain the walkway." (Compl., ¶ 24 [*sic*][6]). However, Plaintiff's "negligent maintenance" claim is simply a reiteration of Plaintiff's premises liability claim. Plaintiff's Complaint states that Defendant had "actual or constructive knowledge of the hazardous condition of the walkway for patrons of the Store," that Defendant "owed a non-delegable duty of case in keeping the premises safe for invitees such as Plaintiff," and Defendant was "negligent in failing to properly inspect the walkway."

---

[5] Similarly, in this case, Plaintiff was shown photographs during her deposition and was unable to identify the spill. (Plaintiff's Deposition, pp. 38-39:9-19).
[6] Plaintiff's Complaint is misnumbered.

(Compl., ¶¶ 19, 22, 23). The "condition of the walkway" Plaintiff is apparently referring to is the spilled chaffing fuel. However, as Defendant discussed in Subsection A (1), *supra,* Defendant had no knowledge of the spill.

While it is true that an owner/occupier owes an invitee the duty of ordinary care in keeping the premises and approaches safe, proof of a fall, without more, does not create liability on the part of a proprietor or landowner because "it is common knowledge that people fall on the best of sidewalks and floors." *Glynn-Brunswick Mem'l Hosp. Auth. v. Benton*, 303 Ga. App. 305, 307 (2010). To presume that a proprietor has somehow been negligent just because a customer falls in a store would make the proprietor an insurer of his customer's safety. Under Georgia law, a proprietor is specifically *not* an insurer of its customer's safety. *H.J. Wings & Things v. Goodman*, 320 Ga. App. 54, 55 (2013).

Importantly, "in the absence of evidence [that] a reasonable inspection would have discovered the foreign substance, no inference can arise that defendant's failure to discover the [defect] was the result of its failure to inspect." *Hopkins v. Kmart Corp.*, 232 Ga. App. 515, 518 (1998) (Citation and punctuation omitted). The undisputed evidence in the record shows that the fuel was spilled from another customer's shopping cart a mere eleven minutes prior to Plaintiff's fall. During the entirety of that time, the group of customers stood directly in front of the spill. An

employee walked by the area of the fall, but this employee's view was blocked by the other patrons. Plaintiff also failed to see the substance on the floor due to the presence of the other patrons. Accordingly, summary judgment is warranted.

      B.     *An alleged violation of O.C.G.A. § 51-3-1 cannot support a claim for negligence per se.*

Count IV [*sic*][7] of Plaintiff's Complaint alleges that Defendant is negligent per se due to Defendant's alleged violation of O.C.G.A. § 51-3-1. However, this statute cannot support a claim for negligence per se. *Sanders v. QuikTrip Corp.*, 378 F. Supp. 3d 1177, 1194 (N.D. Ga. 2019); *see also Burns v. Colonial Stores, Inc.*, 90 Ga. App. 492, 494-95 (1954) (clarifying that a violation of a statutory provision is not negligence per se where "the liability described by th[at] [provision] is simply the common-law liability for injury to another through negligence"); *Williamson v. Kidd*, 65 Ga. App. 285 (1941) (indicating that prior provision of Georgia law which is virtually identical to Section 51-3-1 is a codification of "anciently recognized" common law establishing "the duty of a master to use ordinary care to keep his premises safe"). Plaintiff has not identified any other statute to support her negligence per se claim. Therefore, Defendant is entitled to summary judgment on Plaintiff's negligence per se claim.

---

[7] There are two "Count IV"s in Plaintiff's Complaint. Had the Complaint been properly numbered, Plaintiff's negligence per se claim would be "Count V."

C.    *Plaintiff's Derivative Claims of Vicarious Liability and Negligent Training and Supervision are unsupported and fail as a matter of law.*

Plaintiff's remaining claims are derivative. Under Georgia law, "[f]or the negligence of one person to be properly imputable to another, the one to whom it is imputed must stand in such a relation or privity to the negligent person as to create the relation of principal and agent." O.C.G.A. § 51-2-1 (a). In other words, if a Plaintiff does not show that an employee was liable, the Plaintiff cannot hold the employer liable under a theory of respondeat superior. *Greenway v. S. Health Partners, Inc.*, 827 F. App'x 952, 963 (11th Cir. 2020), cert. denied, 141 S. Ct. 1687, 209 L. Ed. 2d 464 (2021); *Trabue v. Atlanta Women's Specialists, LLC*, 349 Ga. App. 223, 231 (2019), aff'd, 310 Ga. 331 (2020) ("An employer's vicarious liability is derivative and imposed by statute, based solely on its status as the active tortfeasor's employer.").

In this case, the evidence of the record does not support a finding of negligence with regard to any of Defendant's employees. The only negligent act apparent from the evidence in the case is the conduct of the group of customers who allowed chaffing fuel to be spilled onto the floor without notifying a store employee about the spill. It is axiomatic that without first proving that an agent or employee of and Sam's was negligent, Sam's cannot be held liable under a theory of vicarious liability.

Similarly, "[a]n employer may be held liable for negligent supervision only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." (Citation and Punctuation Omitted.) *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 841 (2009). Also, an employer may only be held liable for a negligent training claim if the plaintiff can provide that an employee's inadequate training caused a reasonably foreseeable injury. *Advanced Disposal Servs. Atlanta, LLC v. Marczak*, 359 Ga. App. 316, 319 (2021), cert. denied (Sept. 21, 2021*); Doe I v. Young Women's Christian Ass'n of Greater Atlanta, Inc.*, 321 Ga. App. 403, 408 (2013) ("In order to defeat summary judgment on [a claim for negligent training and supervision], a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.").

Here, Plaintiff may not maintain claims of negligent training and supervision without first identifying an employee or agent of Sam's whose negligent acts or training caused her fall. It is indisputable that Plaintiff has failed to show, nor can she show, that any employee or agent of Sam's was even involved in the subject incident. As such, Plaintiff's derivative claims fail as a matter of law.

# V.  <u>CONCLUSION</u>

WHEREFORE, in consideration of the foregoing, Defendant Sam's East, Inc.

respectfully requests that its Motion for Summary Judgment be GRANTED as to all

of Plaintiff's claims.

Respectfully submitted, this 3rd day of June, 2024.

**DREW ECKL & FARNHAM, LLP**

*/s/ Katherine I. Barton*
Michael L. Miller
Georgia Bar No. 508011
Katherine I. Barton
Georgia Bar No. 882335
*Attorneys for Sam's East, Inc.*

303 Peachtree Street, NE
Suite 3500
Atlanta, Georgia 30308
(404) 885-1400
millerm@deflaw.com
bartonk@deflaw.com

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ARGELIA SOLITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case 1:23-cv-03438-MLB |
| | ) | |
| SAM'S EAST, INC., JOHN DOE 1-2, ABC CORP., and XYZ CORP., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

Today I served a copy of *Defendant Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment* upon all parties to this matter by filing with the Court's CM/ECF system, which will automatically e-mail notification of same to the following counsel of record:

Adam J. Klein, Esq.
Hung Q. Nguyen, Esq.
HQ Alex Nguyen Law Firm LLC
litigation@770goodlaw.com
5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
*Attorneys for Plaintiff*

I further certify that the foregoing has been prepared with Times New Roman, 14-point font, in compliance with L.R. 5.1(C).

This 3rd day of June, 2024.

**DREW ECKL & FARNHAM, LLP**

*/s/Katherine I. Barton*
Katherine I. Barton
Georgia Bar No. 882335
*Attorneys for Sam's East, Inc.*

303 Peachtree Street, NE
Suite 3500
Atlanta, Georgia 30308
(404) 885-1400
bartonk@deflaw.com

14241534/1
05695-260504

# EXHIBIT A

Placeholder for Surveillance Footage from Sam's Club Store No. 6409 on August 5, 2021 - USB drive sent via FedEx to United States District Court for the Northern District of Georgia, Atlanta Division Clerk.

# EXHIBIT B

**ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.**
**Argelia Solito on 12/11/2023**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF GEORGIA

 3                      ATLANTA DIVISION

 4

 5   ARGELIA SOLITO,            )
                                )
 6                              )
          Plaintiff,            )
 7                              )
     v.                         )
 8                              ) CASE 1:23-cv-03438-MLB
     SAM'S EAST, INC., JOHN     )
 9   DOE 1-2, ABC CORP., and    )
     XYZ CORP.,                 )
10                              )
                                )
11        Defendants.           )

12

13                          - - -

14

15        The Deposition of ARGELIA SOLITO, taken at the

16   instance of the Defendants, pursuant to stipulations

17   contained herein; before Alecia Wright, Certified

18   Court Reporter, at 5495 Jimmy Carter Boulevard, Suite

19   B-17, Norcross, Georgia 30093, at 1:00 p.m. on

20   December 11, 2023.

21

22

23            Reported by:  Alecia Wright
                            Certified Court Reporter
24                          Georgia
                            License No. 4902-5798-3471-6160
25
```

1        Q    Okay.  All right.  That's all we wanted to

2    know.  All right.

3             Okay.  And prior to this lawsuit that we're

4    talking about today, have you ever brought any other

5    lawsuits before?

6        A    No, not that I remember.

7        Q    Okay.  All right.  So now I want to talk

8    about the incident that happened at Sam's Club.

9        A    Okay.

10       Q    Okay.  Do you remember what time this

11   accident happened?

12       A    Around 11 or 12, I think.

13       Q    Okay.  Do you remember what you were doing

14   earlier that morning?

15       A    Before going to the store?

16       Q    Yes.

17       A    Well, I was at home.

18       Q    Okay.  And did you have any plans for

19   later?

20       A    No.

21       Q    Okay.  So how many times have you been to

22   the Sam's Club in Tucker, Georgia, before this

23   incident?

24       A    Every week or every two weeks, I would go

25   shopping there.

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                                   Page 30

```
 1        Q    And have you been back since the time of
 2   your fall?
 3        A    To the store?
 4        Q    Yes.
 5        A    Yes.
 6        Q    Do you still go once a week?
 7        A    No.  Now I go with my daughter every month.
 8        Q    Okay.  Do you remember why you were there
 9   on the day of the incident?
10        A    Yes.  I was shopping because the next day I
11   was going to start working.
12        Q    Where were you going to start working?
13        A    I don't remember the name of the company,
14   but it was a sewing company.
15        Q    And you hadn't started work yet?
16        A    No.
17        Q    Okay.  All right.  And were you shopping
18   with anyone?
19        A    No, it was just me.
20        Q    Okay.  Did you speak to anyone at the store
21   before you fell?
22        A    No.
23        Q    And how long were you in the store before
24   you fell?
25        A    I think about a half an hour.
```

1        Q     Do you know anyone who works at the store?

2        A     No.

3        Q     Okay.  And in the 24 hours prior to your

4    fall, had you taken any prescription medicine?

5        A     No.

6        Q     Any over-the-counter medicine?

7        A     No.

8        Q     Any alcohol?

9        A     No, I don't drink.

10       Q     Okay.  Okay.  So why don't you tell me in

11   your own words what happened from the time you parked

12   in the parking lot until your fall.

13       A     I went into the store.  I was there for,

14   like, half an hour.  I went to the area where the

15   bread is, and I needed to get a piece of bread that

16   was on the other side, like, going all around to the

17   other side of the table.  But there were two ladies

18   talking, and they had the shopping cart there and I

19   couldn't get by, so I left my cart on this side and I

20   walked over.  And when I was walking, about to turn

21   is when I fell because there was oil spilled there

22   and there wasn't a sign.

23       Q     Okay.  So you fell -- you were still in the

24   bread aisle when you fell; right?

25       A     Yes.

1       Q     Okay.  And you said there were two ladies?

2       A     Yes.

3       Q     Okay.  And you said that they were blocking

4    the area.

5             What did you mean by that?

6       A     Yes.  They were talking.

7       Q     Okay.  Did you have to walk by the ladies

8    to get to the other side?

9       A     Yes.  I just walked over there because I

10   couldn't go over with my cart.

11      Q     Okay.  Was there anything in front of you

12   that prevented you from seeing the floor as you

13   walked?

14            THE INTERPRETER:  Oh, the interpreter needs

15       to ask for a clarification.

16            Was there any -- anything in front of you

17       preventing you from seeing the --

18            MS. BARTON:  -- floor.

19            THE INTERPRETER:  Ah.  Okay.  Thank you.

20      A     No, just the ladies that were standing

21   there.  So they were standing there, and I just

22   walked up, and I didn't imagine that that was spilled

23   down there.

24   BY MS. BARTON:

25      Q     Okay.  How close to the ladies was the

1   you fell?

2        A    I remember that this leg landed like this

3   (indicating), like, backward.

4        Q    Okay.

5        A    I remember this leg was, like, back here

6   (indicating), and what I do remember is I couldn't

7   get up because I wasn't able to straighten my leg.

8        Q    And which leg was it?

9        A    The right one.

10       Q    At what point did you see the oil on the

11  floor?

12       A    When I was already on the floor.

13       Q    Was it a lot of oil?

14       A    There was a lot.

15       Q    Was it, like, a puddle or more spread out?

16       A    It was, like, spread out.

17       Q    And how did you know that it was oil?

18       A    Because I touched it when I fell.

19       Q    Did it get on in any of your clothes?

20       A    Yes.

21       Q    Did you take any pictures of your clothing

22  with the oil on it?

23       A    No.

24       Q    Where was the oil on your clothing?

25       A    On my leg.

1      Q    Were there any footprints in the oil that

2  you could see from prior people walking through it?

3      A    I didn't notice that.

4      Q    When you eventually stood up, were you able

5  to see the oil on the floor?

6      A    No, I didn't notice because the manager and

7  another man were the ones that came and got me up.

8      Q    Okay.  So you don't know whether or not the

9  substance was visible from a standing position?

10     A    No, I didn't look, to be honest with you.

11     Q    Did the oil have a color?

12     A    I didn't see.

13     Q    Did you see anyone else in the area other

14  than the two women?

15     A    There was a cleaning lady.

16     Q    Okay.  How did you know she was a cleaning

17  lady?  Did she have a cart with her?

18     A    Yes, she told me.  Well, not exactly

19  cleaning, but she was there, like, arranging things.

20     Q    Okay.  Other than that person, anyone else?

21     A    No, not that I remember.

22     Q    Okay.  So we talked about how your leg went

23  out from under you, went backwards when you fell.

24          Did -- do you recall if you hit any other

25  body parts?

1   fell?

2       A    No.

3       Q    Did you take any photographs of the area?

4       A    No.

5       Q    Did you ever return to the store to

6   photograph the area?

7       A    No, because I just called my son and he

8   took me to the hospital.

9       Q    Okay.  Okay.  We'll mark these store photos

10  as Defense Exhibit 2.

11          (Defendant's Exhibit No. 2 was marked for

12          identification.)

13  BY MS. BARTON:

14      Q    And I'll let your attorney look at them

15  first.

16          Okay.  Will you please take a look at the

17  photos, and you can flip through them, look at them.

18      A    What is it that I'm supposed to see here?

19      Q    I just want you to take a look at the --

20  the pictures cause I'm going to ask you about them in

21  a second.

22          And I will state, while you're looking at

23  that, for the record, that the photographs that are

24  marked 1 through 5 were taken at the store on the day

25  of the incident, and photographs 6, 7, and 8 were

1  ones that I took, so they don't represent it how it

2  looked the day of the accident, but it is the same

3  area.

4            Okay.  So if you will look at the -- the

5  first page -- and it is photo of a photo, so it is

6  someone's phone.  And in the phone, on the bottom

7  left corner, it looks like that is where the oily

8  substance is.

9            Does that look like what the oil looked

10 like when you saw it?

11     A    I can't make out anything here.

12     Q    Okay.  It's a little shinier in the second

13 picture.  Okay.  And this is another photo of a

14 photo.

15           Can you see the oil better in this picture?

16     A    I can't make it out, to be honest with you.

17     Q    Okay.  And if you will please go to the

18 last page, page 8, does this show the area in which

19 you fell?

20           MS. TAYLOR:  If you don't know and if

21      you're not sure, you can let her know that.

22 BY MS. BARTON:

23     Q    Okay.  That's fine.

24     A    No, to tell you the truth.

25     Q    If you will just do me a favor and look at

1  photos 3, 4, and 5 and see if you can pick out any of

2  the oil in those pictures?

3          MS. TAYLOR:  Are you stipulating that there

4      was oil on the floor?

5          MS. BARTON:  We have already

6      (indiscernible) there was oil on the floor.

7      A    You said 3 and 5?

8  BY MS. BARTON:

9      Q    Yeah, 3, 4, and 5, if you see any oil in

10  those pictures.

11          MS. TAYLOR:  Are you asking her to be a

12      expert in what, oil --

13          MS. BARTON:  I'm just asking if she is --

14      can pick out oil in any of the pictures.

15          MS. TAYLOR:  If -- if you -- if you know

16      for a fact that it's oil and you can state that

17      with a hundred percent certainty, feel free to

18      answer the question.

19      A    No.  To be honest with you, I don't know.

20  BY MS. BARTON:

21      Q    Okay.  I'll take those back, then.

22          All right.  And have you seen the

23  surveillance footage from this accident?

24      A    No.  The lady said that she was going to

25  send it to me by e-mail, but I never received it.

1   20 seconds.

2              Okay.  So looking at the still, are

3   these -- the group of shoppers that's in front of

4   the -- the white refrigeration unit right here, is

5   that the group of ladies that you saw?

6        A    Yes.  Yes, and I couldn't get by.  That's

7   why I left my cart right there.

8        Q    Okay.  And that was my next question is:

9   These were the carts that you were saying, right here

10  on the screen, that you couldn't get around?

11       A    Yes.  Yes.

12       Q    Okay.  And you had mentioned there was a

13  woman arranging things.

14             Was it the woman that you -- you can see

15  here that has the green apron on?

16             MS. TAYLOR:  I'm gonna object.

17             I don't see that she had no green apron on.

18       The blue shirt -- the lady with the blue shirt

19       on, or --

20       A    No, I -- I don't know.

21  BY MS. BARTON:

22       Q    Okay.  All right.  And we'll just watch it

23  one more time, the same timestamps as before.  Let me

24  get it closer to you.

25             (Whereupon, a video recording was played.)

```
 1   BY MS. BARTON:
 2       Q    Okay.  So it is a little difficult to see
 3   in the video, but it looks like the oil was behind
 4   the shopping cart.
 5                Is that what you recall?
 6                MS. TAYLOR:  Objection.
 7                Is that you testifying to where the oil is,
 8       cause I don't know that that's a piece of
 9       evidence in fact?  If you would like to ask her
10       if she knew where the oil was, you can ask her.
11       But I prefer you not to testify as to where
12       things were.
13   BY MS. BARTON:
14       Q    All right.  So in this -- let's go back to
15   exactly when you fell.  Okay.  So looks like you are
16   falling at 12:25 and 11 seconds.
17                Do you remember where the substance was
18   that you slipped on?
19       A    Well, it must have been where I slipped.
20       Q    Okay.  And to me -- well, I'll -- I'll ask
21   it this way.
22                And that was behind one of these people
23   with the shopping cart; correct?
24       A    I do remember that there was some carts
25   there, but I don't remember whose.
```

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

1    Q    Okay.  I was just asking if the spill was
2  behind a cart.
3    A    Where I fell is where it is.
4    Q    Okay.  Okay.  So after you fell, how long
5  did you stay in the store?
6    A    I just waited until my son arrived.  I
7  think it was about 20 minutes.
8    Q    Did anyone ask you to provide a statement
9  while you were at the store?
10    A    Yes.
11    Q    And was this a written statement or an oral
12  statement?
13    A    Verbal.  They were asking me questions, and
14  I was answering.
15    Q    Did you tell anyone at the store that you
16  were hurt?
17    A    Yes.
18    Q    Okay.  And what were you complaining of?
19    A    What I hurt when I fell?
20    Q    Yes.
21    A    Yes.  I explained that it was my leg, my
22  knee, and my ankle, and back here on my spine.
23    Q    And was it the right leg, knee, and ankle?
24    A    Right.  Yes.
25    Q    And you said right here on your spine.

1    before you fell and you're in the bread aisle, was

2    that your first time in the bakery section that day?

3            THE INTERPRETER:  Can you repeat that

4        question again.  I'm so sorry.

5            MS. BARTON:  Sure.

6    BY MS. BARTON:

7        Q    So I guess I'll make it a little bit -- a

8    better question.

9            Prior to your fall in -- in the bakery

10   aisle, had you been in the bakery aisle before that,

11   that day?

12       A    No.

13       Q    Do you know how long the substance was on

14   the floor?

15       A    No, I don't know.

16       Q    Okay.  And following your fall, did you

17   ever speak to any employees from Sam's Club about

18   this incident again?

19       A    No.

20       Q    Okay.  Do you have any social media?

21       A    Like, which ones?

22       Q    Like, Facebook, Instagram.

23       A    Yes.

24       Q    Okay.  Which do you use?

25       A    Both.

```
 1   BY MS. BARTON:
 2        Q    Okay.  Just one more.
 3             Did you ever get to see what the source of
 4   the substance on the floor was?
 5        A    No.
 6        Q    Okay.
 7             MS. TAYLOR:  I have a follow-up question.
 8                        REEXAMINATION
 9   BY MS. TAYLOR:
10        Q    Did you work at Sam's Club at that time?
11        A    No.
12        Q    Are you responsible for making sure that
13   Sam's Club have no -- no liquids or anything on the
14   floor?
15        A    No.
16        Q    At that time, were you an employee of Sam's
17   Club?
18             MS. BARTON:  Object to the form.
19             Asked and answered.
20             MS. TAYLOR:  I never asked her that.
21             MS. BARTON:  Yes, you did.
22             MS. TAYLOR:  Now, you gone stop.  I never
23        asked her if she was an employee of Sam's Club.
24             MS. BARTON:  Okay.
25             MS. TAYLOR:  How many times did you ask her
```

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ARGELIA SOLITO,

Plaintiff,

v.                                                          Case No. 1:23-cv-03438-MLB

SAM'S EAST, INC., JOHN DOE 1-2,
ABC CORP., and XYZ CORP.,

     Defendants.

## <u>DECLARATION OF CODY SPECK</u>

Pursuant to 28 U.S.C. § 1746, I, Cody Speck, do hereby declare under penalty of perjury that the following is true and correct:

1.

I, Cody Speck, am over the age of eighteen, of sound mind, am competent to give testimony to the matters stated in this Declaration. I give this Declaration based upon my personal knowledge.

2.

I am currently the General Manager of Sam's Club Store Number 8194. On August 5, 2021, I was the General Manager of Sam's Club Store Number 6409.

- 1 -

3.

I am personally familiar with the slip-and-fall incident that occurred on August 5, 2021involving Argelia Solito. Though I did not witness the fall, I arrived shortly after the incident while Ms. Solito was still on the floor.

4.

The surveillance footage attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibit "A"** is a true, accurate, and complete duplicate of the surveillance footage captured at or near the time of Ms. Solito's fall on August 5, 2021.

5.

The surveillance footage shows that Ms. Solito fell at 12:25:11 PM. At 12:25:19 PM, Crossmark employee Elizabeth Billingsley, who was handing out samples near the area where Ms. Solito fell, goes to Ms. Solito's side. Ms. Billingsley is not an employee of Sam's East, Inc.

6.

I appear on the video, along with former Market Manager Anthony Morreale, at 12:25:25 PM. (Exhibit A).  Mr. Morreale and I rendered aid to Ms. Solito and observed the substance in which Ms. Solito had apparently slipped. Upon looking around the scene for the source of spill, I suspected that a package of "Member's

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product) had leaked onto the floor from another customer's shopping cart.

7.

This suspicion as to the source of the spill was confirmed when I watched the surveillance footage from the time of the subject incident and realized that at 12:20:12 PM, one of the women in the group of four customers I had seen directly in front of the area where Plaintiff slipped points to something in one of their shopping carts, and the man in the red shirt goes over to the cart and inspects the contents, eventually pulling out a rectangular package that matches the description of "Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product). (Exhibit A, 12:20:12 PM to 12:20:28 PM).

8.

The man in the red shirt walks around the area of the Ms. Solito's fall with the package, inspecting the package and looking toward the floor as he does so, before eventually walking to the back of the store, where the chaffing fuel is kept. (Exhibit A, 12:20:28 PM to 12:21:03 PM). The man returns to the scene of the incident approximately three minutes later carrying what appears to be a new package of chaffing fuel, as the package in his hand also matches the description of Member's

- 3 -

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad (or another similar chafing fuel product). (Exhibit A, 12:23:45 PM).

9.

At 12:28:54 PM, former Front-End Manager Keira Saffold arrives on screen and began to fill out the Customer Incident Report. At 12:32:38, Ms. Saffold can be seen taking photographs of the area where Plaintiff fell. (Exhibit A).

10.

Sam East, Inc. personnel regularly inspect and monitor the store for potential hazards as they walk through the store. They identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. If an employee notices any hazard on the floor, the employee immediately calls for assistance and monitors the hazard until it is cleaned up. True, accurate, and complete copies of Sam's East, Inc.'s "Slip, Trip and Fall Guidelines" and Spill Clean Up Procedures," which detail these policies and were effective on the day of the subject incident, are attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibits "E"** and **"F"**, respectively, and were made at or near the time by, or from information transmitted by, a person with knowledge.

11.

These records were kept in the course of Defendant Sam East, Inc.'s regularly conducted business activities, and it is Sam East, Inc.'s standard business practice to create and maintain such records.

Further declarant sayeth not.

_____
Cody Speck
Declarant

_____
5/31/24
Date

# EXHIBIT D











# EXHIBIT E

# Slip, Trip and Fall Guidelines

## Guidelines Overview

- Maintain good housekeeping standards by removing trash and debris throughout the facility by practicing the clean-as-you-go method. Clear your work area as your work, removing empty boxes and straps as you stock.
- Avoid placing pallets on the floor between 8 a.m. and 9 p.m. which are typically high traffic shopping times. Placing pallets on the floor creates a tripping hazard for our customers.
  - Remove or restock empty stackbases and pallets immediately.
- Do not leave empty pallets and unmanned pallet jacks or stocking carts on the salesfloor.
- Empty pallets need to be stacked flat in the backroom. Do not place pallets in an upright position or lean them against a wall.
- Cover the corners of pallets, endcaps and stackbases on the salesfloor. When product is merchandised to cover the corners zone these areas often to move product forward.
- Clean up spills, debris and slip and trip hazards immediately: have caution cones and paper towels (or pocket cone and absorbent pads) available.
- Complete safety sweeps on a regular basis to help keep the salesfloor free of slip and trip hazards and falling merchandise. Include endcaps, sidecounters, stackbases and the floor in the safety sweeps. .
- Properly stock and maintain spill stations.
- Utilize maintenance associates to increase floor care coverage during times of increased customer traffic.
- Have CSMs and stockers alert management to changing weather conditions: refer to the Inclement Weather Guidelines for more information.
- Ensure the parking lot is free from potholes, trash, large cracks and cracked sidewalks and curbs.
  - Make the parking lot part of the daily safety sweep.
  - Alert your manager or APM (a salaried member of management) when these items are in need of repair.
- Keep sidewalk sale merchandise a minimum of 44 inches from the edge of the sidewalk. Maintain a clear walkway for customers into and out of the store.
- Paint speed bumps, sidewalks and landscape curbs a bright and visible color.
- Use approved red or yellow hoses in the Garden Center: do not leave them unattended and put them away when not in use.
- Water plants during low traffic hours.
- Provide covered trash cans in the Produce area. Strategically locate trash cans around seasonal produce such as corn to collect corn husks.
- Locate and maintain floor mats in areas where liquids can cause a slip and fall hazard such as in Produce, in front of the bagged ice freezers and the vestibule.
- Ensure freezer and cooler floors are free of ice build up.
  - Ensure plastic curtains are in place and door seals are free from damage. Damaged seals or curtains pulled back increase condensation in the freezers which creates ice on the floors.
  - Clean up spills immediately to avoid them freezing.
  - Maintain functioning lights in the freezers and coolers.
  - Close freezer doors when not in use.
- For issues, questions or additional information regarding the freezers or coolers, contact the Home Office Facilities Maintenance Department at 800-932-3367.
- Utilize the online Maintenance Manual for guidelines on how to handle floor spills.

## Safety Sweeps

All associates have a responsibility to conduct periodic safety sweeps. When conducting a safety sweep, check the entire area including floors, endcaps, side countersand action alley. Safety sweeps need to be a natural part of the daily routine from start of shift to close of shift.

- Perform a visual sweep of the area looking for potential hazards such as falling merchandise, empty pallets, spills, unattended pallet jacks, debris and empty boxes.
- Dust mop or broom sweep high traffic areas including, but not limited to: action alley, frontend, personal care, household chemicals, backroom, fresh areas, parking lot, sidewalks and the vestibule.
- Watch for and correct potential hazards when taking different routes to and from lunch and breaks. This helps keep potential hazards to a minimum.

## Maintaining the Floor

There are many challenges in floor care safety due to weather conditions, spills caused by customers, associates and from merchandise on the shelves. Floor safety requires all associates to be alert, look for hazards and correct the hazards quickly. For floor maintenance information, log onto the Maintenance page of the WIRE.

## Strategic Maintenance

It is recommended to have a maintenance associate strategically scheduled to provide safety sweeps during high traffic times.

## Resources

- Floor Mat Guidelines
- Inclement Weather Guidelines
- Spill Cleanup Job Aid
- Strategic Maintenance

Last Modified: May 20, 2013

# EXHIBIT F

# Spill Clean Up Procedures

Overview ⌃

- Spills are largely responsible for slip/trip/fall accidents in the club. Slip/trip/falls make up a large portion of accident claims.
- Promptly cleaning up spills is the best way to prevent these accident claims.
- Associates should follow these procedures for cleaning up spills in safe and timely manner.

Supplies ⌃

- Supplies to clean up spills need to be readily available for associates.
- Management should create a daily routine and assign the responsibility to inspect and refill supplies.
- The following should be restocked daily:
  - Spill Stations
  - Pocket Pads/Paper Towels
- If you see a location or area that needs to be restocked, take care of it yourself or let your supervisor know.

Towel In Pocket Program ⌃

- The Towel In Pocket Program (TIP) requires that each associate put a paper towel or pocket pad in their pocket prior to starting their shift.
- The purpose of the paper towel/pocket pad is to provide the associate an easy way to immediately clean up a small spill.
- Associates are encouraged to use their paper towel/pocket pad and replace it after it is used.
- The paper towels/pocket pads should be located in multiple areas of the store (e.g., time clock) where the associates can easily access them.
- Educating associates about the importance of immediately cleaning up spills and the convenience of the paper towel/pocket pad should increase participation.
- First, block off the spill area/aisle or have an associate protect the spill area to prevent a customer or another associate from coming in contact with the spill or tracking it through the store.
- It is important to determine if the spill is a biohazard (e.g., blood, bodily fluids) or hazardous material by referring to:
  - Product label/price sign
  - Handheld terminal using "Claims Disposition" screen
  - Material Safety Data Sheet (MSDS)
  - Spill Cleanup Guidelines Flipchart
  - When in doubt, call the Compliance Hotline (800) 530-9923.
  - Biohazard spills:  refer to the Bloodborne  Pathogens guide on the Safety WIRE page for clean up procedures.
  - Hazardous material spills:  refer to the Spill Cleanup Guidelines flipchart for instructions.
    - For spills 10 gallons or more, contact the Compliance Hotline (800) 530-9923.

Retrieve Supplies ⌃

- Retrieve the necessary supplies from the spill station:
- PPE
- The PPE required for a hazardous spill includes:
  - Goggles
  - Green Chemical Resistant Gloves
  - Chemical Resistant Apron
  - Face Shield (if required by MSDS)
- Absorbent
- Broom and dust pan
- Chemical bag or trash can liner
- Caution cone

Cleaning Up Spill                                                                                                                  ⌃

- Place a caution cone next to the spill to prevent any customer and cart traffic from tracking through the spilled material.
- Put on the appropriate PPE.
  - Refer to the Material Safety Data Sheet (MSDS) for specific PPE requirements.
- Non-liquid material such as sugar, flour and powdered laundry detergent can be swept up with the broom and dust pan.
- Do not attempt to pick up broken glass with your hands.   Use the   broom to sweep glass into the dust pan.


Using Spill Absorbent                                                                                                             ⌃

- Pour spill absorbent around the edges of the spill to prevent it from spreading.
  - Do not pour absorbent directly on the spilled product.
- Using a firm circular motion, work absorbent into the spilled liquid with a broom.
- If the absorbent becomes gummy or if a liquid residue remains, add more absorbent and work it into the area.
- If the spill was caused by a broken or leaking container, pour the remaining contents from the container into the chemical bag and add enough spill absorbent to absorb the liquid.
- Remove and dispose of the spilled product by following the appropriate SOP listed below:
  - Hazardous Spill Cleanup SOP
  - Non-Hazardous Spill Cleanup SOP
  - Unknown Spill Cleanup SOP

# EXHIBIT G

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| ARGELIA SOLITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. 23A02118 |
| SAM'S EAST INC.,  JOHN DOE 1-2, | ) | |
| ABC CORP.,  AND XYZ CORP., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES**

**COMES NOW**, ARGELIA SOLITO, Plaintiff, and submits Responses to Defendant's First Interrogatories to Plaintiff.

**GENERAL STATEMENT**

Plaintiff does not waive any objection that may be appropriate to the use of any information provided in his Responses or to the admissibility, relevance, competency or materiality of any of the information to any issue in this case. Identifying or producing any document or supplying any information does not constitute an admission by Plaintiff that the document or information is relevant to the subject matter of this action. The Responses set forth below constitute the best information presently available to Plaintiff. However, Plaintiff reserves the right to amend, supplement or change any response made hereinafter if facts or documents subsequently are discovered which make amendment, supplementation or revision appropriate. Disclosure of any privileged or otherwise protected information, if any, is or was inadvertent and cannot be construed as a waiver of any such privilege.

**collision 11/18/2021. The case has been resolved. Plaintiff reserves the right to supplement this response as discovery continues.**

6.

Please state specifically where the incident giving rise to this lawsuit took place, the date and time of day, the weather conditions at the time of your arrival at the store, and how the occurrence happened, including a specific description of the cause(s) of your fall and your alleged injuries.

**RESPONSE:  Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence. Based on information now known to Plaintiff, Plaintiff contends that on 08/05/2021, she slipped and fell inside Defendant's premises. Plaintiff reserves the right to supplement this response.**

7.

Please describe the mechanics of your accident (i.e., what caused you to fall, how you fell (forward, backward, sideways, etc.), the specific location of where you fell, how you landed, how you recovered, etc.). Also, please confirm whether you actually fell or not.

**RESPONSE: Plaintiff slipped and fell while walking inside Defendant's premises. For more details, please see the video of the incident.**

8.

Please describe, in detail, the substance which you contend caused your fall, including

but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance.  Please identify the source of the substance at issue, where it came from, and where it was located when you fell.

**RESPONSE: Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of the source of the substance and where it came from. It was located near the bread isle.**

9

Give the name, address, and telephone number of all persons that to you or your representatives' knowledge, information or belief were eyewitnesses to the occurrence, and/or have relevant knowledge concerning the occurrence, any issue of liability in this lawsuit, or the damages you claim in connection with this lawsuit, including a brief description of their relevant knowledge.

**RESPONSE: Defendant's employees and other customers. Plaintiff also directs Defendant to the names and addresses of Plaintiff's medical providers, disclosed in responses to these Interrogatories and other discovery propounded by Defendant.  At the present time, Plaintiff has not identified other witnesses responsive to this Interrogatory. However, Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

10.

Please state in specific detail your actions prior to the subject incident, from the time you arrived at the premises until the time of your accident, including a description of everything you did and everyone with whom you spoke.  Please identify everyone whom you were shopping with on the day of the accident.

Please state how many times you had visited the premises prior to the alleged incident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

19.

State the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident; identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts.

**RESPONSE**: **Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

20.

Please set forth in detail each and every act or omission that you contend was a breach of duty on the part of the Defendant:

**RESPONSE**: **Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

21.

With regard to each statement (oral, written, recorded, court or deposition transcript, etc.) taken from any person with knowledge relevant to this lawsuit, please state the name of each

**RESPONSE: Because discovery is still ongoing, Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

Respectfully submitted this July 25th, 2023,

**770-GOOD-LAW, LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC**

_/s/ Hung Q. Nguyen, Esq_
Hung Q. Nguyen, Esq.
Georgia Bar No.: 940370
Attorneys for Plaintiff

5495 Jimmy Carter Boulevard, Suite B-17
Norcross, Georgia 30093
Tel:    770-409-1529
Fax:    770-409-1526
litigation@770goodlaw.com