**ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.**
**Argelia Solito on 12/11/2023**

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4

5   ARGELIA SOLITO,              )
                                 )
6                                )
          Plaintiff,             )
7                                )
    v.                           )
8                                ) CASE 1:23-cv-03438-MLB
    SAM'S EAST, INC., JOHN       )
9   DOE 1-2, ABC CORP., and      )
    XYZ CORP.,                   )
10                               )
                                 )
11        Defendants.            )

12

13                         - - -

14

15       The Deposition of ARGELIA SOLITO, taken at the

16   instance of the Defendants, pursuant to stipulations

17   contained herein; before Alecia Wright, Certified

18   Court Reporter, at 5495 Jimmy Carter Boulevard, Suite

19   B-17, Norcross, Georgia 30093, at 1:00 p.m. on

20   December 11, 2023.

21

22

23          Reported by:  Alecia Wright
                          Certified Court Reporter
24                        Georgia
                          License No. 4902-5798-3471-6160
25

**ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.**
**Argelia Solito on 12/11/2023**                              Page 2

```
 1                      APPEARANCES

 2

 3    ON  BEHALF  OF  THE  PLAINTIFF:

 4
           RENEE  TAYLOR
 5         Attorney at Law
           Law Office of Hung Q. Nguyen & Associates
 6         5495 Jimmy Carter Boulevard
           Suite B-17
 7         Norcross, Georgia 30093
           770-409-1529
 8         renee@770goodlaw.com

 9

10    ON  BEHALF  OF  THE  DEFENDANTS:

11
           KATHERINE I. BARTON
12         Attorney at Law
           Drew Eckl & Farnham, LLP
13         303 Peachtree Street, NE
           Suite 3500
14         Atlanta, Georgia 30308
           404-885-1400
15         bartonk@deflaw.com

16

17

18

19    ALSO APPEARING:   Jartu Toles, Interpreter

20

21

22

23

24

25
```

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                                    Page 3

1                    INDEX TO EXAMINATIONS

2  ARGELIA SOLITO                                      PAGE

3    Examination by Ms. Barton                          5

4    Examination by Ms. Taylor                         80

5    Reexamination by Ms. Barton                       82

6    Reexamination by Ms. Taylor                       88

7    Reexamination by Ms. Barton                       92

8    Reexamination by Ms. Taylor                       93

9    Disclosure                                        96

10    Certification                                     97

11

12

13                    INDEX TO EXHIBITS

14    EXHIBIT            DESCRIPTION                   PAGE

15    No. 1   Letter Dated 10/19/15                    27

16    No. 2   Store Photos                             37

17    No. 3   Video                                    40

18    No. 4   Plaint's Responses to Def's Interrogs    59

19    No. 5   Police Report                            76

20

21

22

23

24

25

1      (Whereupon, the deposition of Argelia Solito

2      commenced at 1:08 p.m. on December 11, 2023.)

3                    P R O C E E D I N G S

4                         - - -

5                    JARTU TOLES,

6   the interpreter, having first been duly sworn to

7   translate the proceedings from English to Spanish and

8   from Spanish to English to the best of her ability,

9   and did so as follows:

10                   ARGELIA SOLITO,

11  having first been duly sworn, was examined and

12  testified as follows:

13        MS. BARTON:  All right.  Okay.  And is it

14     all right if we don't start interpreting until

15     after I get done with the stipulations?

16        THE INTERPRETER:  That's fine.

17        MS. BARTON:  Okay.  All right.

18        This is the deposition of Argelia Solito,

19     taken pursuant to proper notice and by agreement

20     of counsel for purposes of discovery,

21     cross-examination, and all other purposes as

22     allowed by the Federal Rules of Civil Procedure.

23        And, Counsel, is it agreeable that we

24     reserve all objections except for the form of

25     the question and responsiveness of the answer

```
 1        until time of first use?

 2             MS. TAYLOR:  Yes.

 3             MS. BARTON:  Okay.  And have you discussed

 4        signature yet?

 5             MS. TAYLOR:  No.  We'll probably waive.

 6             MS. BARTON:  Okay.

 7             All right.  And we are ready for you to

 8        begin interpreting, please.

 9             THE INTERPRETER:  Okay.

10                       EXAMINATION

11   BY MS. BARTON:

12        Q    All right, Ms. Solito.  Hi.  My name is

13   Katherine Barton, and I am the attorney for Sam's

14   Club.

15        A    Okay.

16        Q    Have you ever given a deposition before?

17        A    Yes.

18        Q    Okay.  When was that?

19        A    I think it was in 2012.

20        Q    And what kind of proceeding was that for?

21        A    It was a car accident.

22        Q    And was that a claim related to a claim

23   that you were bringing?

24        A    I don't really remember.  It was a long

25   time ago.
```

1      Q    Other than in 2012, have you ever given any

2   other depositions?

3      A    No.

4      Q    All right.  So I'm sure you probably talked

5   with your attorney before, and I know you said you've

6   given a deposition prior, but we'll just go over some

7   ground rules just to make sure we're on the same

8   page.

9      A    Okay.

10     Q    Okay.  Obviously, we have an interpreter

11  here today, so it's very important that we don't talk

12  over each other.  When I ask a question, please wait

13  for the interpreter to fully finish translating it

14  before you begin answering it.

15     A    Okay.

16     Q    I will do the same when waiting for our

17  interpreter to translate your answer.

18     A    Okay.

19     Q    And that will make it easier on both the

20  translator and our court reporter here.

21     A    Okay.

22     Q    Another thing that we want to make sure is

23  that we're giving verbal responses, so no nodding

24  your head or shaking your head.

25     A    Okay.

```
 1        Q    And if at any time you forget and I say,
 2   "Is that a yes," I'm not trying to be rude, I'm just
 3   trying to make sure we get a good transcript.
 4        A    Okay.
 5        Q    And before you answer the question, please
 6   make sure that you understand what I'm asking.  There
 7   are going to be times today when my mouth works
 8   faster than my brain and I'll ask a bad question.
 9        A    Okay.
10        Q    So just ask me to repeat it or rephrase it
11   and I'm happy to do that.
12        A    Okay.
13        Q    But if you answer, I'll assume you
14   understood the question, okay?
15        A    Okay.
16        Q    Okay.  And at any point today if you need
17   to take a break, go to the restroom, stretch your
18   legs, anything like that, that's fine.  I just ask,
19   if there is a question on the table, we go ahead and
20   answer that and then we'll take a break.
21        A    Okay.
22        Q    Okay.  Is Spanish your first language?
23        A    Yes.
24        Q    Do you speak any English?
25        A    No.
```

**ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.**
Argelia Solito on 12/11/2023                                  Page 8

```
1        Q    Okay.  Any other languages besides Spanish?

2        A    No.

3        Q    Do you understand English?

4        A    A little bit.

5        Q    Can you read any English?

6        A    A little bit, as well.

7        Q    And what about, can you write in English?

8        A    No.

9        Q    Okay.  Have you taken any prescription

10   medicine in the past 24 hours?

11       A    Yes.

12       Q    Okay.  What medicines?

13       A    Tramadol, and I forget what the other one

14   is called.  Naproxen.  And the other one, I don't

15   remember.

16       Q    Where do you get those prescriptions

17   filled?

18       A    In Walmart, the one here on Jimmy Carter.

19       Q    When did you last take your prescription

20   medicine?

21       A    This morning.

22       Q    Do they have any effect on your cognitive

23   ability?

24       A    No.  They help me for pain.

25       Q    Okay.  Is there anything else or any other
```

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.

```
 1   reason that would stop you from answering my

 2   questions today fully and to the best extent of your

 3   knowledge?

 4       A    No.

 5       Q    Okay.  Can you please state and spell your

 6   full name.

 7       A    Argelia Solito.

 8       Q    Okay.

 9       A    And should I spell it?

10       Q    Yes, please.

11       A    A-R-G-E-L-I-A, S-O-L-I-T-O.

12       Q    Have you ever gone by any other name?

13       A    No.

14       Q    And what is your birthday?

15       A    It's July 18th --

16            THE INTERPRETER:  And the interpreter wants

17   to clarify.

18       A    -- of '66.

19   BY MS. BARTON:

20       Q    And where were you born?

21       A    In El Salvador.

22       Q    And what's your present address?

23       A    1125 Winter Park Lane, Norcross.

24       Q    How long have you lived there?

25       A    Four years.
```

1      Q     Who do you live with?

2      A     I live with my two children -- my two sons,

3   excuse me, and my three grandchildren.

4      Q     All right.  What are your name -- what are

5   the names of your sons?

6      A     Gerson Montes and Adriana Montes.

7      Q     Is that J-E-R-S-O-N?

8      A     No, it's G.

9      Q     And how old is Adriana?

10     A     She's 38.

11     Q     What does she do for work?

12     A     She works from home.  She does nails.  She

13   does -- makes desserts.

14     Q     Okay.  And how old is your son?

15     A     Twenty-eight.

16     Q     What does he do for work?

17     A     He works at Macy's, but he does deliveries.

18     Q     Okay.  And your three grandchildren, are

19   any of them over the age of 18?

20     A     Yes.

21     Q     Are all three of them over 18, or how many?

22     A     No, she's 19.  My other one, she is 14, and

23   there's a six-year-old.

24     Q     Okay.  The 19-year-old, what is her name?

25     A     Genesis Hernandez.

```
 1              THE INTERPRETER:  Excuse me.
 2   BY MS. BARTON:
 3       Q    Does Genesis work?
 4       A    Yes.
 5       Q    Okay.  Where?
 6       A    I don't know exactly the name of where she
 7   works.
 8       Q    Okay.  Any other present addresses like a
 9   vacation home?
10       A    No.
11       Q    And in August of 2021, at the time of this
12   incident we're here to talk about today, did anyone
13   else live with you?
14       A    The same ones.
15       Q    When did you move to the United States?
16       A    It was in 2000.
17       Q    And did you always live in Georgia?
18       A    No.
19       Q    What other states have you lived in?
20       A    Massachusetts.
21       Q    When did you move to Georgia?
22       A    When?
23       Q    Yes.
24       A    That was 2020.
25       Q    Okay.  And are you a United States citizen?
```

1       A    I just have a work permit.

2       **Q    Are you a citizen of any other countries?**

3       A    Just El Salvador.

4       **Q    Okay.  And do you have a social security**

5  **number?**

6       A    Yes.

7       **Q    Okay.  We'll go off the record briefly.**

8            (Whereupon, counsel requests to go off the

9       record.)

10           (Whereupon, counsel is back on the record.)

11  BY MS. BARTON:

12      **Q    Okay.  What's your highest level of**

13  **education?**

14      A    The ninth.

15      **Q    And I'm guessing the high school is in**

16  **El Salvador?**

17      A    Yes.

18      **Q    Any other post-secondary education, like,**

19  **certificates or anything like that?**

20           MS. TAYLOR:  You want to define --

21      objection to the form of the question.  You want

22      to define post-secondary so we're having the

23      same conversation.

24  BY MS. BARTON:

25      **Q    By "post-secondary," I mean anything after**

1   high school.

2        A    I didn't understand your question.

3        Q    Okay.  After high school, did you have any

4   other education such as going to college or getting

5   some sort of work certificate, anything like that?

6        A    No.

7        Q    Have you ever served in the military?

8        A    No.

9        Q    Have you ever been arrested?

10       A    No.

11       Q    Have you ever filed for bankruptcy?

12       A    No.

13       Q    Are you currently married?

14       A    No.

15       Q    Have you ever been married?

16       A    Yes.

17       Q    Okay.  When was that?

18       A    This was in El Salvador.  It's been many

19   years ago.

20       Q    Okay.  Do you know who Julio Edgardo

21   Solozano is?

22       A    Yes.

23       Q    And who was that?

24       A    He was my significant other.

25       Q    I'm sorry?

1      A    He was my significant other.

2           THE INTERPRETER:  If the interpreter may

3      make a correction.

4      A    He was my companion.

5  BY MS. TAYLOR:

6      Q    Okay.  But you were -- you were not

7  married?

8      A    No.

9      Q    Okay.  Are you still in a relationship with

10  Mr. Solozano?

11     A    No.

12     Q    Okay.  And your previous marriage in

13  El Salvador, do you recall how long you were married?

14     A    For 12 years.

15     Q    Does your previous husband still live in

16  El Salvador?

17     A    Yes.

18     Q    So we previously talked about two of your

19  children.

20          Do you have any others besides those two?

21     A    Yes.

22     Q    Okay.  So we've spoken about Adriana and --

23  I'm gonna pronounce his name wrong -- Gerson, Gerson.

24          Who -- what other children do you have?

25  What are their names and ages?

```
1        A     Diego.  Diego Montes.
2        Q     Okay.  How old is Diego?
3        A     He's 25.
4        Q     Okay.  Where does he live?
5        A     Now, he lives in New Mexico.
6        Q     Okay.  Any other children?
7        A     Edgar Montes.
8        Q     How old is Edgar?
9        A     He's 35.
10       Q     Where does he live?
11       A     He lives here, but I don't remember the
12   city.
13       Q     By "here," do you mean Georgia?
14       A     Yes, in Georgia.
15       Q     Okay.  What does Edgar do for work?
16       A     He does the same thing, at Macy's, in
17   delivery.
18       Q     Do you have any other adult relatives in
19   the metro Atlanta area?
20       A     No.
21       Q     Are you currently working?
22       A     No.
23       Q     When was the last time that you had a job?
24       A     So last year, I was working, but it was
25   just -- it was the same thing, like, doing
```

1   deliveries, doing small things.

2        Q     Who was your employer?

3        A     Alejandro was his name.

4        Q     Did he have a company?

5        A     Yes, it's like a painting company.

6        Q     And how long did you work for Alejandro?

7        A     I worked for, like, a year and a half.

8        Q     And prior to working with Alejandro, where

9   did you work?

10       A     No, I wasn't working.

11       Q     In August of 2021, at the time of this

12  incident that we're here to talk about, were you

13  employed?

14       A     Yes, I was working, but I only worked for

15  just three weeks.  That's all.

16       Q     Okay.  Where were you working?

17       A     I don't remember the name of the company.

18       Q     What kind of work were you doing?

19       A     It was, like, doing, like -- like, metal

20  piping.

21       Q     Okay.  And you said you only worked there

22  for three weeks?

23       A     Yes, because the pandemic happened, and

24  then after that, there wasn't.

25       Q     Okay.  In between when you were doing the

```
 1    metal piping and when you worked for Alejandro, did

 2    you work anywhere else?

 3        A    No.

 4        Q    Okay.  Did you work anywhere before you

 5    were working at the metal piping place?

 6        A    No.

 7        Q    And do you do any other activities for

 8    compensation such as Uber, Instacart?

 9        A    No.

10        Q    Are you involved in any clubs or civic

11    groups?

12        A    No.

13        Q    Are you a member of any church?

14        A    Yes.

15        Q    Okay.  What church?

16        A    It's a Christian church.  It's called Dios

17    De Amores [sic].

18        Q    Okay.  And do you have any leadership

19    positions at the church?

20        A    No.

21        Q    Any volunteering with the church?

22        A    No.

23        Q    Okay.  And what is your cell phone number?

24        A    (774) 849-8392.

25        Q    Okay.  Who is your service provider?
```

```
 1        A     AT&T.

 2        Q     And are you the account holder?

 3        A     No.

 4        Q     Okay.  Who is?

 5        A     My son, Gerson.

 6        Q     Is that number the same number that you had

 7   in August of 2021?

 8        A     Yes.

 9        Q     Okay.  So I want to talk about what you did

10   to prepare for today's deposition.  But I want to

11   preface that by saying, I don't want to know about

12   any conversations you had with your lawyer.

13        A     Okay.

14        Q     What did you do to prepare for this

15   deposition?

16        A     Nothing.

17        Q     Okay.  Did you have a meeting with your

18   lawyer?

19              MS. TAYLOR:  No.  I'm gonna object.  I'm

20         gonna object to attorney-client privilege.

21         Anything she talked about or if we met is --

22              MS. BARTON:  If you met isn't privileged,

23         but the contents of the meeting are privileged.

24              MS. TAYLOR:  I'm gonna stick to the

25         objection.
```

1             MS. BARTON:  Okay.  Are you instructing her

2       not to answer?

3             MS. TAYLOR:  I am.

4             MS. BARTON:  Okay.

5    BY MS. BARTON:

6       Q    Okay.  Did you talk to any other parties or

7    witnesses?

8       A    No.

9       Q    Did you review any documents?

10      A    No.

11      Q    Okay.  Any photos?

12      A    No.

13      Q    Any videos?

14      A    No.

15      Q    Okay.  Did you look at your discovery

16   responses?

17      A    No.

18      Q    Okay.  Do you currently have a valid

19   driver's license?

20      A    Yes.

21      Q    Is it a Georgia driver's license?

22      A    Yes.

23      Q    And how long have you had a Georgia

24   driver's license?

25      A    For three years.

```
1        Q    Are there any restrictions on your license?

2        A    Like what?

3        Q    Like, for glasses.

4        A    Oh, no.

5        Q    Has your license ever been suspended or

6   revoked?

7        A    No.

8        Q    Have you ever had a license in another

9   state?

10       A    Yes.

11       Q    Okay.  What other state?

12       A    Massachusetts.

13       Q    Have you ever been in a car accident?

14       A    Yes.

15       Q    Okay.  For now, we'll just talk about

16  accidents before this incident, so before August

17  of 2021.

18       A    Okay.

19       Q    So prior to August of 2021, when was the

20  last time that you had had a motor vehicle accident?

21       A    I don't remember.

22       Q    Okay.  Do you know if you had been in an

23  accident before August of '21?

24       A    Yes.

25       Q    Do you know about how many?
```

```
 1      A    You said how long?

 2      Q    How many.

 3      A    I think, two.

 4      Q    Okay.  You said you had had a deposition in

 5   2012 for a car accident?

 6      A    Yes.

 7      Q    Okay.  For that incident, tell me about

 8   what happened with that car accident.

 9      A    I was hit.  I was at a stop sign.

10      Q    Where was that?

11      A    In Massachusetts.

12      Q    Okay.  Were you injured?

13      A    Yes.

14      Q    Okay.  What was injured in that accident?

15      A    It was one arm and, I think, my back.

16      Q    Which arm?

17      A    I don't remember.  I don't remember

18   anymore.

19      Q    Did you have to go to the doctor for those

20   injuries?

21      A    Yes.

22      Q    Did all of your treatment take place in

23   Massachusetts?

24      A    Yes.

25      Q    And did you make a claim for bodily
```

1    injuries because of that?

2       A    I don't remember.

3       Q    Did you consult an attorney for that

4    incident?

5       A    Yes.

6       Q    Do you know -- or I'm sorry.  Do you recall

7    the name of the attorney?

8       A    No, I don't remember.

9       Q    Okay.  So you don't remember using the same

10   attorney that you have now?

11      A    No.

12      Q    Okay.  So we have the release of the claim

13   for that collision, and it says that you had -- that

14   you did use the same attorney.

15           THE INTERPRETER:  May the interpreter ask a

16       question?

17           MS. BARTON:  Sure.

18           THE INTERPRETER:  When you mean -- when you

19       say "release of claim," do you mean, like,

20       release of information?

21           MS. BARTON:  Like, a settlement release.

22           THE INTERPRETER:  Okay.  Okay.

23      A    And which accident are you talking about?

24   BY MS. BARTON:

25      Q    The one that was involved when you were hit

1    at a stop sign.

2        A    But that was in Massachusetts.

3             MS. TAYLOR:  I don't think that's the same.

4    BY MS. BARTON:

5        Q    Okay.  So it looks like then you had

6    another accident at a stop sign?

7        A    Here?

8        Q    In 2015.

9             MS. TAYLOR:  I'm gonna object.  She said

10       2012.  2012 and 2015 is not the same.  You're

11       trying to confuse her.

12            MS. BARTON:  Yes.  So I'm -- I'm -- we're

13       talking about the second one now.  I'm trying to

14       figure out where this release comes in.

15            MS. TAYLOR:  Okay.  But she said 2012 and

16       you -- and she said in Massachusetts.

17            MS. BARTON:  I know.  And I said, Do you

18       recall having one in 2015?

19            MS. TAYLOR:  I don't know (indiscernible).

20       You said, Did you use the same attorney, and

21       then you said, Well, then why did they sign that

22       release?

23            That implied that we were the same attorney

24       when you specifically knew that we were not the

25       same attorney.

1       MS. BARTON:  Okay.  I'm gonna ask that you

2   don't do speaking objections.  We've reserved

3   everything.

4       MS. TAYLOR:  I'm gonna ask you not to

5   falsely --

6       MS. BARTON:  No, no.  I can --

7       MS. TAYLOR:  I object to the -- to the form

8   of the question --

9       MS. BARTON:  Okay.

10      MS. TAYLOR:  -- because you misstated what

11  she said.

12      MS. BARTON:  I don't agree, but that's

13  fine.  Your objection's noted.

14      MS. TAYLOR:  Okay.  You don't -- you -- you

15  don't have to agree with what I said.

16      MS. BARTON:  Okay.

17      MS. TAYLOR:  But if you're going to state

18  something as a factual matter, it needs to be

19  factually correct.

20      MS. BARTON:  There is -- there is nothing

21  stated as a factual matter.

22      MS. TAYLOR:  You said -- you -- you -- that

23  she used us in 2012, and you specifically know

24  that that release says 2015.  So 2012 and 2015

25  are not the same date --

1          MS. BARTON:  Okay.

2          MS. TAYLOR:  -- so do not factually state

3      incorrect information.

4          MS. BARTON:  Okay.  Yeah.  Got it.

5  BY MS. BARTON:

6      Q    Okay.  So the accident that you were

7  involved in in 2012, you had an attorney that was in

8  Massachusetts?

9      A    Yes.

10     Q    Okay.  And then do you recall being

11 involved in a collision in 2015 in Georgia?

12     A    I don't remember.

13     Q    Okay.  It says it occurred on Roswell Road

14 in Sandy Springs.

15         Does that jog your memory?

16         MS. TAYLOR:  I'm going to object.  If

17     you're going to read from a document that's not

18     in evidence that only you have --

19         MS. BARTON:  Renee, I really hope we're not

20     gonna do this the whole deposition.

21         MS. TAYLOR:  Well, what are we not gonna

22     do?

23         MS. BARTON:  It's not required.  It's not

24     required that I show every single document.

25         MS. TAYLOR:  You can't testify as to --

1      MS. BARTON:  I'm not.

2      MS. TAYLOR:  -- to a document not in

3   evidence.  So you either need to make it as an

4   exhibit so we can all look at it, or you state

5   something.  But you can't state that you're

6   reading something and it's factual matter that

7   you haven't put it in evidence.  Those are rules

8   of evidence.

9      MS. BARTON:  Okay.  That's not how a

10  deposition works.  And if we're gonna have this

11  problem, then we're gonna need to suspend and

12  we're gonna have to have a conversation because

13  that's not how a deposition works.

14     MS. TAYLOR:  Well, you -- you -- you -- we

15  don't have to have a conversation cause I went

16  to law school and have a law license just like

17  you do and I'm a licensed attorney in the state

18  of Georgia just like you are.  So I will object

19  to anything that you reading from as a factual

20  matter that has not been put into evidence.  And

21  if you want to stop it -- if you want to stop

22  it, we can stop it.  It's fine with me.

23     MS. BARTON:  Once again, I'm gonna ask you

24  to stop with speaking objections.  This is a

25  waste of everyone's time, so please stop.

1          MS. TAYLOR:  I am -- who -- who are you

2    talking cause I'm not your child.  I'm a -- I'm

3    a -- I'm an attorney, and if I want to object, I

4    can object.

5          MS. BARTON:  Sure, but we agreed not to do

6    speaking objections.

7          MS. TAYLOR:  And -- and I've been in plenty

8    of deposition where people on your side of the

9    table sit up here and do the exact same thing,

10   so what you will not do is lecture me like you

11   in control of what I object to.  I will object

12   to anything that I do not feel is appropriate.

13         MS. BARTON:  Okay.

14         MS. TAYLOR:  So is it an exhibit or not

15   because I need to verify what you reading from

16   and -- and acting as if it's -- it's something

17   that's in evidence.

18         MS. BARTON:  Sure.  Let's make it an

19   exhibit, then.

20         MS. TAYLOR:  (Indiscernible).

21         MS. BARTON:  We'll make this Defense

22   Exhibit 1.

23         I'm not sure why you would want this in

24   record, but let's go for it.

25         (Defendant's Exhibit No. 1 was marked for

```
 1          identification.)
 2               MS. TAYLOR:  And do you have -- do you have
 3          a copy so we can all look at it?
 4               MS. BARTON:  You are welcome to take a
 5          look.
 6               THE WITNESS:  May I ask a question?
 7     BY MS. BARTON:
 8          Q    Sure.
 9          A    From what I understand, we're here for what
10     happened to me at the Sam's store.
11          Q    Yes, you're correct.
12          A    Why are we bringing up so many things that
13     I don't have in my memory?
14          Q    So because you're making a personal --
15     personal injury claim, I need to know about any prior
16     personal injury claims that you've made.  And if you
17     don't remember, I don't want you to make any guesses.
18     Your saying I don't remember is perfectly acceptable,
19     but I just have to ask.
20               MS. TAYLOR:  I will confirm the release
21          says 10/19/2015 at Roswell Road.
22               MS. BARTON:  Okay.
23     BY MS. BARTON:
24          Q    Okay.  But you don't remember that?
25          A    No, I don't remember.
```

1      Q    Okay.  All right.  That's all we wanted to

2    know.  All right.

3           Okay.  And prior to this lawsuit that we're

4    talking about today, have you ever brought any other

5    lawsuits before?

6      A    No, not that I remember.

7      Q    Okay.  All right.  So now I want to talk

8    about the incident that happened at Sam's Club.

9      A    Okay.

10     Q    Okay.  Do you remember what time this

11   accident happened?

12     A    Around 11 or 12, I think.

13     Q    Okay.  Do you remember what you were doing

14   earlier that morning?

15     A    Before going to the store?

16     Q    Yes.

17     A    Well, I was at home.

18     Q    Okay.  And did you have any plans for

19   later?

20     A    No.

21     Q    Okay.  So how many times have you been to

22   the Sam's Club in Tucker, Georgia, before this

23   incident?

24     A    Every week or every two weeks, I would go

25   shopping there.

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

```
 1        Q     And have you been back since the time of
 2   your fall?
 3        A     To the store?
 4        Q     Yes.
 5        A     Yes.
 6        Q     Do you still go once a week?
 7        A     No.  Now I go with my daughter every month.
 8        Q     Okay.  Do you remember why you were there
 9   on the day of the incident?
10        A     Yes.  I was shopping because the next day I
11   was going to start working.
12        Q     Where were you going to start working?
13        A     I don't remember the name of the company,
14   but it was a sewing company.
15        Q     And you hadn't started work yet?
16        A     No.
17        Q     Okay.  All right.  And were you shopping
18   with anyone?
19        A     No, it was just me.
20        Q     Okay.  Did you speak to anyone at the store
21   before you fell?
22        A     No.
23        Q     And how long were you in the store before
24   you fell?
25        A     I think about a half an hour.
```

```
 1        Q    Do you know anyone who works at the store?

 2        A    No.

 3        Q    Okay.  And in the 24 hours prior to your

 4   fall, had you taken any prescription medicine?

 5        A    No.

 6        Q    Any over-the-counter medicine?

 7        A    No.

 8        Q    Any alcohol?

 9        A    No, I don't drink.

10        Q    Okay.  Okay.  So why don't you tell me in

11   your own words what happened from the time you parked

12   in the parking lot until your fall.

13        A    I went into the store.  I was there for,

14   like, half an hour.  I went to the area where the

15   bread is, and I needed to get a piece of bread that

16   was on the other side, like, going all around to the

17   other side of the table.  But there were two ladies

18   talking, and they had the shopping cart there and I

19   couldn't get by, so I left my cart on this side and I

20   walked over.  And when I was walking, about to turn

21   is when I fell because there was oil spilled there

22   and there wasn't a sign.

23        Q    Okay.  So you fell -- you were still in the

24   bread aisle when you fell; right?

25        A    Yes.
```

1      Q    Okay.  And you said there were two ladies?

2      A    Yes.

3      Q    Okay.  And you said that they were blocking

4   the area.

5           What did you mean by that?

6      A    Yes.  They were talking.

7      Q    Okay.  Did you have to walk by the ladies

8   to get to the other side?

9      A    Yes.  I just walked over there because I

10  couldn't go over with my cart.

11     Q    Okay.  Was there anything in front of you

12  that prevented you from seeing the floor as you

13  walked?

14          THE INTERPRETER:  Oh, the interpreter needs

15     to ask for a clarification.

16          Was there any -- anything in front of you

17     preventing you from seeing the --

18          MS. BARTON:  -- floor.

19          THE INTERPRETER:  Ah.  Okay.  Thank you.

20     A    No, just the ladies that were standing

21  there.  So they were standing there, and I just

22  walked up, and I didn't imagine that that was spilled

23  down there.

24  BY MS. BARTON:

25     Q    Okay.  How close to the ladies was the

1   spill?

2       A    I can't tell you how far away they were

3   because I just walked around, when I slipped.

4       Q    Okay.  And other than the ladies, was there

5   anything that was distracting you immediately before

6   your fall?

7       A    No.

8       Q    Okay.  And were you carrying anything in

9   your hands when you fell?

10      A    No.

11      Q    Okay.  Do you remember what kind of shoes

12  you were wearing that day?

13      A    I was in sneakers.

14      Q    Okay.  Okay.  Do you know how long you'd

15  had the shoes prior to the fall?

16      A    No, I don't remember.

17      Q    Okay.  Were they well worn or new?

18      A    No.  They weren't new, but they weren't old

19  either.

20      Q    Okay.  So can you describe how you fell in

21  as much detail as possible, please?

22      A    I just remember that I was walking over to

23  pick up the bread.  What I do remember is that I

24  slipped and then I -- I couldn't get up.

25      Q    Do you remember how your body landed when

1   you fell?

2        A    I remember that this leg landed like this

3   (indicating), like, backward.

4        Q    Okay.

5        A    I remember this leg was, like, back here

6   (indicating), and what I do remember is I couldn't

7   get up because I wasn't able to straighten my leg.

8        Q    And which leg was it?

9        A    The right one.

10       Q    At what point did you see the oil on the

11   floor?

12       A    When I was already on the floor.

13       Q    Was it a lot of oil?

14       A    There was a lot.

15       Q    Was it, like, a puddle or more spread out?

16       A    It was, like, spread out.

17       Q    And how did you know that it was oil?

18       A    Because I touched it when I fell.

19       Q    Did it get on in any of your clothes?

20       A    Yes.

21       Q    Did you take any pictures of your clothing

22   with the oil on it?

23       A    No.

24       Q    Where was the oil on your clothing?

25       A    On my leg.

1       Q    Were there any footprints in the oil that

2  you could see from prior people walking through it?

3       A    I didn't notice that.

4       Q    When you eventually stood up, were you able

5  to see the oil on the floor?

6       A    No, I didn't notice because the manager and

7  another man were the ones that came and got me up.

8       Q    Okay.  So you don't know whether or not the

9  substance was visible from a standing position?

10      A    No, I didn't look, to be honest with you.

11      Q    Did the oil have a color?

12      A    I didn't see.

13      Q    Did you see anyone else in the area other

14  than the two women?

15      A    There was a cleaning lady.

16      Q    Okay.  How did you know she was a cleaning

17  lady?  Did she have a cart with her?

18      A    Yes, she told me.  Well, not exactly

19  cleaning, but she was there, like, arranging things.

20      Q    Okay.  Other than that person, anyone else?

21      A    No, not that I remember.

22      Q    Okay.  So we talked about how your leg went

23  out from under you, went backwards when you fell.

24           Did -- do you recall if you hit any other

25  body parts?

```
 1      A    Yes.  When I fell, it was my knee that hit,
 2  my knee and here (indicating).  And that's when my --
 3  my leg went back, and I slid back, and that's when I
 4  wasn't able to get up.
 5      Q    Was it your right knee?
 6      A    Right.  The right one.
 7      Q    Okay.  Did you ever hit your head?
 8      A    No.
 9      Q    Okay.  So after you fell, tell me what
10  happened.
11      A    The manager and another gentleman picked me
12  up, and they took me away in a wheelchair.
13      Q    Do you remember what the manager and the
14  other person said?
15      A    They said for me to not move, to be at
16  ease, that they were going to pick me up.
17      Q    Did anyone that came up to you after you
18  fell, did anyone speak Spanish?
19      A    Yes.  There was another lady, and she spoke
20  Spanish.
21      Q    Was that lady that spoke Spanish, was she
22  an employee?
23      A    I don't know.
24      Q    Did either of the two ladies that were in
25  the area come up to you and talk to you after you
```

1    fell?

2         A     No.

3         Q     Did you take any photographs of the area?

4         A     No.

5         Q     Did you ever return to the store to

6    photograph the area?

7         A     No, because I just called my son and he

8    took me to the hospital.

9         Q     Okay.  Okay.  We'll mark these store photos

10   as Defense Exhibit 2.

11              (Defendant's Exhibit No. 2 was marked for

12          identification.)

13   BY MS. BARTON:

14        Q     And I'll let your attorney look at them

15   first.

16              Okay.  Will you please take a look at the

17   photos, and you can flip through them, look at them.

18        A     What is it that I'm supposed to see here?

19        Q     I just want you to take a look at the --

20   the pictures cause I'm going to ask you about them in

21   a second.

22              And I will state, while you're looking at

23   that, for the record, that the photographs that are

24   marked 1 through 5 were taken at the store on the day

25   of the incident, and photographs 6, 7, and 8 were

1    ones that I took, so they don't represent it how it

2    looked the day of the accident, but it is the same

3    area.

4            Okay.  So if you will look at the -- the

5    first page -- and it is photo of a photo, so it is

6    someone's phone.  And in the phone, on the bottom

7    left corner, it looks like that is where the oily

8    substance is.

9            Does that look like what the oil looked

10   like when you saw it?

11       A   I can't make out anything here.

12       Q   Okay.  It's a little shinier in the second

13   picture.  Okay.  And this is another photo of a

14   photo.

15           Can you see the oil better in this picture?

16       A   I can't make it out, to be honest with you.

17       Q   Okay.  And if you will please go to the

18   last page, page 8, does this show the area in which

19   you fell?

20           MS. TAYLOR:  If you don't know and if

21       you're not sure, you can let her know that.

22   BY MS. BARTON:

23       Q   Okay.  That's fine.

24       A   No, to tell you the truth.

25       Q   If you will just do me a favor and look at

1   photos 3, 4, and 5 and see if you can pick out any of

2   the oil in those pictures?

3            MS. TAYLOR:  Are you stipulating that there

4        was oil on the floor?

5            MS. BARTON:  We have already

6        (indiscernible) there was oil on the floor.

7        A    You said 3 and 5?

8   BY MS. BARTON:

9        Q    Yeah, 3, 4, and 5, if you see any oil in

10   those pictures.

11           MS. TAYLOR:  Are you asking her to be a

12       expert in what, oil --

13           MS. BARTON:  I'm just asking if she is --

14       can pick out oil in any of the pictures.

15           MS. TAYLOR:  If -- if you -- if you know

16       for a fact that it's oil and you can state that

17       with a hundred percent certainty, feel free to

18       answer the question.

19       A    No.  To be honest with you, I don't know.

20   BY MS. BARTON:

21       Q    Okay.  I'll take those back, then.

22            All right.  And have you seen the

23   surveillance footage from this accident?

24       A    No.  The lady said that she was going to

25   send it to me by e-mail, but I never received it.

 1   And the report, as well, but she didn't send it.

 2        Q    Okay.  So your attorney has the video and

 3   the report, so if you want to look at them after

 4   this, you should ask them.  They were produced in

 5   discovery.

 6             MS. TAYLOR:  Is there a question?

 7             MS. BARTON:  Just waiting for the

 8        translation.

 9             MS. TAYLOR:  I'm just gonna object to you

10        providing any sort of information to my client.

11             MS. BARTON:  Okay.  She -- I was just

12        responding to her saying that she had never

13        received the store reports and video, and I was

14        just telling her that they were provided, so . .

15        .

16   BY MS. BARTON:

17        Q    Okay.  So I want to -- I'll make this

18   Defense Exhibit 3.  This is the video footage from

19   the incident.  Okay.  And we are just going to watch

20   from the video where it's timestamped 59:53 and only

21   watch about 20 seconds.

22             (Defendant's Exhibit No. 3 was marked for

23        identification.)

24             THE INTERPRETER:  The interpreter thinks

25        she made a mistake.

1          MS. BARTON:  Okay.

2          THE INTERPRETER:  55 to 53 or 59?  I'm so

3     sorry.

4          MS. BARTON:  Sorry.  The minute is 59, the

5     second is 53.

6          THE INTERPRETER:  Oh, okay.

7          MS. BARTON:  So the video timestamp is

8     59:53.

9          THE INTERPRETER:  Oh, I'm so sorry.  Okay.

10         MS. TAYLOR:  That's not even a time, 59:53.

11         MS. BARTON:  It's in the video.  You go

12    into -- 59 minutes into it.  If you're looking

13    at the video, it'll say 12:24 p.m. and

14    48 seconds.

15 BY MS. BARTON:

16    Q    All right.  So I will play this, and I will

17 represent to you that -- I believe this is you.  You

18 can correct me if you're wrong, but I believe that

19 you can overhear.

20         (Whereupon, a video recording was played.)

21    A    That right there.

22 BY MS. BARTON:

23    Q    Okay.  And we will stop it.  The time on

24 the video is -- it's an hour into it and 26 seconds.

25 And the time of day, it says, was 12:25 and

1   20 seconds.

2              Okay.  So looking at the still, are

3   these -- the group of shoppers that's in front of

4   the -- the white refrigeration unit right here, is

5   that the group of ladies that you saw?

6        A    Yes.  Yes, and I couldn't get by.  That's

7   why I left my cart right there.

8        Q    Okay.  And that was my next question is:

9   These were the carts that you were saying, right here

10  on the screen, that you couldn't get around?

11       A    Yes.  Yes.

12       Q    Okay.  And you had mentioned there was a

13  woman arranging things.

14             Was it the woman that you -- you can see

15  here that has the green apron on?

16             MS. TAYLOR:  I'm gonna object.

17             I don't see that she had no green apron on.

18        The blue shirt -- the lady with the blue shirt

19        on, or --

20        A    No, I -- I don't know.

21  BY MS. BARTON:

22       Q    Okay.  All right.  And we'll just watch it

23  one more time, the same timestamps as before.  Let me

24  get it closer to you.

25             (Whereupon, a video recording was played.)

```
 1   BY MS. BARTON:
 2       Q    Okay.  So it is a little difficult to see
 3   in the video, but it looks like the oil was behind
 4   the shopping cart.
 5            Is that what you recall?
 6            MS. TAYLOR:  Objection.
 7            Is that you testifying to where the oil is,
 8       cause I don't know that that's a piece of
 9       evidence in fact?  If you would like to ask her
10       if she knew where the oil was, you can ask her.
11       But I prefer you not to testify as to where
12       things were.
13   BY MS. BARTON:
14       Q    All right.  So in this -- let's go back to
15   exactly when you fell.  Okay.  So looks like you are
16   falling at 12:25 and 11 seconds.
17            Do you remember where the substance was
18   that you slipped on?
19       A    Well, it must have been where I slipped.
20       Q    Okay.  And to me -- well, I'll -- I'll ask
21   it this way.
22            And that was behind one of these people
23   with the shopping cart; correct?
24       A    I do remember that there was some carts
25   there, but I don't remember whose.
```

1      Q    Okay.  I was just asking if the spill was

2   behind a cart.

3      A    Where I fell is where it is.

4      Q    Okay.  Okay.  So after you fell, how long

5   did you stay in the store?

6      A    I just waited until my son arrived.  I

7   think it was about 20 minutes.

8      Q    Did anyone ask you to provide a statement

9   while you were at the store?

10     A    Yes.

11     Q    And was this a written statement or an oral

12   statement?

13     A    Verbal.  They were asking me questions, and

14   I was answering.

15     Q    Did you tell anyone at the store that you

16   were hurt?

17     A    Yes.

18     Q    Okay.  And what were you complaining of?

19     A    What I hurt when I fell?

20     Q    Yes.

21     A    Yes.  I explained that it was my leg, my

22   knee, and my ankle, and back here on my spine.

23     Q    And was it the right leg, knee, and ankle?

24     A    Right.  Yes.

25     Q    And you said right here on your spine.

```
 1               Is that lower back?

 2       A    Yes, my lower back.

 3       Q    Okay.  Got it.

 4            Did anyone at the store ask if you needed

 5   medical assistance?

 6       A    Yes.

 7       Q    Okay.  And it sounds like you called your

 8   son; correct?

 9       A    Yes.  I told them I was gonna call my son.

10       Q    Okay.  And when you fell, did you

11   immediately feel pain?

12       A    Yes.

13       Q    And were you bleeding anywhere?

14       A    No.

15       Q    Any other conversations you can recall

16   having at the scene?

17       A    No.

18       Q    All right.  So we are about to get into

19   medical treatment.

20            MS. BARTON:  Does anyone need a break?

21       We've been going for about an hour and a half.

22            MS. TAYLOR:  It's up to you.  I'm fine.

23            THE WITNESS:  No, I'm good.

24            MS. BARTON:  You good?  Okay.

25   BY MS. BARTON:
```

```
 1        Q    All right.  We'll keep going.

 2             Okay.  So your son came and picked you up

 3   from the store, you said, about 20 minutes after your

 4   fall?

 5        A    Yeah, around 20 minutes.

 6        Q    And I'm sorry, you might have already said;

 7   which son was it?

 8        A    Gerson.

 9        Q    And did you go straight to the hospital or

10   make any stops on the way?

11        A    No, straight to the hospital.

12        Q    How long did you have to stay at the

13   hospital?

14        A    Like, one or two hours, I think.

15        Q    Did your son stay with you at the hospital?

16        A    Yes.

17        Q    And he drove you home from the hospital?

18        A    Yes.

19        Q    Okay.  From the hospital to your house, did

20   you make any stops?

21        A    No.

22        Q    Okay.  And once you got home, what did you

23   do for the rest of the day?

24        A    I had to lie down because I couldn't take

25   the pain.
```

1      Q    Other than the verbal statement you gave

2   while you were still at the store, have you made any

3   other statements to anyone regarding this accident?

4      A    No.

5      Q    The -- the manager and the other person

6   that helped you after your fall, have you ever seen

7   them again?

8      A    No.

9      Q    Okay.  What about the woman that was

10  speaking Spanish with you?

11     A    No.

12     Q    Okay.  And before we get into your

13  treatment for this incident, I just want to talk

14  about your health history a little bit.

15          Okay.  Do you have any diagnosed ongoing

16  condition such as high blood pressure or diabetes?

17     A    No.

18     Q    Who is your primary care doctor?

19     A    At the moment, I don't have one.

20     Q    Did you have one in August of 2021?

21     A    Yes, I had one.

22     Q    Okay.  Who was your primary care?

23     A    I don't remember his name.

24     Q    Do you remember where his office was?

25     A    Yes.  It's up here by the farmers market.

1      Q    Okay.  And I see that you are wearing

2   glasses today.

3           Do you -- are you nearsighted or

4   farsighted?

5      A    With my glasses, I see well close up and

6   far away.

7      Q    Okay.  Without your glasses?

8      A    Without my glasses, I can't see close up.

9      Q    Were you wearing your glasses at the time

10  of your fall?

11     A    Yes.

12     Q    And who is your eye doctor?

13     A    I don't -- I don't have one now.

14     Q    Okay.  When was the last time that you've

15  had an eye exam?

16     A    A year ago.

17     Q    And where did you go for that eye exam?

18     A    I don't remember the name of it, but it's

19  in Lawrenceville.

20     Q    Okay.  Other than the car accidents that we

21  spoke about earlier, have you ever had any other

22  accidents producing injuries such as slip and falls

23  or sporting events?

24     A    No.

25     Q    Prior to your treatment for this incident,

1   have you ever treated with a physical therapist

2   before?

3        A     No.

4        Q     What about a chiropractor?

5        A     I don't remember.

6        Q     Have you ever had surgery before?

7        A     Yes.

8        Q     Okay.  When did you have surgery?

9        A     I think it was in 2004.

10        Q     And what was that surgery for?

11        A     It was on my knee.

12        Q     Which knee?

13        A     The right one.

14        Q     What happened to your knee that

15   necessitated surgery?

16        A    It was -- I don't remember right now.  It

17   was many years ago.

18        Q     Did you get the surgery in Massachusetts?

19        A     Yes, Massachusetts.

20        Q     Do you recall what exactly the surgery was

21   on in your knee?

22        A     No, I don't.  I don't remember.

23        Q     Do you know if the surgery was from an

24   injury to your knee?

25        A     No.

1      Q     Other than the surgery in 2004, have you

2   ever had a prior right knee injury?

3      A     No.

4      Q     Any other surgeries?

5      A     No.

6      Q     Okay.  So earlier I asked about the

7   injuries you had in the fall.  I just want to make

8   sure that I have them correct.  I have your right

9   knee, right ankle, right leg, and lower back.

10     A     Yes.

11     Q     Anything else?

12     A     From that fall in Sam's, no.  It was my

13  ankle, my knee, and my lower back.

14     Q     Okay.  So right after you fell, can you

15  rate your right knee pain on a scale of 1 to 10?

16     A     Oh, it hurt at a 9.

17     Q     What about your right ankle?

18     A     As well.

19     Q     How about your lower back?

20     A     Uh-huh, as well.

21     Q     And your right leg?

22     A     Yes, the right one.

23     Q     Was that also hurting on a scale of 1 to

24  10?

25     A     Yes.

```
 1        Q    Okay.  So it sounds like all of them were
 2   about a 9 out of 10 on the pain scale?
 3        A    Yes.
 4        Q    Okay.  So we talked about prior injuries to
 5   your right knee.
 6             Have you ever had any prior injuries to
 7   your right ankle?
 8        A    No.
 9        Q    Okay.  What about your lower back?
10        A    No, not that either.
11        Q    And what about your right leg?
12        A    I was fine before the fall.
13        Q    So no prior right leg injuries?
14        A    No.
15        Q    Okay.  So let's talk about your treatment
16   from this incident.
17        A    Uh-huh.
18        Q    Okay.  So your son took you to the
19   hospital; correct?
20        A    Yes.
21        Q    Which hospital did you go to?
22        A    Northside.
23        Q    Had you ever treated at Northside Hospital
24   before?
25        A    No.
```

1    Q    Okay.  What kind of treatments and exams

2  they do at Northside?

3    A    What they did was x-rays, and they gave me

4  medicine for pain.  And they gave me a piece of paper

5  so that I could go see a specialist because they said

6  that I was not well.

7    Q    Okay.  The x-rays that you got, do you

8  recall what parts of your body were x-rayed?

9    A    Yes.  My knee, my ankle, and my back.

10    Q    Do you recall if you were told what the

11  x-rays showed?

12    A    No.  They said that the x-ray did not show

13  the exact problem and that I needed to do a test that

14  was more advanced.

15    Q    Okay.  And the medicine for pain that they

16  gave you, was that something you were provided at the

17  hospital or were you given a prescription to go and

18  fill later?

19    A    Yes.  They gave me a prescription, and they

20  also gave me an injection there for pain.

21    Q    Where did you get an injection?

22    A    I don't remember if they put it in here

23  because they had me with this here (indicating), and

24  I think they put it through that.

25    Q    Okay.  Are you talking about -- and by

```
 1    "here," you're pointing to, it looked like, the

 2    inside of your arm?

 3        A    Yes.  They put a injection here with a

 4    syringe.  I don't know exactly because I was on an

 5    IV.

 6        Q    Okay.  Okay.  And the prescription that

 7    they gave you, did you get that filled?

 8        A    Yes.

 9        Q    And was that at the Walmart that you

10    mentioned earlier?

11        A    I can't remember if I filled it right there

12    at the hospital.  I don't remember.

13        Q    Okay.  And you also said they gave you

14    papers for a specialist.

15             Do you remember who they told you to go

16    see?

17        A    No, I don't remember.

18        Q    Do you know what type of doctor they wanted

19    you to go see?

20        A    No, I don't remember.

21        Q    Do you know if you did go and see a

22    specialist?

23        A    I don't remember right now.

24        Q    Okay.  And what were your discharge

25    instructions from the hospital?
```

1      A    To rest a lot and to not walk a lot.

2      Q    Okay.  Do you remember where the next place

3  that you treated was?

4      A    No, I don't remember.

5      Q    Okay.  From the records we got, it looks

6  like you next treated at Peachtree Spine & Sports

7  Physicians.

8           Does that sound right?

9      A    Yes.  That's where I'm going right now.

10     Q    Okay.  So you're still treating there?

11     A    Yes.  Actually they told me that my ankle

12  needs another surgery because they did the MRI and it

13  looked bad.

14     Q    Okay.  So I show that your right ankle

15  surgery was done at Ortho Sport & Spine Physicians?

16     A    Yes.

17     Q    Okay.  So you had the surgery at Ortho

18  Sport & Spine and then returned to Peachtree Spine?

19     A    Yes, that sounds right.  Yes.

20     Q    Okay.  Okay.  So your records show that

21  your first time treating at Peachtree Spine was

22  August 9th of 2021.

23          Does that sound right, about four days

24  after the accident?

25     A    Four days, I don't remember.

1      Q     Do you know how you heard about Peachtree

2  Spine & Sports?

3      A     I -- I don't remember how.

4      Q     Okay.  Have you ever treated there before?

5      A     No.

6      Q     Okay.  Did you go and see your primary care

7  physician after your hospital stay?

8      A     No.

9      Q     Okay.  All right.  So you -- you don't know

10  how you heard about Peachtree Spine & Sports?

11      A     No, I don't remember.

12      Q     Do you remember what your pain level was

13  when you first started treating at Peachtree Spine?

14      A     Yes.

15      Q     Okay.  What was your right knee pain?

16      A     A lot.  It hurt a lot, and my ankle did

17  too.

18      Q     Okay.  On a scale of 1 to 10, what was your

19  right knee pain at when you first started treating?

20      A     Like an 8, yeah.

21      Q     And how was your right ankle pain on a

22  scale of 1 to 10?

23      A     It hurt the same.

24      Q     And by "the same," do you mean an 8 out of

25  10?

1      A     Yes.

2      Q     Was your low back still hurting?

3      A     Yes, it did it.

4      Q     What was your low back pain on a scale of 1

5   to 10?

6      A     My back, the same.

7      Q     And in between the hospital and starting at

8   Peachtree Spine, did you see any other physicians?

9      A     No, I don't remember.

10     Q     Okay.  And you had said earlier that you

11  were about to start a job the next day at the

12  sewing -- the sewing job?

13     A     Yes, sewing.

14     Q     Did you start work the next day?

15     A     No, I couldn't anymore.

16     Q     Okay.  Did you ever begin work at the

17  sewing place?

18     A     No.

19     Q     Okay.  And you -- did you -- or why did you

20  never start working at the sewing place?

21     A     Since I fell, I didn't feel well enough to

22  go to work.

23     Q     Okay.  So going back to your treatment at

24  Peachtree Spine & Sport, do you remember what kind of

25  treatments they did for you there?

```
 1      A    I don't remember.

 2      Q    Okay.  It looks like you received an

 3   injection in your spine?

 4      A    Oh, yes.  Yes.

 5      Q    Okay.  Did that injection help your pain at

 6   all?

 7      A    No.

 8      Q    Okay.  Do you know about how long you

 9   treated at Peachtree Sport & Spine?

10      A    Well, I'm still going there.

11      Q    And you -- the treatment you're currently

12   receiving there, is it still related to your right

13   knee and ankle and low back?

14      A    Yes.

15      Q    Okay.  So it looks like, based on your

16   records, that you treated from August 9th of 2021

17   through November 9th of 2021.

18           MS. TAYLOR:  I'm gonna object.

19           She said several times that she start

20        treating there.

21   BY MS. BARTON:

22      Q    And then after that November 9th, 2021

23   treatment, your records show that you didn't return

24   until July of 2022.

25           MS. TAYLOR:  I'm gonna object that she's
```

1        testifying to the dates.

2            If you know exactly the date that you were

3        there and you treated, you can answer her

4        questions.

5            MS. BARTON:  I'm gonna object to the

6        coaching of the client.

7            MS. TAYLOR:  I'm not.  But you -- do you

8        want me to have them put the records in and

9        we click through every record.  We can do that,

10       but . . .

11   BY MS. BARTON:

12       Q    Do you recall not going to Peachtree Spine

13   & Sports for a period of eight months?

14       A    No, I don't remember.

15       Q    Okay.  So do you -- is your recollection

16   that you've treated there consistently?

17       A    Yes.

18       Q    Okay.  Do you know if you ever got any

19   additional injections at Peachtree Spine & Sport?

20       A    No, I don't remember.

21       Q    So you don't recall what other therapies

22   you received at Peachtree Spine & Sport?

23       A    No, I don't remember.

24       Q    Okay.  The next -- actually, give me

25   one second.  Okay.  So I'm going to make this

1  Plaintiff's discovery responses or interrogatory

2  responses Exhibit 4.

3              (Defendant's Exhibit No. 4 was marked for

4        identification.)

5              MS. BARTON:  And would you like to review

6        these?

7              MS. TAYLOR:  If you'd like to ask a

8        specific question or either a specific question,

9        I don't know what you're gonna ask her, so I

10       don't know (indiscernible).

11  BY MS. BARTON:

12       Q    Okay.  Do you remember giving discovery

13  responses in -- regarding this incident?

14       A    No.

15       Q    Okay.  So the discovery responses, the

16  interrogatories that I'm about to show you, they are

17  a list of questions that we sent over that you

18  provided answers to.

19       A    No, I don't remember.

20       Q    Okay.  So I would let you look over these,

21  but I'm not sure -- would you like to look over them?

22  They're written in English.

23              MS. TAYLOR:  Is there a specific question?

24        I'm gonna -- is there a specific question you

25        would like to ask?

1            MS. BARTON:  The -- the question was if she

2       would like to review these cause I'm not

3       (indiscernible).

4       A    No, because I can't read the English.

5  BY MS. BARTON:

6       **Q    Okay.  So in response to Interrogatory**

7  **No. 32, you have some dates of treatment that were**

8  **included.  The date of treatment that you have listed**

9  **from Peachtree Spine & Sports Physicians was from**

10 **August 9th of '22 until December 12th of '22 -- or**

11 **I'm sorry, I read that wrong.  It's October 12th of**

12 **'22.**

13           THE INTERPRETER:  As in the second day,

14      October 12th?  Okay.

15           MS. BARTON:  Yes.  It's August 9th of '22

16      to October 12th of '22.

17           THE INTERPRETER:  And that's Peachtree

18      Spine & Sport Physicians?

19           MS. BARTON:  Yes.

20           THE INTERPRETER:  Okay.

21           MS. TAYLOR:  I think it specifically says

22      after that that she will supplement any

23      additional interrogatory.  So I think you have

24      not specifically stated what it says, that the

25      treatment -- that the discovery was ongoing.

```
 1   BY MS. BARTON:

 2        Q    Okay.  But I'm just trying to figure out --

 3   your testimony was that you've been back since

 4   October of '22?

 5        A    October 12th?  I don't remember.

 6        Q    So you are -- you're saying that you're

 7   still treating with Peachtree Spine & Sport; correct?

 8        A    Exactly.

 9        Q    Okay.  And you said that that was a

10   continuous treatment, you didn't stop at any time?

11        A    Exactly.

12        Q    Okay.  All right.  Okay.  So when was the

13   last time that you went to Peachtree Spine & Sport?

14        A    On Friday.

15        Q    And what did you do when you went there on

16   Friday?

17        A    They called me, and they said that I needed

18   another operation on my ankle, to explain to me that

19   the MRA -- the MRI -- I'm sorry -- didn't look good.

20        Q    Have you scheduled that surgery?

21        A    That's what I'm doing.  I'm waiting for

22   that.

23        Q    Okay.  And the -- I had mentioned earlier,

24   the first ankle surgery that you had, I have it at

25   Ortho Sport & Spine; is that right?
```

1        A     Yes.

2        Q     Okay.  Do you recall when you first started

3    treating at Ortho Sport & Spine?

4        A     No, I don't remember the date.

5        Q     Okay.  It doesn't have to be a specific

6    date, just the time of year.

7        A     No, I don't remember.

8        Q     Okay.  Do you know, other than the

9    surgeries that you got, what other treatments you got

10   at Ortho Sport & Spine?

11       A     My ankle and my knee?

12       Q     So I was asking:  Other than the surgery

13   that you got on your right ankle and your knee, do

14   you know what other kind of treatment that you had

15   done at Ortho Sport & Spine?

16       A     Yes.  A few weeks later, they actually had

17   to do another surgery again, a small surgery on my

18   knee because it wasn't right.

19       Q     When you say "a few weeks later," what

20   is -- a few weeks later from what?

21       A     A few weeks after they did the surgery on

22   my knee.

23       Q     Okay.  So other than any surgeries, do you

24   recall doing any sort of -- these are just examples,

25   but physical therapy or getting medication, getting

1    imaging done at Ortho Sport & Spine?  I'm

2    specifically talking about treatments that you

3    received that weren't surgical.

4        A    Yes.  Physical therapy and medicine.

5        Q    Okay.  And so the records that you -- or

6    that your attorneys provided to us show that you

7    started treatment in December of 2022.

8             Does that sound right?

9        A    Yes.

10       Q    Okay.  When you first started with Ortho

11   Sport & Spine, can you rate your knee pain on a scale

12   of 1 to 10.

13       A    Yes.  When I started, it was at a 9.

14       Q    Okay.  And what was your ankle pain on a

15   scale of 1 to 10?

16       A    Both of those areas hurt the same.

17       Q    Okay.  So let's talk about your right ankle

18   surgery.  I have that that had been in February of

19   this year.

20            Does that sound right?

21       A    Yes.

22       Q    Okay.  And how did you hear about Ortho

23   Sport & Spine?

24       A    That, I don't remember.

25       Q    Okay.  The right ankle surgery, did they

1  tell you why you needed the surgery?

2      A   Yes, because they said during the fall, I

3  had cracked something, or that's -- that's how the

4  doctor said it to me.

5      Q   How was the recovery time from the surgery?

6          THE INTERPRETER:  How was the recovery

7      time?

8          MS. BARTON:  Or I guess -- that was a bad

9      question.

10 BY MS. BARTON:

11     Q   How long did it take you to recover from

12 the ankle surgery?

13     A   My ankle, I think it was three months.

14     Q   And during that time, could you put any

15 weight on your ankle?

16     A   No.

17     Q   Did they give you any walking aids such as

18 crutches or a boot for your foot?

19     A   They gave me a boot and crutches.

20     Q   Okay.  And you said that you've been told

21 that you need another surgery?

22     A   Yes, because I asked the doctor why was it

23 hurting so much and it would get swollen.  And they

24 said that, Here, we can do another one to see what is

25 it that's bothering you.  And so on Friday, when I

1   got -- when I went to get the results, they said that

2   the MRI did not look good and that I needed another

3   surgery.

4        Q    Okay.  Now, let's talk about your knee

5   replacement surgery.  I have that happened in June of

6   this year.

7             Does that sound right?

8        A    Yes, it seems like it was June.

9        Q    Okay.  And do you recall what you were told

10  about why you needed the knee surgery?

11       A    Yes.  I remember them telling me that in

12  the fall, the bone had, like, become displaced.

13  That's what I remember them telling me.

14       Q    How long was your recovery from the knee

15  surgery?

16       A    Four months, and, to date, I'm still in

17  recovery because I'm still not right.

18            May -- may I say something additional?

19       Q    Yes.

20       A    I can tell you that since the surgery, I

21  don't feel well.  I don't feel like I'm the same

22  person.  I can't be at ease standing or sitting or

23  walking for a long period of time.  And

24  automatically, that makes me emotionally bad off as

25  well because I can't do what I could do before.

1        Q    Do you want to take a moment?

2             (Whereupon, a brief recess was taken.)

3   BY MS. BARTON:

4        Q    So before the break, we were talking about

5   your knee surgery, and you were saying that it is --

6   your knee is still causing you pain; is that right?

7        A    Yes, and my ankle.

8        Q    Yes.

9             Have you -- following the ankle -- or I'm

10  sorry -- following the knee surgery, did you -- or

11  have you ever brought up your continued pain with any

12  of your providers?

13       A    Yes.

14       Q    Okay.  Which doctor?

15       A    The one who's seeing me now, the one whose

16  did my surgery.

17       Q    So the one who did your surgery on your

18  knee, the one you had in June of this year, I have is

19  Ortho Sport & Spine.

20       A    Yes.

21       Q    Okay.  And the one that you said that you

22  are seeing now, is that also Ortho Sport & Spine?

23       A    Yes.

24       Q    Okay.  But you have been talking to

25  Peachtree Spine about your ankle?

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

1      A    Yes.

2      Q    Okay.  What have they told you at Ortho

3   Sport & Spine about your continuing knee pain?

4      A    Well, the explanation that they've been

5   giving me is that I'm always having to bear weight on

6   my ankle, and so it's compensating.  That's what

7   they've told me.  And that's why my ankle and my knee

8   are still hurting.  That was the explanation that

9   they gave me.

10      Q    Are you looking to do any additional

11   treatments for your knee?

12      A    How so?  I don't understand.

13      Q    Like, how we talked about how you're

14   looking to get another ankle surgery, are you looking

15   to get any additional surgeries, injections, physical

16   therapy on your right knee?

17      A    Well, it depends.  Because if they do my

18   ankle, depending on how I do after that, if they --

19   if they do my ankle and my ankle is fine, then what's

20   going on with my knee is no longer from my ankle, so

21   they would have to look at my knee again and see what

22   exactly is the problem.  That's what they explained

23   to me.

24      Q    Okay.  So it's your understanding that the

25   knee pain and ankle pain are connected?

1        A     From what they're telling me -- I mean I'm

2   not a doctor.  To me, one thing is one thing and the

3   other is something else.  But from what they're

4   saying, they -- one thing has to do with the other.

5        **Q     When was the last time that you treated**

6   **with Ortho Sport & Spine?**

7        A     Well, Friday, I said, was the last time.

8   And they still have me there because they're still

9   giving me medicine for the pain.

10       **Q     Okay.  So earlier when we were talking**

11  **about Peachtree Spine, you had said that you had gone**

12  **there on Friday.**

13       A     So Peachtree Spine, no.  I went to the

14  other place.  I was going to Peachtree Spine --

15            THE INTERPRETER:  And if the interpreter

16       may clarify.

17       A     It was the Peachtree Spine people that

18  recommended me to go see the Ortho Sport & Spine.

19  BY MS. BARTON:

20       **Q     Okay.  That makes more sense.  I'm glad**

21  **that I asked.**

22            **Okay.  So you're still treating at Ortho**

23  **Sport & Spine, and that's where you went on Friday?**

24       A     Yes.

25       **Q     Okay.**

```
 1        A      It was there.

 2        Q      Got it.  Okay.

 3               Okay.  So this knee surgery that you had in

 4    June of this year, how does the -- the pain you

 5    experienced during your recovery compare to your knee

 6    surgery in 2004?

 7        A      No.  Totally different.

 8        Q      Okay.  How so?

 9        A      Because this surgery, I felt it more

10    intensely, and also, this surgery was a larger

11    surgery than the one I had in 2004.  This surgery was

12    this big (indicating).  The one in 2004 was very

13    small.  It was only this big (indicating).  It was

14    just a little hole.

15        Q      Okay.  Okay.  So according to the

16    information that you've provided us, you've treated

17    for injuries in this accident at Northside Hospital,

18    Ortho Sport & Spine, Peachtree Spine & Sport.

19        A      Yes.

20        Q      Do -- do you remember -- do you recall

21    treating with any other providers for your injuries

22    from this incident?

23        A      No.

24        Q      Okay.

25               MS. TAYLOR:  I would like to state that,
```

1        when we say "Northside," there are several

2        Northside.  (Indiscernible) radiologist

3        stipulate that those are separate

4        (indiscernible).

5    BY MS. BARTON:

6        Q    Okay.  So as we sit here today, what is

7    your right knee pain on a scale of 1 to 10?

8        A    You could say that right now, it's at a 7.

9    But at night, it's really bad.

10       Q    Is that constant pain you're experiencing,

11   or does it come and go?

12       A    It's constant.

13       Q    Did the surgery help alleviate any of your

14   pain?

15       A    Right now, I haven't felt any relief.

16       Q    Okay.  And as we sit here today, can you

17   please rank your right ankle pain on a scale of 1 to

18   10?

19       A    8.

20       Q    Is that constant pain?

21       A    It is constant.

22       Q    Okay.  So you didn't really get any relief

23   from the surgery?

24       A    I haven't felt much.

25       Q    Okay.  What about your low back, how is

1    that on a scale of 1 to 10?

2        A    That is an 8.  That is, it is always

3    hurting.

4        Q    Okay.  And we talked about you having some

5    injections in your spine.

6             Do you recall any other treatments that you

7    got for your low back pain?

8        A    No, not there because I am afraid for them

9    to touch me there.

10       Q    Okay.  So following this incident in August

11   of 2021, have you been involved in any other

12   accidents or incidents that have caused injury?

13       A    Yes, I had a car incident.

14       Q    Okay.  When was that?

15       A    That was, if I'm remembering right, the

16   15th of November.

17       Q    Of what year?

18       A    Of '21, I think.

19       Q    Okay.  So about three months after this

20   accident, about three and a half months after this

21   accident?

22       A    Yes.

23       Q    Okay.  Can you tell me what happened in

24   that accident?

25       A    I was in my lane and I was going to turn

1   right.  And another person cut off and got in front

2   of me like they wanted to pass me, but I was in my

3   lane.

4        Q    Do you remember where that accident

5   happened?

6        A    It was at Jimmy Carter and Williams.

7        Q    Did the police come to that accident?

8        A    Yes.

9        Q    And were you injured?

10       A    Yes; my arm.

11       Q    And what arm was that?

12       A    The right one.

13       Q    Okay.  You're saying "arm," but you're kind

14  of tapping up near your shoulder, so I just want to

15  make sure.

16       A    Exactly.  Here; my shoulder.

17       Q    Okay.  Did you go to the hospital following

18  that accident?

19       A    No.

20       Q    Did you get any medical treatment?

21       A    Yes, I was receiving treatment.

22       Q    Do you recall where you were getting

23  treatment?

24       A    I don't remember.

25       Q    Okay.  Does Morning Chiropractic sound

```
 1   right?

 2       A    I don't remember.

 3       Q    Okay.  What about Atlas Spine?

 4       A    No, I don't remember.

 5       Q    Okay.  Do you recall going to a

 6   chiropractor following that accident?

 7       A    I don't remember.

 8       Q    Okay.  So going back to interrogatories,

 9   which is Defense Exhibit 4, No. 33 asked about

10   doctors you had seen in the past 15 years and you

11   listed Morning Chiropractic, Atlas Spine, and MRI

12   Imaging Specialists.

13            You don't recall treatment with those

14   providers?

15       A    Morning does sound familiar to me.

16       Q    Okay.

17            MS. TAYLOR:  Actually says Atlas Spine &

18       Rehab, but --

19            MS. BARTON:  I'm sorry?

20            MS. TAYLOR:  It actually says Atlas Spine &

21       Rehab.

22            MS. BARTON:  Okay.

23   BY MS. BARTON:

24       Q    Okay.  So if you don't remember your

25   provider specifically, can you tell me about your
```

 1   treatment that you got after the accident?

 2       A    Here on my arm.

 3       Q    **What did they do for you, for your**

 4   **shoulder?**

 5       A    What I remember is they put, like, little

 6   needles on me.  That's what I remember.

 7       Q    Okay.  And the only thing that you recall

 8   injuring in that November '21 motor vehicle accident

 9   was your shoulder?

10       A    Yes.

11       Q    Okay.  So you don't remember having any

12   neck pain?

13       A    Yes, in my neck.  On my neck.

14       Q    Did they give you any treatments for your

15   neck pain?

16       A    No.  They were more focused on my arm.

17       Q    Okay.  And what about lower back pain?

18       A    No.

19       Q    What about any knee pain?

20            THE INTERPRETER:  I'm sorry, did you say

21       knee pain?

22            MS. BARTON:  Yes.  I said, What about any

23       knee pain?

24       A    No.

25   BY MS. BARTON:

```
 1        Q    Do you recall how long you had treatment
 2   for your November car accident?
 3        A    I don't remember.
 4        Q    Did you make a bodily injury claim for that
 5   accident?
 6        A    For myself or the car?
 7             MS. BARTON:  For herself.
 8        A    Yes.
 9   BY MS. BARTON:
10        Q    Okay.  And who was your attorney for that
11   claim?
12        A    I don't remember if it was the one here.
13   I'm not -- I don't remember.
14        Q    And is that case still ongoing?
15        A    No.  It was resolved a -- a good while ago
16   now.
17        Q    Did you have to do a deposition for that
18   claim?
19        A    No.
20        Q    Okay.  Did the case settle?
21        A    Yes.
22        Q    Do you remember what the settlement amount
23   was?
24        A    I don't remember how much it was.
25        Q    Okay.  Any other car accidents you've been
```

1   involved in after the November '21 incident?

2       A    No.

3       Q    Okay.  Do you recall being involved in a

4   collision on September 14th of 2022?

5       A    No.

6       Q    Okay.  So it looks like there was a

7   collision on Singleton Road near Jimmy Carter

8   Boulevard?

9           MS. TAYLOR:  Is that you testifying, or are

10      you entering the police report?

11          MS. BARTON:  Just asking if she remembers.

12          MS. TAYLOR:  You -- you -- you made a lot

13      of assumptions of evidence that's not in fact.

14          MS. BARTON:  This is a fact deposition.  I

15      don't have -- there's no, like, offerings of

16      fact right now.

17          MS. TAYLOR:  Well, you said, You were

18      involved in a wreck on such and such date.

19          MS. BARTON:  Sure.  Exhibit then.

20          We'll make it Defense Exhibit 5, the police

21      before from November -- or I'm sorry, for

22      September 14th of 2022.

23          (Defendant's Exhibit No. 5 was marked for

24      identification.)

25          MS. TAYLOR:  Has anybody seen that police

1        report besides you?

2            MS. BARTON:  Excuse me?

3            MS. TAYLOR:  Has anyone seen that police

4        report besides you cause I don't think you

5        produced it in discovery.

6            MS. BARTON:  Oh, it's an open records

7        request.  We don't have to produce those, but

8        you're welcome to take a look.  And it's

9        certified, if you want to check out the first

10       page.

11           Okay.  So Defense Exhibit 5, for the

12       record, is a -- a police report from Gwinnett

13       County Police Department where Unit No. 1 is

14       listed as Ms. Solito.

15   BY MS. BARTON:

16       Q    Okay.  And you don't recall this collision?

17       A    I don't remember, but I wasn't, like,

18   involved in -- in -- in an accident.  I don't

19   remember.  Because it wasn't that I hit someone, the

20   girl hit me.  So, I mean, it was -- we just left it,

21   so -- we just left it, so --

22       Q    You remember --

23       A    -- I didn't know.

24       Q    -- the police coming?

25       A    Yeah.  The police did come, but the police

1   didn't blame anyone.

2        Q    Okay.  So on the police report, it

3   states -- trying to figure out how to do this

4   translation-wise.

5             Right.  In this one by Unit 1 and -- do you

6   recognize your name there?

7        A    Yes.

8        Q    Okay.  And right here, it says "suspected

9   at fault," and there is a check right there.

10       A    But I've realized that that's there, but

11  that's not right.  I went and told the police officer

12  what happened.

13       Q    Okay.

14       A    That was not right.

15       Q    Okay.  So why don't you tell me what

16  happened?

17       A    The thing is, I went through the light and

18  the person was coming behind me.  I was going through

19  here, and she wanted to cross to get over to where

20  dd's store was, the store, dd's.  So she was the one

21  that hit me, because the impact was on my side of the

22  car, and had it been me hitting her, it would have

23  been on the left-hand side.

24       Q    Okay.  Which -- which car were you driving?

25       A    My car.

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                                    Page 79

1        Q     Do you remember what kind of car it was?

2        A     It's the Ford Escape.

3        Q     Okay.  Were you injured at all in that

4   collision?

5        A     No.  It was something really insignificant.

6        Q     Did you make a bodily injury claim for that

7   collision?

8        A     Yes, so I could have my car repaired.  Not

9   for my person, but my car.

10       Q     Okay.  So it sounds like a -- a property

11  damage claim?

12       A     Yes.

13       Q     Is that claim still open?

14       A     Well, I don't know anything about it

15  because I haven't received any information.  But

16  that's why I went and sought out the police officer,

17  and he said that he was going to fix the issue.

18       Q     Okay.  But you haven't received any money

19  for any property damages yet; right?

20       A     Yes.  My car was repaired.

21       Q     Okay.  Do you recall if that was through

22  your insurance company or the other driver's

23  insurance company?

24       A     No, it was mine.

25       Q     Who -- who is your insurance provider?

1      A    I don't remember right now.  I can't

2  remember the name.

3      Q    On the report, it says "Progressive."

4           Does that sound right?

5      A    Yes.  That's correct.

6      Q    Okay.  And so other than the claim that

7  you've brought regarding this incident and the claim

8  that you brought regarding the November 2021 car

9  accident, have you ever been a party to any other

10  lawsuits?

11      A    No.

12           MS. BARTON:  Okay.  If I could just have a

13      few minutes to look over my notes, I might be

14      done.

15           Do you have any questions for her?  You're

16      welcome to ask.

17                          EXAMINATION

18  BY MS. TAYLOR:

19      Q    Ms. Solito, your -- your ankle, knee, and

20  back, those were all injured as a result of falling

21  at Sam's Club?

22      A    Yes, correct.

23      Q    Okay.  And the 2021 or 2022 wreck, did

24  those -- those affected a different part of your

25  body?

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                                    Page 81

1        A    Yes.

2        Q    Okay.  And your right ankle surgery and

3    your second surgery that you need, those are related

4    to your injuries from -- directly from the Sam's Club

5    falling; is that correct?

6             MS. BARTON:  Object to the form.

7    BY MS. TAYLOR:

8        Q    You can answer the question.

9        A    Yes.

10       Q    And today, do you have difficulty walking?

11       A    Yes.

12       Q    Prior to the Sam's Club accident -- slip

13   and fall, did you have problems walking?

14       A    No.

15       Q    And the treatment at Ortho Sport & Spine

16   and Peachtree Orthopedics -- I'm sorry, not Peachtree

17   Orthopedics -- Peachtree, is that -- that was

18   directly related to your fall at Sam's Club; is that

19   true?

20            MS. BARTON:  Object to the form.

21            That's a leading question.

22   BY MS. TAYLOR:

23       Q    You can answer the question.

24            MS. BARTON:  Also calls for speculation.

25            THE INTERPRETER:  Could you please repeat

1          the question.  I'm sorry.

2                MS. TAYLOR:  I will.

3     BY MS. TAYLOR:

4          **Q    Would you say your treatment at Peachtree**

5     **and Ortho Sport -- Peachtree Sport & Spine and Ortho**

6     **Sport & Spine is directly related to your slip and**

7     **fall at Sam's Club?**

8                MS. BARTON:  Same objection.

9          A    Yes.

10    BY MS. TAYLOR:

11         **Q    Did you need to treat at Peachtree Sport &**

12    **Spine or Ortho Sport & Spine prior to when you**

13    **slipped and fell at Sam's Club?**

14         A    No.

15               MS. TAYLOR:  I don't have any further

16         questions.

17               MS. BARTON:  Okay.  Sorry.  Just one more

18         second.  I'm still going through . . .

19               Okay.  Ready?

20               THE COURT REPORTER:  I'm dead, but go

21         ahead.

22               MS. BARTON:  Okay.

23               THE COURT REPORTER:  I still got . . .

24               MS. BARTON:  All right.

25                         REEXAMINATION

```
 1   BY MS. BARTON:
 2       Q    Okay.  So just briefly, I want to go back
 3   to the day of the incident.
 4            The substance you saw on the floor, the
 5   first time you saw it was when you were on the
 6   ground; right?
 7       A    Yes.
 8       Q    Okay.  And after you got up from the floor,
 9   you don't recall seeing it again; right?
10            MS. TAYLOR:  I'm going to object to the
11            question because I don't know that she said she
12            did not see it again.  I think she said -- I
13            think she said she saw it when she fell.
14   BY MS. BARTON:
15       Q    Okay.  I'll rephrase my question.
16            Do you recall seeing the oil again once you
17   got up from the floor?
18       A    No, I didn't look to see it.
19       Q    Okay.  And prior to your fall, you didn't
20   see the oil; correct?
21       A    No, I didn't see it.
22       Q    Was there a reason that you couldn't see
23   it?
24       A    There was no sign that said that there was
25   something there.
```

1        Q    Okay.  But just in terms of the oil, you

2    didn't -- you never saw that on the floor?

3        A    No, I didn't see it.

4        Q    Okay.  Do you know of any reason why you

5    didn't see the substance on the floor?

6             MS. TAYLOR:  I'm gonna -- I'm gonna object

7        to asked and answered.

8             She's answered about four or five times

9        before and now.

10            MS. BARTON:  She hasn't answered why she

11       didn't see it, so . . .

12       A    I didn't see it because I was focused on

13   going to pick up what I was coming to get.  I wasn't

14   looking at the floor, so I was focused on going to

15   get what I was going to get.

16   BY MS. BARTON:

17       Q    Okay.  And you said you had been in this

18   store for about 30 minutes prior to your fall; right?

19       A    Yeah, more or less.  I don't -- I don't --

20   did -- don't know exactly.

21       Q    Okay.  And do you recall what areas of the

22   store you went in before you came to the bakery

23   aisle?

24       A    No, I don't remember.

25       Q    On the day of the accident, was -- right

1  before you fell and you're in the bread aisle, was

2  that your first time in the bakery section that day?

3          THE INTERPRETER:  Can you repeat that

4      question again.  I'm so sorry.

5          MS. BARTON:  Sure.

6  BY MS. BARTON:

7      Q   So I guess I'll make it a little bit -- a

8  better question.

9          Prior to your fall in -- in the bakery

10  aisle, had you been in the bakery aisle before that,

11  that day?

12     A   No.

13     Q   Do you know how long the substance was on

14  the floor?

15     A   No, I don't know.

16     Q   Okay.  And following your fall, did you

17  ever speak to any employees from Sam's Club about

18  this incident again?

19     A   No.

20     Q   Okay.  Do you have any social media?

21     A   Like, which ones?

22     Q   Like, Facebook, Instagram.

23     A   Yes.

24     Q   Okay.  Which do you use?

25     A   Both.

1        Q     Okay.  What is your name on Facebook?

2        A     Montes.

3              MS. TAYLOR:  Can you spell Montes?

4              THE WITNESS:  On Facebook, I'm -- no, I

5        don't remember.  I don't remember.

6     BY MS. BARTON:

7        Q     Okay.  What about Instagram?

8        A     I'm on there as Argelia, I think.

9        Q     Can you spell that?

10       A     A-R-G-E-L-I-A.

11       Q     Oh, I'm sorry.  Do you -- is your -- do you

12    have a last name on it as well?

13       A     No.

14       Q     Any other -- I'm sorry.

15       A     I think it's argelia66.

16       Q     Any other social media?

17       A     No.

18       Q     Okay.  Have you ever posted about this

19    incident on social media?

20       A     No.

21       Q     Are you claiming lost wages in this

22    incident?

23       A     What do you mean?  I don't understand.

24       Q     So a form of damages that you can request

25    is lost wages, which is the injuries that you

1  sustained keeping you from work.

2      A    Yes.  As a consequence of this, I couldn't

3  work and I have not worked.  And I can't do a lot

4  because I can't be standing for a long period of time

5  or walking around a lot.

6      Q    Regarding the position with the sewing, I

7  guess the sewing job, did you have communication with

8  them about your injuries after this incident?

9      A    I just communicated to them that I was not

10 going to be able to come to work.

11     Q    Do you know how much you were gonna be paid

12 at the sewing job?

13     A    They were going to pay me at a rate of 12.

14 They said that's how I would start.

15     Q    And you don't remember the name of the

16 company?

17     A    No, I don't remember it.

18     Q    Do you know the total amount of your

19 medical bills?

20     A    No, I don't.

21     Q    Have any of the bills come to your house?

22     A    No.

23     Q    Do you know if any of your bills have been

24 paid?

25     A    No, I don't know.

1        Q    Do you -- well, in August of 2021, did you

2   have health insurance?

3        A    I don't remember.

4        Q    Do you currently have health insurance?

5        A    Yes.

6        Q    And who was your insurer?

7        A    Cigna.

8        Q    Are there any other claims from this

9   incident that we haven't talked about today?

10       A    No.

11       Q    Anything else significant to this lawsuit

12  that you want me to know?

13       A    No.

14       Q    Okay.

15            MS. BARTON:  All right.  That is it from

16       me.

17            MS. TAYLOR:  I have a few follow-up

18       questions.

19                      REEXAMINATION

20  BY MS. TAYLOR:

21       Q    Ms. Solito, did anyone, immediately before

22  the fall, drop anything immediately in front of you

23  like a jar something or a liquid that you saw?

24       A    Not that I saw.

25       Q    Did you drop any bottles of anything, any

1    liquids right before you slipped and fall at the

2    Sam's Club?

3        A    No.

4        Q    So was -- was -- was there anything that

5    would have caught your attention to something being

6    of the floor?

7        A    No.  I didn't know.

8        Q    Normally, when you walk, do you walk just

9    looking down at the floor as to not slip and fall

10   when there should not be liquids on the floor --

11           MS. BARTON:  Object to the form.

12   BY MS. TAYLOR:

13       Q    -- at the Walmart -- I mean, at the Sam's

14   Club?

15       A    After this fall, yes.

16       Q    Before the fall, was that your normal

17   practice?

18       A    No.

19       Q    Is it your normal practice now because

20   you -- because you fell and seriously injured

21   yourself?

22           MS. BARTON:  Object to the form.

23       A    Excuse me?

24   BY MS. TAYLOR:

25       Q    I said, Is that only your practice now

1    because you slipped and seriously injured yourself at

2    Sam's Club?

3            MS. BARTON:  Same objection.

4        A    Yes.

5    BY MS. TAYLOR:

6        Q    And prior to the incident, you had been in

7    Sam's Club a myriad of times and had not had an

8    incident?

9            MS. BARTON:  Object to the form.

10           I'm gonna ask that you stop asking leading

11        questions.

12   BY MS. TAYLOR:

13       Q    I said prior -- I'll rephrase it.

14           Is it true, prior to the -- prior to the

15   incident that we're here to discuss, you had not

16   slipped and fell in Sam's Club?

17           MS. BARTON:  Same objection.

18           MS. TAYLOR:  I said --

19           MS. BARTON:  It's still leading.

20           MS. TAYLOR:  It's not leading.

21           MS. BARTON:  Yes, it is.

22           MS. TAYLOR:  It was a question.

23           MS. BARTON:  A leading question is when

24       you're asking something and the answer that you

25       want is, you know, easily discernable.

1          MS. TAYLOR:  That's -- that's your opinion.

2     I'm gonna object it in --

3          MS. BARTON:  It's -- it's not actually.

4     It's -- it's, like, the law.

5          MS. TAYLOR:  Okay.  Cool.  It's -- it's . .

6     .

7          MS. BARTON:  So my -- I don't want to get

8     into it on the record, but I'm gonna just put my

9     objection.

10          MS. TAYLOR:  You put your objection, and

11     she can answer the question.

12          MS. BARTON:  Okay.

13     A     Yes.

14     BY MS. TAYLOR:

15     Q     Have you been in Publix, Walmart, any other

16     stores?

17     A     In Walmart.

18     Q     Have you slipped and fell in Walmart?

19     A     No.

20     Q     About how many times would you say you went

21     to Walmart?

22     A     A lot of times.  Every week.

23     Q     So specifically, this time -- is it true,

24     this time there was something different that caused

25     that -- let me rephrase the question.

```
 1              Specifically, what was different about this
 2    time when you went to Sam's Club that caused you to
 3    fall?
 4        A    What was different?
 5        Q    What was -- what was different about this
 6    time versus previous times?
 7        A    What -- well, what was on the floor.
 8        Q    Thank you.
 9              Did you bring anything into the store and
10    decide to put it on the floor to slip and fall to sue
11    Sam's Club so that you can get a check?
12              MS. BARTON:  Object to the form.
13              MS. TAYLOR:  Rolling your eyes all you
14        want.
15        A    No, because on the video, it shows that I
16    was just walking.
17    BY MS. TAYLOR:
18        Q    Yes.
19              And did you -- were you just walking and
20    innocently fell?
21              MS. BARTON:  Object to the form.
22        A    Yes.
23              MS. TAYLOR:  And I have no further
24        questions.
25                          REEXAMINATION
```

```
 1   BY MS. BARTON:
 2        Q    Okay.  Just one more.
 3             Did you ever get to see what the source of
 4   the substance on the floor was?
 5        A    No.
 6        Q    Okay.
 7             MS. TAYLOR:  I have a follow-up question.
 8                        REEXAMINATION
 9   BY MS. TAYLOR:
10        Q    Did you work at Sam's Club at that time?
11        A    No.
12        Q    Are you responsible for making sure that
13   Sam's Club have no -- no liquids or anything on the
14   floor?
15        A    No.
16        Q    At that time, were you an employee of Sam's
17   Club?
18             MS. BARTON:  Object to the form.
19             Asked and answered.
20             MS. TAYLOR:  I never asked her that.
21             MS. BARTON:  Yes, you did.
22             MS. TAYLOR:  Now, you gone stop.  I never
23        asked her if she was an employee of Sam's Club.
24             MS. BARTON:  Okay.
25             MS. TAYLOR:  How many times did you ask her
```

1       did she slip and fall?  How many times did you

2       ask her about the oil?

3             MS. BARTON:  Again --

4             MS. TAYLOR:  You asked that question about

5       ten times and I asked you to stop asking it and

6       you kept asking it.  So if I want to ask her

7       two times did -- no, one time, did she -- was

8       she an employee of Sam's Club, I think I will.

9             You don't like the question, that's your

10      problem, not mine.

11  BY MS. TAYLOR:

12      **Q    But back to the original question, were you**

13  **an employee of Sam's Club at the time?**

14            MS. BARTON:  Same objection.

15      A    No.

16  BY MS. TAYLOR:

17      **Q    And the employee, whether it be the store**

18  **manager or the other employees, came over to you and**

19  **acknowledged that you fell on the floor?**

20      A    Yes.

21            MS. TAYLOR:  No further questions.

22            MS. BARTON:  All right.  I don't have

23      anything further, so I think we're good.

24            Did you guys decide if you're gonna read

25      and sign?

1          THE COURT REPORTER:  Gonna read and sign,

2    Ms. Taylor?

3          MS. TAYLOR:  I will waive.

4          THE COURT REPORTER:  You'll waive.

5          (Deposition concluded at 4:26 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        DISCLOSURE

 2

 3     STATE OF GEORGIA
       COUNTY OF CLAYTON
 4

 5                    Pursuant to Article 8.B of the
       RULES AND REGULATIONS OF THE BOARD OF COURT REPORTING
 6     OF THE JUDICIAL COUNCIL OF GEORGIA, I make the
       following disclosure:
 7
                      I am a Georgia Certified Court
 8     Reporter.  I am here as a representative of Huseby
       Global Litigation.
 9
                      Huseby Global Litigation was
10     contacted by the offices of Drew Eckl & Farnham, LLP,
       to provide court reporting services for this
11     deposition.  Huseby Global Litigation will not be
       taking this deposition by O.C.G.A. 15-14-37(a) and
12     (b).

13                    Huseby Global Litigation has no
       contract/agreement to provide court reporting
14     services with any party to the case, any counsel in
       the case, or any reporter or reporting agency from
15     whom a referral might have been made to cover this
       deposition.
16
                      Huseby Global Litigation will
17     charge its usual and customary rates to all parties
       in the case, and a financial discount will not be
18     given to any party to this litigation.

19

20                    This, the 11th day of December

21     2023.

22     _____

23                    Alecia Wright,
                      Certified Court Reporter
24

25
```

```
 1                        CERTIFICATE

 2

 3   STATE OF GEORGIA
     COUNTY OF CLAYTON
 4

 5                        I, Alecia Wright, Certified Court

 6   Reporter, do hereby certify that the foregoing

 7   transcript was recorded by me, as stated in the

 8   caption; the colloquies, statements, questions, and

 9   answers thereto were reduced to typewriting under my

10   direction and supervision; and the transcript is a

11   true and correct record of the testimony/evidence

12   given to the best of my ability.

13                        I further certify that I am not a

14   relative or employee or attorney or counsel of any of

15   the parties, nor am I a relative or employee of such

16   attorney or counsel, nor am I financially interested

17   in the action.

18                        This, the 11th day of December

19   2023.

20

21   _____

22                   Alecia Wright,
                      Certified Court Reporter
23                   Georgia License No. 4902-5798-3471-6160

24

25
```

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                    Index: 1..59:53

Exhibits

SolitoA-1
   3:15
   27:22,25

SolitoA-2
   3:16
   37:10,11

SolitoA-4
   3:18 59:2,
   3 73:9

SolitoA-5
   3:19
   76:20,23
   77:11

_____

1

1   27:22,25
   37:24
   50:15,23
   55:18,22
   56:4
   63:12,15
   70:7,17
   71:1 77:13
   78:5

10   50:15,24
   51:2
   55:18,22,
   25 56:5
   63:12,15
   70:7,18
   71:1

10/19/2015
   28:21

11   4:2
   29:12
   43:16

1125   9:23

12   14:14
   29:12
   87:13

12:24   41:13

12:25   41:25
   43:16

12th   60:10,
   11,14,16
   61:5

14   10:22

14th   76:4,
   22

15   73:10

15th   71:16

18   10:19,21

18th   9:15

19   10:22

19-year-old
   10:24

1:08   4:2

_____

2

2   37:10,11

20   40:21
   42:1 44:7
   46:3,5

2000   11:16

2004   49:9
   50:1 69:6,
   11,12

2012   5:19
   6:1 21:5
   23:10,15
   24:23,24
   25:7

2015   23:8,
   10,18
   24:24
   25:11

2020   11:24

2021   11:11
   16:11 18:7
   20:17,19
   47:20
   54:22
   57:16,17,
   22 71:11
   80:8,23
   88:1

2022   57:24
   63:7 76:4,
   22 80:23

2023   4:2

21   20:23
   71:18 74:8
   76:1

22   60:10,
   12,15,16
   61:4

24   8:10
   31:3

25   15:3

26   41:24

_____

3

3   39:1,7,9
   40:18,22

30   84:18

32   60:7

33   73:9

35   15:9

38   10:10

_____

4

4   39:1,9
   59:2,3
   73:9

48   41:14

4:26   95:5

_____

5

5   37:24
   39:1,7,9
   76:20,23
   77:11

53   41:2,5

55   41:2

59   41:2,4,
   12

59:53   40:20
   41:8,10

---

**6**

6   37:25

66   9:18

---

**7**

7   37:25
70:8

774 849-8392
17:24

---

**8**

8   37:25
38:18
55:20,24
70:19 71:2

---

**9**

9   50:16
51:2 63:13

9th   54:22
57:16,17,
22 60:10,
15

---

**A**

A-R-G-E-L-I-A
9:11 86:10

ability   4:8
8:23

acceptable
28:18

accident
5:21
20:13,20,
23 21:5,8,
14 22:23
23:6 25:6
29:11 38:2
39:23 47:3
54:24
69:17
71:20,21,
24 72:4,7,
18 73:6
74:1,8
75:2,5
77:18 80:9
81:12
84:25

accidents
20:16
48:20,22
71:12
75:25

account   18:2

acknowledged
94:19

acting   27:16

activities
17:7

additional
58:19
60:23
65:18
67:10,15

address   9:22

addresses
11:8

Adriana
10:6,9
14:22

adult   15:18

advanced
52:14

affected
80:24

afraid   71:8

age   10:19

ages   14:25

agree   24:12,
15

agreeable
4:23

agreed   27:5

agreement
4:19

ahead   7:19
82:21

aids   64:17

aisle   31:24
84:23
85:1,10

alcohol   31:8

Alejandro
16:3,6,8
17:1

alleviate
70:13

allowed   4:22

Amores   17:17

amount   75:22
87:18

ankle   44:22,
23 50:9,
13,17 51:7
52:9
54:11,14
55:16,21
57:13
61:18,24
62:11,13
63:14,17,
25 64:12,
13,15
66:7,9,25
67:6,7,14,
18,19,20,
25 70:17
80:19 81:2

answering
6:14 9:1
44:14

answers
59:18

anymore
21:18
56:15

apron   42:15,
17

area   15:19
31:14 32:4
35:13
36:25

---

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

Index: areas..bear

37:3,6
38:3,18

areas 63:16
84:21

Argelia 4:1,
10,18 9:7
86:8

argelia66
86:15

arm 21:15,
16 53:2
72:10,11,
13 74:2,16

arranging
35:19
42:13

arrested
13:9

arrived 44:6

assistance
45:5

assume 7:13

assumptions
76:13

AT&T 18:1

Atlanta
15:19

Atlas 73:3,
11,17,20

attention
89:5

attorney
5:13 6:5

22:3,7,10,
14 23:20,
23,25 25:7
26:17 27:3
37:14 40:2
75:10

attorney-
client 18:20

attorneys
63:6

August 11:11
16:11 18:7
20:16,19,
23 47:20
54:22
57:16
60:10,15
71:10 88:1

automatically
65:24

---
B
---

back 12:10
21:15 30:1
34:5 36:3
39:21
43:14
44:22
45:1,2
50:9,13,19
51:9 52:9
56:2,4,6,
23 57:13
61:3 70:25
71:7 73:8
74:17

80:20 83:2
94:12

backward
34:3

backwards
35:23

bad 7:8
54:13 64:8
65:24 70:9

bakery 84:22
85:2,9,10

bankruptcy
13:11

Barton 4:13,
17 5:3,6,
11,13 9:19
11:2
12:11,24
18:22
19:1,4,5
22:17,21,
24 23:4,
12,17
24:1,6,9,
12,16,20
25:1,4,5,
19,23
26:1,9,23
27:5,13,
18,21
28:4,7,22,
23 32:18,
24 37:13
38:22
39:5,8,13,
20 40:7,

11,16
41:1,4,7,
11,15,22
42:21
43:1,13
45:20,24,
25 57:21
58:5,11
59:5,11
60:1,5,15,
19 61:1
64:8,10
66:3 68:19
70:5
73:19,22,
23 74:22,
25 75:7,9
76:11,14,
19 77:2,6,
15 80:12
81:6,20,24
82:8,17,
22,24
83:1,14
84:10,16
85:5,6
86:6 88:15
89:11,22
90:3,9,17,
19,21,23
91:3,7,12
92:12,21
93:1,18,
21,24
94:3,14,22

based 57:15

bear 67:5

begin 5:8
  6:14 56:16

big 69:12,
  13

bills 87:19,
  21,23

birthday
  9:14

bit 8:4,6
  47:14 85:7

blame 78:1

bleeding
  45:13

blocking
  32:3

blood 47:16

blue 42:18

bodily 21:25
  75:4 79:6

body 33:25
  35:25 52:8
  80:25

bone 65:12

boot 64:18,
  19

born 9:20

bothering
  64:25

bottles
  88:25

bottom 38:6

Boulevard
  76:8

brain 7:8

bread 31:15,
  24 33:23
  85:1

break 7:17,
  20 45:20
  66:4

briefly 12:7
  83:2

bring 92:9

bringing
  5:23 28:12

brought 29:4
  66:11
  80:7,8

———————
    C
———————

call 45:9

called 8:14
  17:16 37:7
  45:7 61:17

calls 81:24

car 5:21
  20:13
  21:5,8
  48:20
  71:13
  75:2,6,25
  78:22,24,
  25 79:1,8,
  9,20 80:8

care 47:18,
  22 55:6

carrying
  33:8

cart 31:18,
  19 32:10
  35:17 42:7
  43:4,23
  44:2

Carter 8:18
  72:6 76:7

carts 42:9
  43:24

case 75:14,
  20

caught 89:5

caused 71:12
  91:24 92:2

causing 66:6

cell 17:23

certainty
  39:17

certificate
  13:5

certificates
  12:19

certified
  77:9

check 77:9
  78:9 92:11

child 27:2

children

10:2
  14:19,24
  15:6

Chiropractic
  72:25
  73:11

chiropractor
  49:4 73:6

Christian
  17:16

church
  17:13,15,
  16,19,21

Cigna 88:7

citizen
  11:25 12:2

city 15:12

civic 17:10

Civil 4:22

claim 5:22
  21:25
  22:12,19
  28:15
  75:4,11,18
  79:6,11,13
  80:6,7

claiming
  86:21

claims 28:16
  88:8

clarification
  32:15

clarify 9:17

68:16

cleaning
  35:15,16,
  19

click  58:9

client  40:10
  58:6

close  32:25
  48:5,8

closer  42:24

clothes
  34:19

clothing
  34:21,24

Club  5:14
  29:8,22
  80:21
  81:4,12,18
  82:7,13
  85:17
  89:2,14
  90:2,7,16
  92:2,11
  93:10,13,
  17,23
  94:8,13

clubs  17:10

coaching
  58:6

cognitive
  8:22

college  13:4

collision

22:13
25:11
76:4,7
77:16
79:4,7

color  35:11

commenced
  4:2

communicated
  87:9

communication
  87:7

companion
  14:4

company
  16:4,5,17
  30:13,14
  79:22,23
  87:16

compare  69:5

compensating
  67:6

compensation
  17:8

complaining
  44:18

concluded
  95:5

condition
  47:16

confirm
  28:20

confuse

23:11

connected
  67:25

consequence
  87:2

consistently
  58:16

constant
  70:10,12,
  20,21

consult  22:3

contents
  18:23

continued
  66:11

continuing
  67:3

continuous
  61:10

control
  27:11

conversation
  12:23
  26:12,15

conversations
  18:12
  45:15

Cool  91:5

copy  28:3

corner  38:7

correct
  24:19

28:11
41:18
43:23 45:8
50:8 51:19
61:7 80:5,
22 81:5
83:20

correction
  14:3

counsel
  4:20,23
  12:8,10

countries
  12:2

County  77:13

court  6:20
  82:20,23
  95:1,4

cracked  64:3

cross  78:19

cross-
examination
  4:21

crutches
  64:18,19

cut  72:1

_____

D

damage  79:11

damages
  79:19
  86:24

date  24:25

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

58:2  60:8
62:4,6
65:16
76:18

dates   58:1
60:7

daughter
30:7

day   30:9,10
33:12
37:24  38:2
41:25
46:23
56:11,14
60:13  83:3
84:25
85:2,11

days   54:23,
25

dd's   78:20

De   17:17

dead   82:20

December   4:2
60:10  63:7

decide   92:10
94:24

defendant's
27:25
37:11
40:22  59:3
76:23

Defense
27:21
37:10

40:18  73:9
76:20
77:11

define
12:20,22

deliveries
10:17  16:1

delivery
15:17

Department
77:13

depending
67:18

depends
67:17

deposition
4:1,18
5:16  6:6
18:10,15
21:4  25:20
26:10,13
27:8  75:17
76:14  95:5

depositions
6:2

describe
33:20

desserts
10:13

detail   33:21

diabetes
47:16

diagnosed

47:15

Diego   15:1,2

difficult
43:2

difficulty
81:10

Dios   17:16

directly
81:4,18
82:6

discernable
90:25

discharge
53:24

discovery
4:20  19:15
40:5  59:1,
12,15
60:25  77:5

discuss
90:15

discussed
5:3

displaced
65:12

distracting
33:5

doctor   21:19
47:18
48:12
53:18
64:4,22
66:14  68:2

doctors
73:10

document
25:17,24
26:2

documents
19:9

drink   31:9

driver's
19:19,21,
24  79:22

driving
78:24

drop   88:22,
25

drove   46:17

duly   4:6,11

E

e-mail   39:25

earlier
29:14
48:21  50:6
53:10
56:10
61:23
68:10

ease   36:16
65:22

easier   6:19

easily   90:25

Edgar   15:7,

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                     Index: Edgardo..feel

8,15

Edgardo
  13:20

education
  12:13,18
  13:4

effect   8:22

El   9:21
  12:3,16
  13:18
  14:13,16

emotionally
  65:24

employed
  16:13

employee
  36:22
  93:16,23
  94:8,13,17

employees
  85:17
  94:18

employer
  16:2

English   4:7,
  8  7:24
  8:3,5,7
  59:22  60:4

entering
  76:10

Escape   79:2

events   48:23

eventually

35:4

everyone's
  26:25

evidence
  25:18
  26:3,7,8,
  20  27:17
  43:9  76:13

exact   27:9
  52:13

exam   48:15,
  17

EXAMINATION
  5:10  80:17

examined
  4:11

examples
  62:24

exams   52:1

excuse   10:3
  11:1  77:2
  89:23

exhibit   26:4
  27:14,19,
  22,25
  37:10,11
  40:18,22
  59:2,3
  73:9
  76:19,20,
  23  77:11

experienced
  69:5

experiencing
  70:10

expert   39:12

explain
  61:18

explained
  44:21
  67:22

explanation
  67:4,8

extent   9:2

eye   48:12,
  15,17

eyes   92:13

———————————

——————————
          F
——————————

Facebook
  85:22
  86:1,4

fact   39:16
  43:9
  76:13,14,
  16

factual
  24:18,21
  26:6,19

factually
  24:19  25:2

fall   30:2
  31:4,12
  33:6,15
  46:4  47:6
  48:10

50:7,12
51:12  64:2
65:12
81:13,18
82:7  83:19
84:18
85:9,16
88:22
89:1,9,15,
16  92:3,10
94:1

falling
  43:16
  80:20  81:5

falls   48:22

falsely   24:5

familiar
  73:15

farmers
  47:25

farsighted
  48:4

faster   7:8

fault   78:9

favor   38:25

February
  63:18

Federal   4:22

feel   27:12
  39:17
  45:11
  56:21
  65:21

fell 30:21,
  24 31:21,
  23,24
  33:9,20
  34:1,18
  35:23
  36:1,9,18
  37:1 38:19
  43:15
  44:3,4,19
  45:10
  50:14
  56:21
  82:13
  83:13 85:1
  89:20
  90:16
  91:18
  92:20
  94:19

felt 69:9
  70:15,24

figure 23:14
  61:2 78:3

filed 13:11

fill 52:18

filled 8:17
  53:7,11

fine 4:16
  7:18 24:13
  26:22
  38:23
  45:22
  51:12
  67:19

finish 6:13

fix 79:17

flip 37:17

floor 32:12,
  18 34:11,
  12 35:5
  39:4,6
  83:4,8,17
  84:2,5,14
  85:14
  89:6,9,10
  92:7,10
  93:4,14
  94:19

focused
  74:16
  84:12,14

follow-up
  88:17 93:7

foot 64:18

footage
  39:23
  40:18

footprints
  35:1

Ford 79:2

forget 7:1
  8:13

form 4:24
  12:21 24:7
  81:6,20
  86:24
  89:11,22
  90:9

92:12,21
  93:18

free 39:17

Friday
  61:14,16
  64:25
  68:7,12,23

front 32:11,
  16 42:3
  72:1 88:22

full 9:6

fully 6:13
  9:2

─────────

G

─────────

gave 47:1
  52:3,4,16,
  19,20
  53:7,13
  64:19 67:9

Genesis
  10:25 11:3

gentleman
  36:11

Georgia
  11:17,21
  15:13,14
  19:21,23
  25:11
  26:18
  29:22

Gerson 10:6
  14:23 18:5
  46:8

girl 77:20

give 58:24
  64:17
  74:14

giving 6:23
  59:12 67:5
  68:9

glad 68:20

glasses 20:3
  48:2,5,7,
  8,9

good 7:3
  45:23,24
  61:19 65:2
  75:15
  94:23

grandchildren
  10:3,18

green 42:15,
  17

ground 6:7
  83:6

group 42:3,5

groups 17:11

guess 64:8
  85:7 87:7

guesses
  28:17

guessing
  12:15

guys 94:24

Gwinnett
  77:12

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023          Index: half..information

```
        H

half   16:7
  30:25
  31:14
  45:21
  71:20
hands   33:9
happened
  16:23 21:8
  28:10
  29:8,11
  31:11
  36:10
  49:14 65:5
  71:23 72:5
  78:12,16
happy   7:11
head   6:24
  36:7
health   47:14
  88:2,4
hear   63:22
heard   55:1,
  10
helped   47:6
Hernandez
  10:25
high   12:15
  13:1,3
  47:16
highest
  12:12
```

```
history
  47:14
hit   21:9
  22:25
  35:24
  36:1,7
  77:19,20
  78:21
hitting
  78:22
holder   18:2
hole   69:14
home   10:12
  11:9 29:17
  46:17,22
honest   35:10
  38:16
  39:19
hope   25:19
hospital
  37:8 46:9,
  11,13,15,
  17,19
  51:19,21,
  23 52:17
  53:12,25
  55:7 56:7
  69:17
  72:17
hour   30:25
  31:14
  41:24
  45:21
hours   8:10
```

```
  31:3 46:14
house   46:19
  87:21
hundred
  39:17
hurt   44:16,
  19 50:16
  55:16,23
  63:16
hurting
  50:23 56:2
  64:23 67:8
  71:3
husband
  14:15

        I

identification
  28:1 37:12
  40:23 59:4
  76:24
imagine
  32:22
imaging   63:1
  73:12
immediately
  33:5 45:11
  88:21,22
impact   78:21
implied
  23:23
important
  6:11
```

```
incident
  11:12
  16:12
  20:16 21:7
  22:4 29:8,
  23 30:9
  37:25
  40:19
  47:13
  48:25
  51:16
  59:13
  69:22
  71:10,13
  76:1 80:7
  83:3 85:18
  86:19,22
  87:8 88:9
  90:6,8,15
incidents
  71:12
included
  60:8
incorrect
  25:3
indicating
  34:3,6
  36:2 52:23
  69:12,13
indiscernible
  23:19
  27:20 39:6
  59:10 60:3
  70:2,4
information
  22:20 25:3
```

40:10
69:16
79:15

injection
52:20,21
53:3 57:3,
5

injections
58:19
67:15 71:5

injured
21:12,14
72:9 79:3
80:20
89:20 90:1

injuries
21:20 22:1
48:22 50:7
51:4,6,13
69:17,21
81:4 86:25
87:8

injuring
74:8

injury
28:15,16
49:24 50:2
71:12 75:4
79:6

innocently
92:20

inside   53:2

insignificant
79:5

Instacart
17:8

Instagram
85:22 86:7

instructing
19:1

instructions
53:25

insurance
79:22,23,
25 88:2,4

insurer   88:6

intensely
69:10

interpreter
4:6,16 5:9
6:10,13,17
9:16 11:1
14:2
22:15,18,
22 32:14,
19 40:24
41:2,6,9
60:13,17,
20 64:6
68:15
74:20
81:25 85:3

interpreting
4:14 5:8

interrogatorie
s   59:16
73:8

interrogatory
59:1 60:6,

23

involved
17:10
22:25
25:7,11
71:11
76:1,3,18
77:18

issue   79:17

IV   53:5

———————————

J

J-E-R-S-O-N
10:7

jar   88:23

JARTU   4:5

Jimmy   8:18
72:6 76:7

job   15:23
56:11,12
87:7,12

jog   25:15

Julio   13:20

July   9:15
57:24

June   65:5,8
66:18 69:4

———————————

K

Katherine
5:13

keeping   87:1

kind   5:20
16:18
33:11 52:1
56:24
62:14
72:13 79:1

knee   36:1,
2,5 44:22,
23 49:11,
12,14,21,
24 50:2,9,
13,15 51:5
52:9
55:15,19
57:13
62:11,13,
18,22
63:11
65:4,10,14
66:5,6,10,
18 67:3,7,
11,16,20,
21,25
69:3,5
70:7
74:19,21,
23 80:19

knew   23:24
43:10

knowledge
9:3

———————————

L

ladies   31:17
32:1,7,20,
25 33:4

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023

36:24 42:5

lady 35:15,
17 36:19,
21 39:24
42:18

landed 33:25
34:2

lane 9:23
71:25 72:3

language
7:22

languages
8:1

larger 69:10

law 26:16
91:4

Lawrenceville
48:19

lawsuit 29:3
88:11

lawsuits
29:5 80:10

lawyer
18:12,18

leadership
17:18

leading
81:21
90:10,19,
20,23

lecture
27:10

left 31:19
38:7 42:7
77:20,21

left-hand
78:23

leg 34:2,5,
7,8,25
35:22 36:3
44:21,23
50:9,21
51:11,13

legs 7:18

level 12:12
55:12

license
19:19,21,
24 20:1,5,
8 26:16

licensed
26:17

lie 46:24

light 78:17

liquid 88:23

liquids
89:1,10
93:13

list 59:17

listed 60:8
73:11
77:14

live 10:1,2
11:13,17
14:15

15:4,10

lived 9:24
11:19

lives 15:5,
11

long 5:24
9:24 14:13
16:6 19:23
21:1 30:23
33:14 44:4
46:12 57:8
64:11
65:14,23
75:1 85:13
87:4

longer 67:20

looked 38:2,
9 53:1
54:13

lost 86:21,
25

lot 31:12
34:13,14
54:1 55:16
76:12
87:3,5
91:22

low 56:2,4
57:13
70:25 71:7

lower 45:1,2
50:9,13,19
51:9 74:17

M

Macy's 10:17
15:16

made 28:16
40:25 47:2
76:12

make 6:7,
19,22 7:3,
6 14:3
21:25 26:3
27:18,21
28:17
38:11,16
40:17
46:10,20
50:7 58:25
72:15 75:4
76:20 79:6
85:7

makes 10:13
65:24
68:20

making 28:14
93:12

man 35:7

manager 35:6
36:11,13
47:5 94:18

mark 37:9

marked 27:25
37:11,24
40:22 59:3
76:23

market   47:25

marriage
  14:12

married
  13:13,15
  14:7,13

Massachusetts
  11:20
  20:12
  21:11,23
  23:2,16
  25:8
  49:18,19

matter
  24:18,21
  26:6,20

media  85:20
  86:16,19

medical
  45:5,19
  72:20
  87:19

medication
  62:25

medicine
  8:10,20
  31:4,6
  52:4,15
  63:4 68:9

medicines
  8:12

meeting
  18:17,23

member  17:13

memory  25:15
  28:13

mentioned
  42:12
  53:10
  61:23

met  18:21,
  22

metal  16:19
  17:1,5

metro  15:19

Mexico  15:5

military
  13:7

mine  79:24
  94:10

minute  41:4

minutes
  41:12 44:7
  46:3,5
  80:13
  84:18

misstated
  24:10

mistake
  40:25

moment  47:19
  66:1

money  79:18

Montes  10:6
  15:1,7
  86:2,3

month  30:7

months  58:13
  64:13
  65:16
  71:19,20

morning  8:21
  29:14
  72:25
  73:11,15

motor  20:20
  74:8

mouth  7:7

move  11:15,
  21 36:15

MRA  61:19

MRI  54:12
  61:19 65:2
  73:11

myriad  90:7

———————————

——————————
        N
——————————

nails  10:12

names  10:5
  14:25

Naproxen
  8:14

nearsighted
  48:3

necessitated
  49:15

neck  74:12,
  13,15

needed  31:15
  45:4 52:13
  61:17 64:1
  65:2,10

needles  74:6

night  70:9

ninth  12:14

nodding  6:23

Norcross
  9:23

normal
  89:16,19

Northside
  51:22,23
  52:2 69:17
  70:1,2

noted  24:13

notes  80:13

notice  4:19
  35:3,6

November
  57:17,22
  71:16 74:8
  75:2 76:1,
  21 80:8

number  12:5
  17:23 18:6

——————————
        O
——————————

object
  18:19,20
  23:9 24:7
  25:16

26:18
27:3,4,11
40:9 42:16
57:18,25
58:5 81:6,
20 83:10
84:6
89:11,22
90:9 91:2
92:12,21
93:18

objection
12:21
18:25 43:6
82:8 90:3,
17 91:9,10
94:14

objection's
24:13

objections
4:24 24:2
26:24 27:6

occurred
25:13

October
60:11,14,
16 61:4,5

offerings
76:15

office   47:24

officer
78:11
79:16

oil   31:21
34:10,13,

17,22,24
35:1,5,11
38:9,15
39:2,4,6,
9,12,14,16
43:3,7,10
83:16,20
84:1 94:2

oily   38:7

ongoing
47:15
60:25
75:14

open   77:6
79:13

operation
61:18

opinion   91:1

oral   44:11

original
94:12

Ortho   54:15,
17 61:25
62:3,10,15
63:1,10,22
66:19,22
67:2 68:6,
18,22
69:18
81:15
82:5,12

Orthopedics
81:16,17

over-the-
counter   31:6

overhear
41:19

---

**P**

---

p.m.   4:2
41:13 95:5

paid   87:11,
24

pain   8:24
45:11
46:25
50:15 51:2
52:4,15,20
55:12,15,
19,21 56:4
57:5
63:11,14
66:6,11
67:3,25
68:9 69:4
70:7,10,
14,17,20
71:7
74:12,15,
17,19,21,
23

painting
16:5

pandemic
16:23

paper   52:4

papers   53:14

Park   9:23

parked   31:11

parking
31:12

part   80:24

parties   19:6

parts   35:25
52:8

party   80:9

pass   72:2

past   8:10
73:10

pay   87:13

Peachtree
54:6,18,21
55:1,10,13
56:8,24
57:9
58:12,19,
22 60:9,17
61:7,13
66:25
68:11,13,
14,17
69:18
81:16,17
82:4,5,11

people   27:8
35:2 43:22
68:17

percent
39:17

perfectly

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023     Index: period..proceeding

28:18

period  58:13
65:23 87:4

permit  12:1

person  35:20
36:14 47:5
65:22 72:1
78:18 79:9

personal
28:14,15,
16

phone  17:23
38:6

photo  38:5,
13,14

photograph
37:6

photographs
37:3,23,25

photos  19:11
37:9,17
39:1

physical
49:1 62:25
63:4 67:15

physician
55:7

physicians
54:7,15
56:8 60:9,
18

pick  33:23
36:16

39:1,14
84:13

picked  36:11
46:2

picture
38:13,15

pictures
34:21
37:20
39:2,10,14

piece  31:15
43:8 52:4

piping  16:20
17:1,5

place  17:5
21:22 54:2
56:17,20
68:14

Plaintiff's
59:1

plans  29:18

play  41:16

played  41:20
42:25

plenty  27:7

point  7:16
34:10

pointing
53:1

police  72:7
76:10,20,
25 77:3,
12,13,24,

25 78:2,11
79:16

position
35:9 87:6

positions
17:19

post-secondary
12:18,22,
25

posted  86:18

practice
89:17,19,
25

preface
18:11

prefer  43:11

prepare
18:10,14

prescription
8:9,19
31:4
52:17,19
53:6

prescriptions
8:16

present  9:22
11:8

pressure
47:16

prevented
32:12

preventing
32:17

previous
14:12,15
92:6

previously
14:18

primary
47:18,22
55:6

prior  6:6
16:8 20:19
28:15 29:3
31:3 33:15
35:2 48:25
50:2 51:4,
6,13 81:12
82:12
83:19
84:18 85:9
90:6,13,14

privilege
18:20

privileged
18:22,23

problem
26:11
52:13
67:22
94:10

problems
81:13

Procedure
4:22

proceeding
5:20

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023          Index: proceedings..recover

proceedings
  4:7

produce   77:7

produced
  40:4 77:5

producing
  48:22

Progressive
  80:3

pronounce
  14:23

proper   4:19

property
  79:10,19

provide   44:8

provided
  40:14
  52:16
  59:18 63:6
  69:16

provider
  17:25
  73:25
  79:25

providers
  66:12
  69:21
  73:14

providing
  40:10

Publix   91:15

puddle   34:15

purposes
  4:20,21

pursuant
  4:19

put   26:7,20
  52:22,24
  53:3 58:8
  64:14 74:5
  91:8,10
  92:10

_____

Q

question
  4:25 6:12
  7:5,8,14,
  19 12:21
  13:2 22:16
  24:8 28:6
  39:18 40:6
  42:8 59:8,
  23,24 60:1
  64:9 81:8,
  21,23 82:1
  83:11,15
  85:4,8
  90:22,23
  91:11,25
  93:7 94:4,
  9,12

questions
  9:2 44:13
  58:4 59:17
  80:15
  82:16
  88:18
  90:11

92:24
94:21

_____

R

radiologist
  70:2

rank   70:17

rate   50:15
  63:11
  87:13

read   8:5
  25:17
  60:4,11
  94:24 95:1

reading
  26:6,19
  27:15

ready   5:7
  82:19

realized
  78:10

reason   9:1
  83:22 84:4

recall   14:13
  22:6 23:18
  25:10
  35:24 43:5
  45:15
  49:20
  52:8,10
  58:12,21
  62:2,24
  65:9 69:20
  71:6 72:22

73:5,13
74:7 75:1
76:3 77:16
79:21
83:9,16
84:21

received
  39:25
  40:13 57:2
  58:22 63:3
  79:15,18

receiving
  57:12
  72:21

recess   66:2

recognize
  78:6

recollection
  58:15

recommended
  68:18

record   12:7,
  9,10 27:24
  37:23 58:9
  77:12 91:8

recording
  41:20
  42:25

records
  54:5,20
  57:16,23
  58:8 63:5
  77:6

recover

64:11

recovery
64:5,6
65:14,17
69:5

REEXAMINATION
82:25
88:19
92:25 93:8

refrigeration
42:4

Rehab 73:18,
21

related 5:22
57:12
81:3,18
82:6

relationship
14:9

relatives
15:18

release
22:12,19,
20,21
23:14,22
24:24
28:20

relief
70:15,22

remember
5:24 8:15
15:11
16:17
20:21

21:17
22:2,8,9
25:12
28:17,18,
24,25
29:6,10,13
30:8,13
33:11,16,
22,23,25
34:2,5,6
35:21
36:13
43:17,24,
25 47:23,
24 48:18
49:5,16,22
52:22
53:11,12,
15,17,20,
23 54:2,4,
25 55:3,
11,12
56:9,24
57:1
58:14,20,
23 59:12,
19 61:5
62:4,7
63:24
65:11,13
69:20
72:4,24
73:2,4,7,
24 74:5,6,
11 75:3,
12,13,22,
24 77:17,
19,22 79:1

80:1,2
84:24 86:5
87:15,17
88:3

remembering
71:15

remembers
76:11

Renee 25:19

repaired
79:8,20

repeat 7:10
81:25 85:3

rephrase
7:10 83:15
90:13
91:25

replacement
65:5

report 40:1,
3 76:10
77:1,4,12
78:2 80:3

reporter
6:20
82:20,23
95:1,4

reports
40:13

represent
38:1 41:17

request 77:7
86:24

requests
12:8

required
25:23,24

reserve 4:24

reserved
24:2

resolved
75:15

responding
40:12

response
60:6

responses
6:23 19:16
59:1,2,13,
15

responsible
93:12

responsiveness
4:25

rest 46:23
54:1

restrictions
20:1

restroom
7:17

result 80:20

results 65:1

return 37:5
57:23

returned

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                    Index: review..slipped

54:18

review  19:9
59:5 60:2

revoked  20:6

Road  25:13
28:21 76:7

Rolling
92:13

Roswell
25:13
28:21

rude  7:2

rules  4:22
6:7 26:7

——————————

         S

——————————

S-O-L-I-T-O
9:11

Salvador
9:21 12:3,
16 13:18
14:13,16

Sam's  5:13
28:10
29:8,22
50:12
80:21
81:4,12,18
82:7,13
85:17
89:2,13
90:2,7,16
92:2,11
93:10,13,

16,23
94:8,13

Sandy  25:14

scale  50:15,
23 51:2
55:18,22
56:4
63:11,15
70:7,17
71:1

scene  45:16

scheduled
61:20

school  12:15
13:1,3
26:16

screen  42:10

seconds
40:21
41:14,24
42:1 43:16

section  85:2

security
12:4

send  39:25
40:1

sense  68:20

separate
70:3

September
76:4,22

served  13:7

service
17:25

settle  75:20

settlement
22:21
75:22

sewing  30:14
56:12,13,
17,20
87:6,7,12

shaking  6:24

shinier
38:12

shirt  42:18

shoes  33:11,
15

shoppers
42:3

shopping
29:25
30:10,17
31:18
43:4,23

shoulder
72:14,16
74:4,9

show  25:24
38:18
52:12
54:14,20
57:23
59:16 63:6

showed  52:11

shows  92:15

sic  17:17

side  27:8
31:16,17,
19 32:8
78:21,23

sign  21:9
23:1,6,21
31:22
83:24
94:25 95:1

signature
5:4

significant
13:24 14:1
88:11

single  25:24

Singleton
76:7

sit  27:9
70:6,16

sitting
65:22

six-year-old
10:23

slid  36:3

slip  48:22
81:12 82:6
89:9 92:10
94:1

slipped
33:3,24
43:18,19

82:13 89:1
90:1,16
91:18

small   16:1
62:17
69:13

sneakers
33:13

social   12:4
85:20
86:16,19

Solito   4:1,
10,18 5:12
9:7 77:14
80:19
88:21

Solozano
13:21
14:10

someone's
38:6

son   10:14
18:5 37:7
44:6 45:8,
9 46:2,7,
15 51:18

sons   10:2,5

sort   13:5
40:10
62:24

sought   79:16

sound   54:8,
23 63:8,20
65:7 72:25

73:15 80:4

sounds   45:7
51:1 54:19
79:10

source   93:3

Spanish   4:7,
8 7:22 8:1
36:18,20,
21 47:10

speak   7:24
30:20
36:18
85:17

speaking
24:2 26:24
27:6 47:10

specialist
52:5
53:14,22

Specialists
73:12

specific
59:8,23,24
62:5

specifically
23:24
24:23
60:21,24
63:2 73:25
91:23 92:1

speculation
81:24

spell   9:5,9
86:3,9

spill   33:1
44:1

spilled
31:21
32:22

spine   44:22,
25 54:6,
15,18,21
55:2,10,13
56:8,24
57:3,9
58:12,19,
22 60:9,18
61:7,13,25
62:3,10,15
63:1,11,23
66:19,22,
25 67:3
68:6,11,
13,14,17,
18,23
69:18 71:5
73:3,11,
17,20
81:15
82:5,6,12

spoke   36:19,
21 48:21

spoken   14:22

Sport   54:15,
18 56:24
57:9
58:19,22
60:18
61:7,13,25
62:3,10,15

63:1,11,23
66:19,22
67:3 68:6,
18,23
69:18
81:15
82:5,6,11,
12

sporting
48:23

Sports   54:6
55:2,10
58:13 60:9

spread
34:15,16

Springs
25:14

standing
32:20,21
35:9 65:22
87:4

start   4:14
30:11,12
56:11,14,
20 57:19
87:14

started
30:15
55:13,19
62:2 63:7,
10,13

starting
56:7

state   9:5
20:9,11

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023                    Index: stated..Taylor

24:17 25:2
26:4,5,17
37:22
39:16
69:25

**stated**  24:21
60:24

**statement**
44:8,11,12
47:1

**statements**
47:3

**states**
11:15,19,
25 78:3

**stay**  44:5
46:12,15
55:7

**stick**  18:24

**stipulate**
70:3

**stipulating**
39:3

**stipulations**
4:15

**stood**  35:4

**stop**  9:1
21:9 23:1,
6 26:21,
22,24,25
41:23
61:10
90:10
93:22 94:5

**stops**  46:10,
20

**store**  28:10
29:15
30:3,20,23
31:1,13
37:5,9,24
40:13
44:5,9,15
45:4 46:3
47:2 78:20
84:18,22
92:9 94:17

**stores**  91:16

**straight**
46:9,11

**straighten**
34:7

**stretch**  7:17

**substance**
35:9 38:8
43:17 83:4
84:5 85:13
93:4

**sue**  92:10

**supplement**
60:22

**supposed**
37:18

**surgeries**
50:4 62:9,
23 67:15

**surgery**
49:6,8,10,

15,18,20,
23 50:1
54:12,15,
17 61:20,
24 62:12,
17,21
63:18,25
64:1,5,12,
21 65:3,5,
10,15,20
66:5,10,
16,17
67:14
69:3,6,9,
10,11
70:13,23
81:2,3

**surgical**
63:3

**surveillance**
39:23

**suspected**
78:8

**suspend**
26:11

**suspended**
20:5

**sustained**
87:1

**swollen**
64:23

**sworn**  4:6,11

**syringe**  53:4

**T**

**table**  7:19
27:9 31:17

**talk**  6:11
11:12
16:12 18:9
19:6 20:15
29:7 36:25
47:13
51:15
63:17 65:4

**talked**  6:4
14:18
18:21
35:22 51:4
67:13 71:4
88:9

**talking**
22:23
23:13 27:2
29:4 31:18
32:6 52:25
63:2 66:4,
24 68:10

**tapping**
72:14

**Taylor**  5:2,5
12:20 14:5
18:19,24
19:3 23:3,
9,15,19
24:4,7,10,
14,17,22
25:2,16,
21,25

ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.
Argelia Solito on 12/11/2023          Index: telling..translator

26:2,14
27:1,7,14,
20 28:2,20
38:20
39:3,11,15
40:6,9
41:10
42:16 43:6
45:22
57:18,25
58:7 59:7,
23 60:21
69:25
73:17,20
76:9,12,
17,25 77:3
80:18
81:7,22
82:2,3,10,
15 83:10
84:6 86:3
88:17,20
89:12,24
90:5,12,
18,20,22
91:1,5,10,
14 92:13,
17,23
93:7,9,20,
22,25
94:4,11,
16,21
95:2,3

telling
40:14
65:11,13
68:1

ten  94:5

terms  84:1

test  52:13

testified
4:12

testify
25:25
43:11

testifying
43:7 58:1
76:9

testimony
61:3

therapies
58:21

therapist
49:1

therapy
62:25 63:4
67:16

thing  6:22
15:16,25
27:9 68:2,
4 74:7
78:17

things  16:1
28:12
35:19
42:13
43:12

thinks  40:24

time  5:1,25
7:1 11:11

15:23
16:11
20:20
26:25
29:10 30:1
31:11
41:10,23,
25 42:23
48:9,14
54:21
61:10,13
62:6 64:5,
7,14 65:23
68:5,7
83:5 85:2
87:4
91:23,24
92:2,6
93:10,16
94:7,13

times  7:7
29:21
57:19 84:8
90:7
91:20,22
92:6 93:25
94:1,5,7

timestamp
41:7

timestamped
40:20

timestamps
42:23

today  6:11
7:7,16 9:2
11:12 29:4

48:2 70:6,
16 81:10
88:9

today's
18:10

told  35:18
45:9 52:10
53:15
54:11
64:20 65:9
67:2,7
78:11

TOLES  4:5

total  87:18

Totally  69:7

touch  71:9

touched
34:18

Tramadol
8:13

transcript
7:3

translate
4:7 6:17

translating
6:13

translation
40:8

translation-
wise  78:4

translator
6:20

treat   82:11

treated   49:1
  51:23
  54:3,6
  55:4 57:9,
  16 58:3,16
  68:5 69:16

treating
  54:10,21
  55:13,19
  57:20 61:7
  62:3 68:22
  69:21

treatment
  21:22
  45:19
  47:13
  48:25
  51:15
  56:23
  57:11,23
  60:7,8,25
  61:10
  62:14 63:7
  72:20,21,
  23 73:13
  74:1 75:1
  81:15 82:4

treatments
  52:1 56:25
  62:9 63:2
  67:11 71:6
  74:14

true   81:19
  90:14
  91:23

truth   38:24

Tucker   29:22

turn   31:20
  71:25

Twenty-eight
  10:15

type   53:18

_____

U

Uber   17:8

Uh-huh   50:20
  51:17

understand
  7:6 8:3
  13:2 28:9
  67:12
  86:23

understanding
  67:24

understood
  7:14

unit   42:4
  77:13 78:5

United
  11:15,25

_____

V

_____

vacation
  11:9

valid   19:18

vehicle
  20:20 74:8

verbal   6:23
  44:13 47:1

verify   27:15

versus   92:6

video   40:2,
  13,18,20
  41:7,11,
  13,20,24
  42:25 43:3
  92:15

videos   19:13

visible   35:9

volunteering
  17:21

_____

W

_____

wages   86:21,
  25

wait   6:12

waited   44:6

waiting   6:16
  40:7 61:21

waive   5:5
  95:3,4

walk   32:7
  54:1 89:8

walked   31:20
  32:9,13,22
  33:3

walking
  31:20
  33:22 35:2

64:17
65:23
81:10,13
87:5
92:16,19

Walmart   8:18
  53:9 89:13
  91:15,17,
  18,21

wanted   29:1
  53:18 72:2
  78:19

waste   26:25

watch   40:19,
  21 42:22

wearing
  33:12
  48:1,9

week   29:24
  30:6 91:22

weeks   16:15,
  22 29:24
  62:16,19,
  20,21

weight   64:15
  67:5

wheelchair
  36:12

white   42:4

Williams
  72:6

Winter   9:23

witnesses

**ARGELIA SOLITO vs SAM'S EAST, INC., ET AL.**
**Argelia Solito on 12/11/2023**                    Index: woman..years

```
19:7                          44:11
woman  42:13,                 59:22
  14 47:9              wrong  14:23
women  35:14                  41:18
                              60:11
words  31:11
work  10:11,          ─────────────
  16 11:3                     X
  12:1 13:5           ─────────────
  15:15               x-ray  52:12
  16:6,9,18
  17:2,4              x-rayed  52:8
  30:15               x-rays  52:3,
  56:14,16,             7,11
  22 87:1,3,
  10 93:10            ─────────────
worked  16:7,                 Y
  14,21 17:1          ─────────────
  87:3                year  15:24
working                 16:7 48:16
  15:21,24              62:6 63:19
  16:8,10,              65:6 66:18
  14,16 17:5            69:4 71:17
  30:11,12
  56:20              years  9:25
works  7:7             13:19
  10:12,17             14:14
  11:7                 19:25
  26:10,13             49:17
  31:1                 73:10
worn  33:17
wreck  76:18
  80:23
write  8:7
written
```

**Hung (Alex) Q. Nguyen**
*Attorney at Law*
**Brett A. Miller**
*"Of Counsel"*
**Bryan A. Brooks**
*"Of Counsel"*



**LAW OFFICE**
OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

Office: 770-409-1529
Fax: 770-409-1526
5495 Jimmy Carter Blvd.,
Suite B-4
Norcross, GA 30093
www.hqnlawfirm.com

August 2, 2016

**VIA FACSIMILE ONLY (678) 380-0661**
Mr. Ricado Brown
Progressive Mountain Insurance Company
4250 Interantional Blvd
Norcross, A 30093

|     |                |                  |
| --- | -------------- | ---------------- |
| RE: | **Claim No.:** | **15-3550130**   |
|     | **Insured:**   | **Vanessa Salas**|
|     | **Date of Loss:** | **October 19, 2015** |
|     | **Our Client:**| **Argelia Solito** |

Dear Mr. Brown:

I hope this facsimile finds you doing well.

I am writing on behalf of my client to accept your offer of $6,600.00 for <u>Argelia Solito</u> to settle her claim. My client acknowledges that your offer is inclusive of all economic damages, known and unknown, and any and all liens, assignments or statutory rights of recovery.

The firm tax identification number is 27-1404761. Please send the appropriate payments and releases to our office.

Thank you for your cooperation and kindness in this matter.

Sincerely,
LAW OFFICE OF HUNG Q. NGUYEN &
ASSOCIATES, LLC.

Brett A. Miller, Esq.
Attorney for Argelia Solito

BAM/rc



**DEFENDANT'S EXHIBIT**

Hung (Alex) Q. Nguyen
*Attorney at Law*
Brett A. Miller
*"Of Counsel"*
Bryan A. Brooks
*"Of Counsel"*


**LAW OFFICE**
OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

Office: 770-409-1529
Fax: 770-409-1526
5495 Jimmy Carter Blvd.
Suite B-4
Norcross, GA 30093
www.hqnlawfirm.com

September 28, 2016

Via US Mail

Ms. Betty DeAngelo
Progressive Mountain Insurance
4250 International Blvd.
Norcross, GA 30093

|      | **Re:** | **Client's Name:** | **Argelia Solito** |
| --- | --- | --- | --- |
|      |      | **Claim Number:** | **15-3550130** |
|      |      | **Loss Date:** | **October 19, 2015** |
|      |      | **Insured's Name:** | **Vanessa Salas** |

Dear Ms. DeAngelo:

Enclosed, please find the executed "Release and Trust Pursuant to Uninsured Motorist Insurance Protection Coverage" for the above referenced client.

Should you have any further questions or concerns regarding these documents and/or this matter, please feel free to contact our office and ask for Rosie.

Thank you for you for your cooperation in settling this matter.

Sincerely,
LAW OFFICE OF HUNG Q. NGUYEN
& ASSOCIATES, LLC

Rosie Clará, Legal Assistant

/rc
Enclosures

## RELEASE AND TRUST AGREEMENT PURSUANT TO
## UNINSURED MOTORIST INSURANCE PROTECTION COVERAGE

Claim No: 15 3550130
Policy No: 47740754
Insurance Company: Progresive Mountain Ins Co

NOW COMES Argelia Solito (hereinafter referred to as the "Undersigneds"), being of lawful age, for the sole consideration of six thousand six hundred dollars ($6,600.00), United states funds, in hand paid, the receipt and sufficiency of which is hereby acknowledged, do hereby remise and forever release, acquit and forever discharge Progressive Mountain Insurance Company and its parent corporations, subsidiary corporations and other associated Progressive underwriting companies (hereinafter referred to as "Releasees"), of and from any and all actions, causes of action, claims or demands for damages, costs, loss of services, expenses, compensation, insurance benefits, uninsured motorist insurance benefits, underinsured motorist insurance benefits, statutory penalties, attorney's fees, consequential damages, or any other thing whatsoever on account of, or in any way growing out of, any and all known and unknown personal injuries and death resulting, and to result, from a certain accident which happened on or about 10/19/15 at Roswell Rd Sandy Springs GA ("Subject Accident") for which the Undersigneds have claimed the said Releasees to be legally liable.

The Undersigneds agree, understand and acknowledge that in consideration of the above-referenced sum that the Undersigneds forever release and discharge any and all claims whatsoever under the provisions of the Georgia Uninsured Motorist Act, as amended, including any and all past, present, or future claims under any policy of motor vehicle insurance issued by Releasees and including any and all claims under O.C.G.A. § 33-7-11, as amended, for personal injury, pain and suffering, wage loss, loss of income, medical bills, medical expenses, hospital expenses, drug expenses, loss of services, loss of consortium, and any other expense, benefit, or kind of claim whatsoever under any policy of motor vehicle insurance issued by Releasees for any and all known and unknown personal injuries and death and property damage resulting or to result from the Subject Accident.

The Undersigneds agree, understand and acknowledge that the above-specified sum is paid to the Undersigneds in consideration for this Release and Trust Agreement, which includes an agreement for the total and complete discharge of Releasees for any and all damages incurred by the Undersigneds, in connection with, arising out of, or that will arise or result from the Subject Accident.

The Undersigneds agree, understand, acknowledge and assume all risk, chance or hazard that the said injuries or damages may be or become permanent, progressive, greater, or more extensive than is now known, anticipated, or expected. No promise or inducement which is not herein expressed has been made to Undersigneds, and, in executing this Release and Trust Agreement, the Undersigneds do not rely upon any statement or representation made by or on behalf of any person, firm or corporation hereby released, or any agent, physician, doctor, or any other person representing them or any of them, concerning the nature, extent, or duration of said damages or losses or the legal liability therefor.

The Undersigneds agree, understand and acknowledge, in accordance with the terms, provisions, and conditions of Releasees' Policy No.: 47740754 to take, through representatives designated by Releasees and at the sole expense of Releasees, such action as may be necessary or appropriate to recover from Unknown driver, or any other responsible party (hereinafter collectively referred to as "Tortfeasors"), the damages resulting from Undersigneds involvement in said accident. The Undersigneds further agree to hold in trust any monies

1

received as a result of any settlement with or judgment against Tortfeasors with said monies to be paid to Releasees immediately upon same coming into the Undersigneds hands.  Further in the event any payment obtained by Releasees exceeds the amount of UM/UIM benefits set forth as consideration for this agreement, such excess shall be remitted directly to the Undersigneds.

The Undersigneds understand, acknowledge and agree to execute, procure and deliver to Releasees any and all papers, instruments and materials that may be deemed necessary or appropriate to institute, prosecute, settle, or compromise any action or claim and to carry out the provisions and intent of said coverage under the aforesaid policy of insurance issued by Releasees.  In this regards, the Undersigneds further understand, acknowledge and agree that no settlement of such claim, demand or cause of action against the owner or operator or organization responsible for the operation of the aforesaid motor vehicle involved in the aforesaid accident or occurrence has been made by Undersigneds or on the Undersigneds behalf.

The Undersigneds further understand, acknowledge and agree to hereby appoint the managers and/or agents of Releasees as their attorneys in fact with irrevocable power to prosecute and collect any such claim or claims against Tortfeasors to begin, prosecute, compromise, or withdraw such efforts to collect any such claim or claims in the Undersigneds names.

The Undersigneds understand, acknowledge and agree to procure, execute, and furnish all papers, documents and materials necessary in any proceedings prosecuted by Releasees against Tortfeasors.  In this regard, Undersigneds further understand, acknowledge and agree that as a specific term of this agreement and in exchange for the consideration set forth above, that they will cooperate, participate and assist Releasees in the prosecution of any and all claims Releasees may pursue against Tortfeasors.   This cooperation, participation and assistance includes, but is not limited to the following:

1.  Furnish all papers, documents, materials and items (including electronic, video, audio, paper or otherwise) necessary to support such an action against the Tortfeasors;
2.  Participate in discovery by assisting counsel hired by Releasees in the formulation of written discovery requests to Tortfeasors and responding to written discovery requests from Tortfeasors, including the execution of any verification forms, certification forms or affidavits as deemed necessary by Releasees and counsel representing Releasees;
3.  Attend and provide testimony at any depositions necessary to support such an action against Tortfeasors; and
4.  Attend, participate in and provide testimony during any trial, arbitration, or other court hearing against Tortfeasors.

The Undersigneds agree, understand, acknowledge and covenant never to sue, arrest, attach, garnish or prosecute any claim against Releasees for any claim Undersigneds have or may have arising under the aforesaid policy of insurance or under any statute or laws of the State of Georgia, arising out of, to arise out of, resulting from, or to result from the Subject Accident nor shall Undersigneds indirectly or otherwise aid any other person or persons to do what the Undersigneds have agreed and covenanted not to do.

The Undersigneds acknowledge, represent and agree to pay and resolve any liens, judgments or claims for payment associated with medical treatment, services and/or equipment provided to the Undersigneds by third parties for injuries suffered by the Undersigneds and resulting from the Subject Accident.

2

The Undersigneds further acknowledge, represent and agree to protect, defend, indemnify and hold harmless Releasees against any and all claims of damages, demands, rights, actions, causes of action or suits of any kind or nature whatsoever for the costs of medical treatment, services and/or treatment received by the Undersigned as a result of injuries from the Subject Accident.  This specifically includes, but is not limited to, liens, judgments, or claims for payment from Medicare, Medicare Advantage Organizations, Medicaid, Tri-Care, Health Insurers, Workers Compensation and all medical liens contemplated by O.C.G.A. § 44-14-470 and O.C.G.A. §44-14-471.

The Undersigneds acknowledge, understand and agree that this Release and Trust Agreement and all its terms and provisions will be governed and construed in accordance with Georgia state law.

The Undersigneds understand, acknowledge and agree that no agreements or understandings have been made between the parties except as expressed herein, and the terms of this Release and Trust Agreement are contractual and not a mere recital.

The Undersigneds further understand, acknowledge, agree and state that they have carefully read the foregoing Release and Trust Agreement and know the contents thereof, and they sign the same as their own free act.

_____    9/13/2016
                                    Date

Argelia Solito                      9/13/2,016
_____    Date

WITNESSED this _____19_____ day of ___September___ , 2016:

_____    Julio Edgardo Solorzano
Signature of Witness                Printed Name of Witness

3



Def. 1

DEFENDANT'S
EXHIBIT
2







Def. 4





Def. 6



Def. 7

Def. 8

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| ARGELIA SOLITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. 23A02118 |
| SAM'S EAST INC.,  JOHN DOE 1-2, | ) | |
| ABC CORP.,  AND XYZ CORP., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES

**COMES NOW**, ARGELIA SOLITO, Plaintiff, and submits Responses to Defendant's First Interrogatories to Plaintiff.

### GENERAL STATEMENT

Plaintiff does not waive any objection that may be appropriate to the use of any information provided in his Responses or to the admissibility, relevance, competency or materiality of any of the information to any issue in this case. Identifying or producing any document or supplying any information does not constitute an admission by Plaintiff that the document or information is relevant to the subject matter of this action. The Responses set forth below constitute the best information presently available to Plaintiff. However, Plaintiff reserves the right to amend, supplement or change any response made hereinafter if facts or documents subsequently are discovered which make amendment, supplementation or revision appropriate. Disclosure of any privileged or otherwise protected information, if any, is or was inadvertent and cannot be construed as a waiver of any such privilege.



DEFENDANT'S
EXHIBIT
4

## GENERAL OBJECTIONS

1.

Plaintiff objects to each interrogatory and document request to the extent that it is overbroad or seeks to impose an undue burden on Plaintiff.

2.

Plaintiff objects to each interrogatory and document request to the extent that it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.

3.

Plaintiff objects to each request for admission, interrogatory and document request to the extent that it seeks information and/or documents that are protected from discovery by the attorney-client privilege, the work product doctrine or any other applicable privilege. No such document will be provided.

4.

Plaintiff objects to each interrogatory and document request to the extent that it seeks information and/or documents that constitute confidential or proprietary business and financial information of Plaintiff.

5.

Plaintiff objects to each interrogatory and document request to the extent that the Defendant attempts to impose obligations on Plaintiff beyond the obligations required or permitted by the Georgia Civil Practice Act. Plaintiff will provide such responses as are required by the Georgia Civil Practice Act but will not assume a greater burden to respond or to supplement responses to than that Act requires.

6.

Plaintiff responds to Defendant's First Interrogatories without waiving, or intending to waive: (a) the right to object on the grounds of competency, privilege, relevance or materiality or any other proper grounds to the use of any documents or other information for any purpose, in whole or in part, in any subsequent proceeding in this action or in any other action; (b) the right to object on any and all grounds, at any time, to interrogatories or other discovery procedures involving or relating to the subject matter of the requests to which Plaintiff has responded herein; and (c) the right at any time to revise, correct, supplement or clarify any of the responses made herein. The inadvertent production of any privileged document or information shall not be deemed a waiver of any privilege with respect to such document or information or any other document or information.

7.

The fact that no objection is interposed to a request for admission, interrogatory or document request does not necessarily mean that responsive documents exist.

8.

Defendant's requests seek confidential information and other information that should be used for no purpose other than the litigation of this case.

9.

The foregoing objections are specifically incorporated as if fully set forth directly in response to each interrogatory and document request.

## RESPONSES TO INTERROGATORIES

1.

Please state your (a) full legal name and any other names you have ever used; (b) your date and place of birth; (c) marital status, full name of spouse(s), and date of your marriage(s) and divorce(s) if applicable; (d) names and ages of all children; (e) social security number; (f) current address and address at time of accident at issue; and (g) education background including all schools, institutions, trade or professional schools attended and the dates of attendance of each, and the degrees, certificates, or licenses obtained at each.

**RESPONSE: Plaintiff objects to the portion of this Interrogatory seeking Plaintiff's social security number and full date of birth. The Privacy Act of 1974, Public Law 93-579, Section 7, enacted by the U.S. Congress and the federal legislative scheme involving the use of social security numbers, establishes a legitimate expectation of privacy of a person in their social security number, prohibits the disclosure of said social security number, and prohibits a state from penalizing an individual in anyway because of failure to reveal her social security number upon request. Subject to said objections and without waiving the same, Plaintiff's full name is Argelia Solito, Plaintiff's date of birth is 07/08/1966. Plaintiff is married to Julio Edgardo Solozano. Plaintiff has 4 children: Adriana Montes 39 years old, Edgar Montes 35 years old, Jerson Montes 26 years old, Diego Montes 24 years old. Plaintiff's Social Security Number will not be provided, without a protective order, for security reasons. Plaintiff current address is 1125 Winter Park Lane, Norcross, GA 30093.**

2.

If you have ever been arrested or convicted of any crime, please identify each crime (other than a traffic offense), date of arrest, the arresting authority, the court in which any

criminal proceeding against you was held, and the disposition of each charge.  See Lewis v. The State, 254 S.E.2d 830 (1979); Hightower v. G.M., 232 S.E.2d 336 (1985).

**RESPONSE: Plaintiff objects to this Interrogatory as it requests information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Georgia law is clear that the only admissible evidence is evidence of convictions of felonies and misdemeanors involving moral turpitude.  Lewis v. State, 243 Ga. 443, 254 S.E.2d 830 (1979).  The Court has specifically held that the prior driving record of a party is not admissible evidence and is irrelevant.  Georgia Power Company v. Hubbard, 142 Ga. App. 531, 236 S.E.2d 515 (1977); Jones v. Cloud, 119 Ga. App. 697, 168 S.E.2d 598 (1969); Williams v. Slusser, 104 Ga. App. 412, 414, 121 S.E.2d (1961).  Subject to said objection and without waiving the same, Plaintiff has not been arrested or convicted of any crime of moral turpitude.**

3.

State specifically the name, address and telephone number of your current employer and every other employer for whom you have worked for the past ten (10) years giving as to each the dates of employment, the nature of your work, name of your supervisor(s), your reason for leaving (if applicable), and your rate of pay.

**RESPONSE:  Plaintiff has not made a past lost wage claim.  However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this collision.   Therefore, Plaintiff reserves the right to supplement this response.**

4.

If you or any member of your immediate family have ever been a party to a lawsuit, including a claim for Worker's Compensation, or a bankruptcy proceeding, please identify the person involved, give the style and number of the case, the nature of the litigation, the role you or  your family member had in the litigation (plaintiff, defendant, etc.), and the court or administrative body before which the suit was filed.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to said objection and without waiving the same, Plaintiff has not filed a petition for bankruptcy. Plaintiff reserves the right to supplement this response as discovery continues**

5.

If you have ever made a claim for bodily injury or property damage against any person, firm or entity, including an insurer, please provide the following with regard to each such claim:

(a) identify the person and/or entity against whom the claim was made;

(b) identify the facts of the claim, including the date and location of the occurrence or event leading to the claim;

(c) the specific injury and/or property damage at issue;

(d) identify the adjuster or other representative who handled the claim; and,

(e) identify all documents including, but not limited to, all notices, correspondence, settlement agreements, releases, drafts, checks, etc., relating to the claim.

**RESPONSE: In 2021, Plaintiff made a bodily injury claim for a car collision on Jimmy Carter Blvd. against Taylor Breaux and her insurance Progressive. Date of the**

Case 1:23-cv-03438-MLB   Document 26-1   Filed 06/03/24   Page 140 of 162


collision 11/18/2021. The case has been resolved. Plaintiff reserves the right to supplement this response as discovery continues.

6.

Please state specifically where the incident giving rise to this lawsuit took place, the date and time of day, the weather conditions at the time of your arrival at the store, and how the occurrence happened, including a specific description of the cause(s) of your fall and your alleged injuries.

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence. Based on information now known to Plaintiff, Plaintiff contends that on 08/05/2021, she slipped and fell inside Defendant's premises. Plaintiff reserves the right to supplement this response.**

7.

Please describe the mechanics of your accident (i.e., what caused you to fall, how you fell (forward, backward, sideways, etc.), the specific location of where you fell, how you landed, how you recovered, etc.). Also, please confirm whether you actually fell or not.

**RESPONSE: Plaintiff slipped and fell while walking inside Defendant's premises. For more details, please see the video of the incident.**

8.

Please describe, in detail, the substance which you contend caused your fall, including

but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance.  Please identify the source of the substance at issue, where it came from, and where it was located when you fell.

**RESPONSE: Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of the source of the substance and where it came from. It was located near the bread isle.**

9

Give the name, address, and telephone number of all persons that to you or your representatives' knowledge, information or belief were eyewitnesses to the occurrence, and/or have relevant knowledge concerning the occurrence, any issue of liability in this lawsuit, or the damages you claim in connection with this lawsuit, including a brief description of their relevant knowledge.

**RESPONSE: Defendant's employees and other customers. Plaintiff also directs Defendant to the names and addresses of Plaintiff's medical providers, disclosed in responses to these Interrogatories and other discovery propounded by Defendant. At the present time, Plaintiff has not identified other witnesses responsive to this Interrogatory. However, Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

10.

Please state in specific detail your actions prior to the subject incident, from the time you arrived at the premises until the time of your accident, including a description of everything you did and everyone with whom you spoke.  Please identify everyone whom you were shopping with on the day of the accident.

**RESPONSE: Plaintiff was shopping at Sam's club for about 15-20 minutes before she fell. Plaintiff was not accompanied by anyone.**

11.

Please state in specific detail your actions after the subject incident, from the time of your accident until the time you departed the premises, including a description of everything you did and everyone with whom you spoke.

**RESPONSE:  After the subject incident, Defendant's employees helped Plaintiff to get up and she was later placed on a wheelchair. Defendant's employees made an incident report. Plaintiff called her son Jerson Montes who picked her up and took to the hospital.**

12.

Please identify all persons whom you contend were in close proximity to you at the time of the incident whom either witnessed the incident, or came to your assistance immediately after the incident, giving for each their full name, address, telephone number, name of their employer, and a brief description of how each assisted you.

**RESPONSE: Please see Plaintiff's response to interrogatory 9.**

13.

Please state the name, address and telephone number of all persons who arrived at the scene of the occurrence within an hour of the occurrence or that you or any other representative or family member spoke with regarding the subject incident in the twenty-four (24) hours following the occurrence.

**RESPONSE:  Please see Plaintiff's response to interrogatory 11.**

14.

Please give your height and weight, and identify all objects in your hands, at the time of the occurrence. Also, please describe your footwear by size, style, and manufacturer.

**RESPONSE: At the time of the incident, Plaintiff was wearing a pair of flat dress shoes. Plaintiff did not have any objects in her hands.**

15.

Please state whether you have used any ambulatory-assistance devices (all of the time or occasionally) prior to the accident at issue. If so, please identify all such devices, identify the condition(s) for which the device was prescribed or recommended, and identify the medical treatment provider (or other person) who prescribed or recommended the device(s).

**RESPONSE: Plaintiff has not used any ambulatory-assistance devices prior to the incident.**

16.

State whether you wear prescription glasses. If so, identify the condition for which you are prescribed glasses (i.e., near-sightedness, far-sightedness, etc.), and state whether you were wearing your glasses at the time of the incident.

**RESPONSE: Plaintiff states that she was wearing prescription glasses at the time of the incident.**

17.

Please state how many times you had walked by, near or through the location of your accident prior to the accident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

18.

Please state how many times you had visited the premises prior to the alleged incident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

19.

State the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident; identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts.

**RESPONSE: Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

20.

Please set forth in detail each and every act or omission that you contend was a breach of duty on the part of the Defendant:

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

21.

With regard to each statement (oral, written, recorded, court or deposition transcript, etc.) taken from any person with knowledge relevant to this lawsuit, please state the name of each

person, the name and address of the person or entity taking each statement, the date each statement was taken, and the name and address of each person having possession, custody or control of each statement.

**RESPONSE: Plaintiff is unaware of any recorded statements pertaining to this incident other than any statements which may or may not have been taken by Defendant's employees. Plaintiff reserves the right to supplement this response as discovery continues.**

22.

Describe with reasonable particularity all photographs, charts, diagrams, videotapes, and other illustrations of any person, place or thing involved in this lawsuit, giving the date each was made, the name and address of the person(s) who made or created each item, and the name and address of the person(s) with possession, custody or control of each item.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Subject to said objections and without waiving the same, Plaintiff directs Defendant to Plaintiff's medical bills and records which may contain photographs, charts and diagrams, and to the photographs provided pursuant to Defendant's Requests for Production. Plaintiff possesses no other documents or things responsive to this Interrogatory. Because discovery is ongoing, Plaintiff reserves the right to supplement this response as discovery progresses.**

23.

Please state whether you were talking to anyone at the time of the accident (either in person, on the telephone, via text message, etc.). If so, please identify all such persons.

**RESPONSE: Plaintiff was not talking to anyone at the time of the incident.**

24.

Identify all United States statutes, state statutes, city ordinances, county ordinances, and all other governmental laws, rules or regulations which you contend the Defendant violated with respect to the incident giving rise to this lawsuit.

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions relevant to this action. Plaintiff reserves the right to supplement this response as more information becomes available.**

25.

If you consumed any alcoholic beverages, prescription or over-the counter medicines or drugs, or illegal drugs within 24 hours prior to the occurrence, please identify the nature and quantity thereof, all persons present, and the time(s) and place(s) where such were consumed.

**RESPONSE: Plaintiff was not under the influence of alcohol or drugs at the time of the incident in question.**

26.

Please describe all accidents or incidents in which you have been involved (including but not limited to all auto accidents, work accidents, slip and falls, trip and falls, sports injuries, home accidents, etc.), prior to the occurrence, and describe the personal injuries, if any, which you received in each such accidents or incidents.

**RESPONSE: Please see Plaintiff's response to interrogatory 5.**

27.

Please describe all accidents or incidents in which you have been involved (including but not limited to all auto accidents, work accidents, slip and falls, trip and falls, sports injuries, home accidents, etc.), subsequent to the occurrence, and describe the personal injuries, if any, which you received in each such accidents or incidents.

**RESPONSE: Please see Plaintiff's response to interrogatory 5.**

28.

State the substance of and names of the parties to all conversations or other communications you had with any representative of the Defendant, and/or other individuals present at the location of the alleged incident on the date of the incident, at the time of or at any time following the occurrence.

**RESPONSE: Plaintiff does not recall the names of Defendant's employees who assisted her after the fall. Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

29.

Please identify each expert expected to testify at trial and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and give a summary of the grounds for each opinion. See O.C.G.A § 9-11-26.  PLEASE NOTE THAT THIS INTERROGATORY APPLIES TO ALL EXPERT WITNESSES INCLUDING ALL PRACTITIONERS OF THE HEALING ARTS.

**RESPONSE: No experts expected to testify at trial have been retained at this time.**

30.

State in detail, to the best of your ability, all injuries you claim you received as a result of the incident giving rise to this lawsuit.

**RESPONSE: Plaintiff has attached the medical records and bills from the medical providers who treated Plaintiff for injuries sustained in the subject incident pursuant to Plaintiff's responses to defendant's request for production of documents. As Plaintiff is not a doctor or medical professional. Plaintiff directs Defendant to such documents for a complete, technical and specific inventory of Plaintiff's physical complaints and symptoms following the accident as well as a more detailed explanation, diagnosis and prognosis of Plaintiff's medical condition. In addition to the information set forth in the documents, Plaintiff states generally that, as a result of the subject incident, she is experiencing pain and discomfort in her back, hip, right knee and right ankle. Because Plaintiff may continue to incur medical treatment, Plaintiff reserves the right to supplement this response as discovery progresses.**

31.

State whether you had any prior or subsequent injuries, diseases or difficulties in the areas of the body which you claim were injured in the occurrence, or to areas of your body involving your senses (sight, hearing, etc.) and/or balance, identify when said injuries, diseases or difficulties occurred, and give the names and addresses of all practitioners of the healing arts, including family doctors, who treated you for such injury, disease or difficulty.

**RESPONSE: Plaintiff had no such prior or subsequent injuries/diseases.**

32.

(a)     State the names and addresses of all doctors, osteopaths, psychologists, physical therapists, chiropractors, and other practitioners of the healing arts who have treated you as a result of the incident that is the subject of this litigation, give the date of your last visit to each and indicate whether each has issued a written report regarding his or her treatment.

(b)     State the exact terms of and all billing, payment, or invoice agreements you and/or your attorney had or have with any of the practitioners identified in subsection (a).

**RESPONSE:**

| Physician Name | Address | Dates of Treatment | Billing |
|---|---|---|---|
| Peachtree Spine and Sport Physicians | 5555 Peachtree Dunwoody Road NE, Suite G65 Atlanta, GA 30342 | 08/09/2022-10/12/2022 | $36,653.80 |
| Ortho Sport & Spine Physicians | 5788 Roswell Rd NE Sandy Springs, GA 30328 | Will be supplemented | Will be supplemented. Est. $40,106.74 |
| Northside Hospital | 1000 Johnson Ferry Road NE Atlanta, GA 30342 | 08/05/2021 | $3,889.00 |
| Northside Radiology | 1000 Johnson Ferry Road NE Atlanta, GA 30342 | 08/05/2021 | Will be supplemented |
| Northside Emergency Associates, PC | 1000 Johnson Ferry Road NE Atlanta, GA 30342 | 08/05/2021 | $653.00 |

**Plaintiff is hereby producing all medical records and medical bills in her possession or in the possession of her attorney. Plaintiff will supplement this response as more information becomes available.**

33.

Give the names and addresses of all treating physicians including all family doctors, interns, osteopaths, psychologists, physical therapists, chiropractors and other practitioners of the healing arts of any type or nature, and all hospitals, infirmaries, clinics, sanitariums, nursing homes, and asylums in which you received treatment, including the dates of such treatment: (a) after the occurrence (for any illness, injury or condition not related to the occurrence); and, (b) for the fifteen (15) years prior to the occurrence.

**RESPONSE: Morning Chiropractic, 5430 Jimmy Carter Blvd., Suite 200, Norcross, GA 30093; Atlas Spine and Rehab, 5855 Jimmy Carter Blvd., STE 180, Norcross, GA 30071; MRI Imaging Specialists, 6760 Jimmy Carter Blvd., Suite 165, Norcross, GA 30071.**

34.

Please itemize all special damages which you allege you incurred (or others have incurred on your behalf) as a result of the occurrence, including medical expenses, hospital expenses, drug expenses, property damage, lost wages, and all other special damages (describing same) you claim you incurred as a result of the occurrence.

**RESPONSE: Please see Plaintiff's response to interrogatory 32. Plaintiff reserves the right to supplement this response as discovery progresses.**

35.

With respect to any payments or benefits which are available or which you have received (or which were made on your behalf by any source) because of the incident giving rise to this lawsuit, please state the amount and payee of each benefit, the name and address of the person, insurance company, corporation, or other entity making each payment or benefit available, and the nature of each payment or benefit made (i.e., PIP, no-fault benefits, worker's compensation, group or individual disability benefits, group or individual medical coverage, U.S. or state government, Medicare, Medicaid, Champus, litigation loan or funding company, et cetera).

**RESPONSE: Plaintiff objects to this Interrogatory on the grounds that evidence of these collateral source payments is not admissible under Georgia law. Subject to said objection and without waiving the same, Plaintiff was a Medicaid beneficiary through Ambetter, policy #: 94706200; Member ID #: U9470620001. Plaintiff is not aware of any other benefits available to her.**

36.

If you are making a claim for lost wages or loss of income, state whether or not you filed state and Federal income tax returns for the preceding five years and, if so, state where each return was filed, the social security or tax number on each return, and the total wages, salaries, tips, etc. on each return.

**RESPONSE: Plaintiff has not made a past lost wage claim. However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this incident. Therefore, Plaintiff reserves the right to supplement this response.**

37.

For any lost wage or salary claim that you make, please explain how you computed the amount of damages and state the name and address of each employer at the relevant time, the name and telephone number of your supervisor, the dates you were unable to work, the date you returned to work, your rate of pay and whether or not your employer continued to pay your salary during any part of the time you were unable to work.

**RESPONSE: Plaintiff has not made a past lost wage claim. However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this incident. Therefore, Plaintiff reserves the right to supplement this response.**

38.

Please identify with reasonable particularity (including the title and date) all documents (proof of loss, loan receipt, subrogation agreements, assignments, settlement agreements, releases, covenants not to sue, etc.) executed by you in connection with the payment of any money to you because of the occurrence by an insurance carrier or any other entity.

**RESPONSE: Plaintiff has not received any such payments.**

39.

Please provide the username for any social media accounts and/or applications used or maintained by you. This request includes, but is not limited to, Facebook, Instagram, Twitter, YouTube, WhatsApp, (Facebook) Messenger, WeChat, Tumblr, WeChat, Tik Tok, Reddit, LinkedIn, Viber, Snapchat, Twitch, 4Chan, and/or Pinterest.

RESPONSE: Plaintiff objects to this Interrogatory as being an undue invasion of Plaintiff's privacy. Plaintiff further objects to any inquiry into any social media activity by Plaintiff which is not within the public domain and which has been protected from general public view pursuant to the privacy settings of any social media account set up or maintained by Plaintiff. Moreover, any attempt to bypass or go around the privacy setting selected by the Plaintiff is an unreasonable invasion of Plaintiff's right of privacy and is not reasonably calculated to lead to the discovery of admission information but instead is simply a fishing expedition pursued solely in an effort to embarrass and harass Plaintiff. "Subject to and without waiving said objections, Plaintiff states that she has not posted general comments on her Facebook, Twitter, etc account about the fact that she had been injured in a incident" Plaintiff reserves the right to supplement this response as discovery continues.

40.

Please state whether you have altered or deleted any content from any of the previously identified accounts since the date of the accident which forms the basis of this lawsuit. If your answer is in the affirmative, please state the date on which the alteration or deletion was made, what content was altered or deleted, and why you deleted or altered the content. [Note: please preserve and do not destroy, alter, or delete any data contained on any of the accounts identified in response to Interrogatory No. 40 for the pendency of this litigation.]

RESPONSE: Please see Plaintiff's response to interrogatory 39.

41.

Please state whether you have altered the privacy settings on any of the previously identified accounts since the date of the accident which forms the basis of this lawsuit.

**RESPONSE: Please see Plaintiff's response to interrogatory 39.**

42.

Since the date of this accident, has Plaintiff worn or utilized a Fitbit, Apple, Garmin, or Samsung wearable fitness tracker/watch? If so, please identify the type of device worn or used.

**RESPONSE: Plaintiff has not worn or utilized any such fitness tracker.**

43.

Please provide the cellular telephone number, cellular provider, and account holder's name for your cellular phone currently and at the time of this accident, if different. [Note: please preserve and do not destroy, alter, or delete any data contained on the telephone identified in response to Interrogatory No. 43 for the pendency of this litigation.]

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.**

44.

Please (a) state in detail all facts and (b) describe with reasonable particularity (including the title and date) all documents which support your claim that Sam's was negligent in failing to property inspect, maintain, and take adequate measures to protect invitees from the danger of the walkway as alleged in Count II, Paragraphs 23-25 [sic] of Plaintiff's Complaint.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Defendant is in possession of the incident report that might have been taken by Defendant's employees and the video recording of the incident that might have been taken on Defendant's premises. Plaintiff reserves the right to supplement this response as more information becomes accessible.

45.

Please (a) state in detail all facts and (b) describe with reasonable particularity (including the title and date) all documents which support your claim for negligent training and supervision as alleged in Count IV, Paragraphs 31-34 [sic] of Plaintiff's Complaint.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Defendant is solely in possession of its policies and procedures relating to employees hiring, training, and supervision.

46.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim for "strict liability" as alleged in Count IV [sic], Paragraph 13 [sic] of Plaintiff's Complaint.

**RESPONSE:** Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.

47.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim that "Defendants have acted and continues to act in a manner that is stubbornly litigious, causing Plaintiff unnecessary trouble and expense within the meaning of O.C.G.A. Section 13-6-11", as alleged in subparagraph (d) of Plaintiff's Prayer for Relief in Plaintiff's Complaint.

**RESPONSE: Defendant denied liability on 10/20/2022 by sending a denial letter to Plaintiff's attorney. Because the video evidence and other evidence requested by Plaintiff's attorney has not been produced yet, Plaintiff has not determined all acts and omissions that constitute Defendant's bad faith within the meaning of O.C.G.A. 13-6-11. Therefore, Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

48.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim that Defendant's defenses in this action lack substantial justification, were imposed for delay or harassment, were not made in good faith, and that Defendant unnecessarily expanded the proceeding by improper conduct as alleged in subparagraphs (e) and (f) of Plaintiff's Prayer for Relief in Plaintiff's Complaint.

**RESPONSE:** Because discovery is still ongoing, **Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

Respectfully submitted this July 25th, 2023,

<div style="margin-left:50%;">

**770-GOOD-LAW, LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC**

*/s/ Hung Q. Nguyen, Esq*
Hung Q. Nguyen, Esq.
Georgia Bar No.: 940370
Attorneys for Plaintiff

</div>

5495 Jimmy Carter Boulevard, Suite B-17
Norcross, Georgia 30093
Tel:    770-409-1529
Fax:    770-409-1526
litigation@770goodlaw.com

 **Gwinnett**

GWINNETT COUNTY
POLICE DEPARTMENT

770 Hi-Hope Road | Lawrenceville, GA 30043
P.O. Box 602 | Lawrenceville, GA 30046-0602
770.513.5000
www.gwinnettcounty.com | www.gwinnettpolice.com

SUBJECT: GWINNETT COUNTY POLICE RECORDS
RE: OPEN RECORDS REQUEST of September 12, 2023, Reference # R145882-091223,
Incident/Case Number unknown

CERTIFICATION OF AUTHENTICITY

Pursuant to O.C.G.A § 24-8-803(6) and 24-9-902, the undersigned declarant hereby declares,
certifies, verifies or states under penalty of perjury the following:

1. The declarant is a records custodian, or other qualified person who can provide a written
declaration regarding the records of regularly conducted business activity which are the subject
of the certification:

2. The records of regularly conducted business activity (hereinafter "records"), which are the
subject of this Certification,

3. The records are originals or duplicate copies of domestic business records; which are true and
correct copies of the original record(s) prepared and/or maintained by:

Gwinnett County Police Department, Records Unit

4. The records were made at, or near the time of the occurrence of the matters set forth by, or
from information transmitted by, a person with knowledge of those matters;

5. The records were kept in the course of a regularly conducted business activity; and

6. The records were made as a regular practice in the course of regularly conducted business
activity. I hereby declare, certify or state, under penalty of perjury, that the foregoing is true and
correct. Executed on 09/15/2023.

If you have any questions, please contact my office at 770.513.5357.
Sincerely,
Renee Castellanos
Customer Service Associate III - Open Records
Police



Page 1 of 4

| Agency Case Number GP220074627 | Agency NCIC Number GA0670200 | GEORGIA MOTOR VEHICLE CRASH REPORT | County GWINNETT | Date Rec. by GDOT |
|---|---|---|---|---|

| Estimated Crash | | Dispatch | | Arrival | | Total Number of | | | Inside City Of |
|---|---|---|---|---|---|---|---|---|---|
| Date 09/14/2022 | Time 15:03 | Date 09/14/2022 | Time 15:07 | Date 09/14/2022 | Time 15:15 | Vehicles 2 | Injuries 0 | Fatalities 0 | |

Road of Occurrence SINGLETON RD

At Its Intersection With _____

☐ Corrected Report

Not At Its Intersection But 80  ☐ Miles ☒ Feet  ☒ North ☐ South  ☐ East ☐ West  of JIMMY CARTER BLVD

☐ Sup To Original

Latitude (Y) (Format) 33.902628   00.00000
Longitude (X) (Format) -84.204691   -00.00000

☐ Hit and Run

| Unit # 1 | ☒ Driver ☐ Ped ☐ Bike | LAST NAME SOLITO | FIRST ARGELIA | MIDDLE | Unit # 2 | ☒ Driver ☐ Ped ☐ Bike | LAST NAME FERNANDEZ | FIRST NATALY | MIDDLE |
|---|---|---|---|---|---|---|---|---|---|
| | | Address 1125 WINTER PARK LN NW | | | | | Address 6971 LISMORE DR NW | | |

☒ Susp At Fault

☐ Susp At Fault

| City NORCROSS | State GA | Zip 30093 | Personal Info 1966 | City NORCROSS | State GA | Zip 30093 | Personal Info 2002 |
|---|---|---|---|---|---|---|---|
| Driver's License No. 070007787 | Class C | State GA | Country US | Driver's License No. 061021715 | Class C | State GA | Country US |
| Insurance Co. PROGRESSIVE MOUN 958908804 | Policy No. | | Telephone No. (774) 849-9392 | Insurance Co. ALLSTATE P & C | Policy No. 0921230989 | | Telephone No. (678) 472-2116 |
| Year 2018 | Make Ford | | Model Escape | Year 2021 | Make Toyota | | Model Corolla |
| VIN 1FMCU0GD9JUA58690 | | Vehicle Color Red | | VIN 5YFEPMAE1MP172696 | | Vehicle Color Black | |
| Tag # TDS1174 | State GA | County GWINNETT | Year 2023 | Tag # RXE9730 | State GA | County GWINNETT | Year 2023 |
| Trailer Tag # | State | County | Year | Trailer Tag # | State | County | Year |

| ☒ Same as Driver | Owner's Last Name | First | Middle | ☒ Same as Driver | Owner's Last Name | First | Middle |
|---|---|---|---|---|---|---|---|
| Address | | | | Address | | | |
| City | State | Zip | | City | State | Zip | |

| Removed By: driver | ☒ Request ☐ List | Removed By: DRIVER | ☒ Request ☐ List |
|---|---|---|---|

| Alco Test: No | Type: | Results: | Drug Test: No | Type: | Results: | Alco Test: No | Type: | Results: | Drug Test: No | Type: | Results: |
|---|---|---|---|---|---|---|---|---|---|---|---|

| First Harmful Event: 11 | Most Harmful Event: 11 | Operator/Ped Cond: 1 | First Harmful Event: 11 | Most Harmful Event: 11 | Operator/Ped Cond: 1 |
|---|---|---|---|---|---|

| Operator Contributing Factors: 11 | | | | Operator Contributing Factors: 1 | | | |
|---|---|---|---|---|---|---|---|

| Vehicle Contributing Factors: 1 | Roadway Contributing Factors: 1 | Vehicle Contributing Factors: 1 | Roadway Contributing Factors: 1 |
|---|---|---|---|

| Direction of Travel: 1 | Vehicle Maneuver: 6 | Non-Motor Maneuver: | Direction of Travel: 1 | Vehicle Maneuver: 5 | Non-Motor Maneuver: |
|---|---|---|---|---|---|

| Vehicle Class: 1 | Vehicle Type: 1 | Vision Obscured: 1 | Vehicle Class: 1 | Vehicle Type: 1 | Vision Obscured: 1 |
|---|---|---|---|---|---|

| Number of Occupants: 2 | Area of Initial Contact: 3 | Damage to Veh: 2 | Number of Occupants: 4 | Area of Initial Contact: 11 | Damage to Veh: 2 |
|---|---|---|---|---|---|

| Traffic-Way Flow: 2 | Road Comp: 2 | Road Character: 1 | Traffic-Way Flow: 2 | Road Comp: 2 | Road Character: 1 |
|---|---|---|---|---|---|

| Number of Lanes: 4 | Posted Speed: 40 | Work Zone: 0 | Number of Lanes: 4 | Posted Speed: 40 | Work Zone: 0 |
|---|---|---|---|---|---|

| Traffic Control: 7 | Device Inoperative: ☐ Yes ☒ No | Traffic Control: 7 | Device Inoperative: ☐ Yes ☒ No |
|---|---|---|---|

| Citation Information: Citation # PE00125355 | O.C.G.A. § 40-6-48(1) | Citation Information: Citation # NONE | O.C.G.A. § |
|---|---|---|---|
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |

**COMMERCIAL MOTOR VEHICLES ONLY**

| Carrier Name: | | | | Carrier Name: | | | |
|---|---|---|---|---|---|---|---|
| Address | City | State | Zip | Address | City | State | Zip |

| U.S. D.O.T. # | No. of Axles | G.V.W.R. | U.S. D.O.T. # | No. of Axles | G.V.W.R. |
|---|---|---|---|---|---|

| Cargo Body Type | Vehicle Config. | ☐ Interstate ☐ Intrastate | Fed. Reportable ☐ Yes ☒ No | Cargo Body Type | Vehicle Config. | ☐ Interstate ☐ Intrastate | Fed. Reportable ☐ Yes ☒ No |
|---|---|---|---|---|---|---|---|

| C.D.L.? | ☐ Yes ☒ No | C.D.L. Suspended? | ☐ Yes ☒ No | C.D.L.? | ☐ Yes ☒ No | C.D.L. Suspended? | ☐ Yes ☒ No |
|---|---|---|---|---|---|---|---|

| Vehicle Placarded? | ☐ Yes ☐ No | Hazardous Materials? | ☐ Yes ☒ No | Vehicle Placarded? | ☐ Yes ☐ No | Hazardous Materials? | ☐ Yes ☒ No |
|---|---|---|---|---|---|---|---|

| Haz Mat Released? | ☐ Yes ☒ No | Haz Mat Released? | ☐ Yes ☒ No |
|---|---|---|---|

If YES: Name or four Digit Number from Diamond or Box: _____

One Digit Number from Bottom of Diamond: _____

If YES: Name or four Digit Number from Diamond or Box: _____

One Digit Number from Bottom of Diamond: _____

☐ Ran Off Road ☐ Down Hill Runaway ☐ Cargo Loss or Shift ☐ Separation of Units

☐ Ran Off Road ☐ Down Hill Runaway ☐ Cargo Loss or Shift ☐ Separation of Units

GDOT-523 (07/17)

## COLLISION FIELDS

| Manner of Collision: 4 | Location at Area of Impact: 1 | Weather: 1 | Surface Condition: 1 | Light Condition: 1 |
|---|---|---|---|---|

## NARRATIVE

D1 STATED THAT SHE WAS TRAVELING NORTHBOUND ON SINGLETON RD, JUST NORTH OF JIMMY CARTER BLVD. D1 SAID THAT SHE LOOKED ON HER MIRROR, ACTIVATED HER TURN SIGNAL, DID NOT SEE A CAR ON THE RIGHT LANE. D1 SAID THAT SHE CHANGED LANES AND V2 STRUCK V1, BECAUSE V2 SPED UP. D2 ADVISED THAT SHE WAS TRAVELING NORTHBOUND ON SINGLETON RD, JUST NORTH OF JIMMY CARTER BLVD. D2 STATED THAT V1 CHANGED LANES AND STRUCK V2. D1 AND THE PASSENGER IN V1 DID NOT COMPLAIN OF INJURIES. D2 AND THE PASSENGERS IN V2 DID NOT COMPLAIN OF INJURIES. I SAW

## DIAGRAM

INDICATE NORTH

See Full Page Diagram

## PROPERTY DAMAGE INFORMATION

| Damage Other Than Vehicle: | Owner: |
|---|---|

## WITNESS INFORMATION

| Name (Last, First) | Address | City | State | Zip Code | Telephone Number |
|---|---|---|---|---|---|
| | | | | | |

## OCCUPANT INFORMATION

| # | Name (Last, First): SOLITO, ARGELIA | | | | | Address: 1125 WINTER PARK LN NW, NORCROSS, GA 30093 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Age: 56 | Sex: F | Unit # 1 | Position: 1 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | | |
| | Name (Last, First): MONTES, ADRIANA | | | | | Address: 1125 WINTER PARK LN NW, NORCROSS, GA 30093 | | | | |
| 2 | Age: 38 | Sex: F | Unit # 1 | Position: 3 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | | |
| | Name (Last, First): FERNANDEZ, NATALY | | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
| 3 | Age: 20 | Sex: F | Unit # 2 | Position: 1 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | | |
| | Name (Last, First): SIFUENTES, GLORIA | | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
| 4 | Age: 49 | Sex: F | Unit # 2 | Position: 3 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | | |

## ADMINISTRATIVE

| Photos Taken: ☐ Yes   ☒ No   By: no | Officer Note: If collision resulted in a fatality, please send prompt notification to the GDOT Crash Reporting Unit via either email at GeorgiaFARS@dot.ga.gov or Fax at (404) 635-2963. |
|---|---|
| Report By: Osorio Giraldo, Daniel E | Agency: Gwinnett County Police Dep. | Report Date: | Checked By: Bruce, Julian J | Date Checked: 10/04/2022 |

GDOT-523 (07/17)   MAIL TO: Georgia Department of Transportation, CRASH REPORTING UNIT, 935 East Confederate Ave., Atlanta, GA 30316-2590

| SUPPLEMENT |
| GEORGIA MOTOR VEHICLE CRASH REPORT |

| Agency Case Number: GP220074627 | Estimated Crash Date: 09/14/2022 15:03 | Officer Name: Osorio Giraldo, Daniel E |
| --- | --- | --- |

**NARRATIVE CONTINUED**

MINOR DAMAGE ON THE RIGHT SIDE OF V1. I SAW MINOR DAMAGE ON THE LEFT SIDE OF V2. I FOUND D1 AT FAULT FOR UNSAFE LANE CHANGE, I ISSUED D1 CITATION PE00125355. V1 WAS REMOVED BY D1. V2 WAS REMOVED BY D2.

BWC ACTIVATED

**ADDITIONAL CITATION INFORMATION**

| Unit # ___: | | Unit # ___: | |
| --- | --- | --- | --- |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |
| Citation # _____ | O.C.G.A. § _____ | Citation # _____ | O.C.G.A. § _____ |

**ADDITIONAL OCCUPANT INFORMATION**

| Name (Last, First): FERNANDEZ, MARCO | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age: 14 | Sex: M | Unit # 2 | Position: 4 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

| Name (Last, First): VELASQUEZ, JAIRO | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age: 2 | Sex: M | Unit # 2 | Position: 6 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

| Name (Last, First): | | | | Address: | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

| Name (Last, First): | | | | Address: | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

| Name (Last, First): | | | | Address: | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

