### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| ARGELIA SOLITO, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case 1:23-cv-03438-MLB |
| VS. | ) |
| | ) |
| SAM'S EAST, INC., JOHN DOE 1- | ) |
| 2, ABC CORP., and XYZ CORP., | ) |
| Defendants. | ) |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT SAM'S EAST, INC.'S MOTION FOR SUMMARY JUDGMENT

Comes the Plaintiffs pursuant to Fed.R. Civ. P. 56, L.R. 7.1, LR 5.1, and L.R. 56 and files a Response in Opposition to Defendant Sam's East, Inc.'s [hereinafter "Defendant"] Motion for Summary Judgment.

### I.    INTRODUCTION

Plaintiff Argelia Solito [hereinafter "Plaintiff"], as shown by the Defendant's Exhibit A, a video of Defendant's Surveillance Footage from Sam's Club Store No. 6409 on August 5, 2021, slipped and fell on "oil spillage" on the floor as she is walking down the aisle (Compl., ¶¶ 13-15).  Defendant's Motion should not be

granted because the evidence demonstrates the existence of genuine issues for trial concerning constructive knowledge of the liquid on the floor on which the Plaintiff fell.

## II.      STATEMENT OF MATERIAL FACTS

On or about August 5th, 2021, Plaintiff was shopping at Sam's Club branch No. 6409 located at 1940 Mountain Industrial Blvd. Tucker, Georgia 30084. Prior to Plaintiff's slip and fall, at around 12:13 P.M. a man in a red shirt along with two women in a blue shirt and a pink shirt are first seen at the north end of the aisle. See picture attached hereto as Exhibit T. At around 12:14 P.M., a man in a red shirt along with two women in a blue shirt and a pink shirt arrive at the area of the incident. See picture attached hereto as Exhibit A. The area of the incident, in reference to Defendant's floor plan of the subject store, is generally between the "commercial bakery" and "Chips and Snacks" shelves and below the "wine" shelves. See Exhibit N, area of incident is noted by a red circle.

At around 12:20 P.M., the customer in the pink shirt points to the man's cart. See picture attached hereto as Exhibit B. At around 12:20 P.M., the man in the red shirt eventually pulls out an allegedly leaking package from his cart. See picture attached hereto as Exhibit C. The man in the red shirt eventually carries the allegedly leaking package and walks eastward. See pictures attached hereto as Exhibit D.

Around 12:23 P.M., the man in the red shirt, while carrying a different, not leaking package to replace the previous, alleged leaking package, is seen signaling to the package, lifting his arm, and gesturing in a direction while interacting with someone wearing a yellow safety vest. See pictures attached hereto as Exhibit E. Individuals in the Sam's Club wearing yellow safety vests are employees of Sam's Club. See picture attached hereto as Exhibit U. In reference to the floor plan, the interaction between the two individuals occurs is located straight north of the area of the subject incident and at around the same horizontal level as the aisles of "Laundry/Homecare" found on the right side of the floor plan. See Exhibit N, location of interaction is noted by a yellow circle. After said interaction, at around 12:23:44 P.M., the employee wearing the yellow safety vest appears to walk in the same direction as the man in the red shirt when the man in the red shirt was carrying the allegedly leaking product. See picture attached hereto as Exhibit F. Around 12:24 P.M., an employee of Defendant walks by the area of the subject incident. See pictures attached hereto as Exhibit G. Around 12:24 P.M.,

Plaintiff enters the video frame. See picture attached hereto as Exhibit H. Around 12:25 P.M., Plaintiff slips and falls. See picture attached hereto as Exhibit I. Around 12:27 P.M. the Crossmark employee Elizabeth Billingsley (hereinafter "Billingsley") brings from her work station a cleaning materials, including a spray

bottle and what appears to be a cleaning cloth or paper towel. <u>See</u> picture attached hereto as Exhibit W. At around 12:27 P.M., Billingsley begins to clean the area, later general manager Cody Speck assists in cleaning the area, and eventually a floor scrubbing machine sweeps the area. <u>See</u> pictures attached hereto as Exhibit J.

The Defendant's employees intersected or crossed the path of the man in the red shirt when he was pushing the cart containing the allegedly leaking product prior to entering the area of the subject incident. <u>See</u> pictures attached hereto as Exhibit K. The Sam's Club store No. 6409 at 1940 Mountain Industrial Blvd. Tucker, Georgia 30084 has inventory of the Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad and the aisle containing the product can be seen from the area where the man in the red shirt and the employee in the yellow safety vest were discussing. <u>See</u> picture attached hereto as Exhibit V. In reference to Defendant's floor plan of the Sam's Club store No. 6409, the aisle with the chafing fuel inventory is at the top of the page where it says, "Restaurant Supplies." <u>See</u> Exhibit N, location of chafing fuel inventory is noted by a blue arrow.

## III.    ARGUMENT AND CITATION OF AUTHORITY

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking

summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record." Cross v. Dolgencorp, U.S. Dist. LEXIS 238232, 6 (Ga. N.D. Ct. 2018) (citing Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012)). "Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. Id. When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion." Id. at 6 (citing Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013); Strickland v. Norfolk S. RY. Co., 692 F.3d 1151, 1154 (11th Cir. 2012)). "The Court also must 'resolve all reasonable doubts about the facts in favor of the non-movant.' Cross at 6 (citing Morton at 1280). "Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented." Id. at 6-7 (citing Strickland at 1154). "Finally, the Court does not make factual determinations." Id. at 7 (citing Rich v. Sec'y. Ha. Dep't of Corr., 716 F.3d 525, 530 (11th Cir. 2013).

1. **PREMISES LIABILITY**

"A plaintiff asserting a cause of action for negligence under Georgia law must establish (1) the existence of a duty on the part of the defendant, (2) a breach of that duty, (3) causation, and (4) damages." <u>Cross</u> at 7 (citing <u>Flanagan v. QuikTrip Corp.</u>, No. 1:13-cv-3836-WSD, 2015 U.S. Dist. LEXIS 70425, 2015 WL 3472957, at 2 (N.D. Ga. June 1, 2015). "Under Georgia premises law, a landowner owes an invitee a duty to exercise ordinary care in keeping the premises and approaches safe." <u>Id.</u> "The duty extends to an invitee where the landowner has actual or constructive knowledge of a hazard <u>and</u> the invitee, in the exercise of ordinary care, lacks knowledge of the hazard." <u>Id.</u> "In other words, '[t]o prove negligence in a premises liability action that is based upon a trip and fall claim, an invitee must plead and prove two specific elements: (1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the defendant.'" <u>Cross</u> at 7-8 (citing <u>Landrum v. Enmark Stations, Inc.</u>, 310 Ga. App. 161, 162, 712 S.E.2d 585, 587 (2011)). "If the owner has no actual or constructive knowledge of the hazard, summary judgment in its favor would be appropriate, because the invitee would not be able to establish that the owner had

knowledge of the hazard superior to that of the invitee." Cross at 8 (citing Drew v. Istar Fin., Inc., 291 Ga. App. 323, 325, 661 S.E.2d 686, 689 (2008)).

Under O.C.G.A. §51-3-1, [w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."

"[T]o survive a motion for summary judgment, a plaintiff must come forward with evidence that, viewed in the most favorable light, would enable a rational trier of fact to find that the defendant had actual or constructive knowledge of the hazard. " Am. Multi-Cinema, Inc. v. Brown, 285 Ga. 442, 444-445, 679 S.E.2d 25 (2009).

Finally, "in a premises liability case, issues of the defendant's negligence, the plaintiff's negligence, and the plaintiff's lack of ordinary care for his own safety are generally not susceptible of summary adjudication. Only where the evidence is plain, palpable, and undisputable can the trial court conclude that a party is entitled to judgment as a matter of law." Cross at 9 (citing Ward v. Autry Petroleum Co., 281 Ga. App. 877, 877, 637 S.E.2d 483, 485 (2006)).

In Cross, video surveillance video showed, "[a] woman with a bottle of orange dish soap that was apparently leaking placed her shopping cart in the area where

plaintiff fell" about twenty-two minutes prior to the plaintiff's slip and fall. Id. at 5. The woman then moves her shopping cart about two minutes later and then proceeds to hand the leaking bottle of dish soap to a cashier about six minutes later. Id.

In Cross, defendant filed a motion for summary judgment and the court held that "viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Defendant had at least constructive knowledge of the hazard and that Defendant had superior knowledge of the hazard." Cross at 1, 5-6, 9. The court based its conclusion on the employee's awareness of a leaky dish soap bottle having been carried through the store, which was about eighteen minutes prior to plaintiff's fall. Id. at 9. The court recognized that a reasonable jury "could find that the liquid remained on the floor for such a time as to establish constructive knowledge on the part of Defendant, especially because an employee knew that a leaky dish soap bottle had been carried through the store." Id. at 9. The court further noted that "although Defendant presented evidence that Dollar General employees are trained to inspect and clean the floors as they walk through the store, Defendant did not present evidence sufficient for the Court to determine whether this inspection program was reasonable as a matter of law, and it is unclear whether the inspection program was properly carried out at the time of the incident, making a grant of summary judgment for Defendant improper at this time." Id. at 9.

a. <u>**Constructive Knowledge**</u>

   i. **There Exists a Genuine Issue of Material Fact as to Whether Defendant Was Informed of a Leaking Product That Contributed to the Spill.**

One piece of evidence that can enable a jury to find for defendant's constructive knowledge of the hazard is based on the interaction between the man in the red shirt and the employee in a yellow safety vest. <u>See</u> Exhibit E. Based on Defendant's photographs of the subject area (attached hereto as Exhibit O), the floor map of the subject Sam's club store, the photographs depicting the vantage point from the interaction between the man in the red shirt and the yellow vested employee to the inventory of the leaking product, and Defendant's brief in support its motion for summary judgment (attached hereto as Exhibit L), the man in the red shirt walking eastward carrying the leaking product is likely heading to the eastside of the store, where housewares, domestics, and home improvement products are located. <u>See</u> Exhibits D, N, O, W, and pages 1-2 of L. On his way to his shopping cart, the man in the red shirt encounters the employee wearing the yellow safety vest and makes arm gestures pointing eastward. <u>See</u> Exhibit E. The same employee in the yellow safety vest is seen walking in the same direction and aisle as the man in the red shirt when he was carrying away the alleged leaking product.

A reasonable jury could conclude that the employee in the yellow safety vest was informed of the leaking product, because the man in the red shirt's gestures appear to first point to the carried package and then to the directions of both where the inventory of the leaking product could be found and where the man in the red shirt carried the alleged leaking product, and eventually, the yellow vested employee walks in the same aisle and lane the man in the red shirt was carrying away the alleged leaking product. Thus, like the <u>Cross</u> case, the employee in the yellow safety vest being informed of the leak is sufficient to establish defendant's constructive knowledge.

According to Defendant, "the surveillance footage shows that the shopping cart containing the leaking package of chaffing fuel entered the area where Plaintiff fell at 12:14:45 PM – less than eleven minutes before Plaintiff fell at 12:25:11 PM." <u>See</u> Exhibit L pg. 16. However, the surveillance footage provided by Defendant lacks the clarity to see any leaking from the package of chaffing fuel. Also, if the package was leaking, there remains the question as to when the leaking started. In addition, a floor scrubbing machine is brought to clean the floor and follows the path along which the cart with the leaking package traveled. <u>See</u> Exhibit J.  Furthermore, Defendant's Brief states that "[i]n this case, an employee walked through the area of the subject incident at 11:46:00 AM, 11:46:10 AM, 11:47:26 AM, and 12:24:25 PM

(less than one minute prior to Plaintiff's fall). None of these employees saw any spill or were informed of the presence of any spill by a customer or anyone else." <u>See</u> Page 10 of Exhibit L. However, Defendant does not cite sources, affidavits, or evidence for such a claim.

Consequently, a reasonable jury can conclude that the leaking could have occurred before the shopping cart entered the area of the subject incident. Thereby, spills could be on the ground along the aisle and an employee passing by could have noticed the spills. <u>See</u> Exhibit K.

Thus, there exists a genuine issue of material fact as to whether employees of Defendant were informed of the leaking product that contributed to the spill.

### ii. The Defendant's Inspection Program is not Reasonable

In comparison to other cases involving inspection programs at Wal-Mart, Defendant's parent company, this case is distinguishable. In <u>Brown v. Wal-Mart Stores East, LP</u>, evidence showed reasonable inspection programs including: constant safety sweeps of visual scanning of the area of any hazards, removing immediately of any hazards using towels employees carry in their pockets, guarding hazards until they are addressed, and maintenance employees required to sweep with a broom throughout "all times of the day" (with increased activity from 11 A.M. to 8 P.M.). No. 1:16-cv-111-WSD, 2017 U.S. Dist. LEXIS 11316, at 2 (N.D. Ga. 2017).

In Ledford v. Wal-Mart Stores E., LP, the defendant had two types of procedures in place, "safety sweeps" and "zoning."  No. 3:09-CV-21-JTC, 2010 U.S. Dist. LEXIS 146502, at 3-4 (Ga. N.D. Ct. 2010). Per defendant policy, safety sweeps were called once per hour and employees were instructed to check their assigned areas for hazards. Id. Zoning involved walking through the aisles of an employee's department and scanning the floor for foreign objects and debris. Id.  An employee was supposed to engage in zoning throughout their shift. Id.

In Williams v. Wal-Mart Stores E., Defendant's policy emphasized targeted safety sweeps more often in high traffic areas like the produce area, physical safety sweeps involving a dust mop occurred once per hour as a "rule of thumb," and constant lookout by employees for hazards, trash, and debris on the floor. No. 3:20-cv-65-TCB, 2021 U.S. Dist. LEXIS 247085, at 9 (Ga. N.D. Ct. 2021).

In this case, the distinction concerns the regularity of the sweeps. The declaration of Cody Speck and the guidelines produced by Defendant do not outline how often the safety sweeps occur and which aisles were designated to which employees. See Exhibit R Defendant's Guidelines for various topics including cleaning spills and declaration of General Manager Cody Speck attached hereto as Exhibit S.

Also, among the produced documents from Defendant, although the guidelines for preventing spills described in detail on handling spills, the same guidelines appear to be lacking in detail concerning timing. For example, one document titled "Strategic Maintenance Overview" mentions:

> "[f]ocus on sweeping, mopping, cleaning, and monitoring the front end, café/fresh departments, and floors in high-traffic areas. These are the primary accident areas for both member and associate slip/trip/fall accidents. This maintenance coverage should generally take place Friday, Saturday, and Sunday from 11 a.m. to close. These are the peak accident times for member and associate slip/trip/fall accidents. However, this can vary depending on sales volume and traffic patterns for each club."

See "Strategic Maintenance Overview" hereto annexed as Exhibit P.

The incident took place on August 5, 2021, which is a Thursday. The "Strategic Maintenance Overview" document does not describe the frequency of a sweep for a Thursday and use non-specific terms like "continuously monitor high-traffic areas for debris, liquids or other slip/trip/fall hazards" and "check for liquids on the floor in the café dining area and on the Fresh sales floor." See Exhibit P.

Concerning the area where Plaintiff fell, there lacks information as to how frequent the area should be surveyed on a Thursday, how the area should be surveyed, and how frequently the area should be cleaned. See Exhibit R. Further, the Defendant's guidelines lack information on addressing areas that are covered by patrons. The "Strategic Maintenance Overview" document mentions "[creating] a

Strategic Maintenance Plan that considers factors such as member traffic, club size, seasonal weather patterns, and accident trends. Know and understand the accident trends in your club. Allocate hours based on the trends." However, for a large store like Sam's Club, Defendant's guidelines do not describe the strategic maintenance plan in place at the time of the incident to prevent injuries from spills and thus fails to account for the frequency of sweeps and how employees should address covered areas.

The declaration of general manager Cody Speck states that

"Sam East, Inc. personnel regularly inspect and monitor the store for potential hazards as they walk through the store. They identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. If an employee notices any hazard on the floor, the employee immediately calls for assistance and monitors the hazard until it is cleaned up. True, accurate, and complete copies of Sam's East, Inc.'s 'Slip, Trip and Fall Guidelines' and Spill Clean Up Procedures,' which detail these policies and were effective on the day of the subject incident, are attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as Exhibits "E" and "F", respectively, and were made at or near the time by, or from information transmitted by, a person with knowledge."

See Exhibit S.

The declaration of Cody Speck fails to describe the strategic maintenance plan in place at the time of the incident to prevent spills and thus fails to account for the frequency of sweeps and how employees should address covered areas.

The guidelines provided by Defendant are more akin to the situation described in Fairview Park, Limited Partnership v. Roddenberry, in which the defendant produced "plans [that] do not list specific policies or procedures to be followed or detail a program in place at the hospital for inspecting the floor for hazardous or dangerous substances." 364 Ga. App. 247, 250 (2022). The employee of defendant mentioned that "he was trained to put up wet floor signs as soon as possible or immediately upon seeing a spill for the safety of patients and family members, he did not testify that the hospital had in place an inspection policy or procedure." Id. In that case, the court held that defendant's failure to present evidence of reasonable inspection procedures can establish an inference of constructive knowledge. Id. In this case, even though Defendant's guidelines call for a strategic maintenance plan, Defendant's evidence do not delineate an account for the frequency of sweeps and how employees should address covered areas. Thus, Defendant's inspection program is not reasonable.

### iii. Even if the Defendant's Inspection Program is Reasonable, the Defendant's Inspection Program was not Properly Implemented the Day of the Incident

There are two ways to demonstrate constructive knowledge of a hazard: "(1) by showing that an employee of the defendant was present in the immediate area and could easily have seen the substance and removed it; or (2) by showing that the

substance was on the floor for such a time that it would have been discovered and removed had the proprietor exercised reasonable care in inspecting the premises." Cross at 8 (citing Sanderson Farms, Inc. v. Atkins, 310 Ga. App. 423, 426, 713 S.E.2d 483, 487 (2001)). Further, "in order to prevail at summary judgment based on lack of constructive knowledge, the owner must demonstrate not only that it had a reasonable inspection program in place, but that such program was actually carried out at the time of the incident." Cross at 9 (citing Sanderson Farms, Inc., at 487).

Defendant states in its brief that the employee who walked by the area of the subject incident at around 12:24 P.M. "did not see any spill or were informed of the presence of any spill." See page 10 of Exhibit L. However, evidence contradicts such a statement and raises genuine issues of material fact pertaining to the size of the spill and an employee's failure to properly implement the inspection procedure.

Defendant claims that the employee's view (hereinafter "12:24 P.M. employee") was blocked by the other patrons in the area. See Exhibit L, page 16. Defendant attempts to support the notion that the patrons blocked the view of the spill using Plaintiff's deposition, placing emphasis on Plaintiff not seeing the spill prior to Plaintiff's fall or not discerning the color or clarity of the spill, and the group of patrons obstructing the Plaintiff's view. See Exhibit L, pg. 17. However, the

Plaintiff's deposition and Defendant's video evidence provide evidence to establish the contrary.

For example, Plaintiff's fall occurs next to the woman in the blue shirt, indicating spillage beyond the location of the other patrons. See Exhibit I and 43-44: 17-3 of Plaintiff's Deposition annexed hereto as Exhibit M. In fact, Plaintiff could not tell how far away the customers were from the spill, because the Plaintiff walked around customers and then slipped. See 33:2-3 of Exhibit M. Plaintiff also stated that there was a lot of oil, spread out on the floor and that oil was on Plaintiff's leg and clothing after Plaintiff's fall. See 34:13-16, 19-20, 24-25 of Exhibit M.

After the incident, Billingsley begins to wipe certain parts of the floor and General Manager Cody Speck later joins in cleaning the floor as well. See Exhibit J. Eventually, a floor scrubbing machine is brought to clean the floor. See Exhibit J. A reasonable jury can conclude that the extent of the spill can be correlated to the extent of the cleaning of certain areas of the floor. Furthermore, the floor scrubbing machine also follows the path along which the cart with the leaking package traveled. See Exhibit J.  Such information can enable a jury to conclude that the spill was larger than suggested or not completely blocked or covered by the customers.

There exists a clear genuine issue of material fact, because the area of the subject incident is adjacent to the patrons and potentially discoverable by the 12:24

P.M. employee. The potential of discoverability can enable a jury to conclude that the 12:24 P.M. employee failed to implement the inspection procedure. The 12:24 P.M. employee that walked by didn't carry out the general "Slip, Trip and Fall Guidelines." Annexed hereto as Exhibit Q. The guidelines specifically state that for "Safety Sweeps All associates have a responsibility to conduct periodic safety sweeps. When conducting a safety sweep, check the entire area including floors, endcaps, side counters and action alley." The 12:24 P.M. employee failed to check the area underneath the patrons, even if Defendant claims that the patrons were blocking the spill. See Exhibit L, page 16. The 12:24 P.M. employee is seen pushing a cart and does make any attempts to check the floor underneath the patrons. See Exhibit G.

Thus, a reasonable jury could find that the 12:24 P.M. employee failed to implement an inspection procedure, or the inspection procedure was not done correctly, even if an area was blocked by patrons, for which the 12:24 P.M. employee could have done a closer inspection to ensure no spillage. Further, if the spillage area was not blocked by the patrons, then a reasonable jury could also conclude that the 12:24 P.M. employee was in a position to easily identify the substance.

### iv. The Crossmark Employee Elizabeth Billingsley's Behavior
### Raises Questions as to Her Relationship with Defendant

Billingsley, wearing a white shirt and green apron, is located in close proximity to the area of the subject incident. See Exhibits A-K, T-W. Billingsley utilizing cleaning materials, such as a spray bottle and paper towel/cleaning cloth, pulled from her station and participating with the cleanup of the spill raises questions of material fact for a reasonable jury. See Exhibits J and X. If Billingsley is not an employee of Defendant, then why did Billingsley assist with the cleanup of the spill? Wouldn't the inspection program be reasonable to **not** have a third-party individual assist with the cleanup since the inspection program is for employees of Defendant? Was Billingsley through Crossmark under an agreement to follow guidelines of Defendant? If yes, do those guidelines include the Defendant's inspection program, and therefore, wouldn't Billingsley have to be on the lookout for spills? With Billingsley near the area of the subject incident, wouldn't Billingsley be in the best position to discover the spill? Billingsley using cleaning materials from her work station and cleaning the area is reminiscent of the guidelines of the inspection program, such as having paper towels in employee pockets or custodial carts of maintenance employees. See Exhibit R. The relationship between Defendant and Billingsley is an issue of material fact, because based on Billingsley's behavior,

Billingsley may have contractual obligations to follow Defendant's guidelines like those of Defendant's employees. If true, then the inspection program would be unreasonable since Billingsley did not regularly inspect the area or Billingsley may have failed to carry out Defendant's inspection program by not inspecting the entire area.

**b. The Present Case is Distinguishable from Cases that Defendant Cited as Factually Similar**

In Brown v. Host/Taco Joint Venture, 305 Ga. App. 248, 250-251 (2010), the plaintiff acknowledged that the spill or "grease spot … was not initially easily visible," said in his deposition that "he did not know the size of the grease spot and that the grease spot was not obvious until after he had fallen."  The manager of defendant stated that she had inspected the area where plaintiff fell 15 minutes prior to his fall and the floor was clean and dry at that time.  Id. at 251.

In Bolton v. Wal Mart Stores, Inc., 257 Ga. App. 198, 198-99 (2002), an assistant manager of the defendant stated that he was in the area of the plaintiff's fall ten to fifteen minutes before the fall and that there was not liquid soap or foreign substance on the floor. Further, plaintiff stated that "between the lights and the color of that floor and where it was at, I would have never seen it in a million years." Id. at 198-199.

In <u>Chastain v. CF Georgia N. Dekalb L.P.</u>, 256 Ga. App. 802, 803–04 (2002), depositions of plaintiff and plaintiff's spouse revealed acknowledgement of the water on the floor not being visible if plaintiff had been looking down, not being easily visible to others, the liquid on the floor was not a puddle, and that one would have to get down to see the water on the floor. Despite a continuous inspection policy, there was no evidence on the record that an employee who could state that the employe walked around the premises during the incident or fall. <u>Id.</u> at 802. The court held that the water was not easily visible, only a small dribble of water in a mall with customers walking. <u>Id.</u> at 804.

<u>Lindsey v. Georgia Bldg. Auth.</u>, plaintiff in this case tripped over a single raised brick that by plaintiff's own admission was difficult to detect and plaintiff's testimony the alleged defect was difficult to see. 235 Ga. App. 718, 719-720 (1998). Plaintiff in that case "[d]uring plaintiff's deposition, [plaintiff] was unable to identify the brick in some photographs shown to him. At the time of the fall, neither [plaintiff nor plaintiff's spouse] was able to ascertain the cause. [plaintiff] only found the brick days later, after a search of several minutes, solely by deducing that because the brick was allegedly raised and [plaintiff] had walked in its general proximity, it had to have caused his fall." <u>Id.</u> at 720.

In contrast to <u>Brown</u>, and <u>Bolton</u>, and <u>Chastain</u>, in this case, there was liquid on the floor when the 12:24 P.M. employee passed by the area of the subject incident. In contrast to <u>Brown</u>, <u>Bolton</u>, <u>Chastain</u>, and <u>Lindsey</u>, Plaintiff is not admitting or acknowledging that the visibility or obviousness of the spill could not be seen upon a reasonable inspection. In other words, Plaintiff's deposition is not making a conclusion on the obviousness or visibility of the spill (i.e. Would the liquid be visible to others?). The deposition of Plaintiff describes what Plaintiff witnessed before Plaintiff's fall: the patrons were blocking part of the floor; Plaintiff couldn't tell how far the spill was from patrons because Plaintiff "just walked around, when [Plaintiff] slipped," and Plaintiff didn't look to see if the substance was visible from a standing position, the last point being in contrast to the plaintiff in <u>Chastain</u> who admitted that the water spill on the floor would not have been visible if the plaintiff had been looking down. <u>See</u> 32:11-24; 33:2-3; 35: 10, 12 of Exhibit M). In contrast to <u>Lindsey</u>, in this case other facts indicate that contrary to what Plaintiff did not notice before Plaintiff's fall, the spill may be more prominent than Defendant's contention.

**2.** **<u>Plaintiff's Claims for Negligent Maintenance of Premises and Vicarious Liability and Negligent Training and Supervision Are Supported by the Evidence</u>**

Summary Judgment should not be granted for Plaintiff's Claims for Negligent Maintenance of Premises, Vicarious Liability, and Negligent Training and Supervision, because those claims are dependent on the constructive knowledge of the Defendant of the spill and the evidence raises issues pertaining to the notification of an employee of Defendant regarding the leaking product, reasonableness of the inspection procedures, and the implementation of the inspection program.

**IV.   CONCLUSION**

The Defendant's Motion for Summary Judgment should be denied.  The facts and the evidence demonstrate that there exist genuine issues of material fact pertaining to Defendant's constructive knowledge of the liquid on the floor on which the Plaintiff slipped and fell.

[SIGNATURE BLOCK ON THE FOLLOWING PAGE]

Respectfully submitted this 21st day of June, 2024.

**770GOODLAW, CAR ACCIDENT LAWYERS, LLC.**

*/s/ Hung Q. Nguyen*
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Attorney(s) for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770) 409-1529 Office
(770) 409-1526 Fax
litigation@770goodlaw.com

## <u>CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1 D</u>

By signature below, counsel certifies that the foregoing document was prepared utilizing 8½" x 11" page with Times New Roman, 14-point font, double spaced, single sided, not containing more than 10 characters per inch of type, margins and page numbering all in compliance with Local Rules 5.1 (C)-(L), and 7.1(D).

Respectfully submitted this 21st day of June, 2024.

**770GOODLAW, CAR ACCIDENT LAWYERS, LLC.**

*/s/ Hung Q. Nguyen*
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Attorney(s) for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770) 409-1529 Office
(770) 409-1526 Fax
litigation@770goodlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have electronically filed the **Plaintiff's Brief in Opposition to Defendant Sam's East, Inc.'s Motion for Summary Judgment** with the Clerk of Court using CM/ECF (Pacer) system which will automatically send email notification of such filing to the following attorney of record.

**Katherine I. Barton, Georgia Bar No. 882335**
**DREW ECKL & FARNHAM, LLP**
**Attorneys for Sam's East, Inc.**
**303 Peachtree Street, NE**
**Suite 3500**
**Atlanta, Georgia 30308**
**(404) 885-1400**
**bartonk@deflaw.com**

Respectfully submitted this 21st day of June, 2024.

**770GOODLAW, CAR ACCIDENT LAWYERS, LLC.**

*/s/ Hung Q. Nguyen*
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Attorney(s) for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770) 409-1529 Office
(770) 409-1526 Fax
litigation@770goodlaw.com