**ARGELIA SOLITO v. SAM'S EAST, INC. ET. AL.**

# Index of Exhibits

**Exhibit A:**   At around 12:14 P.M., a man in a red shirt along with two women in a blue shirt and a pink shirt arrive at the area of the incident.

**Exhibit B:**   At around 12:20 P.M., the customer in the pink shirt points to the man's cart.

**Exhibit C:**   At around 12:20 P.M., the man in the red shirt eventually pulls out an allegedly package from his cart.

**Exhibit D:**   The man in the red shirt eventually carries the allegedly leaking package and walks eastward.

**Exhibit E:**   Around 12:23 P.M., the man in the red shirt, while carrying a different, not leaking package to replace to previous, alleged leaking package, is seen signaling to the package, lifting his arm, and gesturing in a direction while interacting with someone wearing a yellow safety vest.

**Exhibit F:**   After the interaction between the individual wearing the man in the red shirt and the individual wearing the yellow safety vest, at around 12:23:44 P.M., the employee wearing the yellow safety vest appears to walk in the same direction as the man in the red shirt when the man in the red shirt was carrying the allegedly leaking product.

**Exhibit G:**   Around 12:24 P.M., an employee of Defendant walks by the area of the subject incident.

**Exhibit H:**   Around 12:24 P.M., Plaintiff enters the video frame.

**Exhibit I:**   Around 12:25 P.M., Plaintiff slips and falls.

**Exhibit J:**  At around 12:27 P.M., the Crossmark employee Elizabeth Billingsley begins to clean the area, later general manager Cody Speck assists in cleaning the area, and eventually a floor scrubbing machine sweeps the area.

**Exhibit K:**  The Defendant's employees intersected or crossed the path of the man in the red shirt when he was pushing the cart containing the allegedly leaking product prior to entering the area of the subject incident.

**Exhibit L:**  Defendant's Brief in Support of Its Motion for Summary Judgement.

**Exhibit M:**  Deposition of Argelia Solito.

**Exhibit N:**  Floor Plan of Sam's Club Store Number 6409 in Tucker, GA.

**Exhibit O:**  Defendant's photographs of the subject area.

**Exhibit P:**  Defendant's "Strategic Maintenance Overview" Document.

**Exhibit Q:**  Defendant's "Slip, Trip and Fall Guidelines" Document.

**Exhibit R:**  Defendant's Guidelines for Various Topics including Cleaning Spills.

**Exhibit S:**  Declaration of General Manager Cody Speck.

**Exhibit T:**  Prior to Plaintiff's slip and fall, at around 12:13 P.M. a man in a red shirt along with two women in a blue shirt and a pink shirt are first seen at the north end of the aisle.

**Exhibit U:**  Employee wearing a yellow safety vest that says "Sam's Club."

**Exhbiti V:**  The Sam's Club store No. 6409 at 1940 Mountain Industrial Blvd. Tucker, Georgia 30084 has inventory of the Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad and the aisle containing the product can be seen from the area where the man in the red shirt and the employee in the yellow safety vest were discussing.

**Exhibit W:**  Around 12:27 P.M. the Crossmark employee Elizabeth Billingsley brings from her work station a cleaning materials, including a spray bottle and what appears to be a cleaning cloth or paper towel.

# EXHIBIT

At around 12:14 P.M., a man in a red shirt along with two women in a blue shirt and a pink shirt arrive at the area of the incident.

08/05/2021 12:14:46 PM (EDT)

# EXHIBIT

# B

At around 12:20 P.M., the customer in the pink shirt points to the man's cart.

08/05/2021 12:20:12 PM (EDT)

# EXHIBIT

# C

At around 12:20 P.M., the man in the red shirt eventually pulls out an allegedly package from his cart.

08/05/2021 12:20:27 PM (EDT)

# EXHIBIT

# D

The man in the red shirt eventually carries the allegedly leaking package and walks eastward.

08/05/2021 12:20:35 PM (EDT)

08/05/2021 12:20:56 PM (EDT)



08/05/2021 12:21:01 PM (EDT)

# EXHIBIT

# E

Around 12:23 P.M., the man in the red shirt, while carrying a different, not leaking package to replace to previous, alleged leaking package, is seen signaling to the package, lifting his arm, and gesturing in a direction while interacting with someone wearing a yellow safety vest.



08/05/2021 12:22:59 PM (EDT)

08/05/2021 12:22:59 PM (EDT)

08/05/2021 12:23:01 PM (EDT)

08/05/2021 12:23:02 PM (EDT)

08/05/2021 12:23:03 PM (EDT)



08/05/2021 12:23:05 PM (EDT)

08/05/2021 12:23:06 PM (EDT)

08/05/2021 12:23:07 PM (EDT)



08/05/2021 12:23:09 PM (EDT)

08/05/2021 12:23:10 PM (EDT)

08/05/2021 12:23:11 PM (EDT)

# EXHIBIT

# F

After the interaction between the individual wearing the man in the red shirt and the individual wearing the yellow safety vest, at around 12:23:44 P.M., the employee wearing the yellow safety vest appears to walk in the same direction as the man in the red shirt when the man in the red shirt was carrying the allegedly leaking product.

08/05/2021 12:23:44 PM (EDT)

# EXHIBIT

# G

Around 12:24 P.M., an employee of Defendant walks by the area of the subject incident.

08/05/2021 12:24:25 PM (EDT)

08/05/2021 12:24:26 PM (EDT)

08/05/2021 12:24:28 PM (EDT)

08/05/2021 12:24:29 PM (EDT)

08/05/2021 12:24:30 PM (EDT)

# EXHIBIT

# H

Around 12:24 P.M., Plaintiff enters the video frame.

08/05/2021 12:24:56 PM (EDT)

# EXHIBIT

# I

Around 12:25 P.M., Plaintiff slips and falls.

08/05/2021 12:25:11 PM (EDT)

# EXHIBIT

# J

At around 12:27 P.M., the Crossmark employee Elizabeth Billingsley begins to clean the area, later general manager Cody Speck assists in cleaning the area, and eventually a floor scrubbing machine sweeps the area.

08/05/2021 12:27:30 PM (EDT)

08/05/2021 12:27:38 PM (EDT)

08/05/2021 12:28:04 PM (EDT)

08/05/2021 12:28:18 PM (EDT)

08/05/2021 12:28:54 PM (EDT)

08/05/2021 12:29:11 PM (EDT)

08/05/2021 12:35:20 PM (EDT)

08/05/2021 12:36:03 PM (EDT)

08/05/2021 12:36:15 PM (EDT)

08/05/2021 12:36:19 PM (EDT)

08/05/2021 12:36:54 PM (EDT)

08/05/2021 12:37:10 PM (EDT)

08/05/2021 12:37:21 PM (EDT)

08/05/2021 12:42:49 PM (EDT)

08/05/2021 12:44:44 PM (EDT)

08/05/2021 12:45:10 PM (EDT)

08/05/2021 12:45:26 PM (EDT)

08/05/2021 12:45:34 PM (EDT)

08/05/2021 12:47:45 PM (EDT)

08/05/2021 12:48:16 PM (EDT)

08/05/2021 12:49:49 PM (EDT)

08/05/2021 12:50:11 PM (EDT)

08/05/2021 12:50:11 PM (EDT)

08/05/2021 12:53:16 PM (EDT)

08/05/2021 12:53:54 PM (EDT)

08/05/2021 12:54:15 PM (EDT)

# EXHIBIT

# K

The Defendant's employees intersected or crossed the path of the man in the red shirt when he was pushing the cart containing the allegedly leaking product prior to entering the area of the subject incident.

08/05/2021 12:15:06 PM (EDT)

08/05/2021 12:15:52 PM (EDT)

# EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ARGELIA SOLITO,<br><br>Plaintiff,<br>v.<br><br>SAM'S EAST, INC., JOHN DOE 1-2, ABC CORP., and XYZ CORP.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case 1:23-cv-03438-MLB |

**<u>DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

COMES NOW Defendant Sam's East, Inc. ("Sam's" or "Defendant" herein) and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of this Court's Local Rules, hereby files this Brief in Support of its Motion for Summary Judgment, showing this Honorable Court as follows:

## I. INTRODUCTION

This case arises from a slip-and-fall that occurred on August 5, 2021 at Sam's Club Store No. 6409 in Tucker, Georgia ("the store"). (*See generally*, Complaint). Plaintiff claims that on the day of the subject incident, she was walking through the bakery section of the store when she slipped and fell in "oil spillage." (Compl., ¶¶ 13-15). The surveillance footage of the subject incident (a true and accurate copy of which is being mailed to the Court via FedEx on a USB drive as **Exhibit "A"**) shows

that approximately eleven minutes prior to Plaintiff's fall, a group of customers entered the area of the incident with a leaking package of chafing fuel in one of their shopping carts. The customers continued to stand in front of the spill until Plaintiff walked into the area and slipped approximately eleven minutes later. (Exhibit A, 12:14:45 PM to 12:25:11 PM).

Plaintiff filed the lawsuit against Sam's seeking damages for the personal injuries she allegedly sustained in the fall. Plaintiff asserts claims of premises liability, negligent maintenance, vicarious liability, negligent training and supervision, and negligence per se against Sam's. (*See generally*, Compl.). However, Plaintiff cannot prove that Sam's had actual or constructive knowledge of the oil spill, and therefore cannot succeed on her negligence claims against Sam's. Since the remaining allegations in Plaintiff's Complaint are derivative in nature, summary judgment as to all claims is proper as a matter of law.

## II. STATEMENT OF FACTS

### *A. The Subject Incident*

On August 5, 2021, Plaintiff Argelia Solito went shopping at Sam's Club Store No. 6409 in Tucker, Georgia. (*See generally*, Compl.). Prior to this date, Plaintiff shopped at Sam's Club every one to two weeks. (Deposition of Plaintiff

Argelia Solito, p. 29:21-25, a true and accurate excerpt[1] of which is attached hereto

as **Exhibit "B"**). Plaintiff was shopping alone, and believes she was in the store for

approximately half an hour prior to the subject incident. (Plaintiff's Deposition, p.

30:17-25). Based on the surveillance footage, Plaintiff's fall occurred at 12:25:11

PM. (Ex. A). Thus, Plaintiff likely arrived at the store at approximately 11:55AM.

The surveillance footage from the day of the incident shows that at 12:14 PM, as

Plaintiff shopped in another part of the store, a group of shoppers entered the bakery

area:



The group consisted of four customers (a man in a red shirt, and three women

in pink, blue, and gray shirts) with three shopping carts. They remained in the area

for approximately twelve minutes. (Exhibit A, 12:14:45 PM to 12:26:51 PM).

---

[1] Pursuant to the Court's Standing Order, Plaintiff's entire Deposition Transcript is filed separately
under a Notice of Filing Original Deposition Transcript, filed concurrently herewith.

At 12:17:11 PM, the man in the red shirt begins to rearrange the items in the group's three shopping carts, transferring items from one cart to another. At 12:20:12 PM, the woman in the pink shirt points to something in one of the carts.



The man in the red shirt goes over to the cart and inspects the contents, eventually pulling out a rectangular package.



The rectangular package was later identified by Sam's Club Store No. 6409 General Manager Cody Speck as a package of Member's Mark 6-Hour Safe Heat

Chafing Fuel with PowerPad[2] (or another similar chafing fuel product). (Declaration of Cody Speck ¶¶ 6-8, a true and accurate copy of which is attached hereto as **Exhibit "C"**). The product had leaked out of the package and onto the floor. (Speck Declaration, ¶¶ 6-7).

The man in the red shirt walks around the area of Plaintiff's fall with the package, inspecting the package and looking toward the floor as he does so, before eventually walking to the back of the store where the chaffing fuel is kept. (Exhibit A, 12:20:28 PM to 12:21:03 PM). Three minutes later, the man returns to the area with another (presumably different and not leaking) package of chafing fuel and places it in one of the shopping carts. (Speck Declaration, ¶ 8).

[2] This product can be found at the following link: https://www.samsclub.com/p/members-mark-6-hour-safe-heat-chafing-fuel-with-powerpad-12ct/173308. Chafing fuel is a type of fuel used to heat food in a chafing dish, which is commonly seen in buffet setups and catering services.

At 12:24:49, Plaintiff enters the frame.

After looking at the merchandise displayed in the bakery section for approximately 15 seconds, Plaintiff leaves her shopping cart and begins to walk behind the group of customers into the main aisle. At her deposition, Plaintiff explained that she needed to get bread that was on the other side of the display and had to leave her cart because she could not get by the group of customers. (Plaintiff's Deposition, pp. 31:10-22; 42:2-7). At 12:25:11 PM, Plaintiff slips and falls.

Plaintiff testified that she first saw the fuel when she was already on the floor. (Plaintiff's Deposition, p. 34:10-12). Plaintiff admitted there was nothing preventing her from seeing the floor as she walked other than the group of customers standing close to where the fuel was spilled. (Plaintiff's Deposition, p. 32:11-23). Plaintiff could not tell the source of the fuel, how long the fuel had been on the floor, or if the fuel was clear or had a color. (Plaintiff's Deposition, pp. 35:11-12; 85:13-15; 93:3-5). Plaintiff described the fuel as "spread out," but could not describe the dimensions of the spill in greater detail. (Plaintiff's Deposition, p. 34:13-16). Importantly, Plaintiff also did not recall seeing any tracks in the fuel from other people previously traversing through it. (Plaintiff's Deposition, p. 35:1-3).

At 12:25:28 PM, General Manager Cody Speck enters the frame with (former) Market Manager Anthony Morreale, and they assist Plaintiff, along with Crossmark employee Elizabeth Billingsley, who had been handing out samples in the area. (Speck Declaration, ¶¶ 5-6). Mr. Speck is seen in the red circle, Mr. Morreale is seen in the blue circle, and Ms. Billingsley is seen in the green circle, below.



The group of four customers leave the scene shortly thereafter. Plaintiff remains on the floor until 12:30:44 PM, when Mr. Speck and Mr. Morreale help Plaintiff into a wheelchair. When she got up from the floor after her fall, Plaintiff did not look to see whether the fuel was visible from a standing position. (Plaintiff's Deposition, p. 35:4-10). Former Front-End Manager Keira Saffold arrives on the scene to fill out the Customer Incident Report, and can be seen at 12:32:38 PM taking photographs of the area on her phone before wheeling Plaintiff out of frame at 12:34:56 PM. (Speck Declaration, ¶ 9) (True and accurate copies of the photographs taken by Ms. Saffold are attached hereto as **Exhibit "D"**).



Plaintiff was shown the photos at her deposition and asked whether she recognized the substance causing her fall. (Plaintiff's Deposition, pp. 37-38:9-10; Exhibit "2" to Plaintiff's Deposition). Upon review of the photos, Plaintiff testified that she could not identify anything. (Plaintiff's Deposition, pp. 38-39:9-19).

*B. Sam's Inspection Procedures*

All employees of Sam East, Inc. employees inspect and monitor the store for potential hazards as they walk through the store and identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. (Speck Declaration, ¶ 10) (A true and accurate copy of Sam's East, Inc.'s Slip, Trip, and Fall Guidelines are attached hereto as **Exhibit "E"**; a true and accurate copy of Sam's East, Inc.'s Spill Clean Up Procedures are attached hereto as **Exhibit "F"**). Employees are expected to be alert, look for hazards, and

correct the hazards quickly. (Exhibit E). Sam's employs a "clean as-you-go" method and emphasizes the importance of immediate hazard clean up by enforcing the "Towel in Pocket Program," which requires that every employee put a paper towel or pocket pad in their pocket prior to starting their shift in order to provide an easy way to immediately clean up a small spill. (Exhibit E; Exhibit F). If an employee notices any hazard on the floor, the employee immediately blocks off the spill, calls for assistance, and monitors the spill until it is cleaned up in order to prevent a customer or another employee from coming in contact with the spill or tracking it through the store. (Exhibit F).

In this case, an employee walked through the area of the subject incident at 11:46:00 AM, 11:46:10 AM, 11:47:26 AM, and 12:24:25 PM (less than one minute prior to Plaintiff's fall). None of these employees saw any spill or were informed of the presence of any spill by a customer or anyone else.





**III. <u>STANDARD OF REVIEW</u>**

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1073 (11th Cir. 2003). A fact is not material if a dispute over that fact will not affect the outcome of the legal issue before the court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

Once the moving party has discharged its burden of demonstrating that there is an absence of evidence to support the essential elements of the non-moving party's case, the non-moving party must present evidence to establish a genuine issue of material fact. In so doing, he must go beyond the pleadings and submit evidence sufficient to demonstrate that a jury could reasonably find by a preponderance of the evidence that he is entitled to a verdict in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson*, 477 U.S. at 248. [W]hile it is true that all reasonable inferences must be drawn in the non-moving party's favor, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Shotz v. City of Plantation*, 344 F.3d 1161, 1184 (11th Cir. 2003) (internal citations omitted). Indeed, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find . . . by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* (Citation omitted).

## IV. ARGUMENT AND CITATION TO AUTHORITY

*A. Plaintiff Cannot Establish the Essential Elements of Negligence.*

"To state a cause of action for negligence in Georgia, it is necessary to establish the essential elements of duty, breach of that duty, and proximate causation, as well as damages, as a basis for liability for the injuries of another." *Robertson v. Metro. Atlanta Rapid Transit Auth.*, 199 Ga. App. 681, 681 (1991). Though issues of negligence, contributory negligence, and lack of ordinary care for one's own safety are not usually susceptible to summary adjudication, the trial court can conclude as a matter of law that the facts do not show negligence on the part of the defendant where the evidence is plain, palpable, and undisputable. *Robinson v. Kroger Co.*, 268 Ga. 735, 739 (1997). Here, Plaintiff alleges both premises liability and negligent maintenance against Sam's.

**1. Premises Liability**

Pursuant to O.C.G.A. § 51-3-1, an owner or occupier of land who invites "others to come upon his premises for any lawful purpose, ... is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." "Mere proof of an injury, however, does not establish liability." *Ingles Markets, Inc. v. Rhodes*, 340 Ga. App. 769, 770 (2017). "The true basis for liability is the superior knowledge of the proprietor of the

existence of a condition that may subject the invitee to an unreasonable risk of harm." *Id.* (Citation and punctuation omitted). "To demonstrate negligence in a foreign substance slip and fall case, a plaintiff must show that the defendant had knowledge, actual or constructive, of the substance <u>*and*</u> that she was without such knowledge." *Roberson v. Winn-Dixie Atlanta, Inc.*, 247 Ga. App. 825, 825 (2001) (Emphasis added). As the evidence in this case clearly shows, Sam's had neither actual nor constructive knowledge of the spilled chaffing fuel.

I. <u>Actual Knowledge</u>

Though Plaintiff alleged in her Complaint that Defendant had actual knowledge of the spill (Compl., Count I ¶ 2 [*sic*][3]), the record is entirely devoid of any evidence demonstrating that Defendant had actual knowledge of the chaffing fuel at any time prior to Plaintiff's fall. The only deposition taken thus far in this case is the deposition of the Plaintiff, and she made no averments that Sam's had any knowledge of the fuel in which she slipped. (*See generally*, Plaintiff's Deposition).

Further, during discovery, Plaintiff was specifically asked to "[s]tate the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident;

[3] Plaintiff's Complaint restarts numbering following Paragraph 17.

identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts." (Plaintiff's Response to Defendant's First Interrogatories ("Interrogatories"), Interrogatory No. 19, a true and correct redacted[4] copy of which is attached hereto as **Exhibit "G"**). In response, Plaintiff stated: "Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence." (Plaintiff's Response to Interrogatory No. 19). Despite the ten months that have elapsed since Plaintiff's Responses, Plaintiff has neither supplemented her Interrogatory Responses nor requested to depose Defendant or any of its employees. Thus, there is no evidence that Defendant had actual knowledge of the spill; therefore, the inquiry must focus on Defendant's constructive knowledge.

II. Constructive Knowledge

To establish constructive knowledge, Plaintiff is "required to show either that (1) a [Sam's] employee was in the immediate area of the hazard and could have

[4] In an effort to preserve Plaintiff's Privacy, Defendant is only attaching the Interrogatory Responses as relevant to the instant motion. However, should this Court require an unredacted version, Defendant will promptly provide it.

easily seen the substance or (2) the alleged hazard remained on the floor long enough that ordinary diligence by [Sam's] employees should have discovered it." *Brown v. Host/Taco Joint Venture*, 305 Ga. App. 248, 250 (2010).

In this case, Plaintiff admitted she does not know the length of time the fuel had been on the floor. (Plaintiff's Deposition, p. 85:13-15). However, the surveillance footage shows that the shopping cart containing the leaking package of chaffing fuel entered the area where Plaintiff fell at 12:14:45 PM – less than eleven minutes before Plaintiff fell at 12:25:11 PM. (Exhibit A). Though an employee walked by the general area of the fall at 12:24:25 PM, the employee's view was clearly blocked by the other patrons in the area. Georgia law holds that "showing that an employee was merely working in the immediate area of a foreign substance is not enough; the employee must have been in a position to have easily seen the substance and removed it." *Brown*, 305 Ga. App. at 250 (Citation omitted).

During discovery, Plaintiff was specifically asked to "describe, in detail, the substance which you contend caused your fall, including but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance. Please identify the source of the substance at issue, where it came from, and where it was located when you fell." (Interrogatory No. 8). In response, Plaintiff stated, "Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of

the source of the substance and where it came from. It was located near the bread isle [*sic*].” (Plaintiff’s Response to Interrogatory No. 8). Additionally, Plaintiff admitted that she did not see the spill until she had already fallen, she did not look to see whether the spill was visible from a standing position, did not see whether the fuel was clear or had a color, and that the group of customers obstructed her view. (Plaintiff’s Deposition, pp. 32:11-23; 34-35:10-12). Thus, Plaintiff confirms that the patrons in the area blocked the view of the spill.

There is no evidence in the record establishing that the spill could have been easily seen and removed by an employee. A long line of cases supports the grant of summary judgment in factually similar situations. *See, e.g., Brown*, 305 Ga. App. at 250-51 (plaintiff admitted that grease spot on floor was not easily visible and therefore failed to establish that defendant could have easily seen and removed grease prior to fall); *Bolton v. Wal Mart Stores, Inc.*, 257 Ga. App. 198, 198 (2002) (customer who slipped on clear liquid substance in store failed to establish store's constructive knowledge despite employees being in the area at the time of the fall where customer testified that the color of the floor and lighting conditions made substance undetectable, and employee had been in the exact area ten to fifteen minutes earlier, at which time the floor was clear of any foreign substance); *Chastain v. CF Georgia N. Dekalb L.P.*, 256 Ga. App. 802, 803–04 (2002) (no evidence

reasonable inspection would have discovered a "two and a half foot line of dribbled water" where plaintiff testified that the water was not "easily visible"); *Lindsey v. Georgia Bldg. Auth.*, 235 Ga. App. 718, 719 (1998) (no inference of constructive knowledge where plaintiff testified that single raised brick on the edge of the landing "was extremely difficult to see" and was unable to identify the brick in photographs shown to him during his deposition[5]).

Plaintiff is unable to prove that Defendant had knowledge (actual or constructive) of the spilled chaffing fuel. Therefore, her premises liability claim fails as a matter of law.

**2. <u>Negligent Maintenance</u>**

Plaintiff claims that Defendant was "negligent in failing to properly maintain the walkway." (Compl., ¶ 24 [*sic*][6]). However, Plaintiff's "negligent maintenance" claim is simply a reiteration of Plaintiff's premises liability claim. Plaintiff's Complaint states that Defendant had "actual or constructive knowledge of the hazardous condition of the walkway for patrons of the Store," that Defendant "owed a non-delegable duty of case in keeping the premises safe for invitees such as Plaintiff," and Defendant was "negligent in failing to properly inspect the walkway."

---

[5] Similarly, in this case, Plaintiff was shown photographs during her deposition and was unable to identify the spill. (Plaintiff's Deposition, pp. 38-39:9-19).

[6] Plaintiff's Complaint is misnumbered.

(Compl., ¶¶ 19, 22, 23). The "condition of the walkway" Plaintiff is apparently referring to is the spilled chaffing fuel. However, as Defendant discussed in Subsection A (1), *supra*, Defendant had no knowledge of the spill.

While it is true that an owner/occupier owes an invitee the duty of ordinary care in keeping the premises and approaches safe, proof of a fall, without more, does not create liability on the part of a proprietor or landowner because "it is common knowledge that people fall on the best of sidewalks and floors." *Glynn-Brunswick Mem'l Hosp. Auth. v. Benton*, 303 Ga. App. 305, 307 (2010). To presume that a proprietor has somehow been negligent just because a customer falls in a store would make the proprietor an insurer of his customer's safety. Under Georgia law, a proprietor is specifically *not* an insurer of its customer's safety. *H.J. Wings & Things v. Goodman*, 320 Ga. App. 54, 55 (2013).

Importantly, "in the absence of evidence [that] a reasonable inspection would have discovered the foreign substance, no inference can arise that defendant's failure to discover the [defect] was the result of its failure to inspect." *Hopkins v. Kmart Corp.*, 232 Ga. App. 515, 518 (1998) (Citation and punctuation omitted). The undisputed evidence in the record shows that the fuel was spilled from another customer's shopping cart a mere eleven minutes prior to Plaintiff's fall. During the entirety of that time, the group of customers stood directly in front of the spill. An

employee walked by the area of the fall, but this employee's view was blocked by the other patrons. Plaintiff also failed to see the substance on the floor due to the presence of the other patrons. Accordingly, summary judgment is warranted.

*B. An alleged violation of O.C.G.A. § 51-3-1 cannot support a claim for negligence per se.*

Count IV [*sic*][7] of Plaintiff's Complaint alleges that Defendant is negligent per se due to Defendant's alleged violation of O.C.G.A. § 51-3-1. However, this statute cannot support a claim for negligence per se. *Sanders v. QuikTrip Corp.*, 378 F. Supp. 3d 1177, 1194 (N.D. Ga. 2019); *see also Burns v. Colonial Stores, Inc.*, 90 Ga. App. 492, 494-95 (1954) (clarifying that a violation of a statutory provision is not negligence per se where "the liability described by th[at] [provision] is simply the common-law liability for injury to another through negligence"); *Williamson v. Kidd*, 65 Ga. App. 285 (1941) (indicating that prior provision of Georgia law which is virtually identical to Section 51-3-1 is a codification of "anciently recognized" common law establishing "the duty of a master to use ordinary care to keep his premises safe"). Plaintiff has not identified any other statute to support her negligence per se claim. Therefore, Defendant is entitled to summary judgment on Plaintiff's negligence per se claim.

[7] There are two "Count IV"s in Plaintiff's Complaint. Had the Complaint been properly numbered, Plaintiff's negligence per se claim would be "Count V."

*C. Plaintiff's Derivative Claims of Vicarious Liability and Negligent Training and Supervision are unsupported and fail as a matter of law.*

Plaintiff's remaining claims are derivative. Under Georgia law, "[f]or the negligence of one person to be properly imputable to another, the one to whom it is imputed must stand in such a relation or privity to the negligent person as to create the relation of principal and agent." O.C.G.A. § 51-2-1 (a). In other words, if a Plaintiff does not show that an employee was liable, the Plaintiff cannot hold the employer liable under a theory of respondeat superior. *Greenway v. S. Health Partners, Inc.*, 827 F. App'x 952, 963 (11th Cir. 2020), cert. denied, 141 S. Ct. 1687, 209 L. Ed. 2d 464 (2021); *Trabue v. Atlanta Women's Specialists, LLC*, 349 Ga. App. 223, 231 (2019), aff'd, 310 Ga. 331 (2020) ("An employer's vicarious liability is derivative and imposed by statute, based solely on its status as the active tortfeasor's employer.").

In this case, the evidence of the record does not support a finding of negligence with regard to any of Defendant's employees. The only negligent act apparent from the evidence in the case is the conduct of the group of customers who allowed chaffing fuel to be spilled onto the floor without notifying a store employee about the spill. It is axiomatic that without first proving that an agent or employee of and Sam's was negligent, Sam's cannot be held liable under a theory of vicarious liability.

Similarly, "[a]n employer may be held liable for negligent supervision only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." (Citation and Punctuation Omitted.) *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 841 (2009). Also, an employer may only be held liable for a negligent training claim if the plaintiff can provide that an employee's inadequate training caused a reasonably foreseeable injury. *Advanced Disposal Servs. Atlanta, LLC v. Marczak*, 359 Ga. App. 316, 319 (2021), cert. denied (Sept. 21, 2021*); Doe I v. Young Women's Christian Ass'n of Greater Atlanta, Inc.*, 321 Ga. App. 403, 408 (2013) ("In order to defeat summary judgment on [a claim for negligent training and supervision], a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.").

Here, Plaintiff may not maintain claims of negligent training and supervision without first identifying an employee or agent of Sam's whose negligent acts or training caused her fall. It is indisputable that Plaintiff has failed to show, nor can she show, that any employee or agent of Sam's was even involved in the subject incident. As such, Plaintiff's derivative claims fail as a matter of law.

## V. CONCLUSION

WHEREFORE, in consideration of the foregoing, Defendant Sam's East, Inc. respectfully requests that its Motion for Summary Judgment be GRANTED as to all of Plaintiff's claims.

Respectfully submitted, this 3rd day of June, 2024.

**DREW ECKL & FARNHAM, LLP**

*/s/ Katherine I. Barton*
Michael L. Miller
Georgia Bar No. 508011
Katherine I. Barton
Georgia Bar No. 882335
*Attorneys for Sam's East, Inc.*

303 Peachtree Street, NE
Suite 3500
Atlanta, Georgia 30308
(404) 885-1400
millerm@deflaw.com
bartonk@deflaw.com

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ARGELIA SOLITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case 1:23-cv-03438-MLB |
| | ) | |
| SAM'S EAST, INC., JOHN DOE 1-2, ABC CORP., and XYZ CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

Today I served a copy of *Defendant Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment* upon all parties to this matter by filing with the Court's CM/ECF system, which will automatically e-mail notification of same to the following counsel of record:

Adam J. Klein, Esq.
Hung Q. Nguyen, Esq.
HQ Alex Nguyen Law Firm LLC
litigation@770goodlaw.com
5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
*Attorneys for Plaintiff*

I further certify that the foregoing has been prepared with Times New Roman, 14-point font, in compliance with L.R. 5.1(C).

This 3rd day of June, 2024.

**DREW ECKL & FARNHAM, LLP**

/s/Katherine I. Barton
Katherine I. Barton
Georgia Bar No. 882335
*Attorneys for Sam's East, Inc.*

303 Peachtree Street, NE
Suite 3500
Atlanta, Georgia 30308
(404) 885-1400
bartonk@deflaw.com

14241534/1
05695-260504

# EXHIBIT A

Placeholder for Surveillance Footage from Sam's Club Store No. 6409 on August 5, 2021 - USB drive sent via FedEx to United States District Court for the Northern District of Georgia, Atlanta Division Clerk.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

ARGELIA SOLITO, )
)
)
Plaintiff, )
)
v. )
) CASE 1:23-cv-03438-MLB
SAM'S EAST, INC., JOHN )
DOE 1-2, ABC CORP., and )
XYZ CORP., )
)
)
Defendants. )

\- - -

The Deposition of ARGELIA SOLITO, taken at the instance of the Defendants, pursuant to stipulations contained herein; before Alecia Wright, Certified Court Reporter, at 5495 Jimmy Carter Boulevard, Suite B-17, Norcross, Georgia 30093, at 1:00 p.m. on December 11, 2023.

Reported by: Alecia Wright
Certified Court Reporter
Georgia
License No. 4902-5798-3471-6160

**Q Okay. All right. That's all we wanted to know. All right.**

**Okay. And prior to this lawsuit that we're talking about today, have you ever brought any other lawsuits before?**

A No, not that I remember.

**Q Okay. All right. So now I want to talk about the incident that happened at Sam's Club.**

A Okay.

**Q Okay. Do you remember what time this accident happened?**

A Around 11 or 12, I think.

**Q Okay. Do you remember what you were doing earlier that morning?**

A Before going to the store?

**Q Yes.**

A Well, I was at home.

**Q Okay. And did you have any plans for later?**

A No.

**Q Okay. So how many times have you been to the Sam's Club in Tucker, Georgia, before this incident?**

A Every week or every two weeks, I would go shopping there.

**Q And have you been back since the time of your fall?**

A To the store?

**Q Yes.**

A Yes.

**Q Do you still go once a week?**

A No. Now I go with my daughter every month.

**Q Okay. Do you remember why you were there on the day of the incident?**

A Yes. I was shopping because the next day I was going to start working.

**Q Where were you going to start working?**

A I don't remember the name of the company, but it was a sewing company.

**Q And you hadn't started work yet?**

A No.

**Q Okay. All right. And were you shopping with anyone?**

A No, it was just me.

**Q Okay. Did you speak to anyone at the store before you fell?**

A No.

**Q And how long were you in the store before you fell?**

A I think about a half an hour.

**Q Do you know anyone who works at the store?**

A No.

**Q Okay. And in the 24 hours prior to your fall, had you taken any prescription medicine?**

A No.

**Q Any over-the-counter medicine?**

A No.

**Q Any alcohol?**

A No, I don't drink.

**Q Okay. Okay. So why don't you tell me in your own words what happened from the time you parked in the parking lot until your fall.**

A I went into the store. I was there for, like, half an hour. I went to the area where the bread is, and I needed to get a piece of bread that was on the other side, like, going all around to the other side of the table. But there were two ladies talking, and they had the shopping cart there and I couldn't get by, so I left my cart on this side and I walked over. And when I was walking, about to turn is when I fell because there was oil spilled there and there wasn't a sign.

**Q Okay. So you fell -- you were still in the bread aisle when you fell; right?**

A Yes.

**Q Okay. And you said there were two ladies?**

A Yes.

**Q Okay. And you said that they were blocking the area.**

**What did you mean by that?**

A Yes. They were talking.

**Q Okay. Did you have to walk by the ladies to get to the other side?**

A Yes. I just walked over there because I couldn't go over with my cart.

**Q Okay. Was there anything in front of you that prevented you from seeing the floor as you walked?**

THE INTERPRETER: Oh, the interpreter needs to ask for a clarification.

Was there any -- anything in front of you preventing you from seeing the --

MS. BARTON: -- floor.

THE INTERPRETER: Ah. Okay. Thank you.

A No, just the ladies that were standing there. So they were standing there, and I just walked up, and I didn't imagine that that was spilled down there.

BY MS. BARTON:

**Q Okay. How close to the ladies was the**

**you fell?**

A I remember that this leg landed like this (indicating), like, backward.

**Q Okay.**

A I remember this leg was, like, back here (indicating), and what I do remember is I couldn't get up because I wasn't able to straighten my leg.

**Q And which leg was it?**

A The right one.

**Q At what point did you see the oil on the floor?**

A When I was already on the floor.

**Q Was it a lot of oil?**

A There was a lot.

**Q Was it, like, a puddle or more spread out?**

A It was, like, spread out.

**Q And how did you know that it was oil?**

A Because I touched it when I fell.

**Q Did it get on in any of your clothes?**

A Yes.

**Q Did you take any pictures of your clothing with the oil on it?**

A No.

**Q Where was the oil on your clothing?**

A On my leg.

**Q Were there any footprints in the oil that you could see from prior people walking through it?**

A I didn't notice that.

**Q When you eventually stood up, were you able to see the oil on the floor?**

A No, I didn't notice because the manager and another man were the ones that came and got me up.

**Q Okay. So you don't know whether or not the substance was visible from a standing position?**

A No, I didn't look, to be honest with you.

**Q Did the oil have a color?**

A I didn't see.

**Q Did you see anyone else in the area other than the two women?**

A There was a cleaning lady.

**Q Okay. How did you know she was a cleaning lady? Did she have a cart with her?**

A Yes, she told me. Well, not exactly cleaning, but she was there, like, arranging things.

**Q Okay. Other than that person, anyone else?**

A No, not that I remember.

**Q Okay. So we talked about how your leg went out from under you, went backwards when you fell.**

**Did -- do you recall if you hit any other body parts?**

fell?

A No.

Q Did you take any photographs of the area?

A No.

Q Did you ever return to the store to photograph the area?

A No, because I just called my son and he took me to the hospital.

Q Okay. Okay. We'll mark these store photos as Defense Exhibit 2.

(Defendant's Exhibit No. 2 was marked for identification.)

BY MS. BARTON:

Q And I'll let your attorney look at them first.

Okay. Will you please take a look at the photos, and you can flip through them, look at them.

A What is it that I'm supposed to see here?

Q I just want you to take a look at the -- the pictures cause I'm going to ask you about them in a second.

And I will state, while you're looking at that, for the record, that the photographs that are marked 1 through 5 were taken at the store on the day of the incident, and photographs 6, 7, and 8 were

ones that I took, so they don't represent it how it looked the day of the accident, but it is the same area.

Okay. So if you will look at the -- the first page -- and it is photo of a photo, so it is someone's phone. And in the phone, on the bottom left corner, it looks like that is where the oily substance is.

Does that look like what the oil looked like when you saw it?

A I can't make out anything here.

Q Okay. It's a little shinier in the second picture. Okay. And this is another photo of a photo.

Can you see the oil better in this picture?

A I can't make it out, to be honest with you.

Q Okay. And if you will please go to the last page, page 8, does this show the area in which you fell?

MS. TAYLOR: If you don't know and if you're not sure, you can let her know that.

BY MS. BARTON:

Q Okay. That's fine.

A No, to tell you the truth.

Q If you will just do me a favor and look at

**photos 3, 4, and 5 and see if you can pick out any of the oil in those pictures?**

MS. TAYLOR: Are you stipulating that there was oil on the floor?

MS. BARTON: We have already (indiscernible) there was oil on the floor.

A You said 3 and 5?

BY MS. BARTON:

**Q Yeah, 3, 4, and 5, if you see any oil in those pictures.**

MS. TAYLOR: Are you asking her to be a expert in what, oil --

MS. BARTON: I'm just asking if she is -- can pick out oil in any of the pictures.

MS. TAYLOR: If -- if you -- if you know for a fact that it's oil and you can state that with a hundred percent certainty, feel free to answer the question.

A No. To be honest with you, I don't know.

BY MS. BARTON:

**Q Okay. I'll take those back, then.**

**All right. And have you seen the surveillance footage from this accident?**

A No. The lady said that she was going to send it to me by e-mail, but I never received it.

20 seconds.

Okay. So looking at the still, are these -- the group of shoppers that's in front of the -- the white refrigeration unit right here, is that the group of ladies that you saw?

A Yes. Yes, and I couldn't get by. That's why I left my cart right there.

Q Okay. And that was my next question is: These were the carts that you were saying, right here on the screen, that you couldn't get around?

A Yes. Yes.

Q Okay. And you had mentioned there was a woman arranging things.

Was it the woman that you -- you can see here that has the green apron on?

MS. TAYLOR: I'm gonna object.

I don't see that she had no green apron on. The blue shirt -- the lady with the blue shirt on, or --

A No, I -- I don't know.

BY MS. BARTON:

Q Okay. All right. And we'll just watch it one more time, the same timestamps as before. Let me get it closer to you.

(Whereupon, a video recording was played.)

 BY MS. BARTON:

**Q Okay. So it is a little difficult to see in the video, but it looks like the oil was behind the shopping cart.**

**Is that what you recall?**

MS. TAYLOR: Objection.

Is that you testifying to where the oil is, cause I don't know that that's a piece of evidence in fact? If you would like to ask her if she knew where the oil was, you can ask her. But I prefer you not to testify as to where things were.

BY MS. BARTON:

**Q All right. So in this -- let's go back to exactly when you fell. Okay. So looks like you are falling at 12:25 and 11 seconds.**

**Do you remember where the substance was that you slipped on?**

A Well, it must have been where I slipped.

**Q Okay. And to me -- well, I'll -- I'll ask it this way.**

**And that was behind one of these people with the shopping cart; correct?**

A I do remember that there was some carts there, but I don't remember whose.

**Q Okay. I was just asking if the spill was behind a cart.**

A Where I fell is where it is.

**Q Okay. Okay. So after you fell, how long did you stay in the store?**

A I just waited until my son arrived. I think it was about 20 minutes.

**Q Did anyone ask you to provide a statement while you were at the store?**

A Yes.

**Q And was this a written statement or an oral statement?**

A Verbal. They were asking me questions, and I was answering.

**Q Did you tell anyone at the store that you were hurt?**

A Yes.

**Q Okay. And what were you complaining of?**

A What I hurt when I fell?

**Q Yes.**

A Yes. I explained that it was my leg, my knee, and my ankle, and back here on my spine.

**Q And was it the right leg, knee, and ankle?**

A Right. Yes.

**Q And you said right here on your spine.**

**before you fell and you're in the bread aisle, was that your first time in the bakery section that day?**

THE INTERPRETER: Can you repeat that question again. I'm so sorry.

MS. BARTON: Sure.

BY MS. BARTON:

**Q So I guess I'll make it a little bit -- a better question.**

**Prior to your fall in -- in the bakery aisle, had you been in the bakery aisle before that, that day?**

A No.

**Q Do you know how long the substance was on the floor?**

A No, I don't know.

**Q Okay. And following your fall, did you ever speak to any employees from Sam's Club about this incident again?**

A No.

**Q Okay. Do you have any social media?**

A Like, which ones?

**Q Like, Facebook, Instagram.**

A Yes.

**Q Okay. Which do you use?**

A Both.

BY MS. BARTON:

**Q Okay. Just one more.**

**Did you ever get to see what the source of the substance on the floor was?**

A No.

**Q Okay.**

MS. TAYLOR: I have a follow-up question.

REEXAMINATION

BY MS. TAYLOR:

**Q Did you work at Sam's Club at that time?**

A No.

**Q Are you responsible for making sure that Sam's Club have no -- no liquids or anything on the floor?**

A No.

**Q At that time, were you an employee of Sam's Club?**

MS. BARTON: Object to the form.

Asked and answered.

MS. TAYLOR: I never asked her that.

MS. BARTON: Yes, you did.

MS. TAYLOR: Now, you gone stop. I never asked her if she was an employee of Sam's Club.

MS. BARTON: Okay.

MS. TAYLOR: How many times did you ask her

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ARGELIA SOLITO,

Plaintiff,
v.

SAM'S EAST, INC., JOHN DOE 1-2, ABC CORP., and XYZ CORP.,

Defendants.

Case No. 1:23-cv-03438-MLB

**DECLARATION OF CODY SPECK**

Pursuant to 28 U.S.C. § 1746, I, Cody Speck, do hereby declare under penalty of perjury that the following is true and correct:

1.

I, Cody Speck, am over the age of eighteen, of sound mind, am competent to give testimony to the matters stated in this Declaration. I give this Declaration based upon my personal knowledge.

2.

I am currently the General Manager of Sam's Club Store Number 8194. On August 5, 2021, I was the General Manager of Sam's Club Store Number 6409.

3.

I am personally familiar with the slip-and-fall incident that occurred on August 5, 2021involving Argelia Solito. Though I did not witness the fall, I arrived shortly after the incident while Ms. Solito was still on the floor.

4.

The surveillance footage attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibit "A"** is a true, accurate, and complete duplicate of the surveillance footage captured at or near the time of Ms. Solito's fall on August 5, 2021.

5.

The surveillance footage shows that Ms. Solito fell at 12:25:11 PM. At 12:25:19 PM, Crossmark employee Elizabeth Billingsley, who was handing out samples near the area where Ms. Solito fell, goes to Ms. Solito's side. Ms. Billingsley is not an employee of Sam's East, Inc.

6.

I appear on the video, along with former Market Manager Anthony Morreale, at 12:25:25 PM. (Exhibit A).  Mr. Morreale and I rendered aid to Ms. Solito and observed the substance in which Ms. Solito had apparently slipped. Upon looking around the scene for the source of spill, I suspected that a package of "Member's

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product) had leaked onto the floor from another customer's shopping cart.

7.

This suspicion as to the source of the spill was confirmed when I watched the surveillance footage from the time of the subject incident and realized that at 12:20:12 PM, one of the women in the group of four customers I had seen directly in front of the area where Plaintiff slipped points to something in one of their shopping carts, and the man in the red shirt goes over to the cart and inspects the contents, eventually pulling out a rectangular package that matches the description of "Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product). (Exhibit A, 12:20:12 PM to 12:20:28 PM).

8.

The man in the red shirt walks around the area of the Ms. Solito's fall with the package, inspecting the package and looking toward the floor as he does so, before eventually walking to the back of the store, where the chaffing fuel is kept. (Exhibit A, 12:20:28 PM to 12:21:03 PM). The man returns to the scene of the incident approximately three minutes later carrying what appears to be a new package of chaffing fuel, as the package in his hand also matches the description of Member's

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad (or another similar chafing fuel product). (Exhibit A, 12:23:45 PM).

9.

At 12:28:54 PM, former Front-End Manager Keira Saffold arrives on screen and began to fill out the Customer Incident Report. At 12:32:38, Ms. Saffold can be seen taking photographs of the area where Plaintiff fell. (Exhibit A).

10.

Sam East, Inc. personnel regularly inspect and monitor the store for potential hazards as they walk through the store. They identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. If an employee notices any hazard on the floor, the employee immediately calls for assistance and monitors the hazard until it is cleaned up. True, accurate, and complete copies of Sam's East, Inc.'s "Slip, Trip and Fall Guidelines" and Spill Clean Up Procedures," which detail these policies and were effective on the day of the subject incident, are attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibits "E"** and **"F"**, respectively, and were made at or near the time by, or from information transmitted by, a person with knowledge.

11.

These records were kept in the course of Defendant Sam East, Inc.'s regularly conducted business activities, and it is Sam East, Inc.'s standard business practice to create and maintain such records.

Further declarant sayeth not.

Cody Speck

Cody Speck
Declarant

5/31/24
Date

# EXHIBIT D











# EXHIBIT E

# Slip, Trip and Fall Guidelines

## Guidelines Overview

- Maintain good housekeeping standards by removing trash and debris throughout the facility by practicing the clean-as-you-go method. Clear your work area as your work, removing empty boxes and straps as you stock.
- Avoid placing pallets on the floor between 8 a.m. and 9 p.m. which are typically high traffic shopping times. Placing pallets on the floor creates a tripping hazard for our customers.
  - Remove or restock empty stackbases and pallets immediately.
- Do not leave empty pallets and unmanned pallet jacks or stocking carts on the salesfloor.
- Empty pallets need to be stacked flat in the backroom. Do not place pallets in an upright position or lean them against a wall.
- Cover the corners of pallets, endcaps and stackbases on the salesfloor. When product is merchandised to cover the corners zone these areas often to move product forward.
- Clean up spills, debris and slip and trip hazards immediately: have caution cones and paper towels (or pocket cone and absorbent pads) available.
- Complete safety sweeps on a regular basis to help keep the salesfloor free of slip and trip hazards and falling merchandise. Include endcaps, sidecounters, stackbases and the floor in the safety sweeps. .
- Properly stock and maintain spill stations.
- Utilize maintenance associates to increase floor care coverage during times of increased customer traffic.
- Have CSMs and stockers alert management to changing weather conditions: refer to the Inclement Weather Guidelines for more information.
- Ensure the parking lot is free from potholes, trash, large cracks and cracked sidewalks and curbs.
  - Make the parking lot part of the daily safety sweep.
  - Alert your manager or APM (a salaried member of management) when these items are in need of repair.
- Keep sidewalk sale merchandise a minimum of 44 inches from the edge of the sidewalk. Maintain a clear walkway for customers into and out of the store.
- Paint speed bumps, sidewalks and landscape curbs a bright and visible color.
- Use approved red or yellow hoses in the Garden Center: do not leave them unattended and put them away when not in use.
- Water plants during low traffic hours.
- Provide covered trash cans in the Produce area. Strategically locate trash cans around seasonal produce such as corn to collect corn husks.
- Locate and maintain floor mats in areas where liquids can cause a slip and fall hazard such as in Produce, in front of the bagged ice freezers and the vestibule.
- Ensure freezer and cooler floors are free of ice build up.
  - Ensure plastic curtains are in place and door seals are free from damage. Damaged seals or curtains pulled back increase condensation in the freezers which creates ice on the floors.
  - Clean up spills immediately to avoid them freezing.
  - Maintain functioning lights in the freezers and coolers.
  - Close freezer doors when not in use.
- For issues, questions or additional information regarding the freezers or coolers, contact the Home Office Facilities Maintenance Department at 800-932-3367.
- Utilize the online Maintenance Manual for guidelines on how to handle floor spills.

## Safety Sweeps

All associates have a responsibility to conduct periodic safety sweeps. When conducting a safety sweep, check the entire area including floors, endcaps, side countersand action alley. Safety sweeps need to be a natural part of the daily routine from start of shift to close of shift.

- Perform a visual sweep of the area looking for potential hazards such as falling merchandise, empty pallets, spills, unattended pallet jacks, debris and empty boxes.
- Dust mop or broom sweep high traffic areas including, but not limited to: action alley, frontend, personal care, household chemicals, backroom, fresh areas, parking lot, sidewalks and the vestibule.
- Watch for and correct potential hazards when taking different routes to and from lunch and breaks. This helps keep potential hazards to a minimum.

## Maintaining the Floor

There are many challenges in floor care safety due to weather conditions, spills caused by customers, associates and from merchandise on the shelves. Floor safety requires all associates to be alert, look for hazards and correct the hazards quickly. For floor maintenance information, log onto the Maintenance page of the WIRE.

## Strategic Maintenance

It is recommended to have a maintenance associate strategically scheduled to provide safety sweeps during high traffic times.

# Resources

- Floor Mat Guidelines
- Inclement Weather Guidelines
- Spill Cleanup Job Aid
- Strategic Maintenance

Last Modified: May 20, 2013

# EXHIBIT F

Case 1:23-cv-03438-MLB Document 23-1 Filed 06/03/24 Page 59 of 66

# Spill Clean Up Procedures

## Overview

- Spills are largely responsible for slip/trip/fall accidents in the club. Slip/trip/falls make up a large portion of accident claims.
- Promptly cleaning up spills is the best way to prevent these accident claims.
- Associates should follow these procedures for cleaning up spills in safe and timely manner.

## Supplies

- Supplies to clean up spills need to be readily available for associates.
- Management should create a daily routine and assign the responsibility to inspect and refill supplies.
- The following should be restocked daily:
  - Spill Stations
  - Pocket Pads/Paper Towels
- If you see a location or area that needs to be restocked, take care of it yourself or let your supervisor know.

## Towel In Pocket Program

- The Towel In Pocket Program (TIP) requires that each associate put a paper towel or pocket pad in their pocket prior to starting their shift.
- The purpose of the paper towel/pocket pad is to provide the associate an easy way to immediately clean up a small spill.
- Associates are encouraged to use their paper towel/pocket pad and replace it after it is used.
- The paper towels/pocket pads should be located in multiple areas of the store (e.g., time clock) where the associates can easily access them.
- Educating associates about the importance of immediately cleaning up spills and the convenience of the paper towel/pocket pad should increase participation.
- First, block off the spill area/aisle or have an associate protect the spill area to prevent a customer or another associate from coming in contact with the spill or tracking it through the store.
- It is important to determine if the spill is a biohazard (e.g., blood, bodily fluids) or hazardous material by referring to:
  - Product label/price sign
  - Handheld terminal using "Claims Disposition" screen
  - Material Safety Data Sheet (MSDS)
  - Spill Cleanup Guidelines Flipchart
  - When in doubt, call the Compliance Hotline (800) 530-9923.
  - Biohazard spills: refer to the Bloodborne Pathogens guide on the Safety WIRE page for clean up procedures.
  - Hazardous material spills: refer to the Spill Cleanup Guidelines flipchart for instructions.
    - For spills 10 gallons or more, contact the Compliance Hotline (800) 530-9923.

## Retrieve Supplies

- Retrieve the necessary supplies from the spill station:
- PPE
- The PPE required for a hazardous spill includes:
  - Goggles
  - Green Chemical Resistant Gloves
  - Chemical Resistant Apron
  - Face Shield (if required by MSDS)
- Absorbent
- Broom and dust pan
- Chemical bag or trash can liner
- Caution cone

Cleaning Up Spill

- Place a caution cone next to the spill to prevent any customer and cart traffic from tracking through the spilled material.
- Put on the appropriate PPE.
  - Refer to the Material Safety Data Sheet (MSDS) for specific PPE requirements.
- Non-liquid material such as sugar, flour and powdered laundry detergent can be swept up with the broom and dust pan.
- Do not attempt to pick up broken glass with your hands.   Use the   broom to sweep glass into the dust pan.


Using Spill Absorbent

- Pour spill absorbent around the edges of the spill to prevent it from spreading.
  - Do not pour absorbent directly on the spilled product.
- Using a firm circular motion, work absorbent into the spilled liquid with a broom.
- If the absorbent becomes gummy or if a liquid residue remains, add more absorbent and work it into the area.
- If the spill was caused by a broken or leaking container, pour the remaining contents from the container into the chemical bag and add enough spill absorbent to absorb the liquid.
- Remove and dispose of the spilled product by following the appropriate SOP listed below:
  - Hazardous Spill Cleanup SOP
  - Non-Hazardous Spill Cleanup SOP
  - Unknown Spill Cleanup SOP

# EXHIBIT G

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

ARGELIA SOLITO,

Plaintiff,

v.

SAM'S EAST INC., JOHN DOE 1-2, ABC CORP., AND XYZ CORP.,

Defendants.

CIVIL ACTION FILE NO. 23A02118

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES**

**COMES NOW**, ARGELIA SOLITO, Plaintiff, and submits Responses to Defendant's First Interrogatories to Plaintiff.

**GENERAL STATEMENT**

Plaintiff does not waive any objection that may be appropriate to the use of any information provided in his Responses or to the admissibility, relevance, competency or materiality of any of the information to any issue in this case. Identifying or producing any document or supplying any information does not constitute an admission by Plaintiff that the document or information is relevant to the subject matter of this action. The Responses set forth below constitute the best information presently available to Plaintiff. However, Plaintiff reserves the right to amend, supplement or change any response made hereinafter if facts or documents subsequently are discovered which make amendment, supplementation or revision appropriate. Disclosure of any privileged or otherwise protected information, if any, is or was inadvertent and cannot be construed as a waiver of any such privilege.

**collision 11/18/2021. The case has been resolved. Plaintiff reserves the right to supplement this response as discovery continues.**

6.

Please state specifically where the incident giving rise to this lawsuit took place, the date and time of day, the weather conditions at the time of your arrival at the store, and how the occurrence happened, including a specific description of the cause(s) of your fall and your alleged injuries.

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence. Based on information now known to Plaintiff, Plaintiff contends that on 08/05/2021, she slipped and fell inside Defendant's premises. Plaintiff reserves the right to supplement this response.**

7.

Please describe the mechanics of your accident (i.e., what caused you to fall, how you fell (forward, backward, sideways, etc.), the specific location of where you fell, how you landed, how you recovered, etc.). Also, please confirm whether you actually fell or not.

**RESPONSE: Plaintiff slipped and fell while walking inside Defendant's premises. For more details, please see the video of the incident.**

8.

Please describe, in detail, the substance which you contend caused your fall, including

but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance.  Please identify the source of the substance at issue, where it came from, and where it was located when you fell.

**RESPONSE: Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of the source of the substance and where it came from. It was located near the bread isle.**

9

Give the name, address, and telephone number of all persons that to you or your representatives' knowledge, information or belief were eyewitnesses to the occurrence, and/or have relevant knowledge concerning the occurrence, any issue of liability in this lawsuit, or the damages you claim in connection with this lawsuit, including a brief description of their relevant knowledge.

**RESPONSE: Defendant's employees and other customers. Plaintiff also directs Defendant to the names and addresses of Plaintiff's medical providers, disclosed in responses to these Interrogatories and other discovery propounded by Defendant.  At the present time, Plaintiff has not identified other witnesses responsive to this Interrogatory. However, Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

10.

Please state in specific detail your actions prior to the subject incident, from the time you arrived at the premises until the time of your accident, including a description of everything you did and everyone with whom you spoke.  Please identify everyone whom you were shopping with on the day of the accident.

Please state how many times you had visited the premises prior to the alleged incident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

19.

State the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident; identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts.

**RESPONSE**: **Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

20.

Please set forth in detail each and every act or omission that you contend was a breach of duty on the part of the Defendant:

**RESPONSE**: **Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants.  Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

21.

With regard to each statement (oral, written, recorded, court or deposition transcript, etc.) taken from any person with knowledge relevant to this lawsuit, please state the name of each

**RESPONSE: Because discovery is still ongoing, Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

Respectfully submitted this July 25th, 2023,

**770-GOOD-LAW, LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC**

*/s/ Hung Q. Nguyen, Esq*
Hung Q. Nguyen, Esq.
Georgia Bar No.: 940370
Attorneys for Plaintiff

5495 Jimmy Carter Boulevard, Suite B-17
Norcross, Georgia 30093
Tel: 770-409-1529
Fax: 770-409-1526
litigation@770goodlaw.com

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ARGELIA SOLITO, )
)
)
Plaintiff, )
)
v. )
) CASE 1:23-cv-03438-MLB
SAM'S EAST, INC., JOHN )
DOE 1-2, ABC CORP., and )
XYZ CORP., )
)
)
Defendants. )

\- - -

The Deposition of ARGELIA SOLITO, taken at the instance of the Defendants, pursuant to stipulations contained herein; before Alecia Wright, Certified Court Reporter, at 5495 Jimmy Carter Boulevard, Suite B-17, Norcross, Georgia 30093, at 1:00 p.m. on December 11, 2023.

Reported by: Alecia Wright
Certified Court Reporter
Georgia
License No. 4902-5798-3471-6160

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

RENEE TAYLOR
Attorney at Law
Law Office of Hung Q. Nguyen & Associates
5495 Jimmy Carter Boulevard
Suite B-17
Norcross, Georgia 30093
770-409-1529
renee@770goodlaw.com

ON BEHALF OF THE DEFENDANTS:

KATHERINE I. BARTON
Attorney at Law
Drew Eckl & Farnham, LLP
303 Peachtree Street, NE
Suite 3500
Atlanta, Georgia 30308
404-885-1400
bartonk@deflaw.com

ALSO APPEARING: Jartu Toles, Interpreter

INDEX TO EXAMINATIONS

| ARGELIA SOLITO | PAGE |
|---|---|
| Examination by Ms. Barton | 5 |
| Examination by Ms. Taylor | 80 |
| Reexamination by Ms. Barton | 82 |
| Reexamination by Ms. Taylor | 88 |
| Reexamination by Ms. Barton | 92 |
| Reexamination by Ms. Taylor | 93 |
| Disclosure | 96 |
| Certification | 97 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Letter Dated 10/19/15 | 27 |
| No. 2 | Store Photos | 37 |
| No. 3 | Video | 40 |
| No. 4 | Plaint's Responses to Def's Interrogs | 59 |
| No. 5 | Police Report | 76 |

(Whereupon, the deposition of Argelia Solito commenced at 1:08 p.m. on December 11, 2023.)

P R O C E E D I N G S

- - -

JARTU TOLES,

the interpreter, having first been duly sworn to translate the proceedings from English to Spanish and from Spanish to English to the best of her ability, and did so as follows:

ARGELIA SOLITO,

having first been duly sworn, was examined and testified as follows:

MS. BARTON: All right. Okay. And is it all right if we don't start interpreting until after I get done with the stipulations?

THE INTERPRETER: That's fine.

MS. BARTON: Okay. All right.

This is the deposition of Argelia Solito, taken pursuant to proper notice and by agreement of counsel for purposes of discovery, cross-examination, and all other purposes as allowed by the Federal Rules of Civil Procedure.

And, Counsel, is it agreeable that we reserve all objections except for the form of the question and responsiveness of the answer

until time of first use?

MS. TAYLOR: Yes.

MS. BARTON: Okay. And have you discussed signature yet?

MS. TAYLOR: No. We'll probably waive.

MS. BARTON: Okay.

All right. And we are ready for you to begin interpreting, please.

THE INTERPRETER: Okay.

EXAMINATION

BY MS. BARTON:

**Q All right, Ms. Solito. Hi. My name is Katherine Barton, and I am the attorney for Sam's Club.**

A Okay.

**Q Have you ever given a deposition before?**

A Yes.

**Q Okay. When was that?**

A I think it was in 2012.

**Q And what kind of proceeding was that for?**

A It was a car accident.

**Q And was that a claim related to a claim that you were bringing?**

A I don't really remember. It was a long time ago.

**Q Other than in 2012, have you ever given any other depositions?**

A No.

**Q All right. So I'm sure you probably talked with your attorney before, and I know you said you've given a deposition prior, but we'll just go over some ground rules just to make sure we're on the same page.**

A Okay.

**Q Okay. Obviously, we have an interpreter here today, so it's very important that we don't talk over each other. When I ask a question, please wait for the interpreter to fully finish translating it before you begin answering it.**

A Okay.

**Q I will do the same when waiting for our interpreter to translate your answer.**

A Okay.

**Q And that will make it easier on both the translator and our court reporter here.**

A Okay.

**Q Another thing that we want to make sure is that we're giving verbal responses, so no nodding your head or shaking your head.**

A Okay.

Q And if at any time you forget and I say, "Is that a yes," I'm not trying to be rude, I'm just trying to make sure we get a good transcript.
A Okay.
Q And before you answer the question, please make sure that you understand what I'm asking. There are going to be times today when my mouth works faster than my brain and I'll ask a bad question.
A Okay.
Q So just ask me to repeat it or rephrase it and I'm happy to do that.
A Okay.
Q But if you answer, I'll assume you understood the question, okay?
A Okay.
Q Okay. And at any point today if you need to take a break, go to the restroom, stretch your legs, anything like that, that's fine. I just ask, if there is a question on the table, we go ahead and answer that and then we'll take a break.
A Okay.
Q Okay. Is Spanish your first language?
A Yes.
Q Do you speak any English?
A No.

**Q Okay. Any other languages besides Spanish?**
A No.
**Q Do you understand English?**
A A little bit.
**Q Can you read any English?**
A A little bit, as well.
**Q And what about, can you write in English?**
A No.
**Q Okay. Have you taken any prescription medicine in the past 24 hours?**
A Yes.
**Q Okay. What medicines?**
A Tramadol, and I forget what the other one is called. Naproxen. And the other one, I don't remember.
**Q Where do you get those prescriptions filled?**
A In Walmart, the one here on Jimmy Carter.
**Q When did you last take your prescription medicine?**
A This morning.
**Q Do they have any effect on your cognitive ability?**
A No. They help me for pain.
**Q Okay. Is there anything else or any other**

 **reason that would stop you from answering my questions today fully and to the best extent of your knowledge?**

A No.

**Q Okay. Can you please state and spell your full name.**

A Argelia Solito.

**Q Okay.**

A And should I spell it?

**Q Yes, please.**

A A-R-G-E-L-I-A, S-O-L-I-T-O.

**Q Have you ever gone by any other name?**

A No.

**Q And what is your birthday?**

A It's July 18th --

THE INTERPRETER: And the interpreter wants to clarify.

A -- of '66.

BY MS. BARTON:

**Q And where were you born?**

A In El Salvador.

**Q And what's your present address?**

A 1125 Winter Park Lane, Norcross.

**Q How long have you lived there?**

A Four years.

**Q Who do you live with?**
A I live with my two children -- my two sons, excuse me, and my three grandchildren.
**Q All right. What are your name -- what are the names of your sons?**
A Gerson Montes and Adriana Montes.
**Q Is that J-E-R-S-O-N?**
A No, it's G.
**Q And how old is Adriana?**
A She's 38.
**Q What does she do for work?**
A She works from home. She does nails. She does -- makes desserts.
**Q Okay. And how old is your son?**
A Twenty-eight.
**Q What does he do for work?**
A He works at Macy's, but he does deliveries.
**Q Okay. And your three grandchildren, are any of them over the age of 18?**
A Yes.
**Q Are all three of them over 18, or how many?**
A No, she's 19. My other one, she is 14, and there's a six-year-old.
**Q Okay. The 19-year-old, what is her name?**
A Genesis Hernandez.

THE INTERPRETER: Excuse me.

BY MS. BARTON:

**Q Does Genesis work?**

A Yes.

**Q Okay. Where?**

A I don't know exactly the name of where she works.

**Q Okay. Any other present addresses like a vacation home?**

A No.

**Q And in August of 2021, at the time of this incident we're here to talk about today, did anyone else live with you?**

A The same ones.

**Q When did you move to the United States?**

A It was in 2000.

**Q And did you always live in Georgia?**

A No.

**Q What other states have you lived in?**

A Massachusetts.

**Q When did you move to Georgia?**

A When?

**Q Yes.**

A That was 2020.

**Q Okay. And are you a United States citizen?**

A I just have a work permit.

**Q Are you a citizen of any other countries?**

A Just El Salvador.

**Q Okay. And do you have a social security number?**

A Yes.

**Q Okay. We'll go off the record briefly.**

(Whereupon, counsel requests to go off the record.)

(Whereupon, counsel is back on the record.)

BY MS. BARTON:

**Q Okay. What's your highest level of education?**

A The ninth.

**Q And I'm guessing the high school is in El Salvador?**

A Yes.

**Q Any other post-secondary education, like, certificates or anything like that?**

MS. TAYLOR: You want to define -- objection to the form of the question. You want to define post-secondary so we're having the same conversation.

BY MS. BARTON:

**Q By "post-secondary," I mean anything after**

**high school.**

A I didn't understand your question.

**Q Okay. After high school, did you have any other education such as going to college or getting some sort of work certificate, anything like that?**

A No.

**Q Have you ever served in the military?**

A No.

**Q Have you ever been arrested?**

A No.

**Q Have you ever filed for bankruptcy?**

A No.

**Q Are you currently married?**

A No.

**Q Have you ever been married?**

A Yes.

**Q Okay. When was that?**

A This was in El Salvador. It's been many years ago.

**Q Okay. Do you know who Julio Edgardo Solozano is?**

A Yes.

**Q And who was that?**

A He was my significant other.

**Q I'm sorry?**

A He was my significant other.

THE INTERPRETER: If the interpreter may make a correction.

A He was my companion.

BY MS. TAYLOR:

**Q Okay. But you were -- you were not married?**

A No.

**Q Okay. Are you still in a relationship with Mr. Solozano?**

A No.

**Q Okay. And your previous marriage in El Salvador, do you recall how long you were married?**

A For 12 years.

**Q Does your previous husband still live in El Salvador?**

A Yes.

**Q So we previously talked about two of your children.**

**Do you have any others besides those two?**

A Yes.

**Q Okay. So we've spoken about Adriana and -- I'm gonna pronounce his name wrong -- Gerson, Gerson.**

**Who -- what other children do you have? What are their names and ages?**

A Diego. Diego Montes.
**Q Okay. How old is Diego?**
A He's 25.
**Q Okay. Where does he live?**
A Now, he lives in New Mexico.
**Q Okay. Any other children?**
A Edgar Montes.
**Q How old is Edgar?**
A He's 35.
**Q Where does he live?**
A He lives here, but I don't remember the city.
**Q By "here," do you mean Georgia?**
A Yes, in Georgia.
**Q Okay. What does Edgar do for work?**
A He does the same thing, at Macy's, in delivery.
**Q Do you have any other adult relatives in the metro Atlanta area?**
A No.
**Q Are you currently working?**
A No.
**Q When was the last time that you had a job?**
A So last year, I was working, but it was just -- it was the same thing, like, doing

deliveries, doing small things.

**Q Who was your employer?**

A Alejandro was his name.

**Q Did he have a company?**

A Yes, it's like a painting company.

**Q And how long did you work for Alejandro?**

A I worked for, like, a year and a half.

**Q And prior to working with Alejandro, where did you work?**

A No, I wasn't working.

**Q In August of 2021, at the time of this incident that we're here to talk about, were you employed?**

A Yes, I was working, but I only worked for just three weeks. That's all.

**Q Okay. Where were you working?**

A I don't remember the name of the company.

**Q What kind of work were you doing?**

A It was, like, doing, like -- like, metal piping.

**Q Okay. And you said you only worked there for three weeks?**

A Yes, because the pandemic happened, and then after that, there wasn't.

**Q Okay. In between when you were doing the**

metal piping and when you worked for Alejandro, did you work anywhere else?

A No.

Q Okay. Did you work anywhere before you were working at the metal piping place?

A No.

Q And do you do any other activities for compensation such as Uber, Instacart?

A No.

Q Are you involved in any clubs or civic groups?

A No.

Q Are you a member of any church?

A Yes.

Q Okay. What church?

A It's a Christian church. It's called Dios De Amores [sic].

Q Okay. And do you have any leadership positions at the church?

A No.

Q Any volunteering with the church?

A No.

Q Okay. And what is your cell phone number?

A (774) 849-8392.

Q Okay. Who is your service provider?

A AT&T.

**Q And are you the account holder?**

A No.

**Q Okay. Who is?**

A My son, Gerson.

**Q Is that number the same number that you had in August of 2021?**

A Yes.

**Q Okay. So I want to talk about what you did to prepare for today's deposition. But I want to preface that by saying, I don't want to know about any conversations you had with your lawyer.**

A Okay.

**Q What did you do to prepare for this deposition?**

A Nothing.

**Q Okay. Did you have a meeting with your lawyer?**

MS. TAYLOR: No. I'm gonna object. I'm gonna object to attorney-client privilege. Anything she talked about or if we met is --

MS. BARTON: If you met isn't privileged, but the contents of the meeting are privileged.

MS. TAYLOR: I'm gonna stick to the objection.

MS. BARTON: Okay. Are you instructing her not to answer?

MS. TAYLOR: I am.

MS. BARTON: Okay.

BY MS. BARTON:

**Q Okay. Did you talk to any other parties or witnesses?**

A No.

**Q Did you review any documents?**

A No.

**Q Okay. Any photos?**

A No.

**Q Any videos?**

A No.

**Q Okay. Did you look at your discovery responses?**

A No.

**Q Okay. Do you currently have a valid driver's license?**

A Yes.

**Q Is it a Georgia driver's license?**

A Yes.

**Q And how long have you had a Georgia driver's license?**

A For three years.

Q Are there any restrictions on your license?
A Like what?
Q Like, for glasses.
A Oh, no.
Q Has your license ever been suspended or revoked?
A No.
Q Have you ever had a license in another state?
A Yes.
Q Okay. What other state?
A Massachusetts.
Q Have you ever been in a car accident?
A Yes.
Q Okay. For now, we'll just talk about accidents before this incident, so before August of 2021.
A Okay.
Q So prior to August of 2021, when was the last time that you had had a motor vehicle accident?
A I don't remember.
Q Okay. Do you know if you had been in an accident before August of '21?
A Yes.
Q Do you know about how many?

A You said how long?
**Q How many.**
A I think, two.
**Q Okay. You said you had had a deposition in 2012 for a car accident?**
A Yes.
**Q Okay. For that incident, tell me about what happened with that car accident.**
A I was hit. I was at a stop sign.
**Q Where was that?**
A In Massachusetts.
**Q Okay. Were you injured?**
A Yes.
**Q Okay. What was injured in that accident?**
A It was one arm and, I think, my back.
**Q Which arm?**
A I don't remember. I don't remember anymore.
**Q Did you have to go to the doctor for those injuries?**
A Yes.
**Q Did all of your treatment take place in Massachusetts?**
A Yes.
**Q And did you make a claim for bodily**

 **injuries because of that?**

A I don't remember.

**Q Did you consult an attorney for that incident?**

A Yes.

**Q Do you know -- or I'm sorry. Do you recall the name of the attorney?**

A No, I don't remember.

**Q Okay. So you don't remember using the same attorney that you have now?**

A No.

**Q Okay. So we have the release of the claim for that collision, and it says that you had -- that you did use the same attorney.**

THE INTERPRETER: May the interpreter ask a question?

MS. BARTON: Sure.

THE INTERPRETER: When you mean -- when you say "release of claim," do you mean, like, release of information?

MS. BARTON: Like, a settlement release.

THE INTERPRETER: Okay. Okay.

A And which accident are you talking about?

BY MS. BARTON:

**Q The one that was involved when you were hit**

**at a stop sign.**

A But that was in Massachusetts.

MS. TAYLOR: I don't think that's the same.

BY MS. BARTON:

**Q Okay. So it looks like then you had another accident at a stop sign?**

A Here?

**Q In 2015.**

MS. TAYLOR: I'm gonna object. She said 2012. 2012 and 2015 is not the same. You're trying to confuse her.

MS. BARTON: Yes. So I'm -- I'm -- we're talking about the second one now. I'm trying to figure out where this release comes in.

MS. TAYLOR: Okay. But she said 2012 and you -- and she said in Massachusetts.

MS. BARTON: I know. And I said, Do you recall having one in 2015?

MS. TAYLOR: I don't know (indiscernible). You said, Did you use the same attorney, and then you said, Well, then why did they sign that release?

That implied that we were the same attorney when you specifically knew that we were not the same attorney.

MS. BARTON: Okay. I'm gonna ask that you don't do speaking objections. We've reserved everything.

MS. TAYLOR: I'm gonna ask you not to falsely --

MS. BARTON: No, no. I can --

MS. TAYLOR: I object to the -- to the form of the question --

MS. BARTON: Okay.

MS. TAYLOR: -- because you misstated what she said.

MS. BARTON: I don't agree, but that's fine. Your objection's noted.

MS. TAYLOR: Okay. You don't -- you -- you don't have to agree with what I said.

MS. BARTON: Okay.

MS. TAYLOR: But if you're going to state something as a factual matter, it needs to be factually correct.

MS. BARTON: There is -- there is nothing stated as a factual matter.

MS. TAYLOR: You said -- you -- you -- that she used us in 2012, and you specifically know that that release says 2015. So 2012 and 2015 are not the same date --

MS. BARTON: Okay.

MS. TAYLOR: -- so do not factually state incorrect information.

MS. BARTON: Okay. Yeah. Got it.

BY MS. BARTON:

**Q Okay. So the accident that you were involved in in 2012, you had an attorney that was in Massachusetts?**

A Yes.

**Q Okay. And then do you recall being involved in a collision in 2015 in Georgia?**

A I don't remember.

**Q Okay. It says it occurred on Roswell Road in Sandy Springs.**

**Does that jog your memory?**

MS. TAYLOR: I'm going to object. If you're going to read from a document that's not in evidence that only you have --

MS. BARTON: Renee, I really hope we're not gonna do this the whole deposition.

MS. TAYLOR: Well, what are we not gonna do?

MS. BARTON: It's not required. It's not required that I show every single document.

MS. TAYLOR: You can't testify as to --

MS. BARTON: I'm not.

MS. TAYLOR: -- to a document not in evidence. So you either need to make it as an exhibit so we can all look at it, or you state something. But you can't state that you're reading something and it's factual matter that you haven't put it in evidence. Those are rules of evidence.

MS. BARTON: Okay. That's not how a deposition works. And if we're gonna have this problem, then we're gonna need to suspend and we're gonna have to have a conversation because that's not how a deposition works.

MS. TAYLOR: Well, you -- you -- you -- we don't have to have a conversation cause I went to law school and have a law license just like you do and I'm a licensed attorney in the state of Georgia just like you are. So I will object to anything that you reading from as a factual matter that has not been put into evidence. And if you want to stop it -- if you want to stop it, we can stop it. It's fine with me.

MS. BARTON: Once again, I'm gonna ask you to stop with speaking objections. This is a waste of everyone's time, so please stop.

MS. TAYLOR: I am -- who -- who are you talking cause I'm not your child. I'm a -- I'm a -- I'm an attorney, and if I want to object, I can object.

MS. BARTON: Sure, but we agreed not to do speaking objections.

MS. TAYLOR: And -- and I've been in plenty of deposition where people on your side of the table sit up here and do the exact same thing, so what you will not do is lecture me like you in control of what I object to. I will object to anything that I do not feel is appropriate.

MS. BARTON: Okay.

MS. TAYLOR: So is it an exhibit or not because I need to verify what you reading from and -- and acting as if it's -- it's something that's in evidence.

MS. BARTON: Sure. Let's make it an exhibit, then.

MS. TAYLOR: (Indiscernible).

MS. BARTON: We'll make this Defense Exhibit 1.

I'm not sure why you would want this in record, but let's go for it.

(Defendant's Exhibit No. 1 was marked for

identification.)

MS. TAYLOR: And do you have -- do you have a copy so we can all look at it?

MS. BARTON: You are welcome to take a look.

THE WITNESS: May I ask a question?

BY MS. BARTON:

**Q Sure.**

A From what I understand, we're here for what happened to me at the Sam's store.

**Q Yes, you're correct.**

A Why are we bringing up so many things that I don't have in my memory?

**Q So because you're making a personal -- personal injury claim, I need to know about any prior personal injury claims that you've made. And if you don't remember, I don't want you to make any guesses. Your saying I don't remember is perfectly acceptable, but I just have to ask.**

MS. TAYLOR: I will confirm the release says 10/19/2015 at Roswell Road.

MS. BARTON: Okay.

BY MS. BARTON:

**Q Okay. But you don't remember that?**

A No, I don't remember.

**Q Okay. All right. That's all we wanted to know. All right.**

**Okay. And prior to this lawsuit that we're talking about today, have you ever brought any other lawsuits before?**

A No, not that I remember.

**Q Okay. All right. So now I want to talk about the incident that happened at Sam's Club.**

A Okay.

**Q Okay. Do you remember what time this accident happened?**

A Around 11 or 12, I think.

**Q Okay. Do you remember what you were doing earlier that morning?**

A Before going to the store?

**Q Yes.**

A Well, I was at home.

**Q Okay. And did you have any plans for later?**

A No.

**Q Okay. So how many times have you been to the Sam's Club in Tucker, Georgia, before this incident?**

A Every week or every two weeks, I would go shopping there.

**Q And have you been back since the time of your fall?**

A To the store?

**Q Yes.**

A Yes.

**Q Do you still go once a week?**

A No. Now I go with my daughter every month.

**Q Okay. Do you remember why you were there on the day of the incident?**

A Yes. I was shopping because the next day I was going to start working.

**Q Where were you going to start working?**

A I don't remember the name of the company, but it was a sewing company.

**Q And you hadn't started work yet?**

A No.

**Q Okay. All right. And were you shopping with anyone?**

A No, it was just me.

**Q Okay. Did you speak to anyone at the store before you fell?**

A No.

**Q And how long were you in the store before you fell?**

A I think about a half an hour.

**Q Do you know anyone who works at the store?**

A No.

**Q Okay. And in the 24 hours prior to your fall, had you taken any prescription medicine?**

A No.

**Q Any over-the-counter medicine?**

A No.

**Q Any alcohol?**

A No, I don't drink.

**Q Okay. Okay. So why don't you tell me in your own words what happened from the time you parked in the parking lot until your fall.**

A I went into the store. I was there for, like, half an hour. I went to the area where the bread is, and I needed to get a piece of bread that was on the other side, like, going all around to the other side of the table. But there were two ladies talking, and they had the shopping cart there and I couldn't get by, so I left my cart on this side and I walked over. And when I was walking, about to turn is when I fell because there was oil spilled there and there wasn't a sign.

**Q Okay. So you fell -- you were still in the bread aisle when you fell; right?**

A Yes.

**Q Okay. And you said there were two ladies?**

A Yes.

**Q Okay. And you said that they were blocking the area.**

**What did you mean by that?**

A Yes. They were talking.

**Q Okay. Did you have to walk by the ladies to get to the other side?**

A Yes. I just walked over there because I couldn't go over with my cart.

**Q Okay. Was there anything in front of you that prevented you from seeing the floor as you walked?**

THE INTERPRETER: Oh, the interpreter needs to ask for a clarification.

Was there any -- anything in front of you preventing you from seeing the --

MS. BARTON: -- floor.

THE INTERPRETER: Ah. Okay. Thank you.

A No, just the ladies that were standing there. So they were standing there, and I just walked up, and I didn't imagine that that was spilled down there.

BY MS. BARTON:

**Q Okay. How close to the ladies was the**

 **spill?**

A I can't tell you how far away they were because I just walked around, when I slipped.

**Q Okay. And other than the ladies, was there anything that was distracting you immediately before your fall?**

A No.

**Q Okay. And were you carrying anything in your hands when you fell?**

A No.

**Q Okay. Do you remember what kind of shoes you were wearing that day?**

A I was in sneakers.

**Q Okay. Okay. Do you know how long you'd had the shoes prior to the fall?**

A No, I don't remember.

**Q Okay. Were they well worn or new?**

A No. They weren't new, but they weren't old either.

**Q Okay. So can you describe how you fell in as much detail as possible, please?**

A I just remember that I was walking over to pick up the bread. What I do remember is that I slipped and then I -- I couldn't get up.

**Q Do you remember how your body landed when**

**you fell?**

A I remember that this leg landed like this (indicating), like, backward.

**Q Okay.**

A I remember this leg was, like, back here (indicating), and what I do remember is I couldn't get up because I wasn't able to straighten my leg.

**Q And which leg was it?**

A The right one.

**Q At what point did you see the oil on the floor?**

A When I was already on the floor.

**Q Was it a lot of oil?**

A There was a lot.

**Q Was it, like, a puddle or more spread out?**

A It was, like, spread out.

**Q And how did you know that it was oil?**

A Because I touched it when I fell.

**Q Did it get on in any of your clothes?**

A Yes.

**Q Did you take any pictures of your clothing with the oil on it?**

A No.

**Q Where was the oil on your clothing?**

A On my leg.

**Q Were there any footprints in the oil that you could see from prior people walking through it?**

A I didn't notice that.

**Q When you eventually stood up, were you able to see the oil on the floor?**

A No, I didn't notice because the manager and another man were the ones that came and got me up.

**Q Okay. So you don't know whether or not the substance was visible from a standing position?**

A No, I didn't look, to be honest with you.

**Q Did the oil have a color?**

A I didn't see.

**Q Did you see anyone else in the area other than the two women?**

A There was a cleaning lady.

**Q Okay. How did you know she was a cleaning lady? Did she have a cart with her?**

A Yes, she told me. Well, not exactly cleaning, but she was there, like, arranging things.

**Q Okay. Other than that person, anyone else?**

A No, not that I remember.

**Q Okay. So we talked about how your leg went out from under you, went backwards when you fell.**

**Did -- do you recall if you hit any other body parts?**

A Yes. When I fell, it was my knee that hit, my knee and here (indicating). And that's when my -- my leg went back, and I slid back, and that's when I wasn't able to get up.

**Q Was it your right knee?**

A Right. The right one.

**Q Okay. Did you ever hit your head?**

A No.

**Q Okay. So after you fell, tell me what happened.**

A The manager and another gentleman picked me up, and they took me away in a wheelchair.

**Q Do you remember what the manager and the other person said?**

A They said for me to not move, to be at ease, that they were going to pick me up.

**Q Did anyone that came up to you after you fell, did anyone speak Spanish?**

A Yes. There was another lady, and she spoke Spanish.

**Q Was that lady that spoke Spanish, was she an employee?**

A I don't know.

**Q Did either of the two ladies that were in the area come up to you and talk to you after you**

 **fell?**

A No.

**Q Did you take any photographs of the area?**

A No.

**Q Did you ever return to the store to photograph the area?**

A No, because I just called my son and he took me to the hospital.

**Q Okay. Okay. We'll mark these store photos as Defense Exhibit 2.**

(Defendant's Exhibit No. 2 was marked for identification.)

BY MS. BARTON:

**Q And I'll let your attorney look at them first.**

**Okay. Will you please take a look at the photos, and you can flip through them, look at them.**

A What is it that I'm supposed to see here?

**Q I just want you to take a look at the -- the pictures cause I'm going to ask you about them in a second.**

**And I will state, while you're looking at that, for the record, that the photographs that are marked 1 through 5 were taken at the store on the day of the incident, and photographs 6, 7, and 8 were**

**ones that I took, so they don't represent it how it looked the day of the accident, but it is the same area.**

**Okay. So if you will look at the -- the first page -- and it is photo of a photo, so it is someone's phone. And in the phone, on the bottom left corner, it looks like that is where the oily substance is.**

**Does that look like what the oil looked like when you saw it?**

A I can't make out anything here.

**Q Okay. It's a little shinier in the second picture. Okay. And this is another photo of a photo.**

**Can you see the oil better in this picture?**

A I can't make it out, to be honest with you.

**Q Okay. And if you will please go to the last page, page 8, does this show the area in which you fell?**

MS. TAYLOR: If you don't know and if you're not sure, you can let her know that.

BY MS. BARTON:

**Q Okay. That's fine.**

A No, to tell you the truth.

**Q If you will just do me a favor and look at**

**photos 3, 4, and 5 and see if you can pick out any of the oil in those pictures?**

MS. TAYLOR: Are you stipulating that there was oil on the floor?

MS. BARTON: We have already (indiscernible) there was oil on the floor.

A You said 3 and 5?

BY MS. BARTON:

**Q Yeah, 3, 4, and 5, if you see any oil in those pictures.**

MS. TAYLOR: Are you asking her to be a expert in what, oil --

MS. BARTON: I'm just asking if she is -- can pick out oil in any of the pictures.

MS. TAYLOR: If -- if you -- if you know for a fact that it's oil and you can state that with a hundred percent certainty, feel free to answer the question.

A No. To be honest with you, I don't know.

BY MS. BARTON:

**Q Okay. I'll take those back, then.**

**All right. And have you seen the surveillance footage from this accident?**

A No. The lady said that she was going to send it to me by e-mail, but I never received it.

And the report, as well, but she didn't send it.

**Q Okay. So your attorney has the video and the report, so if you want to look at them after this, you should ask them. They were produced in discovery.**

MS. TAYLOR: Is there a question?

MS. BARTON: Just waiting for the translation.

MS. TAYLOR: I'm just gonna object to you providing any sort of information to my client.

MS. BARTON: Okay. She -- I was just responding to her saying that she had never received the store reports and video, and I was just telling her that they were provided, so . . .

BY MS. BARTON:

**Q Okay. So I want to -- I'll make this Defense Exhibit 3. This is the video footage from the incident. Okay. And we are just going to watch from the video where it's timestamped 59:53 and only watch about 20 seconds.**

(Defendant's Exhibit No. 3 was marked for identification.)

THE INTERPRETER: The interpreter thinks she made a mistake.

MS. BARTON: Okay.

THE INTERPRETER: 55 to 53 or 59? I'm so sorry.

MS. BARTON: Sorry. The minute is 59, the second is 53.

THE INTERPRETER: Oh, okay.

MS. BARTON: So the video timestamp is 59:53.

THE INTERPRETER: Oh, I'm so sorry. Okay.

MS. TAYLOR: That's not even a time, 59:53.

MS. BARTON: It's in the video. You go into -- 59 minutes into it. If you're looking at the video, it'll say 12:24 p.m. and 48 seconds.

BY MS. BARTON:

**Q All right. So I will play this, and I will represent to you that -- I believe this is you. You can correct me if you're wrong, but I believe that you can overhear.**

(Whereupon, a video recording was played.)

A That right there.

BY MS. BARTON:

**Q Okay. And we will stop it. The time on the video is -- it's an hour into it and 26 seconds. And the time of day, it says, was 12:25 and**

**20 seconds.**

**Okay. So looking at the still, are these -- the group of shoppers that's in front of the -- the white refrigeration unit right here, is that the group of ladies that you saw?**

A Yes. Yes, and I couldn't get by. That's why I left my cart right there.

**Q Okay. And that was my next question is: These were the carts that you were saying, right here on the screen, that you couldn't get around?**

A Yes. Yes.

**Q Okay. And you had mentioned there was a woman arranging things.**

**Was it the woman that you -- you can see here that has the green apron on?**

MS. TAYLOR: I'm gonna object.

I don't see that she had no green apron on. The blue shirt -- the lady with the blue shirt on, or --

A No, I -- I don't know.

BY MS. BARTON:

**Q Okay. All right. And we'll just watch it one more time, the same timestamps as before. Let me get it closer to you.**

(Whereupon, a video recording was played.)

BY MS. BARTON:

**Q Okay. So it is a little difficult to see in the video, but it looks like the oil was behind the shopping cart.**

**Is that what you recall?**

MS. TAYLOR: Objection.

Is that you testifying to where the oil is, cause I don't know that that's a piece of evidence in fact? If you would like to ask her if she knew where the oil was, you can ask her. But I prefer you not to testify as to where things were.

BY MS. BARTON:

**Q All right. So in this -- let's go back to exactly when you fell. Okay. So looks like you are falling at 12:25 and 11 seconds.**

**Do you remember where the substance was that you slipped on?**

A Well, it must have been where I slipped.

**Q Okay. And to me -- well, I'll -- I'll ask it this way.**

**And that was behind one of these people with the shopping cart; correct?**

A I do remember that there was some carts there, but I don't remember whose.

**Q Okay. I was just asking if the spill was behind a cart.**

A Where I fell is where it is.

**Q Okay. Okay. So after you fell, how long did you stay in the store?**

A I just waited until my son arrived. I think it was about 20 minutes.

**Q Did anyone ask you to provide a statement while you were at the store?**

A Yes.

**Q And was this a written statement or an oral statement?**

A Verbal. They were asking me questions, and I was answering.

**Q Did you tell anyone at the store that you were hurt?**

A Yes.

**Q Okay. And what were you complaining of?**

A What I hurt when I fell?

**Q Yes.**

A Yes. I explained that it was my leg, my knee, and my ankle, and back here on my spine.

**Q And was it the right leg, knee, and ankle?**

A Right. Yes.

**Q And you said right here on your spine.**

**Is that lower back?**

A Yes, my lower back.

**Q Okay. Got it.**

**Did anyone at the store ask if you needed medical assistance?**

A Yes.

**Q Okay. And it sounds like you called your son; correct?**

A Yes. I told them I was gonna call my son.

**Q Okay. And when you fell, did you immediately feel pain?**

A Yes.

**Q And were you bleeding anywhere?**

A No.

**Q Any other conversations you can recall having at the scene?**

A No.

**Q All right. So we are about to get into medical treatment.**

MS. BARTON: Does anyone need a break? We've been going for about an hour and a half.

MS. TAYLOR: It's up to you. I'm fine.

THE WITNESS: No, I'm good.

MS. BARTON: You good? Okay.

BY MS. BARTON:

**Q All right. We'll keep going.**

**Okay. So your son came and picked you up from the store, you said, about 20 minutes after your fall?**

A Yeah, around 20 minutes.

**Q And I'm sorry, you might have already said; which son was it?**

A Gerson.

**Q And did you go straight to the hospital or make any stops on the way?**

A No, straight to the hospital.

**Q How long did you have to stay at the hospital?**

A Like, one or two hours, I think.

**Q Did your son stay with you at the hospital?**

A Yes.

**Q And he drove you home from the hospital?**

A Yes.

**Q Okay. From the hospital to your house, did you make any stops?**

A No.

**Q Okay. And once you got home, what did you do for the rest of the day?**

A I had to lie down because I couldn't take the pain.

**Q Other than the verbal statement you gave while you were still at the store, have you made any other statements to anyone regarding this accident?**

A No.

**Q The -- the manager and the other person that helped you after your fall, have you ever seen them again?**

A No.

**Q Okay. What about the woman that was speaking Spanish with you?**

A No.

**Q Okay. And before we get into your treatment for this incident, I just want to talk about your health history a little bit.**

**Okay. Do you have any diagnosed ongoing condition such as high blood pressure or diabetes?**

A No.

**Q Who is your primary care doctor?**

A At the moment, I don't have one.

**Q Did you have one in August of 2021?**

A Yes, I had one.

**Q Okay. Who was your primary care?**

A I don't remember his name.

**Q Do you remember where his office was?**

A Yes. It's up here by the farmers market.

Q Okay. And I see that you are wearing glasses today.
Do you -- are you nearsighted or farsighted?
A With my glasses, I see well close up and far away.
Q Okay. Without your glasses?
A Without my glasses, I can't see close up.
Q Were you wearing your glasses at the time of your fall?
A Yes.
Q And who is your eye doctor?
A I don't -- I don't have one now.
Q Okay. When was the last time that you've had an eye exam?
A A year ago.
Q And where did you go for that eye exam?
A I don't remember the name of it, but it's in Lawrenceville.
Q Okay. Other than the car accidents that we spoke about earlier, have you ever had any other accidents producing injuries such as slip and falls or sporting events?
A No.
Q Prior to your treatment for this incident,

 **have you ever treated with a physical therapist before?**

A No.

**Q What about a chiropractor?**

A I don't remember.

**Q Have you ever had surgery before?**

A Yes.

**Q Okay. When did you have surgery?**

A I think it was in 2004.

**Q And what was that surgery for?**

A It was on my knee.

**Q Which knee?**

A The right one.

**Q What happened to your knee that necessitated surgery?**

A It was -- I don't remember right now. It was many years ago.

**Q Did you get the surgery in Massachusetts?**

A Yes, Massachusetts.

**Q Do you recall what exactly the surgery was on in your knee?**

A No, I don't. I don't remember.

**Q Do you know if the surgery was from an injury to your knee?**

A No.

**Q Other than the surgery in 2004, have you ever had a prior right knee injury?**

A No.

**Q Any other surgeries?**

A No.

**Q Okay. So earlier I asked about the injuries you had in the fall. I just want to make sure that I have them correct. I have your right knee, right ankle, right leg, and lower back.**

A Yes.

**Q Anything else?**

A From that fall in Sam's, no. It was my ankle, my knee, and my lower back.

**Q Okay. So right after you fell, can you rate your right knee pain on a scale of 1 to 10?**

A Oh, it hurt at a 9.

**Q What about your right ankle?**

A As well.

**Q How about your lower back?**

A Uh-huh, as well.

**Q And your right leg?**

A Yes, the right one.

**Q Was that also hurting on a scale of 1 to 10?**

A Yes.

Q Okay. So it sounds like all of them were about a 9 out of 10 on the pain scale?

A Yes.

Q Okay. So we talked about prior injuries to your right knee.

Have you ever had any prior injuries to your right ankle?

A No.

Q Okay. What about your lower back?

A No, not that either.

Q And what about your right leg?

A I was fine before the fall.

Q So no prior right leg injuries?

A No.

Q Okay. So let's talk about your treatment from this incident.

A Uh-huh.

Q Okay. So your son took you to the hospital; correct?

A Yes.

Q Which hospital did you go to?

A Northside.

Q Had you ever treated at Northside Hospital before?

A No.

**Q Okay. What kind of treatments and exams they do at Northside?**

A What they did was x-rays, and they gave me medicine for pain. And they gave me a piece of paper so that I could go see a specialist because they said that I was not well.

**Q Okay. The x-rays that you got, do you recall what parts of your body were x-rayed?**

A Yes. My knee, my ankle, and my back.

**Q Do you recall if you were told what the x-rays showed?**

A No. They said that the x-ray did not show the exact problem and that I needed to do a test that was more advanced.

**Q Okay. And the medicine for pain that they gave you, was that something you were provided at the hospital or were you given a prescription to go and fill later?**

A Yes. They gave me a prescription, and they also gave me an injection there for pain.

**Q Where did you get an injection?**

A I don't remember if they put it in here because they had me with this here (indicating), and I think they put it through that.

**Q Okay. Are you talking about -- and by**

**"here," you're pointing to, it looked like, the inside of your arm?**

A Yes. They put a injection here with a syringe. I don't know exactly because I was on an IV.

**Q Okay. Okay. And the prescription that they gave you, did you get that filled?**

A Yes.

**Q And was that at the Walmart that you mentioned earlier?**

A I can't remember if I filled it right there at the hospital. I don't remember.

**Q Okay. And you also said they gave you papers for a specialist.**

**Do you remember who they told you to go see?**

A No, I don't remember.

**Q Do you know what type of doctor they wanted you to go see?**

A No, I don't remember.

**Q Do you know if you did go and see a specialist?**

A I don't remember right now.

**Q Okay. And what were your discharge instructions from the hospital?**

A To rest a lot and to not walk a lot.

**Q Okay. Do you remember where the next place that you treated was?**

A No, I don't remember.

**Q Okay. From the records we got, it looks like you next treated at Peachtree Spine & Sports Physicians.**

**Does that sound right?**

A Yes. That's where I'm going right now.

**Q Okay. So you're still treating there?**

A Yes. Actually they told me that my ankle needs another surgery because they did the MRI and it looked bad.

**Q Okay. So I show that your right ankle surgery was done at Ortho Sport & Spine Physicians?**

A Yes.

**Q Okay. So you had the surgery at Ortho Sport & Spine and then returned to Peachtree Spine?**

A Yes, that sounds right. Yes.

**Q Okay. Okay. So your records show that your first time treating at Peachtree Spine was August 9th of 2021.**

**Does that sound right, about four days after the accident?**

A Four days, I don't remember.

Q Do you know how you heard about Peachtree Spine & Sports?
A I -- I don't remember how.
Q Okay. Have you ever treated there before?
A No.
Q Okay. Did you go and see your primary care physician after your hospital stay?
A No.
Q Okay. All right. So you -- you don't know how you heard about Peachtree Spine & Sports?
A No, I don't remember.
Q Do you remember what your pain level was when you first started treating at Peachtree Spine?
A Yes.
Q Okay. What was your right knee pain?
A A lot. It hurt a lot, and my ankle did too.
Q Okay. On a scale of 1 to 10, what was your right knee pain at when you first started treating?
A Like an 8, yeah.
Q And how was your right ankle pain on a scale of 1 to 10?
A It hurt the same.
Q And by "the same," do you mean an 8 out of 10?

A Yes.
**Q Was your low back still hurting?**
A Yes, it did it.
**Q What was your low back pain on a scale of 1 to 10?**
A My back, the same.
**Q And in between the hospital and starting at Peachtree Spine, did you see any other physicians?**
A No, I don't remember.
**Q Okay. And you had said earlier that you were about to start a job the next day at the sewing -- the sewing job?**
A Yes, sewing.
**Q Did you start work the next day?**
A No, I couldn't anymore.
**Q Okay. Did you ever begin work at the sewing place?**
A No.
**Q Okay. And you -- did you -- or why did you never start working at the sewing place?**
A Since I fell, I didn't feel well enough to go to work.
**Q Okay. So going back to your treatment at Peachtree Spine & Sport, do you remember what kind of treatments they did for you there?**

A I don't remember.

**Q Okay. It looks like you received an injection in your spine?**

A Oh, yes. Yes.

**Q Okay. Did that injection help your pain at all?**

A No.

**Q Okay. Do you know about how long you treated at Peachtree Sport & Spine?**

A Well, I'm still going there.

**Q And you -- the treatment you're currently receiving there, is it still related to your right knee and ankle and low back?**

A Yes.

**Q Okay. So it looks like, based on your records, that you treated from August 9th of 2021 through November 9th of 2021.**

MS. TAYLOR: I'm gonna object.

She said several times that she start treating there.

BY MS. BARTON:

**Q And then after that November 9th, 2021 treatment, your records show that you didn't return until July of 2022.**

MS. TAYLOR: I'm gonna object that she's

testifying to the dates.

If you know exactly the date that you were there and you treated, you can answer her questions.

MS. BARTON: I'm gonna object to the coaching of the client.

MS. TAYLOR: I'm not. But you -- do you want me to have them put the records in and we click through every record. We can do that, but . . .

BY MS. BARTON:

**Q Do you recall not going to Peachtree Spine & Sports for a period of eight months?**

A No, I don't remember.

**Q Okay. So do you -- is your recollection that you've treated there consistently?**

A Yes.

**Q Okay. Do you know if you ever got any additional injections at Peachtree Spine & Sport?**

A No, I don't remember.

**Q So you don't recall what other therapies you received at Peachtree Spine & Sport?**

A No, I don't remember.

**Q Okay. The next -- actually, give me one second. Okay. So I'm going to make this**

**Plaintiff's discovery responses or interrogatory responses Exhibit 4.**

(Defendant's Exhibit No. 4 was marked for identification.)

MS. BARTON: And would you like to review these?

MS. TAYLOR: If you'd like to ask a specific question or either a specific question, I don't know what you're gonna ask her, so I don't know (indiscernible).

BY MS. BARTON:

**Q Okay. Do you remember giving discovery responses in -- regarding this incident?**

A No.

**Q Okay. So the discovery responses, the interrogatories that I'm about to show you, they are a list of questions that we sent over that you provided answers to.**

A No, I don't remember.

**Q Okay. So I would let you look over these, but I'm not sure -- would you like to look over them? They're written in English.**

MS. TAYLOR: Is there a specific question? I'm gonna -- is there a specific question you would like to ask?

MS. BARTON: The -- the question was if she would like to review these cause I'm not (indiscernible).

A No, because I can't read the English.

BY MS. BARTON:

**Q Okay. So in response to Interrogatory No. 32, you have some dates of treatment that were included. The date of treatment that you have listed from Peachtree Spine & Sports Physicians was from August 9th of '22 until December 12th of '22 -- or I'm sorry, I read that wrong. It's October 12th of '22.**

THE INTERPRETER: As in the second day, October 12th? Okay.

MS. BARTON: Yes. It's August 9th of '22 to October 12th of '22.

THE INTERPRETER: And that's Peachtree Spine & Sport Physicians?

MS. BARTON: Yes.

THE INTERPRETER: Okay.

MS. TAYLOR: I think it specifically says after that that she will supplement any additional interrogatory. So I think you have not specifically stated what it says, that the treatment -- that the discovery was ongoing.

BY MS. BARTON:

**Q Okay. But I'm just trying to figure out -- your testimony was that you've been back since October of '22?**

A October 12th? I don't remember.

**Q So you are -- you're saying that you're still treating with Peachtree Spine & Sport; correct?**

A Exactly.

**Q Okay. And you said that that was a continuous treatment, you didn't stop at any time?**

A Exactly.

**Q Okay. All right. Okay. So when was the last time that you went to Peachtree Spine & Sport?**

A On Friday.

**Q And what did you do when you went there on Friday?**

A They called me, and they said that I needed another operation on my ankle, to explain to me that the MRA -- the MRI -- I'm sorry -- didn't look good.

**Q Have you scheduled that surgery?**

A That's what I'm doing. I'm waiting for that.

**Q Okay. And the -- I had mentioned earlier, the first ankle surgery that you had, I have it at Ortho Sport & Spine; is that right?**

A Yes.

**Q Okay. Do you recall when you first started treating at Ortho Sport & Spine?**

A No, I don't remember the date.

**Q Okay. It doesn't have to be a specific date, just the time of year.**

A No, I don't remember.

**Q Okay. Do you know, other than the surgeries that you got, what other treatments you got at Ortho Sport & Spine?**

A My ankle and my knee?

**Q So I was asking: Other than the surgery that you got on your right ankle and your knee, do you know what other kind of treatment that you had done at Ortho Sport & Spine?**

A Yes. A few weeks later, they actually had to do another surgery again, a small surgery on my knee because it wasn't right.

**Q When you say "a few weeks later," what is -- a few weeks later from what?**

A A few weeks after they did the surgery on my knee.

**Q Okay. So other than any surgeries, do you recall doing any sort of -- these are just examples, but physical therapy or getting medication, getting**

imaging done at Ortho Sport & Spine? I'm specifically talking about treatments that you received that weren't surgical.

A Yes. Physical therapy and medicine.

Q Okay. And so the records that you -- or that your attorneys provided to us show that you started treatment in December of 2022.

Does that sound right?

A Yes.

Q Okay. When you first started with Ortho Sport & Spine, can you rate your knee pain on a scale of 1 to 10.

A Yes. When I started, it was at a 9.

Q Okay. And what was your ankle pain on a scale of 1 to 10?

A Both of those areas hurt the same.

Q Okay. So let's talk about your right ankle surgery. I have that that had been in February of this year.

Does that sound right?

A Yes.

Q Okay. And how did you hear about Ortho Sport & Spine?

A That, I don't remember.

Q Okay. The right ankle surgery, did they

**tell you why you needed the surgery?**

A Yes, because they said during the fall, I had cracked something, or that's -- that's how the doctor said it to me.

**Q How was the recovery time from the surgery?**

THE INTERPRETER: How was the recovery time?

MS. BARTON: Or I guess -- that was a bad question.

BY MS. BARTON:

**Q How long did it take you to recover from the ankle surgery?**

A My ankle, I think it was three months.

**Q And during that time, could you put any weight on your ankle?**

A No.

**Q Did they give you any walking aids such as crutches or a boot for your foot?**

A They gave me a boot and crutches.

**Q Okay. And you said that you've been told that you need another surgery?**

A Yes, because I asked the doctor why was it hurting so much and it would get swollen. And they said that, Here, we can do another one to see what is it that's bothering you. And so on Friday, when I

got -- when I went to get the results, they said that the MRI did not look good and that I needed another surgery.

**Q Okay. Now, let's talk about your knee replacement surgery. I have that happened in June of this year.**

**Does that sound right?**

A Yes, it seems like it was June.

**Q Okay. And do you recall what you were told about why you needed the knee surgery?**

A Yes. I remember them telling me that in the fall, the bone had, like, become displaced. That's what I remember them telling me.

**Q How long was your recovery from the knee surgery?**

A Four months, and, to date, I'm still in recovery because I'm still not right.

May -- may I say something additional?

**Q Yes.**

A I can tell you that since the surgery, I don't feel well. I don't feel like I'm the same person. I can't be at ease standing or sitting or walking for a long period of time. And automatically, that makes me emotionally bad off as well because I can't do what I could do before.

**Q Do you want to take a moment?**

(Whereupon, a brief recess was taken.)

BY MS. BARTON:

**Q So before the break, we were talking about your knee surgery, and you were saying that it is -- your knee is still causing you pain; is that right?**

A Yes, and my ankle.

**Q Yes.**

**Have you -- following the ankle -- or I'm sorry -- following the knee surgery, did you -- or have you ever brought up your continued pain with any of your providers?**

A Yes.

**Q Okay. Which doctor?**

A The one who's seeing me now, the one whose did my surgery.

**Q So the one who did your surgery on your knee, the one you had in June of this year, I have is Ortho Sport & Spine.**

A Yes.

**Q Okay. And the one that you said that you are seeing now, is that also Ortho Sport & Spine?**

A Yes.

**Q Okay. But you have been talking to Peachtree Spine about your ankle?**

A Yes.

**Q Okay. What have they told you at Ortho Sport & Spine about your continuing knee pain?**

A Well, the explanation that they've been giving me is that I'm always having to bear weight on my ankle, and so it's compensating. That's what they've told me. And that's why my ankle and my knee are still hurting. That was the explanation that they gave me.

**Q Are you looking to do any additional treatments for your knee?**

A How so? I don't understand.

**Q Like, how we talked about how you're looking to get another ankle surgery, are you looking to get any additional surgeries, injections, physical therapy on your right knee?**

A Well, it depends. Because if they do my ankle, depending on how I do after that, if they -- if they do my ankle and my ankle is fine, then what's going on with my knee is no longer from my ankle, so they would have to look at my knee again and see what exactly is the problem. That's what they explained to me.

**Q Okay. So it's your understanding that the knee pain and ankle pain are connected?**

A From what they're telling me -- I mean I'm not a doctor. To me, one thing is one thing and the other is something else. But from what they're saying, they -- one thing has to do with the other.

**Q When was the last time that you treated with Ortho Sport & Spine?**

A Well, Friday, I said, was the last time. And they still have me there because they're still giving me medicine for the pain.

**Q Okay. So earlier when we were talking about Peachtree Spine, you had said that you had gone there on Friday.**

A So Peachtree Spine, no. I went to the other place. I was going to Peachtree Spine --

THE INTERPRETER: And if the interpreter may clarify.

A It was the Peachtree Spine people that recommended me to go see the Ortho Sport & Spine.

BY MS. BARTON:

**Q Okay. That makes more sense. I'm glad that I asked.**

**Okay. So you're still treating at Ortho Sport & Spine, and that's where you went on Friday?**

A Yes.

**Q Okay.**

A It was there.

**Q Got it. Okay.**

**Okay. So this knee surgery that you had in June of this year, how does the -- the pain you experienced during your recovery compare to your knee surgery in 2004?**

A No. Totally different.

**Q Okay. How so?**

A Because this surgery, I felt it more intensely, and also, this surgery was a larger surgery than the one I had in 2004. This surgery was this big (indicating). The one in 2004 was very small. It was only this big (indicating). It was just a little hole.

**Q Okay. Okay. So according to the information that you've provided us, you've treated for injuries in this accident at Northside Hospital, Ortho Sport & Spine, Peachtree Spine & Sport.**

A Yes.

**Q Do -- do you remember -- do you recall treating with any other providers for your injuries from this incident?**

A No.

**Q Okay.**

MS. TAYLOR: I would like to state that,

when we say "Northside," there are several Northside. (Indiscernible) radiologist stipulate that those are separate (indiscernible).

BY MS. BARTON:

**Q Okay. So as we sit here today, what is your right knee pain on a scale of 1 to 10?**

A You could say that right now, it's at a 7. But at night, it's really bad.

**Q Is that constant pain you're experiencing, or does it come and go?**

A It's constant.

**Q Did the surgery help alleviate any of your pain?**

A Right now, I haven't felt any relief.

**Q Okay. And as we sit here today, can you please rank your right ankle pain on a scale of 1 to 10?**

A 8.

**Q Is that constant pain?**

A It is constant.

**Q Okay. So you didn't really get any relief from the surgery?**

A I haven't felt much.

**Q Okay. What about your low back, how is**

**that on a scale of 1 to 10?**

A That is an 8. That is, it is always hurting.

**Q Okay. And we talked about you having some injections in your spine.**

**Do you recall any other treatments that you got for your low back pain?**

A No, not there because I am afraid for them to touch me there.

**Q Okay. So following this incident in August of 2021, have you been involved in any other accidents or incidents that have caused injury?**

A Yes, I had a car incident.

**Q Okay. When was that?**

A That was, if I'm remembering right, the 15th of November.

**Q Of what year?**

A Of '21, I think.

**Q Okay. So about three months after this accident, about three and a half months after this accident?**

A Yes.

**Q Okay. Can you tell me what happened in that accident?**

A I was in my lane and I was going to turn

right. And another person cut off and got in front of me like they wanted to pass me, but I was in my lane.

**Q Do you remember where that accident happened?**

A It was at Jimmy Carter and Williams.

**Q Did the police come to that accident?**

A Yes.

**Q And were you injured?**

A Yes; my arm.

**Q And what arm was that?**

A The right one.

**Q Okay. You're saying "arm," but you're kind of tapping up near your shoulder, so I just want to make sure.**

A Exactly. Here; my shoulder.

**Q Okay. Did you go to the hospital following that accident?**

A No.

**Q Did you get any medical treatment?**

A Yes, I was receiving treatment.

**Q Do you recall where you were getting treatment?**

A I don't remember.

**Q Okay. Does Morning Chiropractic sound**

**right?**

A I don't remember.

**Q Okay. What about Atlas Spine?**

A No, I don't remember.

**Q Okay. Do you recall going to a chiropractor following that accident?**

A I don't remember.

**Q Okay. So going back to interrogatories, which is Defense Exhibit 4, No. 33 asked about doctors you had seen in the past 15 years and you listed Morning Chiropractic, Atlas Spine, and MRI Imaging Specialists.**

**You don't recall treatment with those providers?**

A Morning does sound familiar to me.

**Q Okay.**

MS. TAYLOR: Actually says Atlas Spine & Rehab, but --

MS. BARTON: I'm sorry?

MS. TAYLOR: It actually says Atlas Spine & Rehab.

MS. BARTON: Okay.

BY MS. BARTON:

**Q Okay. So if you don't remember your provider specifically, can you tell me about your**

**treatment that you got after the accident?**

A Here on my arm.

**Q What did they do for you, for your shoulder?**

A What I remember is they put, like, little needles on me. That's what I remember.

**Q Okay. And the only thing that you recall injuring in that November '21 motor vehicle accident was your shoulder?**

A Yes.

**Q Okay. So you don't remember having any neck pain?**

A Yes, in my neck. On my neck.

**Q Did they give you any treatments for your neck pain?**

A No. They were more focused on my arm.

**Q Okay. And what about lower back pain?**

A No.

**Q What about any knee pain?**

THE INTERPRETER: I'm sorry, did you say knee pain?

MS. BARTON: Yes. I said, What about any knee pain?

A No.

BY MS. BARTON:

**Q Do you recall how long you had treatment for your November car accident?**

A I don't remember.

**Q Did you make a bodily injury claim for that accident?**

A For myself or the car?

MS. BARTON: For herself.

A Yes.

BY MS. BARTON:

**Q Okay. And who was your attorney for that claim?**

A I don't remember if it was the one here. I'm not -- I don't remember.

**Q And is that case still ongoing?**

A No. It was resolved a -- a good while ago now.

**Q Did you have to do a deposition for that claim?**

A No.

**Q Okay. Did the case settle?**

A Yes.

**Q Do you remember what the settlement amount was?**

A I don't remember how much it was.

**Q Okay. Any other car accidents you've been**

**involved in after the November '21 incident?**

A No.

**Q Okay. Do you recall being involved in a collision on September 14th of 2022?**

A No.

**Q Okay. So it looks like there was a collision on Singleton Road near Jimmy Carter Boulevard?**

MS. TAYLOR: Is that you testifying, or are you entering the police report?

MS. BARTON: Just asking if she remembers.

MS. TAYLOR: You -- you -- you made a lot of assumptions of evidence that's not in fact.

MS. BARTON: This is a fact deposition. I don't have -- there's no, like, offerings of fact right now.

MS. TAYLOR: Well, you said, You were involved in a wreck on such and such date.

MS. BARTON: Sure. Exhibit then.

We'll make it Defense Exhibit 5, the police before from November -- or I'm sorry, for September 14th of 2022.

(Defendant's Exhibit No. 5 was marked for identification.)

MS. TAYLOR: Has anybody seen that police

report besides you?

MS. BARTON: Excuse me?

MS. TAYLOR: Has anyone seen that police report besides you cause I don't think you produced it in discovery.

MS. BARTON: Oh, it's an open records request. We don't have to produce those, but you're welcome to take a look. And it's certified, if you want to check out the first page.

Okay. So Defense Exhibit 5, for the record, is a -- a police report from Gwinnett County Police Department where Unit No. 1 is listed as Ms. Solito.

BY MS. BARTON:

**Q Okay. And you don't recall this collision?**

A I don't remember, but I wasn't, like, involved in -- in -- in an accident. I don't remember. Because it wasn't that I hit someone, the girl hit me. So, I mean, it was -- we just left it, so -- we just left it, so --

**Q You remember --**

A -- I didn't know.

**Q -- the police coming?**

A Yeah. The police did come, but the police

didn't blame anyone.

**Q Okay. So on the police report, it states -- trying to figure out how to do this translation-wise.**

**Right. In this one by Unit 1 and -- do you recognize your name there?**

A Yes.

**Q Okay. And right here, it says "suspected at fault," and there is a check right there.**

A But I've realized that that's there, but that's not right. I went and told the police officer what happened.

**Q Okay.**

A That was not right.

**Q Okay. So why don't you tell me what happened?**

A The thing is, I went through the light and the person was coming behind me. I was going through here, and she wanted to cross to get over to where dd's store was, the store, dd's. So she was the one that hit me, because the impact was on my side of the car, and had it been me hitting her, it would have been on the left-hand side.

**Q Okay. Which -- which car were you driving?**

A My car.

**Q Do you remember what kind of car it was?**

A It's the Ford Escape.

**Q Okay. Were you injured at all in that collision?**

A No. It was something really insignificant.

**Q Did you make a bodily injury claim for that collision?**

A Yes, so I could have my car repaired. Not for my person, but my car.

**Q Okay. So it sounds like a -- a property damage claim?**

A Yes.

**Q Is that claim still open?**

A Well, I don't know anything about it because I haven't received any information. But that's why I went and sought out the police officer, and he said that he was going to fix the issue.

**Q Okay. But you haven't received any money for any property damages yet; right?**

A Yes. My car was repaired.

**Q Okay. Do you recall if that was through your insurance company or the other driver's insurance company?**

A No, it was mine.

**Q Who -- who is your insurance provider?**

A I don't remember right now. I can't remember the name.

**Q On the report, it says "Progressive."**

**Does that sound right?**

A Yes. That's correct.

**Q Okay. And so other than the claim that you've brought regarding this incident and the claim that you brought regarding the November 2021 car accident, have you ever been a party to any other lawsuits?**

A No.

MS. BARTON: Okay. If I could just have a few minutes to look over my notes, I might be done.

Do you have any questions for her? You're welcome to ask.

EXAMINATION

BY MS. TAYLOR:

**Q Ms. Solito, your -- your ankle, knee, and back, those were all injured as a result of falling at Sam's Club?**

A Yes, correct.

**Q Okay. And the 2021 or 2022 wreck, did those -- those affected a different part of your body?**

A Yes.
**Q Okay. And your right ankle surgery and your second surgery that you need, those are related to your injuries from -- directly from the Sam's Club falling; is that correct?**
MS. BARTON: Object to the form.
BY MS. TAYLOR:
**Q You can answer the question.**
A Yes.
**Q And today, do you have difficulty walking?**
A Yes.
**Q Prior to the Sam's Club accident -- slip and fall, did you have problems walking?**
A No.
**Q And the treatment at Ortho Sport & Spine and Peachtree Orthopedics -- I'm sorry, not Peachtree Orthopedics -- Peachtree, is that -- that was directly related to your fall at Sam's Club; is that true?**
MS. BARTON: Object to the form. That's a leading question.
BY MS. TAYLOR:
**Q You can answer the question.**
MS. BARTON: Also calls for speculation.
THE INTERPRETER: Could you please repeat

the question. I'm sorry.

MS. TAYLOR: I will.

BY MS. TAYLOR:

**Q Would you say your treatment at Peachtree and Ortho Sport -- Peachtree Sport & Spine and Ortho Sport & Spine is directly related to your slip and fall at Sam's Club?**

MS. BARTON: Same objection.

A Yes.

BY MS. TAYLOR:

**Q Did you need to treat at Peachtree Sport & Spine or Ortho Sport & Spine prior to when you slipped and fell at Sam's Club?**

A No.

MS. TAYLOR: I don't have any further questions.

MS. BARTON: Okay. Sorry. Just one more second. I'm still going through . . .

Okay. Ready?

THE COURT REPORTER: I'm dead, but go ahead.

MS. BARTON: Okay.

THE COURT REPORTER: I still got . . .

MS. BARTON: All right.

REEXAMINATION

BY MS. BARTON:

**Q Okay. So just briefly, I want to go back to the day of the incident.**

**The substance you saw on the floor, the first time you saw it was when you were on the ground; right?**

A Yes.

**Q Okay. And after you got up from the floor, you don't recall seeing it again; right?**

MS. TAYLOR: I'm going to object to the question because I don't know that she said she did not see it again. I think she said -- I think she said she saw it when she fell.

BY MS. BARTON:

**Q Okay. I'll rephrase my question.**

**Do you recall seeing the oil again once you got up from the floor?**

A No, I didn't look to see it.

**Q Okay. And prior to your fall, you didn't see the oil; correct?**

A No, I didn't see it.

**Q Was there a reason that you couldn't see it?**

A There was no sign that said that there was something there.

**Q Okay. But just in terms of the oil, you didn't -- you never saw that on the floor?**

A No, I didn't see it.

**Q Okay. Do you know of any reason why you didn't see the substance on the floor?**

MS. TAYLOR: I'm gonna -- I'm gonna object to asked and answered.

She's answered about four or five times before and now.

MS. BARTON: She hasn't answered why she didn't see it, so . . .

A I didn't see it because I was focused on going to pick up what I was coming to get. I wasn't looking at the floor, so I was focused on going to get what I was going to get.

BY MS. BARTON:

**Q Okay. And you said you had been in this store for about 30 minutes prior to your fall; right?**

A Yeah, more or less. I don't -- I don't -- did -- don't know exactly.

**Q Okay. And do you recall what areas of the store you went in before you came to the bakery aisle?**

A No, I don't remember.

**Q On the day of the accident, was -- right**

 **before you fell and you're in the bread aisle, was that your first time in the bakery section that day?**

THE INTERPRETER: Can you repeat that question again. I'm so sorry.

MS. BARTON: Sure.

BY MS. BARTON:

**Q So I guess I'll make it a little bit -- a better question.**

**Prior to your fall in -- in the bakery aisle, had you been in the bakery aisle before that, that day?**

A No.

**Q Do you know how long the substance was on the floor?**

A No, I don't know.

**Q Okay. And following your fall, did you ever speak to any employees from Sam's Club about this incident again?**

A No.

**Q Okay. Do you have any social media?**

A Like, which ones?

**Q Like, Facebook, Instagram.**

A Yes.

**Q Okay. Which do you use?**

A Both.

**Q Okay. What is your name on Facebook?**
A Montes.
MS. TAYLOR: Can you spell Montes?
THE WITNESS: On Facebook, I'm -- no, I don't remember. I don't remember.
BY MS. BARTON:
**Q Okay. What about Instagram?**
A I'm on there as Argelia, I think.
**Q Can you spell that?**
A A-R-G-E-L-I-A.
**Q Oh, I'm sorry. Do you -- is your -- do you have a last name on it as well?**
A No.
**Q Any other -- I'm sorry.**
A I think it's argelia66.
**Q Any other social media?**
A No.
**Q Okay. Have you ever posted about this incident on social media?**
A No.
**Q Are you claiming lost wages in this incident?**
A What do you mean? I don't understand.
**Q So a form of damages that you can request is lost wages, which is the injuries that you**

**sustained keeping you from work.**

A Yes. As a consequence of this, I couldn't work and I have not worked. And I can't do a lot because I can't be standing for a long period of time or walking around a lot.

**Q Regarding the position with the sewing, I guess the sewing job, did you have communication with them about your injuries after this incident?**

A I just communicated to them that I was not going to be able to come to work.

**Q Do you know how much you were gonna be paid at the sewing job?**

A They were going to pay me at a rate of 12. They said that's how I would start.

**Q And you don't remember the name of the company?**

A No, I don't remember it.

**Q Do you know the total amount of your medical bills?**

A No, I don't.

**Q Have any of the bills come to your house?**

A No.

**Q Do you know if any of your bills have been paid?**

A No, I don't know.

**Q Do you -- well, in August of 2021, did you have health insurance?**

A I don't remember.

**Q Do you currently have health insurance?**

A Yes.

**Q And who was your insurer?**

A Cigna.

**Q Are there any other claims from this incident that we haven't talked about today?**

A No.

**Q Anything else significant to this lawsuit that you want me to know?**

A No.

**Q Okay.**

MS. BARTON: All right. That is it from me.

MS. TAYLOR: I have a few follow-up questions.

REEXAMINATION

BY MS. TAYLOR:

**Q Ms. Solito, did anyone, immediately before the fall, drop anything immediately in front of you like a jar something or a liquid that you saw?**

A Not that I saw.

**Q Did you drop any bottles of anything, any**

liquids right before you slipped and fall at the Sam's Club?

A No.

Q So was -- was -- was there anything that would have caught your attention to something being of the floor?

A No. I didn't know.

Q Normally, when you walk, do you walk just looking down at the floor as to not slip and fall when there should not be liquids on the floor --

MS. BARTON: Object to the form.

BY MS. TAYLOR:

Q -- at the Walmart -- I mean, at the Sam's Club?

A After this fall, yes.

Q Before the fall, was that your normal practice?

A No.

Q Is it your normal practice now because you -- because you fell and seriously injured yourself?

MS. BARTON: Object to the form.

A Excuse me?

BY MS. TAYLOR:

Q I said, Is that only your practice now

**because you slipped and seriously injured yourself at Sam's Club?**

MS. BARTON: Same objection.

A Yes.

BY MS. TAYLOR:

**Q And prior to the incident, you had been in Sam's Club a myriad of times and had not had an incident?**

MS. BARTON: Object to the form.

I'm gonna ask that you stop asking leading questions.

BY MS. TAYLOR:

**Q I said prior -- I'll rephrase it.**

**Is it true, prior to the -- prior to the incident that we're here to discuss, you had not slipped and fell in Sam's Club?**

MS. BARTON: Same objection.

MS. TAYLOR: I said --

MS. BARTON: It's still leading.

MS. TAYLOR: It's not leading.

MS. BARTON: Yes, it is.

MS. TAYLOR: It was a question.

MS. BARTON: A leading question is when you're asking something and the answer that you want is, you know, easily discernable.

MS. TAYLOR: That's -- that's your opinion. I'm gonna object it in --

MS. BARTON: It's -- it's not actually. It's -- it's, like, the law.

MS. TAYLOR: Okay. Cool. It's -- it's . . .

MS. BARTON: So my -- I don't want to get into it on the record, but I'm gonna just put my objection.

MS. TAYLOR: You put your objection, and she can answer the question.

MS. BARTON: Okay.

A Yes.

BY MS. TAYLOR:

**Q Have you been in Publix, Walmart, any other stores?**

A In Walmart.

**Q Have you slipped and fell in Walmart?**

A No.

**Q About how many times would you say you went to Walmart?**

A A lot of times. Every week.

**Q So specifically, this time -- is it true, this time there was something different that caused that -- let me rephrase the question.**

**Specifically, what was different about this time when you went to Sam's Club that caused you to fall?**

A What was different?

**Q What was -- what was different about this time versus previous times?**

A What -- well, what was on the floor.

**Q Thank you.**

**Did you bring anything into the store and decide to put it on the floor to slip and fall to sue Sam's Club so that you can get a check?**

MS. BARTON: Object to the form.

MS. TAYLOR: Rolling your eyes all you want.

A No, because on the video, it shows that I was just walking.

BY MS. TAYLOR:

**Q Yes.**

**And did you -- were you just walking and innocently fell?**

MS. BARTON: Object to the form.

A Yes.

MS. TAYLOR: And I have no further questions.

REEXAMINATION

BY MS. BARTON:
**Q Okay. Just one more.**
**Did you ever get to see what the source of the substance on the floor was?**
A No.
**Q Okay.**
MS. TAYLOR: I have a follow-up question.
REEXAMINATION
BY MS. TAYLOR:
**Q Did you work at Sam's Club at that time?**
A No.
**Q Are you responsible for making sure that Sam's Club have no -- no liquids or anything on the floor?**
A No.
**Q At that time, were you an employee of Sam's Club?**
MS. BARTON: Object to the form.
Asked and answered.
MS. TAYLOR: I never asked her that.
MS. BARTON: Yes, you did.
MS. TAYLOR: Now, you gone stop. I never asked her if she was an employee of Sam's Club.
MS. BARTON: Okay.
MS. TAYLOR: How many times did you ask her

did she slip and fall? How many times did you ask her about the oil?

MS. BARTON: Again --

MS. TAYLOR: You asked that question about ten times and I asked you to stop asking it and you kept asking it. So if I want to ask her two times did -- no, one time, did she -- was she an employee of Sam's Club, I think I will.

You don't like the question, that's your problem, not mine.

BY MS. TAYLOR:

**Q But back to the original question, were you an employee of Sam's Club at the time?**

MS. BARTON: Same objection.

A No.

BY MS. TAYLOR:

**Q And the employee, whether it be the store manager or the other employees, came over to you and acknowledged that you fell on the floor?**

A Yes.

MS. TAYLOR: No further questions.

MS. BARTON: All right. I don't have anything further, so I think we're good.

Did you guys decide if you're gonna read and sign?

THE COURT REPORTER: Gonna read and sign, Ms. Taylor?

MS. TAYLOR: I will waive.

THE COURT REPORTER: You'll waive.

(Deposition concluded at 4:26 p.m.)

DISCLOSURE

STATE OF GEORGIA
COUNTY OF CLAYTON

Pursuant to Article 8.B of the RULES AND REGULATIONS OF THE BOARD OF COURT REPORTING OF THE JUDICIAL COUNCIL OF GEORGIA, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Huseby Global Litigation.

Huseby Global Litigation was contacted by the offices of Drew Eckl & Farnham, LLP, to provide court reporting services for this deposition. Huseby Global Litigation will not be taking this deposition by O.C.G.A. 15-14-37(a) and (b).

Huseby Global Litigation has no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Huseby Global Litigation will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

This, the 11th day of December 2023.

Alecia Wright,
Certified Court Reporter

CERTIFICATE

STATE OF GEORGIA
COUNTY OF CLAYTON

I, Alecia Wright, Certified Court Reporter, do hereby certify that the foregoing transcript was recorded by me, as stated in the caption; the colloquies, statements, questions, and answers thereto were reduced to typewriting under my direction and supervision; and the transcript is a true and correct record of the testimony/evidence given to the best of my ability.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action.

This, the 11th day of December 2023.

________________________________________

Alecia Wright,
Certified Court Reporter
Georgia License No. 4902-5798-3471-6160

Exhibits

**SolitoA-1** 3:15 27:22,25

**SolitoA-2** 3:16 37:10,11

**SolitoA-4** 3:18 59:2, 3 73:9

**SolitoA-5** 3:19 76:20,23 77:11

1

**1** 27:22,25 37:24 50:15,23 55:18,22 56:4 63:12,15 70:7,17 71:1 77:13 78:5

**10** 50:15,24 51:2 55:18,22, 25 56:5 63:12,15 70:7,18 71:1

**10/19/2015** 28:21

**11** 4:2 29:12 43:16

**1125** 9:23

**12** 14:14 29:12 87:13

**12:24** 41:13

**12:25** 41:25 43:16

**12th** 60:10, 11,14,16 61:5

**14** 10:22

**14th** 76:4, 22

**15** 73:10

**15th** 71:16

**18** 10:19,21

**18th** 9:15

**19** 10:22

**19-year-old** 10:24

**1:08** 4:2

2

**2** 37:10,11

**20** 40:21 42:1 44:7 46:3,5

**2000** 11:16

**2004** 49:9 50:1 69:6, 11,12

**2012** 5:19 6:1 21:5 23:10,15 24:23,24 25:7

**2015** 23:8, 10,18 24:24 25:11

**2020** 11:24

**2021** 11:11 16:11 18:7 20:17,19 47:20 54:22 57:16,17, 22 71:11 80:8,23 88:1

**2022** 57:24 63:7 76:4, 22 80:23

**2023** 4:2

**21** 20:23 71:18 74:8 76:1

**22** 60:10, 12,15,16 61:4

**24** 8:10 31:3

**25** 15:3

**26** 41:24

3

**3** 39:1,7,9 40:18,22

**30** 84:18

**32** 60:7

**33** 73:9

**35** 15:9

**38** 10:10

4

**4** 39:1,9 59:2,3 73:9

**48** 41:14

**4:26** 95:5

5

**5** 37:24 39:1,7,9 76:20,23 77:11

**53** 41:2,5

**55** 41:2

**59** 41:2,4, 12

**59:53** 40:20 41:8,10

**6**

**6** 37:25

**66** 9:18

**7**

**7** 37:25 70:8

**774 849-8392** 17:24

**8**

**8** 37:25 38:18 55:20,24 70:19 71:2

**9**

**9** 50:16 51:2 63:13

**9th** 54:22 57:16,17, 22 60:10, 15

**A**

**A-R-G-E-L-I-A** 9:11 86:10

**ability** 4:8 8:23

**acceptable** 28:18

**accident** 5:21 20:13,20, 23 21:5,8, 14 22:23 23:6 25:6 29:11 38:2 39:23 47:3 54:24 69:17 71:20,21, 24 72:4,7, 18 73:6 74:1,8 75:2,5 77:18 80:9 81:12 84:25

**accidents** 20:16 48:20,22 71:12 75:25

**account** 18:2

**acknowledged** 94:19

**acting** 27:16

**activities** 17:7

**additional** 58:19 60:23 65:18 67:10,15

**address** 9:22

**addresses** 11:8

**Adriana** 10:6,9 14:22

**adult** 15:18

**advanced** 52:14

**affected** 80:24

**afraid** 71:8

**age** 10:19

**ages** 14:25

**agree** 24:12, 15

**agreeable** 4:23

**agreed** 27:5

**agreement** 4:19

**ahead** 7:19 82:21

**aids** 64:17

**aisle** 31:24 84:23 85:1,10

**alcohol** 31:8

**Alejandro** 16:3,6,8 17:1

**alleviate** 70:13

**allowed** 4:22

**Amores** 17:17

**amount** 75:22 87:18

**ankle** 44:22, 23 50:9, 13,17 51:7 52:9 54:11,14 55:16,21 57:13 61:18,24 62:11,13 63:14,17, 25 64:12, 13,15 66:7,9,25 67:6,7,14, 18,19,20, 25 70:17 80:19 81:2

**answering** 6:14 9:1 44:14

**answers** 59:18

**anymore** 21:18 56:15

**apron** 42:15, 17

**area** 15:19 31:14 32:4 35:13 36:25

37:3,6 38:3,18

**areas** 63:16 84:21

**Argelia** 4:1, 10,18 9:7 86:8

**argelia66** 86:15

**arm** 21:15, 16 53:2 72:10,11, 13 74:2,16

**arranging** 35:19 42:13

**arrested** 13:9

**arrived** 44:6

**assistance** 45:5

**assume** 7:13

**assumptions** 76:13

**AT&T** 18:1

**Atlanta** 15:19

**Atlas** 73:3, 11,17,20

**attention** 89:5

**attorney** 5:13 6:5 22:3,7,10, 14 23:20, 23,25 25:7 26:17 27:3 37:14 40:2 75:10

**attorney-client** 18:20

**attorneys** 63:6

**August** 11:11 16:11 18:7 20:16,19, 23 47:20 54:22 57:16 60:10,15 71:10 88:1

**automatically** 65:24

**B**

**back** 12:10 21:15 30:1 34:5 36:3 39:21 43:14 44:22 45:1,2 50:9,13,19 51:9 52:9 56:2,4,6, 23 57:13 61:3 70:25 71:7 73:8 74:17 80:20 83:2 94:12

**backward** 34:3

**backwards** 35:23

**bad** 7:8 54:13 64:8 65:24 70:9

**bakery** 84:22 85:2,9,10

**bankruptcy** 13:11

**Barton** 4:13, 17 5:3,6, 11,13 9:19 11:2 12:11,24 18:22 19:1,4,5 22:17,21, 24 23:4, 12,17 24:1,6,9, 12,16,20 25:1,4,5, 19,23 26:1,9,23 27:5,13, 18,21 28:4,7,22, 23 32:18, 24 37:13 38:22 39:5,8,13, 20 40:7, 11,16 41:1,4,7, 11,15,22 42:21 43:1,13 45:20,24, 25 57:21 58:5,11 59:5,11 60:1,5,15, 19 61:1 64:8,10 66:3 68:19 70:5 73:19,22, 23 74:22, 25 75:7,9 76:11,14, 19 77:2,6, 15 80:12 81:6,20,24 82:8,17, 22,24 83:1,14 84:10,16 85:5,6 86:6 88:15 89:11,22 90:3,9,17, 19,21,23 91:3,7,12 92:12,21 93:1,18, 21,24 94:3,14,22

**based** 57:15

**bear** 67:5

**begin** 5:8 6:14 56:16

**big** 69:12, 13

**bills** 87:19, 21,23

**birthday** 9:14

**bit** 8:4,6 47:14 85:7

**blame** 78:1

**bleeding** 45:13

**blocking** 32:3

**blood** 47:16

**blue** 42:18

**bodily** 21:25 75:4 79:6

**body** 33:25 35:25 52:8 80:25

**bone** 65:12

**boot** 64:18, 19

**born** 9:20

**bothering** 64:25

**bottles** 88:25

**bottom** 38:6

**Boulevard** 76:8

**brain** 7:8

**bread** 31:15, 24 33:23 85:1

**break** 7:17, 20 45:20 66:4

**briefly** 12:7 83:2

**bring** 92:9

**bringing** 5:23 28:12

**brought** 29:4 66:11 80:7,8

**C**

**call** 45:9

**called** 8:14 17:16 37:7 45:7 61:17

**calls** 81:24

**car** 5:21 20:13 21:5,8 48:20 71:13 75:2,6,25 78:22,24, 25 79:1,8, 9,20 80:8

**care** 47:18, 22 55:6

**carrying** 33:8

**cart** 31:18, 19 32:10 35:17 42:7 43:4,23 44:2

**Carter** 8:18 72:6 76:7

**carts** 42:9 43:24

**case** 75:14, 20

**caught** 89:5

**caused** 71:12 91:24 92:2

**causing** 66:6

**cell** 17:23

**certainty** 39:17

**certificate** 13:5

**certificates** 12:19

**certified** 77:9

**check** 77:9 78:9 92:11

**child** 27:2

**children** 10:2 14:19,24 15:6

**Chiropractic** 72:25 73:11

**chiropractor** 49:4 73:6

**Christian** 17:16

**church** 17:13,15, 16,19,21

**Cigna** 88:7

**citizen** 11:25 12:2

**city** 15:12

**civic** 17:10

**Civil** 4:22

**claim** 5:22 21:25 22:12,19 28:15 75:4,11,18 79:6,11,13 80:6,7

**claiming** 86:21

**claims** 28:16 88:8

**clarification** 32:15

**clarify** 9:17

68:16

**cleaning** 35:15,16,19

**click** 58:9

**client** 40:10 58:6

**close** 32:25 48:5,8

**closer** 42:24

**clothes** 34:19

**clothing** 34:21,24

**Club** 5:14 29:8,22 80:21 81:4,12,18 82:7,13 85:17 89:2,14 90:2,7,16 92:2,11 93:10,13,17,23 94:8,13

**clubs** 17:10

**coaching** 58:6

**cognitive** 8:22

**college** 13:4

**collision** 22:13 25:11 76:4,7 77:16 79:4,7

**color** 35:11

**commenced** 4:2

**communicated** 87:9

**communication** 87:7

**companion** 14:4

**company** 16:4,5,17 30:13,14 79:22,23 87:16

**compare** 69:5

**compensating** 67:6

**compensation** 17:8

**complaining** 44:18

**concluded** 95:5

**condition** 47:16

**confirm** 28:20

**confuse** 23:11

**connected** 67:25

**consequence** 87:2

**consistently** 58:16

**constant** 70:10,12,20,21

**consult** 22:3

**contents** 18:23

**continued** 66:11

**continuing** 67:3

**continuous** 61:10

**control** 27:11

**conversation** 12:23 26:12,15

**conversations** 18:12 45:15

**Cool** 91:5

**copy** 28:3

**corner** 38:7

**correct** 24:19 28:11 41:18 43:23 45:8 50:8 51:19 61:7 80:5,22 81:5 83:20

**correction** 14:3

**counsel** 4:20,23 12:8,10

**countries** 12:2

**County** 77:13

**court** 6:20 82:20,23 95:1,4

**cracked** 64:3

**cross** 78:19

**cross-examination** 4:21

**crutches** 64:18,19

**cut** 72:1

**D**

**damage** 79:11

**damages** 79:19 86:24

**date** 24:25

58:2 60:8 62:4,6 65:16 76:18

**dates** 58:1 60:7

**daughter** 30:7

**day** 30:9,10 33:12 37:24 38:2 41:25 46:23 56:11,14 60:13 83:3 84:25 85:2,11

**days** 54:23, 25

**dd's** 78:20

**De** 17:17

**dead** 82:20

**December** 4:2 60:10 63:7

**decide** 92:10 94:24

**defendant's** 27:25 37:11 40:22 59:3 76:23

**Defense** 27:21 37:10 40:18 73:9 76:20 77:11

**define** 12:20,22

**deliveries** 10:17 16:1

**delivery** 15:17

**Department** 77:13

**depending** 67:18

**depends** 67:17

**deposition** 4:1,18 5:16 6:6 18:10,15 21:4 25:20 26:10,13 27:8 75:17 76:14 95:5

**depositions** 6:2

**describe** 33:20

**desserts** 10:13

**detail** 33:21

**diabetes** 47:16

**diagnosed** 47:15

**Diego** 15:1,2

**difficult** 43:2

**difficulty** 81:10

**Dios** 17:16

**directly** 81:4,18 82:6

**discernable** 90:25

**discharge** 53:24

**discovery** 4:20 19:15 40:5 59:1, 12,15 60:25 77:5

**discuss** 90:15

**discussed** 5:3

**displaced** 65:12

**distracting** 33:5

**doctor** 21:19 47:18 48:12 53:18 64:4,22 66:14 68:2

**doctors** 73:10

**document** 25:17,24 26:2

**documents** 19:9

**drink** 31:9

**driver's** 19:19,21, 24 79:22

**driving** 78:24

**drop** 88:22, 25

**drove** 46:17

**duly** 4:6,11

**E**

**e-mail** 39:25

**earlier** 29:14 48:21 50:6 53:10 56:10 61:23 68:10

**ease** 36:16 65:22

**easier** 6:19

**easily** 90:25

**Edgar** 15:7,

8,15
**Edgardo** 13:20
**education** 12:13,18 13:4
**effect** 8:22
**El** 9:21 12:3,16 13:18 14:13,16
**emotionally** 65:24
**employed** 16:13
**employee** 36:22 93:16,23 94:8,13,17
**employees** 85:17 94:18
**employer** 16:2
**English** 4:7, 8 7:24 8:3,5,7 59:22 60:4
**entering** 76:10
**Escape** 79:2
**events** 48:23
**eventually** 35:4
**everyone's** 26:25
**evidence** 25:18 26:3,7,8, 20 27:17 43:9 76:13
**exact** 27:9 52:13
**exam** 48:15, 17
**EXAMINATION** 5:10 80:17
**examined** 4:11
**examples** 62:24
**exams** 52:1
**excuse** 10:3 11:1 77:2 89:23
**exhibit** 26:4 27:14,19, 22,25 37:10,11 40:18,22 59:2,3 73:9 76:19,20, 23 77:11
**experienced** 69:5
**experiencing** 70:10
**expert** 39:12
**explain** 61:18
**explained** 44:21 67:22
**explanation** 67:4,8
**extent** 9:2
**eye** 48:12, 15,17
**eyes** 92:13

**F**

**Facebook** 85:22 86:1,4
**fact** 39:16 43:9 76:13,14, 16
**factual** 24:18,21 26:6,19
**factually** 24:19 25:2
**fall** 30:2 31:4,12 33:6,15 46:4 47:6 48:10 50:7,12 51:12 64:2 65:12 81:13,18 82:7 83:19 84:18 85:9,16 88:22 89:1,9,15, 16 92:3,10 94:1
**falling** 43:16 80:20 81:5
**falls** 48:22
**falsely** 24:5
**familiar** 73:15
**farmers** 47:25
**farsighted** 48:4
**faster** 7:8
**fault** 78:9
**favor** 38:25
**February** 63:18
**Federal** 4:22
**feel** 27:12 39:17 45:11 56:21 65:21

**fell** 30:21, 24 31:21, 23,24 33:9,20 34:1,18 35:23 36:1,9,18 37:1 38:19 43:15 44:3,4,19 45:10 50:14 56:21 82:13 83:13 85:1 89:20 90:16 91:18 92:20 94:19

**felt** 69:9 70:15,24

**figure** 23:14 61:2 78:3

**filed** 13:11

**fill** 52:18

**filled** 8:17 53:7,11

**fine** 4:16 7:18 24:13 26:22 38:23 45:22 51:12 67:19

**finish** 6:13

**fix** 79:17

**flip** 37:17

**floor** 32:12, 18 34:11, 12 35:5 39:4,6 83:4,8,17 84:2,5,14 85:14 89:6,9,10 92:7,10 93:4,14 94:19

**focused** 74:16 84:12,14

**follow-up** 88:17 93:7

**foot** 64:18

**footage** 39:23 40:18

**footprints** 35:1

**Ford** 79:2

**forget** 7:1 8:13

**form** 4:24 12:21 24:7 81:6,20 86:24 89:11,22 90:9 92:12,21 93:18

**free** 39:17

**Friday** 61:14,16 64:25 68:7,12,23

**front** 32:11, 16 42:3 72:1 88:22

**full** 9:6

**fully** 6:13 9:2

**G**

**gave** 47:1 52:3,4,16, 19,20 53:7,13 64:19 67:9

**Genesis** 10:25 11:3

**gentleman** 36:11

**Georgia** 11:17,21 15:13,14 19:21,23 25:11 26:18 29:22

**Gerson** 10:6 14:23 18:5 46:8

**girl** 77:20

**give** 58:24 64:17 74:14

**giving** 6:23 59:12 67:5 68:9

**glad** 68:20

**glasses** 20:3 48:2,5,7, 8,9

**good** 7:3 45:23,24 61:19 65:2 75:15 94:23

**grandchildren** 10:3,18

**green** 42:15, 17

**ground** 6:7 83:6

**group** 42:3,5

**groups** 17:11

**guess** 64:8 85:7 87:7

**guesses** 28:17

**guessing** 12:15

**guys** 94:24

**Gwinnett** 77:12

H

half 16:7 30:25 31:14 45:21 71:20
hands 33:9
happened 16:23 21:8 28:10 29:8,11 31:11 36:10 49:14 65:5 71:23 72:5 78:12,16
happy 7:11
head 6:24 36:7
health 47:14 88:2,4
hear 63:22
heard 55:1, 10
helped 47:6
Hernandez 10:25
high 12:15 13:1,3 47:16
highest 12:12
history 47:14
hit 21:9 22:25 35:24 36:1,7 77:19,20 78:21
hitting 78:22
holder 18:2
hole 69:14
home 10:12 11:9 29:17 46:17,22
honest 35:10 38:16 39:19
hope 25:19
hospital 37:8 46:9, 11,13,15, 17,19 51:19,21, 23 52:17 53:12,25 55:7 56:7 69:17 72:17
hour 30:25 31:14 41:24 45:21
hours 8:10 31:3 46:14
house 46:19 87:21
hundred 39:17
hurt 44:16, 19 50:16 55:16,23 63:16
hurting 50:23 56:2 64:23 67:8 71:3
husband 14:15

I

identification 28:1 37:12 40:23 59:4 76:24
imagine 32:22
imaging 63:1 73:12
immediately 33:5 45:11 88:21,22
impact 78:21
implied 23:23
important 6:11
incident 11:12 16:12 20:16 21:7 22:4 29:8, 23 30:9 37:25 40:19 47:13 48:25 51:16 59:13 69:22 71:10,13 76:1 80:7 83:3 85:18 86:19,22 87:8 88:9 90:6,8,15
incidents 71:12
included 60:8
incorrect 25:3
indicating 34:3,6 36:2 52:23 69:12,13
indiscernible 23:19 27:20 39:6 59:10 60:3 70:2,4
information 22:20 25:3

40:10 69:16 79:15

**injection** 52:20,21 53:3 57:3, 5

**injections** 58:19 67:15 71:5

**injured** 21:12,14 72:9 79:3 80:20 89:20 90:1

**injuries** 21:20 22:1 48:22 50:7 51:4,6,13 69:17,21 81:4 86:25 87:8

**injuring** 74:8

**injury** 28:15,16 49:24 50:2 71:12 75:4 79:6

**innocently** 92:20

**inside** 53:2

**insignificant** 79:5

**Instacart** 17:8

**Instagram** 85:22 86:7

**instructing** 19:1

**instructions** 53:25

**insurance** 79:22,23, 25 88:2,4

**insurer** 88:6

**intensely** 69:10

**interpreter** 4:6,16 5:9 6:10,13,17 9:16 11:1 14:2 22:15,18, 22 32:14, 19 40:24 41:2,6,9 60:13,17, 20 64:6 68:15 74:20 81:25 85:3

**interpreting** 4:14 5:8

**interrogatories** 59:16 73:8

**interrogatory** 59:1 60:6, 23

**involved** 17:10 22:25 25:7,11 71:11 76:1,3,18 77:18

**issue** 79:17

**IV** 53:5

**J**

**J-E-R-S-O-N** 10:7

**jar** 88:23

**JARTU** 4:5

**Jimmy** 8:18 72:6 76:7

**job** 15:23 56:11,12 87:7,12

**jog** 25:15

**Julio** 13:20

**July** 9:15 57:24

**June** 65:5,8 66:18 69:4

**K**

**Katherine** 5:13

**keeping** 87:1

**kind** 5:20 16:18 33:11 52:1 56:24 62:14 72:13 79:1

**knee** 36:1, 2,5 44:22, 23 49:11, 12,14,21, 24 50:2,9, 13,15 51:5 52:9 55:15,19 57:13 62:11,13, 18,22 63:11 65:4,10,14 66:5,6,10, 18 67:3,7, 11,16,20, 21,25 69:3,5 70:7 74:19,21, 23 80:19

**knew** 23:24 43:10

**knowledge** 9:3

**L**

**ladies** 31:17 32:1,7,20, 25 33:4

36:24 42:5

**lady** 35:15, 17 36:19, 21 39:24 42:18

**landed** 33:25 34:2

**lane** 9:23 71:25 72:3

**language** 7:22

**languages** 8:1

**larger** 69:10

**law** 26:16 91:4

**Lawrenceville** 48:19

**lawsuit** 29:3 88:11

**lawsuits** 29:5 80:10

**lawyer** 18:12,18

**leadership** 17:18

**leading** 81:21 90:10,19, 20,23

**lecture** 27:10

**left** 31:19 38:7 42:7 77:20,21

**left-hand** 78:23

**leg** 34:2,5, 7,8,25 35:22 36:3 44:21,23 50:9,21 51:11,13

**legs** 7:18

**level** 12:12 55:12

**license** 19:19,21, 24 20:1,5, 8 26:16

**licensed** 26:17

**lie** 46:24

**light** 78:17

**liquid** 88:23

**liquids** 89:1,10 93:13

**list** 59:17

**listed** 60:8 73:11 77:14

**live** 10:1,2 11:13,17 14:15

15:4,10

**lived** 9:24 11:19

**lives** 15:5, 11

**long** 5:24 9:24 14:13 16:6 19:23 21:1 30:23 33:14 44:4 46:12 57:8 64:11 65:14,23 75:1 85:13 87:4

**longer** 67:20

**looked** 38:2, 9 53:1 54:13

**lost** 86:21, 25

**lot** 31:12 34:13,14 54:1 55:16 76:12 87:3,5 91:22

**low** 56:2,4 57:13 70:25 71:7

**lower** 45:1,2 50:9,13,19 51:9 74:17

M

**Macy's** 10:17 15:16

**made** 28:16 40:25 47:2 76:12

**make** 6:7, 19,22 7:3, 6 14:3 21:25 26:3 27:18,21 28:17 38:11,16 40:17 46:10,20 50:7 58:25 72:15 75:4 76:20 79:6 85:7

**makes** 10:13 65:24 68:20

**making** 28:14 93:12

**man** 35:7

**manager** 35:6 36:11,13 47:5 94:18

**mark** 37:9

**marked** 27:25 37:11,24 40:22 59:3 76:23

**market** 47:25

**marriage** 14:12

**married** 13:13,15 14:7,13

**Massachusetts** 11:20 20:12 21:11,23 23:2,16 25:8 49:18,19

**matter** 24:18,21 26:6,20

**media** 85:20 86:16,19

**medical** 45:5,19 72:20 87:19

**medication** 62:25

**medicine** 8:10,20 31:4,6 52:4,15 63:4 68:9

**medicines** 8:12

**meeting** 18:17,23

**member** 17:13

**memory** 25:15 28:13

**mentioned** 42:12 53:10 61:23

**met** 18:21, 22

**metal** 16:19 17:1,5

**metro** 15:19

**Mexico** 15:5

**military** 13:7

**mine** 79:24 94:10

**minute** 41:4

**minutes** 41:12 44:7 46:3,5 80:13 84:18

**misstated** 24:10

**mistake** 40:25

**moment** 47:19 66:1

**money** 79:18

**Montes** 10:6 15:1,7 86:2,3

**month** 30:7

**months** 58:13 64:13 65:16 71:19,20

**morning** 8:21 29:14 72:25 73:11,15

**motor** 20:20 74:8

**mouth** 7:7

**move** 11:15, 21 36:15

**MRA** 61:19

**MRI** 54:12 61:19 65:2 73:11

**myriad** 90:7

**N**

**nails** 10:12

**names** 10:5 14:25

**Naproxen** 8:14

**nearsighted** 48:3

**necessitated** 49:15

**neck** 74:12, 13,15

**needed** 31:15 45:4 52:13 61:17 64:1 65:2,10

**needles** 74:6

**night** 70:9

**ninth** 12:14

**nodding** 6:23

**Norcross** 9:23

**normal** 89:16,19

**Northside** 51:22,23 52:2 69:17 70:1,2

**noted** 24:13

**notes** 80:13

**notice** 4:19 35:3,6

**November** 57:17,22 71:16 74:8 75:2 76:1, 21 80:8

**number** 12:5 17:23 18:6

**O**

**object** 18:19,20 23:9 24:7 25:16

26:18 27:3,4,11 40:9 42:16 57:18,25 58:5 81:6, 20 83:10 84:6 89:11,22 90:9 91:2 92:12,21 93:18

**objection** 12:21 18:25 43:6 82:8 90:3, 17 91:9,10 94:14

**objection's** 24:13

**objections** 4:24 24:2 26:24 27:6

**occurred** 25:13

**October** 60:11,14, 16 61:4,5

**offerings** 76:15

**office** 47:24

**officer** 78:11 79:16

**oil** 31:21 34:10,13, 17,22,24 35:1,5,11 38:9,15 39:2,4,6, 9,12,14,16 43:3,7,10 83:16,20 84:1 94:2

**oily** 38:7

**ongoing** 47:15 60:25 75:14

**open** 77:6 79:13

**operation** 61:18

**opinion** 91:1

**oral** 44:11

**original** 94:12

**Ortho** 54:15, 17 61:25 62:3,10,15 63:1,10,22 66:19,22 67:2 68:6, 18,22 69:18 81:15 82:5,12

**Orthopedics** 81:16,17

**over-the-counter** 31:6

**overhear** 41:19

**P**

**p.m.** 4:2 41:13 95:5

**paid** 87:11, 24

**pain** 8:24 45:11 46:25 50:15 51:2 52:4,15,20 55:12,15, 19,21 56:4 57:5 63:11,14 66:6,11 67:3,25 68:9 69:4 70:7,10, 14,17,20 71:7 74:12,15, 17,19,21, 23

**painting** 16:5

**pandemic** 16:23

**paper** 52:4

**papers** 53:14

**Park** 9:23

**parked** 31:11

**parking** 31:12

**part** 80:24

**parties** 19:6

**parts** 35:25 52:8

**party** 80:9

**pass** 72:2

**past** 8:10 73:10

**pay** 87:13

**Peachtree** 54:6,18,21 55:1,10,13 56:8,24 57:9 58:12,19, 22 60:9,17 61:7,13 66:25 68:11,13, 14,17 69:18 81:16,17 82:4,5,11

**people** 27:8 35:2 43:22 68:17

**percent** 39:17

**perfectly**

28:18

**period** 58:13 65:23 87:4

**permit** 12:1

**person** 35:20 36:14 47:5 65:22 72:1 78:18 79:9

**personal** 28:14,15, 16

**phone** 17:23 38:6

**photo** 38:5, 13,14

**photograph** 37:6

**photographs** 37:3,23,25

**photos** 19:11 37:9,17 39:1

**physical** 49:1 62:25 63:4 67:15

**physician** 55:7

**physicians** 54:7,15 56:8 60:9, 18

**pick** 33:23 36:16 39:1,14 84:13

**picked** 36:11 46:2

**picture** 38:13,15

**pictures** 34:21 37:20 39:2,10,14

**piece** 31:15 43:8 52:4

**piping** 16:20 17:1,5

**place** 17:5 21:22 54:2 56:17,20 68:14

**Plaintiff's** 59:1

**plans** 29:18

**play** 41:16

**played** 41:20 42:25

**plenty** 27:7

**point** 7:16 34:10

**pointing** 53:1

**police** 72:7 76:10,20, 25 77:3, 12,13,24, 25 78:2,11 79:16

**position** 35:9 87:6

**positions** 17:19

**post-secondary** 12:18,22, 25

**posted** 86:18

**practice** 89:17,19, 25

**preface** 18:11

**prefer** 43:11

**prepare** 18:10,14

**prescription** 8:9,19 31:4 52:17,19 53:6

**prescriptions** 8:16

**present** 9:22 11:8

**pressure** 47:16

**prevented** 32:12

**preventing** 32:17

**previous** 14:12,15 92:6

**previously** 14:18

**primary** 47:18,22 55:6

**prior** 6:6 16:8 20:19 28:15 29:3 31:3 33:15 35:2 48:25 50:2 51:4, 6,13 81:12 82:12 83:19 84:18 85:9 90:6,13,14

**privilege** 18:20

**privileged** 18:22,23

**problem** 26:11 52:13 67:22 94:10

**problems** 81:13

**Procedure** 4:22

**proceeding** 5:20

**proceedings** 4:7
**produce** 77:7
**produced** 40:4 77:5
**producing** 48:22
**Progressive** 80:3
**pronounce** 14:23
**proper** 4:19
**property** 79:10,19
**provide** 44:8
**provided** 40:14 52:16 59:18 63:6 69:16
**provider** 17:25 73:25 79:25
**providers** 66:12 69:21 73:14
**providing** 40:10
**Publix** 91:15
**puddle** 34:15
**purposes** 4:20,21
**pursuant** 4:19
**put** 26:7,20 52:22,24 53:3 58:8 64:14 74:5 91:8,10 92:10

**Q**

**question** 4:25 6:12 7:5,8,14, 19 12:21 13:2 22:16 24:8 28:6 39:18 40:6 42:8 59:8, 23,24 60:1 64:9 81:8, 21,23 82:1 83:11,15 85:4,8 90:22,23 91:11,25 93:7 94:4, 9,12
**questions** 9:2 44:13 58:4 59:17 80:15 82:16 88:18 90:11 92:24 94:21

**R**

**radiologist** 70:2
**rank** 70:17
**rate** 50:15 63:11 87:13
**read** 8:5 25:17 60:4,11 94:24 95:1
**reading** 26:6,19 27:15
**ready** 5:7 82:19
**realized** 78:10
**reason** 9:1 83:22 84:4
**recall** 14:13 22:6 23:18 25:10 35:24 43:5 45:15 49:20 52:8,10 58:12,21 62:2,24 65:9 69:20 71:6 72:22 73:5,13 74:7 75:1 76:3 77:16 79:21 83:9,16 84:21
**received** 39:25 40:13 57:2 58:22 63:3 79:15,18
**receiving** 57:12 72:21
**recess** 66:2
**recognize** 78:6
**recollection** 58:15
**recommended** 68:18
**record** 12:7, 9,10 27:24 37:23 58:9 77:12 91:8
**recording** 41:20 42:25
**records** 54:5,20 57:16,23 58:8 63:5 77:6
**recover**

64:11

**recovery** 64:5,6 65:14,17 69:5

**REEXAMINATION** 82:25 88:19 92:25 93:8

**refrigeration** 42:4

**Rehab** 73:18, 21

**related** 5:22 57:12 81:3,18 82:6

**relationship** 14:9

**relatives** 15:18

**release** 22:12,19, 20,21 23:14,22 24:24 28:20

**relief** 70:15,22

**remember** 5:24 8:15 15:11 16:17 20:21 21:17 22:2,8,9 25:12 28:17,18, 24,25 29:6,10,13 30:8,13 33:11,16, 22,23,25 34:2,5,6 35:21 36:13 43:17,24, 25 47:23, 24 48:18 49:5,16,22 52:22 53:11,12, 15,17,20, 23 54:2,4, 25 55:3, 11,12 56:9,24 57:1 58:14,20, 23 59:12, 19 61:5 62:4,7 63:24 65:11,13 69:20 72:4,24 73:2,4,7, 24 74:5,6, 11 75:3, 12,13,22, 24 77:17, 19,22 79:1 80:1,2 84:24 86:5 87:15,17 88:3

**remembering** 71:15

**remembers** 76:11

**Renee** 25:19

**repaired** 79:8,20

**repeat** 7:10 81:25 85:3

**rephrase** 7:10 83:15 90:13 91:25

**replacement** 65:5

**report** 40:1, 3 76:10 77:1,4,12 78:2 80:3

**reporter** 6:20 82:20,23 95:1,4

**reports** 40:13

**represent** 38:1 41:17

**request** 77:7 86:24

**requests** 12:8

**required** 25:23,24

**reserve** 4:24

**reserved** 24:2

**resolved** 75:15

**responding** 40:12

**response** 60:6

**responses** 6:23 19:16 59:1,2,13, 15

**responsible** 93:12

**responsiveness** 4:25

**rest** 46:23 54:1

**restrictions** 20:1

**restroom** 7:17

**result** 80:20

**results** 65:1

**return** 37:5 57:23

**returned**

54:18

**review** 19:9 59:5 60:2

**revoked** 20:6

**Road** 25:13 28:21 76:7

**Rolling** 92:13

**Roswell** 25:13 28:21

**rude** 7:2

**rules** 4:22 6:7 26:7

S

**S-O-L-I-T-O** 9:11

**Salvador** 9:21 12:3, 16 13:18 14:13,16

**Sam's** 5:13 28:10 29:8,22 50:12 80:21 81:4,12,18 82:7,13 85:17 89:2,13 90:2,7,16 92:2,11 93:10,13, 16,23 94:8,13

**Sandy** 25:14

**scale** 50:15, 23 51:2 55:18,22 56:4 63:11,15 70:7,17 71:1

**scene** 45:16

**scheduled** 61:20

**school** 12:15 13:1,3 26:16

**screen** 42:10

**seconds** 40:21 41:14,24 42:1 43:16

**section** 85:2

**security** 12:4

**send** 39:25 40:1

**sense** 68:20

**separate** 70:3

**September** 76:4,22

**served** 13:7

**service** 17:25

**settle** 75:20

**settlement** 22:21 75:22

**sewing** 30:14 56:12,13, 17,20 87:6,7,12

**shaking** 6:24

**shinier** 38:12

**shirt** 42:18

**shoes** 33:11, 15

**shoppers** 42:3

**shopping** 29:25 30:10,17 31:18 43:4,23

**shoulder** 72:14,16 74:4,9

**show** 25:24 38:18 52:12 54:14,20 57:23 59:16 63:6

**showed** 52:11

**shows** 92:15

**sic** 17:17

**side** 27:8 31:16,17, 19 32:8 78:21,23

**sign** 21:9 23:1,6,21 31:22 83:24 94:25 95:1

**signature** 5:4

**significant** 13:24 14:1 88:11

**single** 25:24

**Singleton** 76:7

**sit** 27:9 70:6,16

**sitting** 65:22

**six-year-old** 10:23

**slid** 36:3

**slip** 48:22 81:12 82:6 89:9 92:10 94:1

**slipped** 33:3,24 43:18,19

82:13 89:1 90:1,16 91:18

**small** 16:1 62:17 69:13

**sneakers** 33:13

**social** 12:4 85:20 86:16,19

**Solito** 4:1, 10,18 5:12 9:7 77:14 80:19 88:21

**Solozano** 13:21 14:10

**someone's** 38:6

**son** 10:14 18:5 37:7 44:6 45:8, 9 46:2,7, 15 51:18

**sons** 10:2,5

**sort** 13:5 40:10 62:24

**sought** 79:16

**sound** 54:8, 23 63:8,20 65:7 72:25

73:15 80:4

**sounds** 45:7 51:1 54:19 79:10

**source** 93:3

**Spanish** 4:7, 8 7:22 8:1 36:18,20, 21 47:10

**speak** 7:24 30:20 36:18 85:17

**speaking** 24:2 26:24 27:6 47:10

**specialist** 52:5 53:14,22

**Specialists** 73:12

**specific** 59:8,23,24 62:5

**specifically** 23:24 24:23 60:21,24 63:2 73:25 91:23 92:1

**speculation** 81:24

**spell** 9:5,9 86:3,9

**spill** 33:1 44:1

**spilled** 31:21 32:22

**spine** 44:22, 25 54:6, 15,18,21 55:2,10,13 56:8,24 57:3,9 58:12,19, 22 60:9,18 61:7,13,25 62:3,10,15 63:1,11,23 66:19,22, 25 67:3 68:6,11, 13,14,17, 18,23 69:18 71:5 73:3,11, 17,20 81:15 82:5,6,12

**spoke** 36:19, 21 48:21

**spoken** 14:22

**Sport** 54:15, 18 56:24 57:9 58:19,22 60:18 61:7,13,25 62:3,10,15

63:1,11,23 66:19,22 67:3 68:6, 18,23 69:18 81:15 82:5,6,11, 12

**sporting** 48:23

**Sports** 54:6 55:2,10 58:13 60:9

**spread** 34:15,16

**Springs** 25:14

**standing** 32:20,21 35:9 65:22 87:4

**start** 4:14 30:11,12 56:11,14, 20 57:19 87:14

**started** 30:15 55:13,19 62:2 63:7, 10,13

**starting** 56:7

**state** 9:5 20:9,11

24:17 25:2
26:4,5,17
37:22
39:16
69:25

**stated** 24:21
60:24

**statement**
44:8,11,12
47:1

**statements**
47:3

**states**
11:15,19,
25 78:3

**stay** 44:5
46:12,15
55:7

**stick** 18:24

**stipulate**
70:3

**stipulating**
39:3

**stipulations**
4:15

**stood** 35:4

**stop** 9:1
21:9 23:1,
6 26:21,
22,24,25
41:23
61:10
90:10
93:22 94:5

**stops** 46:10,
20

**store** 28:10
29:15
30:3,20,23
31:1,13
37:5,9,24
40:13
44:5,9,15
45:4 46:3
47:2 78:20
84:18,22
92:9 94:17

**stores** 91:16

**straight**
46:9,11

**straighten**
34:7

**stretch** 7:17

**substance**
35:9 38:8
43:17 83:4
84:5 85:13
93:4

**sue** 92:10

**supplement**
60:22

**supposed**
37:18

**surgeries**
50:4 62:9,
23 67:15

**surgery**
49:6,8,10,

15,18,20,
23 50:1
54:12,15,
17 61:20,
24 62:12,
17,21
63:18,25
64:1,5,12,
21 65:3,5,
10,15,20
66:5,10,
16,17
67:14
69:3,6,9,
10,11
70:13,23
81:2,3

**surgical**
63:3

**surveillance**
39:23

**suspected**
78:8

**suspend**
26:11

**suspended**
20:5

**sustained**
87:1

**swollen**
64:23

**sworn** 4:6,11

**syringe** 53:4

**T**

**table** 7:19
27:9 31:17

**talk** 6:11
11:12
16:12 18:9
19:6 20:15
29:7 36:25
47:13
51:15
63:17 65:4

**talked** 6:4
14:18
18:21
35:22 51:4
67:13 71:4
88:9

**talking**
22:23
23:13 27:2
29:4 31:18
32:6 52:25
63:2 66:4,
24 68:10

**tapping**
72:14

**Taylor** 5:2,5
12:20 14:5
18:19,24
19:3 23:3,
9,15,19
24:4,7,10,
14,17,22
25:2,16,
21,25

26:2,14 27:1,7,14, 20 28:2,20 38:20 39:3,11,15 40:6,9 41:10 42:16 43:6 45:22 57:18,25 58:7 59:7, 23 60:21 69:25 73:17,20 76:9,12, 17,25 77:3 80:18 81:7,22 82:2,3,10, 15 83:10 84:6 86:3 88:17,20 89:12,24 90:5,12, 18,20,22 91:1,5,10, 14 92:13, 17,23 93:7,9,20, 22,25 94:4,11, 16,21 95:2,3

**telling** 40:14 65:11,13 68:1

**ten** 94:5

**terms** 84:1

**test** 52:13

**testified** 4:12

**testify** 25:25 43:11

**testifying** 43:7 58:1 76:9

**testimony** 61:3

**therapies** 58:21

**therapist** 49:1

**therapy** 62:25 63:4 67:16

**thing** 6:22 15:16,25 27:9 68:2, 4 74:7 78:17

**things** 16:1 28:12 35:19 42:13 43:12

**thinks** 40:24

**time** 5:1,25 7:1 11:11 15:23 16:11 20:20 26:25 29:10 30:1 31:11 41:10,23, 25 42:23 48:9,14 54:21 61:10,13 62:6 64:5, 7,14 65:23 68:5,7 83:5 85:2 87:4 91:23,24 92:2,6 93:10,16 94:7,13

**times** 7:7 29:21 57:19 84:8 90:7 91:20,22 92:6 93:25 94:1,5,7

**timestamp** 41:7

**timestamped** 40:20

**timestamps** 42:23

**today** 6:11 7:7,16 9:2 11:12 29:4 48:2 70:6, 16 81:10 88:9

**today's** 18:10

**told** 35:18 45:9 52:10 53:15 54:11 64:20 65:9 67:2,7 78:11

**TOLES** 4:5

**total** 87:18

**Totally** 69:7

**touch** 71:9

**touched** 34:18

**Tramadol** 8:13

**transcript** 7:3

**translate** 4:7 6:17

**translating** 6:13

**translation** 40:8

**translation-wise** 78:4

**translator** 6:20

**treat** 82:11

**treated** 49:1 51:23 54:3,6 55:4 57:9, 16 58:3,16 68:5 69:16

**treating** 54:10,21 55:13,19 57:20 61:7 62:3 68:22 69:21

**treatment** 21:22 45:19 47:13 48:25 51:15 56:23 57:11,23 60:7,8,25 61:10 62:14 63:7 72:20,21, 23 73:13 74:1 75:1 81:15 82:4

**treatments** 52:1 56:25 62:9 63:2 67:11 71:6 74:14

**true** 81:19 90:14 91:23

**truth** 38:24

**Tucker** 29:22

**turn** 31:20 71:25

**Twenty-eight** 10:15

**type** 53:18

**U**

**Uber** 17:8

**Uh-huh** 50:20 51:17

**understand** 7:6 8:3 13:2 28:9 67:12 86:23

**understanding** 67:24

**understood** 7:14

**unit** 42:4 77:13 78:5

**United** 11:15,25

**V**

**vacation** 11:9

**valid** 19:18

**vehicle** 20:20 74:8

**verbal** 6:23 44:13 47:1

**verify** 27:15

**versus** 92:6

**video** 40:2, 13,18,20 41:7,11, 13,20,24 42:25 43:3 92:15

**videos** 19:13

**visible** 35:9

**volunteering** 17:21

**W**

**wages** 86:21, 25

**wait** 6:12

**waited** 44:6

**waiting** 6:16 40:7 61:21

**waive** 5:5 95:3,4

**walk** 32:7 54:1 89:8

**walked** 31:20 32:9,13,22 33:3

**walking** 31:20 33:22 35:2 64:17 65:23 81:10,13 87:5 92:16,19

**Walmart** 8:18 53:9 89:13 91:15,17, 18,21

**wanted** 29:1 53:18 72:2 78:19

**waste** 26:25

**watch** 40:19, 21 42:22

**wearing** 33:12 48:1,9

**week** 29:24 30:6 91:22

**weeks** 16:15, 22 29:24 62:16,19, 20,21

**weight** 64:15 67:5

**wheelchair** 36:12

**white** 42:4

**Williams** 72:6

**Winter** 9:23

**witnesses**

19:7

**woman** 42:13, 14 47:9

**women** 35:14

**words** 31:11

**work** 10:11, 16 11:3 12:1 13:5 15:15 16:6,9,18 17:2,4 30:15 56:14,16, 22 87:1,3, 10 93:10

**worked** 16:7, 14,21 17:1 87:3

**working** 15:21,24 16:8,10, 14,16 17:5 30:11,12 56:20

**works** 7:7 10:12,17 11:7 26:10,13 31:1

**worn** 33:17

**wreck** 76:18 80:23

**write** 8:7

**written** 44:11 59:22

**wrong** 14:23 41:18 60:11

**X**

**x-ray** 52:12

**x-rayed** 52:8

**x-rays** 52:3, 7,11

**Y**

**year** 15:24 16:7 48:16 62:6 63:19 65:6 66:18 69:4 71:17

**years** 9:25 13:19 14:14 19:25 49:17 73:10

Hung (Alex) Q. Nguyen
*Attorney at Law*
Brett A. Miller
*"Of Counsel"*
Bryan A. Brooks
*"Of Counsel"*

LAW OFFICE
OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

Office: 770-409-1529
Fax: 770-409-1526
5495 Jimmy Carter Blvd.,
Suite B-4
Norcross, GA 30093
www.hqnlawfirm.com

Betty.

August 2, 2016

**VIA FACSIMILE ONLY (678) 380-0661**
Mr. Ricado Brown
Progressive Mountain Insurance Company
4250 Interantional Blvd
Norcross, A 30093

| RE: | Claim No.: | 15-3550130 |
|---|---|---|
| | Insured: | Vanessa Salas |
| | Date of Loss: | October 19, 2015 |
| | Our Client: | Argelia Solito |

Dear Mr. Brown:

I hope this facsimile finds you doing well.

I am writing on behalf of my client to accept your offer of $6,600.00 for Argelia Solito to settle her claim. My client acknowledges that your offer is inclusive of all economic damages, known and unknown, and any and all liens, assignments or statutory rights of recovery.

The firm tax identification number is 27-1404761. Please send the appropriate payments and releases to our office.

Thank you for your cooperation and kindness in this matter.

Sincerely,
LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

Brett A. Miller, Esq.
Attorney for Argelia Solito

BAM/rc

DEFENDANT'S
EXHIBIT
tabbies
1

**Hung (Alex) Q. Nguyen**
*Attorney at Law*
**Brett A. Miller**
*"Of Counsel"*
**Bryan A. Brooks**
*"Of Counsel"*

LAW OFFICE
OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

Office: 770-409-1529
Fax: 770-409-1526
5495 Jimmy Carter Blvd.
Suite B-4
Norcross, GA 30093
www.hqnlawfirm.com

September 28, 2016

**Via US Mail**

Ms. Betty DeAngelo
Progressive Mountain Insurance
4250 International Blvd.
Norcross, GA 30093

| **Re:** | **Client's Name:** | **Argelia Solito** |
|---|---|---|
| | **Claim Number:** | **15-3550130** |
| | **Loss Date:** | **October 19, 2015** |
| | **Insured's Name:** | **Vanessa Salas** |

Dear Ms. DeAngelo:

Enclosed, please find the executed "Release and Trust Pursuant to Uninsured Motorist Insurance Protection Coverage" for the above referenced client.

Should you have any further questions or concerns regarding these documents and/or this matter, please feel free to contact our office and ask for Rosie.

Thank you for you for your cooperation in settling this matter.

Sincerely,
LAW OFFICE OF HUNG Q. NGUYEN
& ASSOCIATES, LLC

R. Clará

Rosie Clará, Legal Assistant

/rc
Enclosures

# RELEASE AND TRUST AGREEMENT PURSUANT TO UNINSURED MOTORIST INSURANCE PROTECTION COVERAGE

Claim No: 15 3550130
Policy No: 47740754
Insurance Company: Progresive Mountain Ins Co

NOW COMES Argelia Solito (hereinafter referred to as the "Undersigneds"), being of lawful age, for the sole consideration of six thousand six hundred dollars ($6,600.00), United states funds, in hand paid, the receipt and sufficiency of which is hereby acknowledged, do hereby remise and forever release, acquit and forever discharge Progressive Mountain Insurance Company and its parent corporations, subsidiary corporations and other associated Progressive underwriting companies (hereinafter referred to as "Releasees"), of and from any and all actions, causes of action, claims or demands for damages, costs, loss of services, expenses, compensation, insurance benefits, uninsured motorist insurance benefits, underinsured motorist insurance benefits, statutory penalties, attorney's fees, consequential damages, or any other thing whatsoever on account of, or in any way growing out of, any and all known and unknown personal injuries and death resulting, and to result, from a certain accident which happened on or about 10/19/15 at Roswell Rd Sandy Springs GA ("Subject Accident") for which the Undersigneds have claimed the said Releasees to be legally liable.

The Undersigneds agree, understand and acknowledge that in consideration of the above-referenced sum that the Undersigneds forever release and discharge any and all claims whatsoever under the provisions of the Georgia Uninsured Motorist Act, as amended, including any and all past, present, or future claims under any policy of motor vehicle insurance issued by Releasees and including any and all claims under O.C.G.A. § 33-7-11, as amended, for personal injury, pain and suffering, wage loss, loss of income, medical bills, medical expenses, hospital expenses, drug expenses, loss of services, loss of consortium, and any other expense, benefit, or kind of claim whatsoever under any policy of motor vehicle insurance issued by Releasees for any and all known and unknown personal injuries and death and property damage resulting or to result from the Subject Accident.

The Undersigneds agree, understand and acknowledge that the above-specified sum is paid to the Undersigneds in consideration for this Release and Trust Agreement, which includes an agreement for the total and complete discharge of Releasees for any and all damages incurred by the Undersigneds, in connection with, arising out of, or that will arise or result from the Subject Accident.

The Undersigneds agree, understand, acknowledge and assume all risk, chance or hazard that the said injuries or damages may be or become permanent, progressive, greater, or more extensive than is now known, anticipated, or expected. No promise or inducement which is not herein expressed has been made to Undersigneds, and, in executing this Release and Trust Agreement, the Undersigneds do not rely upon any statement or representation made by or on behalf of any person, firm or corporation hereby released, or any agent, physician, doctor, or any other person representing them or any of them, concerning the nature, extent, or duration of said damages or losses or the legal liability therefor.

The Undersigneds agree, understand and acknowledge, in accordance with the terms, provisions, and conditions of Releasees' Policy No.: 47740754 to take, through representatives designated by Releasees and at the sole expense of Releasees, such action as may be necessary or appropriate to recover from Unknown driver, or any other responsible party (hereinafter collectively referred to as "Tortfeasors"), the damages resulting from Undersigneds involvement in said accident. The Undersigneds further agree to hold in trust any monies

received as a result of any settlement with or judgment against Tortfeasors with said monies to be paid to Releasees immediately upon same coming into the Undersigneds hands. Further in the event any payment obtained by Releasees exceeds the amount of UM/UIM benefits set forth as consideration for this agreement, such excess shall be remitted directly to the Undersigneds.

The Undersigneds understand, acknowledge and agree to execute, procure and deliver to Releasees any and all papers, instruments and materials that may be deemed necessary or appropriate to institute, prosecute, settle, or compromise any action or claim and to carry out the provisions and intent of said coverage under the aforesaid policy of insurance issued by Releasees. In this regards, the Undersigneds further understand, acknowledge and agree that no settlement of such claim, demand or cause of action against the owner or operator or organization responsible for the operation of the aforesaid motor vehicle involved in the aforesaid accident or occurrence has been made by Undersigneds or on the Undersigneds behalf.

The Undersigneds further understand, acknowledge and agree to hereby appoint the managers and/or agents of Releasees as their attorneys in fact with irrevocable power to prosecute and collect any such claim or claims against Tortfeasors to begin, prosecute, compromise, or withdraw such efforts to collect any such claim or claims in the Undersigneds names.

The Undersigneds understand, acknowledge and agree to procure, execute, and furnish all papers, documents and materials necessary in any proceedings prosecuted by Releasees against Tortfeasors. In this regard, Undersigneds further understand, acknowledge and agree that as a specific term of this agreement and in exchange for the consideration set forth above, that they will cooperate, participate and assist Releasees in the prosecution of any and all claims Releasees may pursue against Tortfeasors. This cooperation, participation and assistance includes, but is not limited to the following:

1. Furnish all papers, documents, materials and items (including electronic, video, audio, paper or otherwise) necessary to support such an action against the Tortfeasors;
2. Participate in discovery by assisting counsel hired by Releasees in the formulation of written discovery requests to Tortfeasors and responding to written discovery requests from Tortfeasors, including the execution of any verification forms, certification forms or affidavits as deemed necessary by Releasees and counsel representing Releasees;
3. Attend and provide testimony at any depositions necessary to support such an action against Tortfeasors; and
4. Attend, participate in and provide testimony during any trial, arbitration, or other court hearing against Tortfeasors.

The Undersigneds agree, understand, acknowledge and covenant never to sue, arrest, attach, garnish or prosecute any claim against Releasees for any claim Undersigneds have or may have arising under the aforesaid policy of insurance or under any statute or laws of the State of Georgia, arising out of, to arise out of, resulting from, or to result from the Subject Accident nor shall Undersigneds indirectly or otherwise aid any other person or persons to do what the Undersigneds have agreed and covenanted not to do.

The Undersigneds acknowledge, represent and agree to pay and resolve any liens, judgments or claims for payment associated with medical treatment, services and/or equipment provided to the Undersigneds by third parties for injuries suffered by the Undersigneds and resulting from the Subject Accident.

The Undersigneds further acknowledge, represent and agree to protect, defend, indemnify and hold harmless Releasees against any and all claims of damages, demands, rights, actions, causes of action or suits of any kind or nature whatsoever for the costs of medical treatment, services and/or treatment received by the Undersigned as a result of injuries from the Subject Accident. This specifically includes, but is not limited to, liens, judgments, or claims for payment from Medicare, Medicare Advantage Organizations, Medicaid, Tri-Care, Health Insurers, Workers Compensation and all medical liens contemplated by O.C.G.A. § 44-14-470 and O.C.G.A. §44-14-471.

The Undersigneds acknowledge, understand and agree that this Release and Trust Agreement and all its terms and provisions will be governed and construed in accordance with Georgia state law.

The Undersigneds understand, acknowledge and agree that no agreements or understandings have been made between the parties except as expressed herein, and the terms of this Release and Trust Agreement are contractual and not a mere recital.

The Undersigneds further understand, acknowledge, agree and state that they have carefully read the foregoing Release and Trust Agreement and know the contents thereof, and they sign the same as their own free act.

______________________ 9/13/2016
Date

Angelia Solito 9/13/2016
Date

**WITNESSED** this 13 day of September, 2016:

______________________ Julio Edgardo Solorzano
Signature of Witness Printed Name of Witness



DEFENDANT'S
EXHIBIT
2
tabbies

Def. 4

Def. 6



Def. 7



Def. 8

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| ARGELIA SOLITO,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S EAST INC., JOHN DOE 1-2, ABC CORP., AND XYZ CORP.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE<br>NO. 23A02118 |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES

**COMES NOW**, ARGELIA SOLITO, Plaintiff, and submits Responses to Defendant's First Interrogatories to Plaintiff.

## GENERAL STATEMENT

Plaintiff does not waive any objection that may be appropriate to the use of any information provided in his Responses or to the admissibility, relevance, competency or materiality of any of the information to any issue in this case. Identifying or producing any document or supplying any information does not constitute an admission by Plaintiff that the document or information is relevant to the subject matter of this action. The Responses set forth below constitute the best information presently available to Plaintiff. However, Plaintiff reserves the right to amend, supplement or change any response made hereinafter if facts or documents subsequently are discovered which make amendment, supplementation or revision appropriate. Disclosure of any privileged or otherwise protected information, if any, is or was inadvertent and cannot be construed as a waiver of any such privilege.

DEFENDANT'S
EXHIBIT
4
tabbies

## GENERAL OBJECTIONS

1.

Plaintiff objects to each interrogatory and document request to the extent that it is overbroad or seeks to impose an undue burden on Plaintiff.

2.

Plaintiff objects to each interrogatory and document request to the extent that it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.

3.

Plaintiff objects to each request for admission, interrogatory and document request to the extent that it seeks information and/or documents that are protected from discovery by the attorney-client privilege, the work product doctrine or any other applicable privilege. No such document will be provided.

4.

Plaintiff objects to each interrogatory and document request to the extent that it seeks information and/or documents that constitute confidential or proprietary business and financial information of Plaintiff.

5.

Plaintiff objects to each interrogatory and document request to the extent that the Defendant attempts to impose obligations on Plaintiff beyond the obligations required or permitted by the Georgia Civil Practice Act. Plaintiff will provide such responses as are required by the Georgia Civil Practice Act but will not assume a greater burden to respond or to supplement responses to than that Act requires.

6.

Plaintiff responds to Defendant's First Interrogatories without waiving, or intending to waive: (a) the right to object on the grounds of competency, privilege, relevance or materiality or any other proper grounds to the use of any documents or other information for any purpose, in whole or in part, in any subsequent proceeding in this action or in any other action; (b) the right to object on any and all grounds, at any time, to interrogatories or other discovery procedures involving or relating to the subject matter of the requests to which Plaintiff has responded herein; and (c) the right at any time to revise, correct, supplement or clarify any of the responses made herein. The inadvertent production of any privileged document or information shall not be deemed a waiver of any privilege with respect to such document or information or any other document or information.

7.

The fact that no objection is interposed to a request for admission, interrogatory or document request does not necessarily mean that responsive documents exist.

8.

Defendant's requests seek confidential information and other information that should be used for no purpose other than the litigation of this case.

9.

The foregoing objections are specifically incorporated as if fully set forth directly in response to each interrogatory and document request.

**RESPONSES TO INTERROGATORIES**

1.

Please state your (a) full legal name and any other names you have ever used; (b) your date and place of birth; (c) marital status, full name of spouse(s), and date of your marriage(s) and divorce(s) if applicable; (d) names and ages of all children; (e) social security number; (f) current address and address at time of accident at issue; and (g) education background including all schools, institutions, trade or professional schools attended and the dates of attendance of each, and the degrees, certificates, or licenses obtained at each.

**RESPONSE: Plaintiff objects to the portion of this Interrogatory seeking Plaintiff's social security number and full date of birth. The Privacy Act of 1974, Public Law 93-579, Section 7, enacted by the U.S. Congress and the federal legislative scheme involving the use of social security numbers, establishes a legitimate expectation of privacy of a person in their social security number, prohibits the disclosure of said social security number, and prohibits a state from penalizing an individual in anyway because of failure to reveal her social security number upon request. Subject to said objections and without waiving the same, Plaintiff's full name is Argelia Solito, Plaintiff's date of birth is 07/08/1966. Plaintiff is married to Julio Edgardo Solozano. Plaintiff has 4 children: Adriana Montes 39 years old, Edgar Montes 35 years old, Jerson Montes 26 years old, Diego Montes 24 years old. Plaintiff's Social Security Number will not be provided, without a protective order, for security reasons. Plaintiff' current address is 1125 Winter Park Lane, Norcross, GA 30093.**

2.

If you have ever been arrested or convicted of any crime, please identify each crime (other than a traffic offense), date of arrest, the arresting authority, the court in which any

criminal proceeding against you was held, and the disposition of each charge. See Lewis v. The State, 254 S.E.2d 830 (1979); Hightower v. G.M., 232 S.E.2d 336 (1985).

**RESPONSE: Plaintiff objects to this Interrogatory as it requests information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Georgia law is clear that the only admissible evidence is evidence of convictions of felonies and misdemeanors involving moral turpitude. Lewis v. State, 243 Ga. 443, 254 S.E.2d 830 (1979). The Court has specifically held that the prior driving record of a party is not admissible evidence and is irrelevant. Georgia Power Company v. Hubbard, 142 Ga. App. 531, 236 S.E.2d 515 (1977); Jones v. Cloud, 119 Ga. App. 697, 168 S.E.2d 598 (1969); Williams v. Slusser, 104 Ga. App. 412, 414, 121 S.E.2d (1961). Subject to said objection and without waiving the same, Plaintiff has not been arrested or convicted of any crime of moral turpitude.**

3.

State specifically the name, address and telephone number of your current employer and every other employer for whom you have worked for the past ten (10) years giving as to each the dates of employment, the nature of your work, name of your supervisor(s), your reason for leaving (if applicable), and your rate of pay.

**RESPONSE: Plaintiff has not made a past lost wage claim. However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this collision. Therefore, Plaintiff reserves the right to supplement this response.**

4.

If you or any member of your immediate family have ever been a party to a lawsuit, including a claim for Worker's Compensation, or a bankruptcy proceeding, please identify the person involved, give the style and number of the case, the nature of the litigation, the role you or  your family member had in the litigation (plaintiff, defendant, etc.), and the court or administrative body before which the suit was filed.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Subject to said objection and without waiving the same, Plaintiff has not filed a petition for bankruptcy. Plaintiff reserves the right to supplement this response as discovery continues**

5.

If you have ever made a claim for bodily injury or property damage against any person, firm or entity, including an insurer, please provide the following with regard to each such claim:
(a) identify the person and/or entity against whom the claim was made;
(b) identify the facts of the claim, including the date and location of the occurrence or event leading to the claim;
(c) the specific injury and/or property damage at issue;
(d) identify the adjuster or other representative who handled the claim; and,
(e) identify all documents including, but not limited to, all notices, correspondence, settlement agreements, releases, drafts, checks, etc., relating to the claim.

**RESPONSE: In 2021, Plaintiff made a bodily injury claim for a car collision on Jimmy Carter Blvd. against Taylor Breaux and her insurance Progressive. Date of the**

**collision 11/18/2021. The case has been resolved. Plaintiff reserves the right to supplement this response as discovery continues.**

6.

Please state specifically where the incident giving rise to this lawsuit took place, the date and time of day, the weather conditions at the time of your arrival at the store, and how the occurrence happened, including a specific description of the cause(s) of your fall and your alleged injuries.

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence. Based on information now known to Plaintiff, Plaintiff contends that on 08/05/2021, she slipped and fell inside Defendant's premises. Plaintiff reserves the right to supplement this response.**

7.

Please describe the mechanics of your accident (i.e., what caused you to fall, how you fell (forward, backward, sideways, etc.), the specific location of where you fell, how you landed, how you recovered, etc.). Also, please confirm whether you actually fell or not.

**RESPONSE: Plaintiff slipped and fell while walking inside Defendant's premises. For more details, please see the video of the incident.**

8.

Please describe, in detail, the substance which you contend caused your fall, including

but not limited to the identity, size, shape, color, dimensions, amount, odor, and exact location of the substance. Please identify the source of the substance at issue, where it came from, and where it was located when you fell.

**RESPONSE: Oily and slippery substance, such as vegetable oil. Plaintiff is not aware of the source of the substance and where it came from. It was located near the bread isle.**

9

Give the name, address, and telephone number of all persons that to you or your representatives' knowledge, information or belief were eyewitnesses to the occurrence, and/or have relevant knowledge concerning the occurrence, any issue of liability in this lawsuit, or the damages you claim in connection with this lawsuit, including a brief description of their relevant knowledge.

**RESPONSE: Defendant's employees and other customers. Plaintiff also directs Defendant to the names and addresses of Plaintiff's medical providers, disclosed in responses to these Interrogatories and other discovery propounded by Defendant. At the present time, Plaintiff has not identified other witnesses responsive to this Interrogatory. However, Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

10.

Please state in specific detail your actions prior to the subject incident, from the time you arrived at the premises until the time of your accident, including a description of everything you did and everyone with whom you spoke. Please identify everyone whom you were shopping with on the day of the accident.

**RESPONSE: Plaintiff was shopping at Sam's club for about 15-20 minutes before she fell. Plaintiff was not accompanied by anyone.**

11.

Please state in specific detail your actions after the subject incident, from the time of your accident until the time you departed the premises, including a description of everything you did and everyone with whom you spoke.

**RESPONSE: After the subject incident, Defendant's employees helped Plaintiff to get up and she was later placed on a wheelchair. Defendant's employees made an incident report. Plaintiff called her son Jerson Montes who picked her up and took to the hospital.**

12.

Please identify all persons whom you contend were in close proximity to you at the time of the incident whom either witnessed the incident, or came to your assistance immediately after the incident, giving for each their full name, address, telephone number, name of their employer, and a brief description of how each assisted you.

**RESPONSE: Please see Plaintiff's response to interrogatory 9.**

13.

Please state the name, address and telephone number of all persons who arrived at the scene of the occurrence within an hour of the occurrence or that you or any other representative or family member spoke with regarding the subject incident in the twenty-four (24) hours following the occurrence.

**RESPONSE: Please see Plaintiff's response to interrogatory 11.**

14.

Please give your height and weight, and identify all objects in your hands, at the time of the occurrence. Also, please describe your footwear by size, style, and manufacturer.

**RESPONSE**: **At the time of the incident, Plaintiff was wearing a pair of flat dress shoes. Plaintiff did not have any objects in her hands.**

15.

Please state whether you have used any ambulatory-assistance devices (all of the time or occasionally) prior to the accident at issue. If so, please identify all such devices, identify the condition(s) for which the device was prescribed or recommended, and identify the medical treatment provider (or other person) who prescribed or recommended the device(s).

**RESPONSE**: **Plaintiff has not used any ambulatory-assistance devices prior to the incident.**

16.

State whether you wear prescription glasses. If so, identify the condition for which you are prescribed glasses (i.e., near-sightedness, far-sightedness, etc.), and state whether you were wearing your glasses at the time of the incident.

**RESPONSE**: **Plaintiff states that she was wearing prescription glasses at the time of the incident.**

17.

Please state how many times you had walked by, near or through the location of your accident prior to the accident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

18.

Please state how many times you had visited the premises prior to the alleged incident at issue in Plaintiff's Complaint.

**RESPONSE: Plaintiff visits Sam's Club approximately once a week.**

19.

State the facts upon which you rely in support of your allegation that Defendant had actual or constructive knowledge of the condition which you alleged caused the incident; identify all persons with knowledge of the foregoing facts; and identify all documents which you contend support or demonstrate the foregoing facts.

**RESPONSE: Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

20.

Please set forth in detail each and every act or omission that you contend was a breach of duty on the part of the Defendant:

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions that constitute negligence on the part of Defendant or Defendants. Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

21.

With regard to each statement (oral, written, recorded, court or deposition transcript, etc.) taken from any person with knowledge relevant to this lawsuit, please state the name of each

person, the name and address of the person or entity taking each statement, the date each statement was taken, and the name and address of each person having possession, custody or control of each statement.

**RESPONSE: Plaintiff is unaware of any recorded statements pertaining to this incident other than any statements which may or may not have been taken by Defendant's employees. Plaintiff reserves the right to supplement this response as discovery continues.**

22.

Describe with reasonable particularity all photographs, charts, diagrams, videotapes, and other illustrations of any person, place or thing involved in this lawsuit, giving the date each was made, the name and address of the person(s) who made or created each item, and the name and address of the person(s) with possession, custody or control of each item.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Subject to said objections and without waiving the same, Plaintiff directs Defendant to Plaintiff's medical bills and records which may contain photographs, charts and diagrams, and to the photographs provided pursuant to Defendant's Requests for Production. Plaintiff possesses no other documents or things responsive to this Interrogatory. Because discovery is ongoing, Plaintiff reserves the right to supplement this response as discovery progresses.**

23.

Please state whether you were talking to anyone at the time of the accident (either in person, on the telephone, via text message, etc.). If so, please identify all such persons.

**RESPONSE: Plaintiff was not talking to anyone at the time of the incident.**

24.

Identify all United States statutes, state statutes, city ordinances, county ordinances, and all other governmental laws, rules or regulations which you contend the Defendant violated with respect to the incident giving rise to this lawsuit.

**RESPONSE: Plaintiff directs Defendant to the allegations in Plaintiff's Complaint. Moreover, because discovery has not yet been completed, and Plaintiff has not yet taken depositions in this case, Plaintiff has not determined all acts and omissions relevant to this action. Plaintiff reserves the right to supplement this response as more information becomes available.**

25.

If you consumed any alcoholic beverages, prescription or over-the counter medicines or drugs, or illegal drugs within 24 hours prior to the occurrence, please identify the nature and quantity thereof, all persons present, and the time(s) and place(s) where such were consumed.

**RESPONSE: Plaintiff was not under the influence of alcohol or drugs at the time of the incident in question.**

26.

Please describe all accidents or incidents in which you have been involved (including but not limited to all auto accidents, work accidents, slip and falls, trip and falls, sports injuries, home accidents, etc.), prior to the occurrence, and describe the personal injuries, if any, which you received in each such accidents or incidents.

**RESPONSE: Please see Plaintiff's response to interrogatory 5.**

27.

Please describe all accidents or incidents in which you have been involved (including but not limited to all auto accidents, work accidents, slip and falls, trip and falls, sports injuries, home accidents, etc.), subsequent to the occurrence, and describe the personal injuries, if any, which you received in each such accidents or incidents.

**RESPONSE: Please see Plaintiff's response to interrogatory 5.**

28.

State the substance of and names of the parties to all conversations or other communications you had with any representative of the Defendant, and/or other individuals present at the location of the alleged incident on the date of the incident, at the time of or at any time following the occurrence.

**RESPONSE: Plaintiff does not recall the names of Defendant's employees who assisted her after the fall. Plaintiff reserves the right to supplement this response as discovery progresses and more information becomes available.**

29.

Please identify each expert expected to testify at trial and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and give a summary of the grounds for each opinion. See O.C.G.A § 9-11-26. PLEASE NOTE THAT THIS INTERROGATORY APPLIES TO ALL EXPERT WITNESSES INCLUDING ALL PRACTITIONERS OF THE HEALING ARTS.

**RESPONSE: No experts expected to testify at trial have been retained at this time.**

30.

State in detail, to the best of your ability, all injuries you claim you received as a result of the incident giving rise to this lawsuit.

**RESPONSE: Plaintiff has attached the medical records and bills from the medical providers who treated Plaintiff for injuries sustained in the subject incident pursuant to Plaintiff's responses to defendant's request for production of documents. As Plaintiff is not a doctor or medical professional. Plaintiff directs Defendant to such documents for a complete, technical and specific inventory of Plaintiff's physical complaints and symptoms following the accident as well as a more detailed explanation, diagnosis and prognosis of Plaintiff's medical condition. In addition to the information set forth in the documents, Plaintiff states generally that, as a result of the subject incident, she is experiencing pain and discomfort in her back, hip, right knee and right ankle. Because Plaintiff may continue to incur medical treatment, Plaintiff reserves the right to supplement this response as discovery progresses.**

31.

State whether you had any prior or subsequent injuries, diseases or difficulties in the areas of the body which you claim were injured in the occurrence, or to areas of your body involving your senses (sight, hearing, etc.) and/or balance, identify when said injuries, diseases or difficulties occurred, and give the names and addresses of all practitioners of the healing arts, including family doctors, who treated you for such injury, disease or difficulty.

**RESPONSE: Plaintiff had no such prior or subsequent injuries/diseases.**

32.

(a) State the names and addresses of all doctors, osteopaths, psychologists, physical therapists, chiropractors, and other practitioners of the healing arts who have treated you as a result of the incident that is the subject of this litigation, give the date of your last visit to each and indicate whether each has issued a written report regarding his or her treatment.

(b) State the exact terms of and all billing, payment, or invoice agreements you and/or your attorney had or have with any of the practitioners identified in subsection (a).

**RESPONSE:**

| Physician Name | Address | Dates of Treatment | Billing |
|---|---|---|---|
| **Peachtree Spine and Sport Physicians** | **5555 Peachtree Dunwoody Road NE, Suite G65 Atlanta, GA 30342** | **08/09/2022-10/12/2022** | **$36,653.80** |
| **Ortho Sport & Spine Physicians** | **5788 Roswell Rd NE Sandy Springs, GA 30328** | **Will be supplemented** | **Will be supplemented. Est. $40,106.74** |
| **Northside Hospital** | **1000 Johnson Ferry Road NE Atlanta, GA 30342** | **08/05/2021** | **$3,889.00** |
| **Northside Radiology** | **1000 Johnson Ferry Road NE Atlanta, GA 30342** | **08/05/2021** | **Will be supplemented** |
| **Northside Emergency Associates, PC** | **1000 Johnson Ferry Road NE Atlanta, GA 30342** | **08/05/2021** | **$653.00** |

**Plaintiff is hereby producing all medical records and medical bills in her possession or in the possession of her attorney. Plaintiff will supplement this response as more information becomes available.**

33.

Give the names and addresses of all treating physicians including all family doctors, interns, osteopaths, psychologists, physical therapists, chiropractors and other practitioners of the healing arts of any type or nature, and all hospitals, infirmaries, clinics, sanitariums, nursing homes, and asylums in which you received treatment, including the dates of such treatment: (a) after the occurrence (for any illness, injury or condition not related to the occurrence); and, (b) for the fifteen (15) years prior to the occurrence.

**RESPONSE: Morning Chiropractic, 5430 Jimmy Carter Blvd., Suite 200, Norcross, GA 30093; Atlas Spine and Rehab, 5855 Jimmy Carter Blvd., STE 180, Norcross, GA 30071; MRI Imaging Specialists, 6760 Jimmy Carter Blvd., Suite 165, Norcross, GA 30071.**

34.

Please itemize all special damages which you allege you incurred (or others have incurred on your behalf) as a result of the occurrence, including medical expenses, hospital expenses, drug expenses, property damage, lost wages, and all other special damages (describing same) you claim you incurred as a result of the occurrence.

**RESPONSE: Please see Plaintiff's response to interrogatory 32. Plaintiff reserves the right to supplement this response as discovery progresses.**

35.

With respect to any payments or benefits which are available or which you have received (or which were made on your behalf by any source) because of the incident giving rise to this lawsuit, please state the amount and payee of each benefit, the name and address of the person, insurance company, corporation, or other entity making each payment or benefit available, and the nature of each payment or benefit made (i.e., PIP, no-fault benefits, worker's compensation, group or individual disability benefits, group or individual medical coverage, U.S. or state government, Medicare, Medicaid, Champus, litigation loan or funding company, et cetera).

**RESPONSE: Plaintiff objects to this Interrogatory on the grounds that evidence of these collateral source payments is not admissible under Georgia law. Subject to said objection and without waiving the same, Plaintiff was a Medicaid beneficiary through Ambetter, policy #: 94706200; Member ID #: U9470620001. Plaintiff is not aware of any other benefits available to her.**

36.

If you are making a claim for lost wages or loss of income, state whether or not you filed state and Federal income tax returns for the preceding five years and, if so, state where each return was filed, the social security or tax number on each return, and the total wages, salaries, tips, etc. on each return.

**RESPONSE: Plaintiff has not made a past lost wage claim. However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this incident. Therefore, Plaintiff reserves the right to supplement this response.**

37.

For any lost wage or salary claim that you make, please explain how you computed the amount of damages and state the name and address of each employer at the relevant time, the name and telephone number of your supervisor, the dates you were unable to work, the date you returned to work, your rate of pay and whether or not your employer continued to pay your salary during any part of the time you were unable to work.

**RESPONSE: Plaintiff has not made a past lost wage claim. However, Plaintiff may make a claim for future lost wages or future inability to earn an income depending upon Plaintiff's future recovery from the injuries resulting from this incident. Therefore, Plaintiff reserves the right to supplement this response.**

38.

Please identify with reasonable particularity (including the title and date) all documents (proof of loss, loan receipt, subrogation agreements, assignments, settlement agreements, releases, covenants not to sue, etc.) executed by you in connection with the payment of any money to you because of the occurrence by an insurance carrier or any other entity.

**RESPONSE: Plaintiff has not received any such payments.**

39.

Please provide the username for any social media accounts and/or applications used or maintained by you. This request includes, but is not limited to, Facebook, Instagram, Twitter, YouTube, WhatsApp, (Facebook) Messenger, WeChat, Tumblr, WeChat, Tik Tok, Reddit, LinkedIn, Viber, Snapchat, Twitch, 4Chan, and/or Pinterest.

**RESPONSE: Plaintiff objects to this Interrogatory as being an undue invasion of Plaintiff's privacy. Plaintiff further objects to any inquiry into any social media activity by Plaintiff which is not within the public domain and which has been protected from general public view pursuant to the privacy settings of any social media account set up or maintained by Plaintiff. Moreover, any attempt to bypass or go around the privacy setting selected by the Plaintiff is an unreasonable invasion of Plaintiff's right of privacy and is not reasonably calculated to lead to the discovery of admission information but instead is simply a fishing expedition pursued solely in an effort to embarrass and harass Plaintiff. "Subject to and without waiving said objections, Plaintiff states that she has not posted general comments on her Facebook, Twitter, etc account about the fact that she had been injured in a incident" Plaintiff reserves the right to supplement this response as discovery continues.**

40.

Please state whether you have altered or deleted any content from any of the previously identified accounts since the date of the accident which forms the basis of this lawsuit. If your answer is in the affirmative, please state the date on which the alteration or deletion was made, what content was altered or deleted, and why you deleted or altered the content. [Note: please preserve and do not destroy, alter, or delete any data contained on any of the accounts identified in response to Interrogatory No. 40 for the pendency of this litigation.]

**RESPONSE: Please see Plaintiff's response to interrogatory 39.**

41.

Please state whether you have altered the privacy settings on any of the previously identified accounts since the date of the accident which forms the basis of this lawsuit.

**RESPONSE: Please see Plaintiff's response to interrogatory 39.**

42.

Since the date of this accident, has Plaintiff worn or utilized a Fitbit, Apple, Garmin, or Samsung wearable fitness tracker/watch? If so, please identify the type of device worn or used.

**RESPONSE: Plaintiff has not worn or utilized any such fitness tracker.**

43.

Please provide the cellular telephone number, cellular provider, and account holder's name for your cellular phone currently and at the time of this accident, if different. [Note: please preserve and do not destroy, alter, or delete any data contained on the telephone identified in response to Interrogatory No. 43 for the pendency of this litigation.]

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.**

44.

Please (a) state in detail all facts and (b) describe with reasonable particularity (including the title and date) all documents which support your claim that Sam's was negligent in failing to property inspect, maintain, and take adequate measures to protect invitees from the danger of the walkway as alleged in Count II, Paragraphs 23-25 [sic] of Plaintiff's Complaint.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Defendant is in possession of the incident report that might have been taken by Defendant's employees and the video recording of the incident that might have been taken on Defendant's premises. Plaintiff reserves the right to supplement this response as more information becomes accessible.**

45.

Please (a) state in detail all facts and (b) describe with reasonable particularity (including the title and date) all documents which support your claim for negligent training and supervision as alleged in Count IV, Paragraphs 31-34 [sic] of Plaintiff's Complaint.

**RESPONSE: Plaintiff objects to this Interrogatory to the extent it calls for information that is more accessible to Defendant than Plaintiff. Defendant is solely in possession of its policies and procedures relating to employees hiring, training, and supervision.**

46.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim for "strict liability" as alleged in Count IV [sic], Paragraph 13 [sic] of Plaintiff's Complaint.

**RESPONSE: Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

47.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim that "Defendants have acted and continues to act in a manner that is stubbornly litigious, causing Plaintiff unnecessary trouble and expense within the meaning of O.C.G.A. Section 13-6-11", as alleged in subparagraph (d) of Plaintiff's Prayer for Relief in Plaintiff's Complaint.

**RESPONSE: Defendant denied liability on 10/20/2022 by sending a denial letter to Plaintiff's attorney. Because the video evidence and other evidence requested by Plaintiff's attorney has not been produced yet, Plaintiff has not determined all acts and omissions that constitute Defendant's bad faith within the meaning of O.C.G.A. 13-6-11. Therefore, Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

48.

Please (a) state in detail all facts; (b) identify all applicable legal authority; and (c) describe with reasonable particularity (including the title and date) all documents which support your claim that Defendant's defenses in this action lack substantial justification, were imposed for delay or harassment, were not made in good faith, and that Defendant unnecessarily expanded the proceeding by improper conduct as alleged in subparagraphs (e) and (f) of Plaintiff's Prayer for Relief in Plaintiff's Complaint.

**RESPONSE: Because discovery is still ongoing, Plaintiff reserves the right to supplement this response as well as to amend the pleadings to conform to the evidence.**

Respectfully submitted this July 25th, 2023,

**770-GOOD-LAW, LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC**

*/s/ Hung Q. Nguyen, Esq*
Hung Q. Nguyen, Esq.
Georgia Bar No.: 940370
Attorneys for Plaintiff

5495 Jimmy Carter Boulevard, Suite B-17
Norcross, Georgia 30093
Tel: 770-409-1529
Fax: 770-409-1526
litigation@770goodlaw.com



GWINNETT COUNTY
POLICE DEPARTMENT
770 Hi-Hope Road | Lawrenceville, GA 30043
P.O. Box 602 | Lawrenceville, GA 30046-0602
770.513.5000
www.gwinnettcounty.com | www.gwinnettpolice.com

SUBJECT: GWINNETT COUNTY POLICE RECORDS
RE: OPEN RECORDS REQUEST of September 12, 2023, Reference # R145882-091223, Incident/Case Number unknown

CERTIFICATION OF AUTHENTICITY

Pursuant to O.C.G.A § 24-8-803(6) and 24-9-902, the undersigned declarant hereby declares, certifies, verifies or states under penalty of perjury the following:

1. The declarant is a records custodian, or other qualified person who can provide a written declaration regarding the records of regularly conducted business activity which are the subject of the certification:

2. The records of regularly conducted business activity (hereinafter "records"), which are the subject of this Certification,

3. The records are originals or duplicate copies of domestic business records; which are true and correct copies of the original record(s) prepared and/or maintained by:

Gwinnett County Police Department, Records Unit

4. The records were made at, or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

5. The records were kept in the course of a regularly conducted business activity; and

6. The records were made as a regular practice in the course of regularly conducted business activity. I hereby declare, certify or state, under penalty of perjury, that the foregoing is true and correct. Executed on 09/15/2023.

If you have any questions, please contact my office at 770.513.5357.
Sincerely,
Renee Castellanos
Customer Service Associate III - Open Records
Police

DEFENDANT'S
EXHIBIT
5
tabbies

# GEORGIA MOTOR VEHICLE CRASH REPORT

| Agency Case Number | Agency NCIC Number | County | Date Rec. by GDOT |
|---|---|---|---|
| GP220074627 | GA0670200 | GWINNETT | |

| Estimated Crash Date | Estimated Crash Time | Dispatch Date | Dispatch Time | Arrival Date | Arrival Time | Vehicles | Injuries | Fatalities | Inside City Of |
|---|---|---|---|---|---|---|---|---|---|
| 09/14/2022 | 15:03 | 09/14/2022 | 15:07 | 09/14/2022 | 15:15 | 2 | 0 | 0 | |

Road of Occurrence: SINGLETON RD — At Its Intersection With: ____

Not At Its Intersection But: 80 ☐ Miles ☒ Feet ☒ North ☐ South ☐ East ☐ West Of: JIMMY CARTER BLVD

Latitude (Y) (Format 00.00000): 33.902628 — Longitude (X) (Format -00.00000): -84.204691

☐ Corrected Report ☐ Sup To Original ☐ Hit and Run

| Field | Unit 1 | Unit 2 |
|---|---|---|
| Unit # | 1 ☒ Driver ☐ Ped ☐ Bike | 2 ☒ Driver ☐ Ped ☐ Bike |
| Susp At Fault | ☒ | ☐ |
| Last Name / First / Middle | SOLITO / ARGELIA / | FERNANDEZ / NATALY / |
| Address | 1125 WINTER PARK LN NW | 6971 LISMORE DR NW |
| City / State / Zip | NORCROSS / GA / 30093 | NORCROSS / GA / 30093 |
| Personal Info | Personal Info 1966 | Personal Info 2002 |
| Driver's License No. / Class / State / Country | 070007787 / C / GA / US | 061021715 / C / GA / US |
| Insurance Co. / Policy No. / Telephone No. | PROGRESSIVE MOUN' / 958908804 / (774) 849-9392 | ALLSTATE P & C / 0921230989 / (678) 472-2116 |
| Year / Make / Model | 2018 / Ford / Escape | 2021 / Toyota / Corolla |
| VIN / Vehicle Color | 1FMCU0GD9JUA58690 / Red | 5YFEPMAE1MP172696 / Black |
| Tag # / State / County / Year | TDS1174 / GA / GWINNETT / 2023 | RXE9730 / GA / GWINNETT / 2023 |
| Trailer Tag # / State / County / Year | | |
| Owner | ☒ Same as Driver | ☒ Same as Driver |
| Owner's Last Name / First / Middle | | |
| Address | | |
| City / State / Zip | | |
| Removed By | driver ☒ Request ☐ List | DRIVER ☒ Request ☐ List |
| Alco Test / Type / Results | No / / | No / / |
| Drug Test / Type / Results | No / / | No / / |
| First Harmful Event | 11 | 11 |
| Most Harmful Event | 11 | 11 |
| Operator/Ped Cond | 1 | 1 |
| Operator Contributing Factors | 11 | 1 |
| Vehicle Contributing Factors | 1 | 1 |
| Roadway Contributing Factors | 1 | 1 |
| Direction of Travel | 1 | 1 |
| Vehicle Maneuver | 6 | 5 |
| Non-Motor Maneuver | | |
| Vehicle Class | 1 | 1 |
| Vehicle Type | 1 | 1 |
| Vision Obscured | 1 | 1 |
| Number of Occupants | 2 | 4 |
| Area of Initial Contact | 3 | 11 |
| Damage to Veh | 2 | 2 |
| Traffic-Way Flow | 2 | 2 |
| Road Comp | 2 | 2 |
| Road Character | 1 | 1 |
| Number of Lanes | 4 | 4 |
| Posted Speed | 40 | 40 |
| Work Zone | 0 | 0 |
| Traffic Control | 7 | 7 |
| Device Inoperative | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Citation # / O.C.G.A. § | PE00125355 / 40-6-48(1) | NONE / |
| Citation # / O.C.G.A. § | | |
| Citation # / O.C.G.A. § | | |

## COMMERCIAL MOTOR VEHICLES ONLY

| Field | Unit 1 | Unit 2 |
|---|---|---|
| Carrier Name | | |
| Address / City / State / Zip | | |
| U.S. D.O.T. # / No. of Axles / G.V.W.R. | | |
| Cargo Body Type / Vehicle Config. | | |
| Interstate / Intrastate | ☐ Interstate ☐ Intrastate | ☐ Interstate ☐ Intrastate |
| Fed. Reportable | ☐ Yes ☒ No | ☐ Yes ☒ No |
| C.D.L.? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| C.D.L. Suspended? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Vehicle Placarded? | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Hazardous Materials? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Haz Mat Released? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| If YES: Name or four Digit Number from Diamond or Box | | |
| One Digit Number from Bottom of Diamond | | |
| | ☐ Ran Off Road ☐ Down Hill Runaway ☐ Cargo Loss or Shift ☐ Separation of Units | ☐ Ran Off Road ☐ Down Hill Runaway ☐ Cargo Loss or Shift ☐ Separation of Units |

## COLLISION FIELDS

| Manner of Collision: 4 | Location at Area of Impact: 1 | Weather: 1 | Surface Condition: 1 | Light Condition: 1 |
|---|---|---|---|---|

## NARRATIVE

D1 STATED THAT SHE WAS TRAVELING NORTHBOUND ON SINGLETON RD, JUST NORTH OF JIMMY CARTER BLVD. D1 SAID THAT SHE LOOKED ON HER MIRROR, ACTIVATED HER TURN SIGNAL, DID NOT SEE A CAR ON THE RIGHT LANE. D1 SAID THAT SHE CHANGED LANES AND V2 STRUCK V1, BECAUSE V2 SPED UP. D2 ADVISED THAT SHE WAS TRAVELING NORTHBOUND ON SINGLETON RD, JUST NORTH OF JIMMY CARTER BLVD. D2 STATED THAT V1 CHANGED LANES AND STRUCK V2. D1 AND THE PASSENGER IN V1 DID NOT COMPLAIN OF INJURIES. D2 AND THE PASSENGERS IN V2 DID NOT COMPLAIN OF INJURIES. I SAW

## DIAGRAM

INDICATE NORTH

See Full Page Diagram

## PROPERTY DAMAGE INFORMATION

| Damage Other Than Vehicle: | Owner: |
|---|---|

## WITNESS INFORMATION

| Name (Last, First) | Address | City | State | Zip Code | Telephone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

## OCCUPANT INFORMATION

| # | Name (Last, First) | Address | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SOLITO, ARGELIA | 1125 WINTER PARK LN NW, NORCROSS, GA 30093 | | | | | | | | |
| | Age: 56 | Sex: F | Unit # 1 | Position: 1 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | By: | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | Hospital Arrival Time (Fatality Only): | | | | | |
| 2 | MONTES, ADRIANA | 1125 WINTER PARK LN NW, NORCROSS, GA 30093 | | | | | | | | |
| | Age: 38 | Sex: F | Unit # 1 | Position: 3 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | By: | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | Hospital Arrival Time (Fatality Only): | | | | | |
| 3 | FERNANDEZ, NATALY | 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | | | | | |
| | Age: 20 | Sex: F | Unit # 2 | Position: 1 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | By: | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | Hospital Arrival Time (Fatality Only): | | | | | |
| 4 | SIFUENTES, GLORIA | 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | | | | | |
| | Age: 49 | Sex: F | Unit # 2 | Position: 3 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| | Injured Taken To: | By: | EMS Notified Time (Fatality Only): | EMS Arrival Time (Fatality Only): | Hospital Arrival Time (Fatality Only): | | | | | |

## ADMINISTRATIVE

Photos Taken: ☐ Yes ☒ No By: no

*Officer Note: If collision resulted in a fatality, please send prompt notification to the GDOT Crash Reporting Unit via either email at GeorgiaFARS@dot.ga.gov or Fax at (404) 635-2963.*

| Report By: | Agency: | Report Date: | Checked By: | Date Checked: |
|---|---|---|---|---|
| Osorio Giraldo, Daniel E | Gwinnett County Police Dep: | | Bruce, Julian J | 10/04/2022 |

## SUPPLEMENT
### GEORGIA MOTOR VEHICLE CRASH REPORT

| Agency Case Number: GP220074627 | Estimated Crash Date: 09/14/2022 15:03 | Officer Name: Osorio Giraldo, Daniel E |
|---|---|---|

**NARRATIVE CONTINUED**

MINOR DAMAGE ON THE RIGHT SIDE OF V1. I SAW MINOR DAMAGE ON THE LEFT SIDE OF V2. I FOUND D1 AT FAULT FOR UNSAFE LANE CHANGE, I ISSUED D1 CITATION PE00125355. V1 WAS REMOVED BY D1. V2 WAS REMOVED BY D2.

BWC ACTIVATED

**ADDITIONAL CITATION INFORMATION**

| Unit # ___: | | Unit # ___: | |
|---|---|---|---|
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |
| Citation # | O.C.G.A. § | Citation # | O.C.G.A. § |

**ADDITIONAL OCCUPANT INFORMATION**

| Name (Last, First): FERNANDEZ, MARCO | | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Age: 14 | Sex: M | Unit # 2 | Position: 4 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |
| Name (Last, First): VELASQUEZ, JAIRO | | | | | Address: 6971 LISMORE DR NW, NORCROSS, GA 30093 | | | | |
| Age: 2 | Sex: M | Unit # 2 | Position: 6 | Safety Eq: 3 | Ejected: 1 | Extricated: 2 | Air Bag: 2 | Injury: 0 | Taken for Treatment: 2 |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |
| Name (Last, First): | | | | | Address: | | | | |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |
| Name (Last, First): | | | | | Address: | | | | |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |
| Name (Last, First): | | | | | Address: | | | | |
| Age: | Sex: | Unit # | Position: | Safety Eq: | Ejected: | Extricated: | Air Bag: | Injury: | Taken for Treatment: |
| Injured Taken To: | | By: | | EMS Notified Time (Fatality Only): | | EMS Arrival Time (Fatality Only): | | Hospital Arrival Time (Fatality Only): | |

ADDITIONAL or FULL PAGE DIAGRAM

# EXHIBIT N

## REVISIONS

| REV. NO. | DATE: | BY: | DESCRIPTION: |
|---|---|---|---|
| 1 | 8/27/13 | SCH | UPDATED ELECTRONICS AND OTC PER MSMS |
| 2 | 111113 | JGP | REMOVED BEER RACKS PER BUYER. ALL PALLET DRIVEN |
| 3 | 012814 | BOB | REMOVED CONVERTIBLE BOX STAND CHECKOUTS TO PROTO BOX STAND CHECKOUTS |
| 4 | 040214 | MRG | RELOCATED FLORAL STEM CUTTER |
| 5 | 060514 | MRG | CANDY/ SNACKS RESET |
| 6 | 091014 | MRG | CURRENT CONDITIONS - QC |
| 7 | 061815 | MRG | ADD MAJORS, MOVED LUGGAGE |
| 8 | 091615 | MRG | 2015 FALL PROJECT |
| 9 | 030916 | MRG | ADDED EVGC FIXTURE |
| 10 | 4/17/2017 | DEM | CAT UNROLL |
| 11 | 6/2/2017 | LRT | 2017 SPRING PROJECT-JEWERLY/ELECTRONICS, SOFTWARE |
| 12 | 092617 | LRT | UPDATED NEW CASH MACHINE |
| 13 | 12/1/17 | LRT | FIRST FEATURE ROLLOUT |
| 14 | 2/15/18 | LRT | CHUTE REGISTER ROLLOUT |
| 15 | 8/16/18 | LRT | 2018 REDLINE |
| 16 | 10/4/19 | LRT | POD REMOVAL PROJECT |
| 17 | 2/26/20 | LRT | UPDATED BOOKS LAYOUT |
| 18 | 07/02/2020 | MAH | CPU PROJECT |
| 19 | 08/14/2020 | MAH | 2020 PRINT UPDATE |
| 20 | 09/18/20 | MAF | CAT UPDATE PER REQ: RETURN C_045 TOBACCO IN CLUB |
| 21 | 12/17/2020 | MAH | 2021 CELL BOOTH REPLACEMENT PROJECT |
| 22 | 06/23/2021 | MAH | DSDBAKERY RACK FIX / TITLE BLOCK UDPATE |
| 23 | 07/09/2021 | MAH | ADDED BACK C48 TABLES TO PRINT |
| 24 | 09/10/2021 | MAH | Q3 UPDATES:READING GLASSES FIXTURE/ BOOKS UPDATE, ADD CART RAIL. |
| 25 | 01/20/2022 | MAH | Q1: BOLD AND BLUE |
| 26 | 07/21/2022 | MAH | 2022 FRESH BAKERY POD RESET |
| 27 | 11/29/2022 | MAH | 2022 Q3 COMPILED PROJECT LIST |
| 28 | 01/05/2023 | MAH | OTC PHARMACY STEEL REMOVAL |
| 29 | 02/02/2023 | MAH | MEAT, HMS, SUSHI VALIDATION |
| 30 | 04/04/2023 | MAH | 2023 Q1 COMPILED LIST: HMS LABEL REMOVED, POS FLIP |
| 31 | 05/15/2023 | MAH | Q1 INTERIM COMPILED LIST: APPAREL TABLE ADDITIONS & LOCKER KIOSK ADDTION |

| CAT. # | CATEGORY | BEFORE # OF PALLETS | AFTER # OF PALLETS | CAT. # | CATEGORY | BEFORE # OF PALLETS | AFTER # OF PALLETS |
|---|---|---|---|---|---|---|---|
| 1 | CANDY | 44 | 44 | 57 | DELI | 29 | 29 |
| 2 | H.B.A | 66 | 66 | 58/78 | CHIPS & SNACKS | 186 | 186 |
| 3 | OFFICE SUPPLIES | 25 | 25 | 60 | MATTRESSES | 14 | 14 |
| 4 | TABLETOP AND BAGS | 76 | 76 | 63 | POP UP SHOPS | 8 | 8 |
| 5 | TELEVISIONS | 59 | 59 | 66 | JEWLERY | 5 | 5 |
| 6/20/31 61/64/86 | ELECTRONICS | 52 | 52 | 69 | GIFT CARDS | 2 | 2 |
| 8 | PET SUPPLIES | 40 | 40 | 70 | BOOKS | 16 | 16 |
| 10 | AUTOMOTIVE | 12 | 12 | 74 | MOBILE PHONES | 4 | 4 |
| 11 | HOME IMPROVEMENT | 39 | 39 | 76 | FRESH MEAT | 31 | 31 |
| 13 | LAUNDRY/HOME CARE | 59 | 59 | 77 | FRESH BAKERY | 35 | 35 |
| 14 | HOUSEWARES | 23 | 23 | 79 | PREPARED FOODS | 6 | 6 |
| 15 | KITCHEN ELECTRICS | 45 | 45 | 80 | MAJOR APPLIANCES | 10 | 10 |
| 16/18/51 7/9/12/89 | SEASONAL | 136 | 136 | 83 | EXTREME VALUE GIFT CARDS | 2 | 2 |
| 17 | FURNITURE | 27 | 27 | 88 | OPTICAL | 2 | 2 |
| 19 | WINE | 26 | 26 | 92 | AUTO BATTERY (WIPERS) | 1 | 1 |
| 21 | DOMESTICS | 39 | 39 | 94 | PAPER GOODS | 46 | 46 |
| 22/23 33/34 | APPAREL | 86 | 86 | 95 | BASIC APPAREL | 19 | 19 |
| 28 | SPIRITS | 0 | 0 | 98 | JANITORIAL | 12 | 12 |
| 29 | INK AND PRINTERS | 6 | 6 | | FIRST FEATURE | 8 | 8 |
| 36 | BUSINESS AUTO | 6 | 6 | | FEATURE PODS | 0 | 0 |
| 40/52 | BEVERAGE | 136 | 136 | | | | |
| 41/43 46/49 | DRY GROCERY | 271 | 271 | | | | |
| 42/38 | COOLER DOORS | 43 | 43 | | | | |
| 44 | FREEZER DOORS | 95 | 95 | | | | |
| 45 | TOBACCO | 27 | 27 | | | | |
| 47 | BABYCARE | 41 | 41 | | | | |
| 48 | COMMERICAL BREAD & BAKERY | 38 | 38 | | | | |
| 50 | TIRES | 1747 | 1747 | | | | |
| 53 | RESTAURANT SUPPLIES | 12 | 12 | | | | |
| 54 | O.T.C | 48 | 48 | | | | |
| 55 | BEER | 29 | 29 | | | | |
| 56 | PRODUCE | 75 | 75 | | | | |

CLUB NUMBER: **6409** PROJECT CITY: **TUCKER, GA** PLOT DATE: May 24 2023 PROTO: 130 TOTAL CLUB SQUARE FOOTAGE: 136,417

MARKET NUMBER: 28 PROJECT TYPE & YEAR: 2023 SPECIAL PROJECT SHELL DATE: 01/28/14 T.B.C. SALES AREA SQ. FT.: 2,694

**Sam's Club®**
CLUB SUPPORT-SPACE PLANNING DIVISION
2101 SE SIMPLE SAVINGS DRIVE BENTONVILLE, AR 72716-0745

# EXHIBIT O











# EXHIBIT P

# Strategic Maintenance Overview

Strategic maintenance means sweeping and cleaning the front end, cafe/fresh departments and other high-traffic areas at certain intervals during the day to provide a better shopping experience for members and help prevent slip/trip/fall accidents. Strategic maintenance scheduling has two parts:

- **Where**: Focus on sweeping, mopping, cleaning and monitoring the front end, cafe/fresh departments and floors in high-traffic areas. These are the primary accident areas for both member and associate slip/trip/fall accidents.

- **When**: This maintenance coverage should generally take place Friday, Saturday, and Sunday from 11 a.m. to close. These are the peak accident times for member and associate slip/trip/fall accidents. However, this can vary depending on sales volume and traffic patterns for each club.

# Making a Strategic Maintenance Plan

- Create a Strategic Maintenance Plan that considers factors such as member traffic, club size, seasonal weather patterns, and accident trends.
- Know and understand the accident trends in your club. Allocate hours based on the trends.
- Do not assign additional hours or an increase the number of payroll hours.
- Clearly define roles and responsibilities of maintenance associates, including but not limited to:
  - Continuously monitor high-traffic areas for debris, liquids or other slip/trip/fall hazards
  - Check trash receptacles and empty when appropriate
  - Check for liquids on the floor in the café dining area and on the Fresh sales floor
- Review your Plan with maintenance associates to discuss expectations for execution as well as:
  - What specific duties/activities they are to perform
  - When they should perform them
  - Where they should perform them
- Task maintenance associates with ensuring their carts are ready and stocked with supplies:
  - Spill absorbent
  - Paper towels
  - Vinyl gloves
  - Dry mop
  - Wet mop and bucket
  - Broom and dustpan
  - Trashcan
  - Company-approved degreaser

Last Update Aug. 13, 2019

# EXHIBIT Q

# Slip, Trip and Fall Guidelines

## Guidelines Overview

- Maintain good housekeeping standards by removing trash and debris throughout the facility by practicing the clean-as-you-go method. Clear your work area as your work, removing empty boxes and straps as you stock.
- Avoid placing pallets on the floor between 8 a.m. and 9 p.m. which are typically high traffic shopping times. Placing pallets on the floor creates a tripping hazard for our customers.
  - Remove or restock empty stackbases and pallets immediately.
- Do not leave empty pallets and unmanned pallet jacks or stocking carts on the salesfloor.
- Empty pallets need to be stacked flat in the backroom. Do not place pallets in an upright position or lean them against a wall.
- Cover the corners of pallets, endcaps and stackbases on the salesfloor. When product is merchandised to cover the corners zone these areas often to move product forward.
- Clean up spills, debris and slip and trip hazards immediately: have caution cones and paper towels (or pocket cone and absorbent pads) available.
- Complete safety sweeps on a regular basis to help keep the salesfloor free of slip and trip hazards and falling merchandise. Include endcaps, sidecounters, stackbases and the floor in the safety sweeps. .
- Properly stock and maintain spill stations.
- Utilize maintenance associates to increase floor care coverage during times of increased customer traffic.
- Have CSMs and stockers alert management to changing weather conditions: refer to the Inclement Weather Guidelines for more information.
- Ensure the parking lot is free from potholes, trash, large cracks and cracked sidewalks and curbs.
  - Make the parking lot part of the daily safety sweep.
  - Alert your manager or APM (a salaried member of management) when these items are in need of repair.
- Keep sidewalk sale merchandise a minimum of 44 inches from the edge of the sidewalk. Maintain a clear walkway for customers into and out of the store.
- Paint speed bumps, sidewalks and landscape curbs a bright and visible color.
- Use approved red or yellow hoses in the Garden Center: do not leave them unattended and put them away when not in use.
- Water plants during low traffic hours.
- Provide covered trash cans in the Produce area. Strategically locate trash cans around seasonal produce such as corn to collect corn husks.
- Locate and maintain floor mats in areas where liquids can cause a slip and fall hazard such as in Produce, in front of the bagged ice freezers and the vestibule.
- Ensure freezer and cooler floors are free of ice build up.
  - Ensure plastic curtains are in place and door seals are free from damage. Damaged seals or curtains pulled back increase condensation in the freezers which creates ice on the floors.
  - Clean up spills immediately to avoid them freezing.
  - Maintain functioning lights in the freezers and coolers.
  - Close freezer doors when not in use.
- For issues, questions or additional information regarding the freezers or coolers, contact the Home Office Facilities Maintenance Department at 800-932-3367.
- Utilize the online Maintenance Manual for guidelines on how to handle floor spills.

## Safety Sweeps

All associates have a responsibility to conduct periodic safety sweeps. When conducting a safety sweep, check the entire area including floors, endcaps, side countersand action alley. Safety sweeps need to be a natural part of the daily routine from start of shift to close of shift.

- Perform a visual sweep of the area looking for potential hazards such as falling merchandise, empty pallets, spills, unattended pallet jacks, debris and empty boxes.
- Dust mop or broom sweep high traffic areas including, but not limited to: action alley, frontend, personal care, household chemicals, backroom, fresh areas, parking lot, sidewalks and the vestibule.
- Watch for and correct potential hazards when taking different routes to and from lunch and breaks. This helps keep potential hazards to a minimum.

## Maintaining the Floor

There are many challenges in floor care safety due to weather conditions, spills caused by customers, associates and from merchandise on the shelves. Floor safety requires all associates to be alert, look for hazards and correct the hazards quickly. For floor maintenance information, log onto the Maintenance page of the WIRE.

## Strategic Maintenance

It is recommended to have a maintenance associate strategically scheduled to provide safety sweeps during high traffic times.

# Resources

- Floor Mat Guidelines
- Inclement Weather Guidelines
- Spill Cleanup Job Aid
- Strategic Maintenance

Last Modified: May 20, 2013

# EXHIBIT R

# Safety 24/7 – Good Housekeeping

**Action: Discuss topic to associates in club meeting's** *(Refrain from simply reading the text, make it personal to the associates by selecting key points from the information provided)*

## Discussion Points

At work or home, poor house keeping standards is a leading cause of accidents.
Below are some common examples of poor housekeeping that leads to accidents.
Can you name more?

- Tripping over loose objects on floors, stairs, and platforms.
- Unstable stacking of products can lead to being struck by falling objects.
- Failing to clean floors properly may lead to slipping on greasy, wet, or dirty surfaces.
- Being exposed to potentially dangerous chemicals if not stored properly.
- Cutting, puncturing, or tearing of the skin on projecting objects if not addressed timely.

**Keep it Clean and Organized**

These types of injuries can be avoided by employing good housekeeping.
Good housekeeping is not just cleanliness, it includes:

✓ Keeping work and living areas neat and orderly.
✓ Maintaining halls and floors free of slip/trip hazards.
✓ Removing of waste materials (e.g., paper, cardboard, plastic) and other fire hazards from work and living areas.
✓ Paying attention to important details such as the layout of the entire workplace, living and play areas, etc. (aisles, storage facilities, offices)
✓ Effective housekeeping is an ongoing operation; it is not a hit-or-miss cleanup done occasionally. (**Clean As You Go** away from work applies)

**Did You Know**

➢ Nearly 8.6 million Americans receive medical treatment yearly from falls.
➢ Falls are the second-leading cause of unintentional deaths in the home.
➢ Wearing slip resistant shoes at home and work can help avert slip/falls.
➢ Almost 30% of all workplace injuries involve cuts or lacerations.
➢ 10% of kitchen accidents are a result of being struck by a falling object.

**Manager's Notes:** (Include key learning's and comments from associates)

_______________________________________________________________________________
_______________________________________________________________________________
_______________________________________________________________________________
_______________________________________________________________________________
_______________________________________________________________________________
_______________________________________________________________________________
_______________________________________________________________________________

Club Manager Signature ___________________________ Date: ___/____/______

**RESOURCES**
- **KeepSafe Inc.**
- **National Safety Council**

# Customer Incident Claims Process

**NOTE:** All customer incidents, regardless of seriousness, must be entered into the Incident Reporting System within 24 hours of receipt of report.

## When Responding to an Incident:

- Make NO promises of payment.
- Do NOT give authorization for treatment.
- NEVER give medical advice.
- NEVER take photos of the customer.

## The Incident Scene

- Display a caring attitude. Do not call an ambulance unless the customer requests one, or is unable to make the decision. Document this on the reversible file folder. The customer should complete the Customer Incident Report (English/Spanish) when the incident is reported. Refer customer to CMI for all questions. If possible, have the customer show you exactly where the incident occurred and investigate the scene. Pay attention to detail, investigate the scene getting the "Who, What, When, Where and Why".
  - For instructions on a specific claim type, select from below:
    - Slip/Trip and Fall
    - Falling Merchandise
    - Fall from Shopping Cart
    - Door Claims
    - Product Claims
    - Food Claims
    - TLE/TMA Claims and 952/1084 Account Payments
    - Car/Cart Claim
    - Property Damage Claims
- Search area for witnesses who may have seen or heard the incident and obtain Witness Statement (English/Spanish) and contact information.
- Secure any evidence such as chairs, ladders, videos, fallen merchandise, bag, debris, etc., for claims investigations.
- Prior to altering the condition of the scene, use a digital camera to take photos of the incident scene - several close-up and wide-area views from different angles.
- If available, secure video of the incident scene - at least 1 hour prior to the incident and 1 hour after.

## Evidence Handling

- Do not discard ANY evidence without first consulting a CMI case manager.
- Load the digital photos on a CD and retain in a reversible file folder.
- Retain a copy of any video evidence in the reversible file folder.
- Keep copies of all witness statements.
  - Examples of witnesses include, but not limited to, the injured customer, a companion of the injured customer, customers who were shopping in the area, associates, suppliers, etc.
- Retain all physical evidence in secure location.
- Be sure to use evidence tag to label all evidence.

## Reporting the Incident and the Follow-Up

- Use the on-line Incident Reporting System to enter the accident.
- Mail copy of CD with all digital photos and customer information (i.e., claim #, customer name, store #, date of incident); along with statements, in a secure envelope to CMI, P.O. Box 14731, Lexington, KY 40512-4731
- If video secured, mail labeled original copy to CMI, P.O. Box 14731, Lexington, KY 40512-4731
- Document all attempted and actual contacts on the file folder.
- Document names of witnesses and associates on the scene and associates in the area prior to incident.
- Contact the customer within 24 hours.
- If the customer is unable or refuses to provide any name and/or contact information, go ahead and enter the accident as a customer incident using the last name “Unknown” and the first name “Male” or “Female.”

## *Special Instructions on Specific Types of Claims*

## Slip and Fall/Trip and Fall Incidents

- Determine what was on the floor, where it came from, and how long it was there.
- If trip and fall on endcap or stackbase, was it fully stocked with merchandise? Were safety cones on unstocked corners?
- If slip and fall, look for safety cones in the area. Document condition of spill: tracking, drying, size, etc.
- Document if weather related. If snow and ice, CMI will need records for parking lot clearing and salting.
- Determine direction of travel of customer before fall.
- Determine if any prior spills in area.
- If nothing can be seen on the floor, do a "touch test" of the floor for slickness.
- What injury is the customer reporting?
- Using a digital camera, take wide angle and close up photos of floor, endcap, and/or area of incident. Include an object in the photo, such as a ruler, to show size of object, item, spill, etc., causing the incident. Attempt to take photo of area as the customer would have seen it; same direction that the customer was approaching. Send a labeled CD copy of digital photos to CMI; keep a copy of CD in the customer's file.

*Back to Top*

## Falling Merchandise Incidents

- What fell?
- How many items fell?
- Approximately how much did the item weigh?
- From where did it fall? How far did it fall?
- Were any associates working in area?
- Who stocked the area and when?
- Was a bump test performed?
- Check for defects in the shelving.
- Using a digital camera, take photos of fallen merchandise and/or area of incident with a digital camera. Attempt to secure photos of where merchandise was on shelf at time of incident. Send a labeled CD copy of digital photos to CMI; keep a copy of CD in the customer's file.

*Back to Top*

# Fall from Shopping Cart Claims

- Inspect cart for seat belts and any defects.
- Take photos of cart with a digital camera. Send a labeled CD copy of digital photos to CMI; keep copy of photos on CD in the customer's file.
- Secure any video of the area.
- Secure ID number from cart. If cart is defective, have it secured and labeled with evidence tag.

Back to Top

# Door Claims

- Inspect the door for defects.
- Copy CMI on service and maintenance records.
- Call a service company for inspection of the door.
- Deactivate the door and post "Out of Order" on it if necessary.
- Secure all video of the doors.
- Document the door number.

Back to Top

# Product Claims

- Using a digital camera, take photos of the product. Send a labeled CD copy of digital photos to CMI, P.O. Box 14731, Lexington, KY 40512-4731; keep a copy of photos on CD in the customer's file.
- Define product defect.
- If injury to customer - did they seek medical treatment?
- Obtain written statement from customer.
- Obtain item # and UPC # of product.
- Request the customer to keep the product as their evidence, to avoid spoliation even if given a refund or exchange.
- If it's necessary for the store to keep the product for customer service reason, attach evidence tag and secure product pending notification from CMI on how to proceed.
- If store must ship product to vendor, send it certified mail with a return receipt request. File certified mail receipt along with customer incident report and any other written information in a hard-copy file of the incident. If vendor sends label or envelope to send product, make a copy of that label or envelope and place in a hard-copy file of the incident.

Back to Top

# Food Claims

- Using a digital camera, take photos of the food in question, if appropriate. Send a labeled CD copy of digital photos to CMI, P.O. Box 14731, Lexington, KY 40512-4731; keep copy of photos on CD in the customer's file.
- Obtain item # and UPC # for food in question.
- Obtain use by, sell by and best by dates.
- If food is from deli, pull cooking and holding logs.
- If injury/sickness to customer - did they seek medical treatment?
- Obtain written statement from customer.
- Obtain copy of receipt of purchase from customer.
- Request the customer to keep the product as their evidence, to avoid spoliation even if given a refund or exchange (freeze, if needed).
- If it's necessary for the store to keep the product for customer service reason, attach evidence tag and secure product pending notification from CMI on how to proceed (freeze, if needed).
- If store must ship product to vendor, send it certified mail with return receipt request. File certified mail receipt along with customer incident report and any other written information in a hard-copy file of the incident. If vendor sends label or envelope to send product, make a copy of that label or envelope and place in a hard-copy file of the incident.

Back to Top

# TLE/TMA Incidents and Garage Keepers Claims

- Reporting a TLE/TMA Claim or 952/1084 Account Payment

Back to Top

# Car/Cart Claims

- How many cart pushers were on duty at the time of incident?
- How many loose carts were on the lot?
- How full were the cart corrals?

- What were the weather conditions at the time?
- Are the cart corrals weighted or anchored?

ESPAÑOL AL DORSO

# Spill clean-up

Use the shelf label or hand held device to determine if the spill is hazardous or non-hazardous.

## Is the spill hazardous?

No

Yes

## Non-hazardous spill

- Place safety cone.
- Absorb spill with absorbent or paper towels as appropriate.
- Absorb liquid remaining in container, place paper towel or absorbent and empty container in compactor.

## Hazardous spill

1

Place safety cone, gather all supplies, label chemical bag, and put on PPE.

2

Absorb spill with absorbent and remaining liquid in container. Place in chemical bag and seal.

Empty containers go in compactor.

3

Place chemical bag inside bucket liner, tie knot in liner and attach completed zip tie tag. Place in appropriate hazardous waste bucket.

If hazardous spill is result of damaged container, secure lid to stop leak or take container to back room for processing immediately. Refer to the Waste Management poster.

For questions about identification or processing of spills, contact the Compliance Hotline.

Questions?
Call the Compliance Hotline:
**1-800-530-9923**

# Limpieza de vertidos

Use la etiqueta del estante o el dispositivo manual para determinar si el vertido es peligroso o no peligroso.

## ¿El vertido es peligroso?

**No** / **Sí**

## Vertido no peligroso

- Coloque el cono de seguridad.
- Absorba el vertido con toallas absorbentes o de papel según corresponda.
- Absorba el líquido restante en el recipiente, coloque una toalla de papel o absorbente y vacíe el recipiente en el compactador.

Si se produce un vertido peligroso debido a un recipiente dañado, cierre la tapa para detener la fuga o lleve el recipiente a la trastienda para procesarlo inmediatamente. Consulte el cartel sobre Gestión de Residuos.

Si tiene preguntas sobre la identificación o el procesamiento de vertidos, comuníquese con la Línea directa de cumplimiento.

¿Preguntas? Llame a la Línea directa de cumplimiento:
**1-800-530-9923**

## Vertido peligroso

**1**

Coloque un cono de seguridad, reúna todos los suministros, etiquete la bolsa para residuos químicos y póngase el equipo de protección personal.

**2**

Absorba el vertido con el absorbente y ponga el líquido restante en el recipiente. Coloque en la bolsa para residuos químicos y selle.

Los recipientes vacíos van al compactador.

**3**

Coloque la bolsa para productos químicos dentro de la bolsa del cubo, ate el nudo en la bolsa y coloque la etiqueta de precinto completado. Coloque en un cubo para residuos peligrosos adecuado.

**Environmental, Health & Safety Compliance**

# Non-Hazardous Waste Spill Clean-Up

How to properly clean-up and manage non-hazardous spills.

## Things I Need:

- Personal Protective Equipment (found at the spill stations)
  - Safety Glasses or Goggles
  - Gloves
  - Apron (optional)
- Spill Cleanup Job Aid
- Paper Towels
- Dust Pan
- Broom/Squeegee
- Safety Cone
- Plastic trash bag
- Handheld Device
- Blank Return to Claims Slip

## More Information:

- Spill Cleanup Guidelines Job Aid
- Hazardous Waste Management Chart
- Standard Operating Procedure "Hazardous Spill Clean-up"
- Standard Operating Procedure "Stocking a Spill Station"
- Safety Data Sheets (SDS)

| | **S**tandard **O**perating **P**rocedure |
|---|---|
| **Step** | **Action Required** |
| **1** | Have another Associate guard the spill before gathering supplies for proper clean-up.<br>**Note**: *If you do not carry a communication device, such as a radio, it may be necessary to "call out" to a passing associate in order to keep the spill guarded*. |
| **2** | Confirm the spill is non- hazardous by referring to:<br>• Product label/price sign<br>• Mobile Device using the handheld device<br>• Safety Data Sheets (SDS)<br>• Spill Cleanup Job Aid<br>If the spill is hazardous, then refer to Standard Operating Procedure "Hazardous Waste Spill Clean-up". |
| **3** | Retrieve supplies from the closest spill station. |
| **4** | Put on required PPE. |
| **5** | Place safety cone next to the spill to prevent Customer/Member traffic from passing through the spilled material. |
| **6** | Use the squeegee to reduce the size of the spill.<br>**Note**: Associates should not pick up broken glass with their hands. Use the squeegee to sweep glass into the dust pan. |
| **7** | Use paper towels to absorb a liquid spill. |
| **8** | Absorb the remaining contents of the container with approved absorbent in the trash bag containing the absorbed spill. Place the empty container in the bag.<br>**Note**: A container is empty when no continuous stream of liquid pours from the container when the container is held in any direction. |

| SOP# | EHS-SOP-SPL-003 |
|---|---|
| Version | 1.2 |
| Last Updated | April 2021 |

| | |
|---|---|
| **9** | Rinse the broom/squeegee and dust pan with water.<br>**Note**: Associates should not use bare hands to clean any equipment. |
| **10** | Remove PPE. |
| **11** | **Walmart**<br>Associates should process the item using the Claims Application.<br>Select "New Carton". Do not add to an existing carton. Place the DNI label on the bag.<br>Immediately take the bag to the disposal staging area in Claims to await audit.<br><br>**Sam's Club**<br>Dispose of the trash bag containing the absorbed spill into the trash or compactor.<br>**Note:** A member of management is required to open the compactor if needed. |
| **12** | If unable to process the item through the Claims Application, place the bag in the "Unprocessed" bin, fill out a "Return to Claims" slip. **Walmart:** Attached the Return to Claims Slip to the bag. **Sam's**: Leave the Return to Claims Slip with Claims.<br>UPC of item. / Associate completing slip. / Detailed description of item. / Detailed reason for return. Be specific. / Check one<br>UPC # / Initials / Date / DEFECTIVE MERCHANDISE SLIP / Description of Merchandise / Reason for Return / Refund / Exchange<br>Transaction information / POS description UPC and price / Additional description details / Detailed reason for return. Be specific. / Check One<br>**Note:** Blank Return to Claims Slips are kept in the Claims Area. |
| **13** | Return the supplies to the spill station and refill the spill absorbent container if it is less than half full. |

| | |
|---|---|
| SOP# | EHS-SOP-SPL-003 |
| Version | 1.2 |
| Last Updated | April 2021 |

# Management Guidelines - Customer/Member/Non-Walmart Associate Incidents Policy

(SA-02)

Updated: January 22, 2021

These guidelines are a management supplement to Customer/Member/Non-Walmart Associate Incidents Policy (SA-02). It applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

These guidelines address the following:

- Incident Reporting
- Death, Multiple Injured Customers/Members/Non Walmart Associates or Serious Injury
- Following Up With the Customer/Member/Non-Walmart Associate

# Incident Reporting

All incidents involving a Customer/Member/Non-Walmart Associate, as defined in the policy, must be reported to Walmart Claims Services (WCS) within 24 hours. This provides a record of the incident, enabling WCS to manage the file appropriately. Accurate reporting includes conducting an investigation of the accident utilizing the Customer Accident Investigation (Walmart Stores only), obtaining the Customer/Member/Non-Walmart Associate statement, taking photographs as appropriate, and securing video footage of the incident scene.

It is the responsibility of the People Lead/Merchandising/Compliance Manager to maintain the Customer/Member/Non-Walmart Associate incident files in a secure location.

# Death, Multiple Injured Customers/Member/Non-Walmart Associate or Serious Injury

Any serious injury or death incurred by a Customer/Member or multiple Customers/Members must be reported immediately to the following:

- Emergency Operations Center (479) 277-1001
- Market Manager
- Asset Protection Operations Lead/Market Asset Protection Manager
- Walmart Claims Services (WCS)

Examples of reportable serious injuries include, but are not limited to, the following:

- Loss of consciousness or breathing;
- Injuries that result in the loss of large amounts of blood or other bodily fluids from the Customer/Member;
- Injuries resulting from gunshot, stabbing, assault, or other acts of violence;
- Injuries that result in the Customer/Member airlifted to the medical facility;
- Loss of a body part, such as from amputation;
- Significant or serious burns to the body;
- Injuries that result in media attention.

When in doubt as to the severity of the injury, report the incident to the parties listed in the policy.

# Following Up with the Customer/Member/Non-Walmart

## Resources

**Policy**

Customer/Member/Non-Walmart Associate Incidents Policy (SA-02)

**Related Policies**

Investigation and Detention of Shoplifters Policy (AP-09)
Sale of Firearms Policy (OP-16)
Sale of Tobacco Products and Paraphernalia Policy (OP-32)
Violence Free Workplace Policy

**Printed Materials**

Refer to the Walmart Claims Services Toolkit

# Associate

It is the responsibility of a salaried member of management to call every Customer/Member/Non-Walmart Associate involved in an incident that results in an alleged or perceived injury.  We call every Customer/Member/Non-Walmart Associate within 24 hours after the incident because we genuinely care about their well-being.

If one of the following situations is identified during the telephone call, facility management should notify WCS immediately.

- Customer/Member/Non-Walmart Associate seeks medical treatment;
- Customer/Member/Non-Walmart Associate requests payment or other compensation from the company;
- Customer/Member/Non-Walmart Associate mentions an attorney;
- Customer/Member/Non-Walmart Associate is pregnant.

# Contacts

For further guidance, contact:

| Facility | Contact Person |
| --- | --- |
| Walmart Stores | Walmart Claims Services: 1-800-527-0566<br>Asset Protection Operations Lead<br>People Operations Lead<br>Regional Human Resources Director |
| Sam's Clubs | Walmart Claims Services 1-800-527-0566<br>Market Asset Protection Manager<br>Market Human Resources Manager<br>Regional Human Resources Director |

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: January 22, 2021

**Safety Training Topics**

**Strategic Maintenance**

# Strategic Maintenance

## Safety





## Strategic Maintenance: Overview

- Strategic maintenance means sweeping and cleaning action alleys, front end, and food/fresh departments during high traffic times of the day.
- Strategic maintenance is a way for management to ensure that key locations in the store are maintained free from hazards during high traffic times.
- To prepare an effective strategic maintenance plan management should understand the accident trends of the store.
- A good plan is written, communicated to the associates and includes:
  - Where strategic maintenance needs to take place in the store
  - When strategic maintenance needs to be performed
  - Who will be responsible
  - What are the responsibilities and expectations



## Strategic Maintenance:  Plan

- Creating a Strategic Maintenance Plan should include factors such as customer traffic, size of the store, and accident trends.

- Prepare a map of the store that clearly identifies areas of the store that are identified as strategic maintenance locations.

- Strategic Maintenance Scheduling does not require additional hours or an increase in the number of payroll hours.

- Ideal times to schedule strategic maintenance are on Friday, Saturday and Sunday from 11 a.m. – 8 p.m. and 12 p.m. – 9 p.m.   These have traditionally been the peak times when accidents occur most frequently.

- Create an alternate list of associates than can perform the maintenance responsibilities in the event that maintenance staff is not available.



## Strategic Maintenance: Routine

- The routines are not all inclusive and additional tasks may be required for a more effective plan.
- Maintenance should be dedicated to sweeping, monitoring, and cleaning action alleys, front end, and food/fresh department. Include any other high slip/trip/fall areas for your store.
- The plan for the store should clearly indicate the roles and responsibilities of the maintenance associates including, but not limited to:
  - Monitoring Action Alley continuously.
  - Checking trash receptacles and emptying when appropriate .



## Strategic Maintenance: Routine (continued)

- Management should review the Strategic Maintenance Plan with the maintenance associates to discuss expectations for execution as well as:
  - Specific duties/activities they are to perform
  - Hours when they should perform them
  - Areas of the store where they should perform them
- The schedule may require alterations to accommodate the store's accident trends.



## Strategic Maintenance: Supplies

- Maintenance associates should ensure that their custodial carts are available with necessary supplies:
  - Spill absorbent
  - Paper towels
  - Vinyl gloves
  - Dry mop
  - Wet mop and bucket
  - Broom and dustpan
  - Trashcan
  - Company-approved degreaser

# Spill Clean Up Procedures

Overview

- Spills are largely responsible for slip/trip/fall accidents in the club. Slip/trip/falls make up a large portion of accident claims.
- Promptly cleaning up spills is the best way to prevent these accident claims.
- Associates should follow these procedures for cleaning up spills in safe and timely manner.

Supplies

- Supplies to clean up spills need to be readily available for associates.
- Management should create a daily routine and assign the responsibility to inspect and refill supplies.
- The following should be restocked daily:
  - Spill Stations
  - Pocket Pads/Paper Towels
- If you see a location or area that needs to be restocked, take care of it yourself or let your supervisor know.

Towel In Pocket Program

- The Towel In Pocket Program (TIP) requires that each associate put a paper towel or pocket pad in their pocket prior to starting their shift.
- The purpose of the paper towel/pocket pad is to provide the associate an easy way to immediately clean up a small spill.
- Associates are encouraged to use their paper towel/pocket pad and replace it after it is used.
- The paper towels/pocket pads should be located in multiple areas of the store (e.g., time clock) where the associates can easily access them.
- Educating associates about the importance of immediately cleaning up spills and the convenience of the paper towel/pocket pad should increase participation.
- First, block off the spill area/aisle or have an associate protect the spill area to prevent a customer or another associate from coming in contact with the spill or tracking it through the store.
- It is important to determine if the spill is a biohazard (e.g., blood, bodily fluids) or hazardous material by referring to:
  - Product label/price sign
  - Handheld terminal using "Claims Disposition" screen
  - Material Safety Data Sheet (MSDS)
  - Spill Cleanup Guidelines Flipchart
  - When in doubt, call the Compliance Hotline (800) 530-9923.
  - Biohazard spills: refer to the Bloodborne Pathogens guide on the Safety WIRE page for clean up procedures.
  - Hazardous material spills: refer to the Spill Cleanup Guidelines flipchart for instructions.
    - For spills 10 gallons or more, contact the Compliance Hotline (800) 530-9923.

Retrieve Supplies

- Retrieve the necessary supplies from the spill station:
- PPE
- The PPE required for a hazardous spill includes:
  - Goggles
  - Green Chemical Resistant Gloves
  - Chemical Resistant Apron
  - Face Shield (if required by MSDS)
- Absorbent
- Broom and dust pan
- Chemical bag or trash can liner
- Caution cone

Cleaning Up Spill

- Place a caution cone next to the spill to prevent any customer and cart traffic from tracking through the spilled material.
- Put on the appropriate PPE.
  - Refer to the Material Safety Data Sheet (MSDS) for specific PPE requirements.
- Non-liquid material such as sugar, flour and powdered laundry detergent can be swept up with the broom and dust pan.
- Do not attempt to pick up broken glass with your hands. Use the broom to sweep glass into the dust pan.

Using Spill Absorbent

- Pour spill absorbent around the edges of the spill to prevent it from spreading.
  - Do not pour absorbent directly on the spilled product.
- Using a firm circular motion, work absorbent into the spilled liquid with a broom.
- If the absorbent becomes gummy or if a liquid residue remains, add more absorbent and work it into the area.
- If the spill was caused by a broken or leaking container, pour the remaining contents from the container into the chemical bag and add enough spill absorbent to absorb the liquid.
- Remove and dispose of the spilled product by following the appropriate SOP listed below:
  - Hazardous Spill Cleanup SOP
  - Non-Hazardous Spill Cleanup SOP
  - Unknown Spill Cleanup SOP

# Spill Station Maintenance - Sam's

Safety Awareness and Education

## Spill Station Maintenance: Overview

- Slips, trips and falls make up a large portion of accident claims.
- Promptly cleaning up spills is the best way to prevent these accident claims.
- Spill stations are utilized for the cleanup of non-hazardous and hazardous spills. Spill stations are placed in strategic locations throughout the facility for quick accessibility.
- The purpose of the spill station is to provide access to materials to clean up a spill promptly.
- Priority must be given to establishing a regular routine for maintaining a spill station.

## Spill Station Maintenance: Locations

- Spill stations are hung with mounting racks on columns or are installed as spill station end caps with a cabinet for ladder storage.
- Spill stations should be placed in strategic locations that traditionally experience spills more often. Quantities and locations of spill stations depend on the store layout.
- A complete list of required spill station locations can be found in the Stocking a Spill Station SOP.
- Some of these locations include:
  - TBC
  - Claims
  - Grocery
  - Fresh Areas
  - Electronics
  - Front End
  - Front Entrance
  - Hazardous Waste Storage Area
  - Maintenance Room
  - Receiving
  - Restrooms

## Spill Station Maintenance: Contents

- Spill stations must be inspected daily and missing items replaced when necessary. A spill station cannot serve its function if not in good working order.
- The following items, at a minimum, should be stocked in every spill station:
- Approved spill absorbent (keep refillable bottle over half full)
- Broom/squeegee and dust pan
- Roll of plastic trash liners and chemical bag
- Vinyl gloves
- Personal protective equipment (PPE) (goggle, apron, chemical resistant gloves)
- Safety caution cones
- Paper towel dispenser with paper towels
- Spill cleanup Job Aid

July 19, 2019

# Towel In Pocket (TIP) Program

## Overview

Clean, clear and dry floors are vital to preventing accidents. The Towel In Pocket (TIP) Program encourages associates to maintain dry floors as they perform their regular duties.

## Instructions

- Each associate and member of management puts a paper towel or pocket pad in their pocket prior to starting their shift.
- The purpose of the paper towel/pocket pad is for the immediate clean-up of small spills by the associate who finds the spill rather than calling a maintenance associate to clean it up.
- Encourage the associates to refill their pocket after breaks or lunch, prior to returning to their work area.
- The paper towels/pocket pads should be located in multiple areas of the store (e.g., time clock and front-end) where the associates can easily access them.
- Encourage participation in the program by rewarding or recognizing associates who have their paper towel/pocket pad during store meetings, through CBWA, store tours, etc.

# Spill Absorbent Program

## Overview

In our facilities, there is a potential for spills to occur.  In an effort to keep our associates and customers safe, use an authorized spill absorbent product to quickly and efficiently clean up hazardous and non-hazardous spills. Effective Oct. 2012, the authorized spill absorbent product is Spill Magic.

## Product Use

- Use the 3-pound refillable bottle for storing the absorbent on the spill station.
  - Keep the bottle over half full at all times.
- Do not throw away the refillable bottles.
- Call the Compliance Hotline 800-530-9923 or Spill Magic 800-969-1467 with any questions or comments about the spill absorbent product.
- Order empty refillable bottles and the 25-pound box of absorbent from 99 Supplies.

## Spill Stations

Refer to the Stocking a Spill Station Standard Operating Procedures (SOP) for identifying the required spill station locations and list of supplies for each station

- WIRE > Knowledge Center > Business Support - Operations > Routines > Routine/SOP Search

## Spill Cleanup Procedures

Determine the type of spill (hazardous, non-hazardous, or unknown material) and follow the procedures listed in the appropriate Spill Cleanup SOP

- WIRE > Knowledge Center > Business Support - Operations > Routines > Routine/SOP Search
  - Hazardous Spill Cleanup SOP
  - Non-Hazardous Spill Cleanup SOP
  - Unknown Spill Cleanup SOP

There are four basic steps to follow when absorbing the spilled material with Spill Magic:

1. Surround the spilled liquid on one side with Spill Magic. Do not pour Spill Magic directly on the spilled product.
2. Using a firm circular motion, work Spill Magic into the spilled liquid with a broom.
3. If Spill Magic becomes gummy or if a liquid residue remains, add more Spill Magic and work it into the area.
4. Remove and dispose of the spilled product by following the appropriate SOP listed above.

## Resources

Use the following resources to train associates on how to clean up spills using Spill Magic and maintain spill stations:

- Spill Magic Job Aid
- Spill Clean Up Procedures
- Spill Station Maintenance

## Additional Resources

- Bloodborne Pathogens
  - Work > Compliance > OSHA > Bloodborne Pathogens

Content Name: en_US_09010aff810c089f_A_18injury_accidents_codewhite.htm
Version #: 1.3
Start Date: 2018-05-08 20:17:05
End Date: Currently Active

# Injury / Accidents: Code White

Injuries can happen at anytime in any workplace environment. Often, the misconception is that only laborers and manufacturing employees are hurt on the job. However, the truth is that people in every industry can be seriously hurt on the job. Over one million employee injuries and illnesses require recuperation away from work. When an Associate suffers an injury or illness, there is a personal loss that cannot be measured in dollars. It can mean the absence of a valued Associate with exceptional knowledge and skills. Using preventive measures can help reduce the number of accidents in a facility. Although there are situations in which you will have no control over, injuries still may occur. Facility management should be committed to promoting a safe environment for all Associates.

Encourage Associates to become involved in being safe and keeping a mindful eye about possible hazards. If an incident occurs in your facility that results in an injury, a quick and proper response is a must. A member of the management team should respond immediately and assess the situation.

## Before an incident occurs

- Know the proper procedures to follow before an injury incident happens. Details regarding Customer and Associate incidents can be found in the CMI (Claims Management) section of the WIRE. Log onto the WIRE, go to the WORK tab and select CMI (Claims Management)
on the left hand column.
- Ensure all forms for Customer and Associate incidents are available at all times.
- Set up and maintain a secure claim file storage area.
- Assign an Associate to manage claims paperwork.
- Know the Temporary Alternative Duty guidelines. This documentation provides guidance relevant to Associates with worker's compensation injuries that have been released to a modified duty by their physician. The document offers temporary alternate duty for workers' compensation cases. This information can be found on the Claims Management page of the WIRE.
- Display the Medical Provider poster. The Medical Provider Poster is supplied to the facilities from the state. These posters are issued by the state and sent to the facilities each year.
- Develop a partnership with your adjuster. An adjuster is assigned to a case once the claims worker (usually the store personnel manager) calls [REDACTED] and gives the necessary information regarding the incident.
- Confirm that basic first aid supplies are placed throughout the facility and are easily accessible during a Code White.
- Use proper housekeeping techniques such as keeping aisles and walkways clear and free of clutter, cleaning up spills quickly, and ensuring that there is proper lighting.
- Ensure that any known hazards are immediately removed or controls are put in place to protect workers.

## When an incident occurs

- Management should respond immediately when a "Code White" is called. If management is not in the building, a Support Manager, Sam's Club Night Area Manager, or other management representative should respond.
- Use the PA system, or direct another Associate to make an announcement similar to:
  "May I have your attention, please? There is a CODE WHITE in…. (say department or location). We need a manager to come to (department or location)."
  Repeat the message.
- A manager should report immediately to the area where the incident occurred.
- Assess the scene to ensure there is nothing that will injure others (e.g., objects obstructing pathways, non-chemical spills, placing notifications on any malfunctioning equipment.)
- Call 911 if necessary or if the injured person(s) requests it.
- Provide the injured person/s with care and supportive communications (i.e., sensitivity to the situation, demonstrate care over the situation, representing Respect for the Individual).
- If an Associate chooses to administer first-aid, ensure that the procedures outlined in the Bloodborne Pathogen section of the Safety Resource Manual are followed. The Safety Resource Manual can be found on the Safety homepage of the WIRE.
- Use the following precautions when dealing with minor chemical related injuries:
  - For injuries involving overexposure to chemical fumes, help the Associate to an area with fresh air.
  - Treat exposure to a foreign substance on the skin by cleaning the affected area with mild soap and water.
  - For eye contamination from debris, particles, or liquids, immediately move the Associate to an eyewash station.
  - If the cause of the injury is a known substance, refer to the label on the chemical for first-aid instructions.

## Associate / Member Injury / Accidents

- If the injury appears to be serious, send the Associate to the closest clinic, hospital, or trauma center. Call 911 or an ambulance if necessary or if requested by the Associate.
- If the situation is not an emergency but the Associate requests medical attention, refer the Associate to the physician normally used by your facility if the state allows the employer to direct medical care. If not, follow proper state procedures regarding medical care for worker's compensation claims. For questions on worker's comp claims, contact CMI ([REDACTED]-[REDACTED]) or review the information provided on the CMI homepage of the WIRE.
- There are many state specific regulations in regards to Associate incidents. Refer to the WIRE for information regarding the state in question. Log onto the WIRE, go to the WORK tab and select CMI (Claims Management) on the left hand column. Select the appropriate state in which to reference the individual state regulations.
- All Associate accidents involving medical treatment must be keyed into the Accident- Incident Reporting System immediately. This IRS (Incident Reporting System) can be found on the WIRE under the CMI homepage.
  - All claims requiring medical attention must be reported within 24 hours via the stores computer system. If there are questions or problems regarding the claims entered into the computer, please contact CMI at (800) 551-2154.
- Ensure a member of management begins to properly document information regarding the incident as outlined in the CMI (Claims Management) procedures.
- Complete the Associate Incident Log Form. This form is used to provide a simple method for management to document incidents in order to determine the cause (why it occurred) and to help determine step(s) that can be created to prevent another incident. Retain the Associate Incident Log Form at facility level. The Associate Incident Log Form can be found in Appendix T.
  - Refer to the diagram of the incident log process to assist in proceeding with the appropriate steps. This diagram can be found in Appendix T.

## Customer / Visitor Injury or Accidents

- If a customer, member, or visitor is injured in the facility or on company property, assess the situation to determine the level of injury

of injury.

- If a customer, member, or visitor asks about medical expense or other payments, refer them to CMI and provide the phone number: 1-800-527-0566.
  - Show compassion, but do not commit to paying medical bills, or admit fault. If the customer, member, or visitor has questions, please refer them to CMI.
- The customer needs to complete a Customer Statement. The Customer Statement can be found in Appendix R.
- Give the customer a Customer Courtesy Card. (These can be ordered from the WIRE on the CMI homepage.)
- Obtain witness statements. The Witness Statement document can be found in Appendix R.
- Photograph the unaltered area of the incident with a 35mm camera and forward the developed photos to CMI. Place the claim number (given after the incident is keyed into the IRS) once on the back of each photograph prior to mailing to CMI. Do not photograph the Customer/Member or take photographs while they are present in the area. Document safeguards in the area at the time of the accident (e.g., safety floor cones, "Ask for Assistance" signs, etc). Attach to the Customer Incident Photo Sheet which can be found in Appendix R.
- Verify whether the area was captured on video tape. If the area is video taped, secure the tape and communicate this to CMI.
- All customer incidents must be keyed into the reporting system immediately. A link can be found on the WIRE under the CMI (Claims Management) page.

## How to prevent injuries

- **Training:** Make sure all Associates are trained in proper body mechanics (e.g., lifting, bending, twisting, etc.) relevant to their job.
- **Correction:** Correct unsafe conditions and behaviors immediately and consistently.
- **Positive Reinforcement:** Recognize good performances.
- **Communication:** Regularly communicate the importance of safe working habits. Provide time during your weekly facility meeting to discuss safety in the store/club, evaluate progress, and respond to suggestions.
- **Investigate:** By investigating the cause of the injury, one can take the appropriate steps to prevent a repeat occurrence in the future.
- **Support:** the Safety Team in the ongoing efforts to create new methods, plans, and strategies to keep the facilities and clubs safe.

## Management Responsibilities

- Ensure a member of management accompanies the Associate to the medical facility and drug testing policies are followed where applicable by state law.
- In the event that a death or serious incident occurs in your facility, follow these steps for initial reporting:
  - The facility manager must call the Wal-Mart Emergency Line at [redacted]
  - The facility manager must immediately report the death or incident to their immediate supervisor and Asset Protection Manager.
  - Refer to the CMI Homepage and the Personnel Resource Guide on the WIRE for additional information regarding Associate/customer/visitor accidents and injuries.



# Customer/Member/Non-Walmart Associate Incidents Policy

(SA-02)

Updated: January 22, 2021

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

# Policy

This policy outlines how the facilities should respond to an incident involving a Customer/Member, Vendor/Suppliers, Contractors, any other individuals not directly employed by Walmart. Refer to the Management Guidelines for Customer/Member/Non-Walmart Associate Incidents for additional clarification on Store and Club management expectations.

It is the responsibility of the People Lead/Merchandising/Compliance Manger to maintain the Customer/Member/Non-Walmart Associate incident files in a secure location.

With any vendor, supplier, contractor, or Non-Walmart Associate general liability incidents that occur on the Home Office Campus, E-Commerce Facilities, or other corporate satellite locations, the manager of the department that is accompanying or meeting with the individual will have the responsibility to report the incident via the Incident Reporting System (IRS) or call WCS at (800) 527-0566 for assistance with entering the information into IRS.

# Incident Reporting

All Customer/Member/Non-Walmart Associate incidents must be reported by a member of management within 24 hours of the facility becoming aware and/or being notified of the incident on the Accident app or Incident Reporting System (IRS). This provides a record of the incident, enabling WCS to manage the file appropriately. Accurate reporting includes conducting an investigation of the incident by obtaining a statement from the individual involved in the incident, witness statements, taking photographs as appropriate, securing video footage of the incident scene, if available, and securing any physical evidence, if applicable.

*Incidents are defined as the following:*

- a Customer/Member/Non-Walmart Associate alleges an injury, false arrest, or property damage resulting from an incident on the premises, regardless of how the incident occurred or who is perceived to be at fault;
- *a Customer/Member/Non-Walmart Associate alleges injury or property damage from ACC/TBC procedures;*
- *Customer/Member/Non-Walmart Associate Vendor / Supplier or Contractor alleges an injury or property damage resulting from an incident on the premises, regardless of how the incident occurred or who is perceived to be at fault*

Important: All wheel off incidents must be reported as a claim on IRS and not paid from the 952/1084 Account if:

- a Customer/Member/Non-Walmart Associate sustains a perceived injury resulting from an incident on the premises even though the individual does not allege an injury occurred or that medical attention was sought;
- a Customer/Member/Non-Walmart Associate sustains an injury resulting from acts of violence on the premises, regardless of how the incident occurred or who is perceived to be at fault;
- a Customer/Member/Non-Walmart Associate alleges injury or property damage from merchandise purchased at the facility (e.g., product liability claims);
- a Customer/Member/Non-Walmart Associate alleges false arrest, unlawful detention, malicious prosecution, verbal or physical assault, discrimination, harassment, slander/libel, or improper sale.

## Resources

**Guidelines**
Management Guidelines for Customer/Member/Non-Walmart Associate Incidents Policy

**Related Policies**
Investigation and Detention of Shoplifters Policy (AP-09)
Sale of Firearms Policy (OP-16)
Sale of Tobacco Products and Paraphernalia Policy (OP-32)
Violence Free Workplace

**Printed Materials**
Refer to the Walmart Claims Services Toolkit

The following definitions pertain to Customer/Member/Non-Walmart Associate allegations of false arrest, unlawful detention, malicious prosecution, verbal or physical assault, discrimination, harassment, slander/libel, or improper sale:

*False arrest* is an incident where a Customer/Member/Non-Walmart Associate is stopped, detained or arrested for a crime (such as shoplifting or passing a bad check) without any reasonable basis or probable cause.

*Unlawful detention* is an incident where a Customer/Member/Non-Walmart Associate is stopped and/or detained without a reasonable basis or probable cause.

*Malicious prosecution* occurs when a Customer/Member/Non-Walmart Associate alleges Wal-Mart pressed criminal charges against the Customer/Member/Non-Walmart Associate without a reasonable basis or probable cause.

*Physical assault* is any willful attempt or threat to cause injury to another combined with the apparent ability to do so.  An assault may be committed without actually touching or causing injury to another.

*Verbal assault* is an incident where a heated, verbal argument occurs between two or more people with no physical confrontation or touching.

*Discrimination* is an incident where the Customer/Member/Non-Walmart Associate alleges they were treated with prejudice or bias and/or were intentionally singled out due to their age, race, sex, ethnicity or other similar characteristics.

*Harassment* is an incident where the Customer/Member/Non-Walmart Associate alleges they were followed or intentionally being bothered by an associate for no legal purpose.

*Slander/libel* is an incident where the Customer/Member/Non-Walmart Associate alleges their reputation or character was damaged by the statements made about them by an associate.

*Improper sale* is an incident where the Customer/Member/Non-Walmart Associate alleges the store sold merchandise and knew of or should have known that the completion of the transaction would result in the cause of injury to the customer or damage brought about by the customer.

Example: Selling alcohol to a minor, sale of firearm or ammunition to an individual who knowingly was emotionally unstable or intoxicated, sale of merchandise to a prohibited person because they have not met the age requirements or they have a been legally prohibited from making the purchase of an item.

Exception: Payments from the 952 (Walmart Stores) or 1084 (Sam's Club) Account should be submitted on the IRS using the 952/1084 Payments application.

# Death, Multiple Injured Customers/Member/Non-Walmart Associate or Serious Injury

Any serious injury or death incurred by a Customer/Member/Non-Walmart Associate or multiple individuals must be reported immediately to the following:

- Emergency Operations Center (479) 277-1001
- Market Manager
- Asset Protection Operations  Lead
- Walmart Claims Services (WCS)

Refer to the Management Guidelines for Customer/Member/Non-Walmart Associate Incidents for further clarification on death, multiple injured customers/members, or serious injury.

# Customer/Member/Non-Walmart Associate Follow-Up

It is the responsibility of a salaried member of management to call every Customer/Member/Non-Walmart Associate involved in an incident and make notations of the call within 24 hour (Walmart) or on the back of the Reversible File Folder Form (Sam's) of incident reporting.

If one of the following situations is identified during the telephone call, facility management should notify the claims administrator immediately.

- Customer/Member/Non-Walmart Associate seeks medical treatment;
- Customer/Member/Non-Walmart Associate requests payment or other compensation from the company;
- Customer/Member/Non-Walmart Associate mentions an attorney;
- Customer/Member/Non-Walmart Associate is pregnant.

# Contacts

For further guidance, contact:

| Facility | Contact Person |
|---|---|
| Walmart Stores | Walmart Claims Services: 1-800-527-0566<br>Asset Protection Operations Lead<br>People Operations Lead<br>Regional Human Resources Director |
| Sam's Clubs | Walmart Claims Services 1-800-527-0566<br>Market Asset Protection Manager<br>Regional Human Resources Director |

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: January 27, 2017



# Spill Clean Up Procedures

## Safety Awareness and Education

Feb. 27th, 2014

# Spill Cleanup Procedures: Overview

- Spills are largely responsible for slip/trip/fall accidents in the store. Slip/trip/falls make up a large portion of accident claims and are included in the "Big Three".

- Promptly cleaning up spills is the best way to prevent these accident claims.

- Associates should follow these procedures for cleaning up spills in safe and timely manner.



# Spill Clean Up Procedures: Supplies

- Supplies to clean up spills need to be readily available for associates.
- Management should create a daily routine and assign the responsibility to inspect and refill supplies.
- The following should be restocked daily:
  - Spill Stations
  - Pocket Pads/Paper Towels
  - Custodial Carts
  - Inclement Weather Carts
- If you see a location or area that needs to be restocked, take care of it yourself or let your supervisor know.



# Spill Clean Up Procedures: Towel In Pocket Program

- The Towel In Pocket Program (TIP) requires that each associate put a paper towel or pocket pad in their pocket prior to starting their shift.

- The purpose of the paper towel/pocket pad is to provide the associate an easy way to immediately clean up a small spill.

- Associates are encouraged to use their paper towel/pocket pad and replace it after it is used.

- The paper towels/pocket pads should be located in multiple areas of the store (e.g., time clock) where the associates can easily access them.

- Educating associates about the importance of immediately cleaning up spills and the convenience of the paper towel/pocket pad should increase participation.



# Spill Clean Up Procedures: Determine the Type of Spill

- First, block off the spill area/aisle or have an associate protect the spill area to prevent a customer or another associate from coming in contact with the spill or tracking it through the store.
- It is important to determine if the spill is a biohazard (e.g., blood, bodily fluids) or hazardous material by referring to:
  - Product label/price sign
  - Handheld terminal using "Claims Disposition" screen
  - Material Safety Data Sheet (MSDS)
  - Spill Cleanup Guidelines Flipchart
  - When in doubt, call the Compliance Hotline (800) 530-9923.
  - Biohazard spills: refer to the Bloodborne Pathogens guide on the Safety WIRE page for clean up procedures.
  - Hazardous material spills: refer to the Spill Cleanup Guidelines flipchart for instructions.
    - For spills 10 gallons or more, contact the Compliance Hotline (800) 530-9923.



# Spill Clean Up Procedures: Retrieve Supplies

Retrieve the necessary supplies from the spill station:

- PPE
- The PPE required for a hazardous spill includes:
  - Goggles
  - Green Chemical Resistant Gloves
  - Chemical Resistant Apron
  - Face Shield (if required by MSDS)
- Absorbent
- Broom and dust pan
- Chemical bag or trash can liner
- Caution cone





# Spill Clean Up Procedures: Cleaning Up a Spill

- Place a caution cone next to the spill to prevent any customer and cart traffic from tracking through the spilled material.

- Put on the appropriate PPE.
  - Refer to the Material Safety Data Sheet (MSDS) for specific PPE requirements.

- Non-liquid material such as sugar, flour and powdered laundry detergent can be swept up with the broom and dust pan.

- Do not attempt to pick up broken glass with your hands. Use the broom to sweep glass into the dust pan.



# Spill Clean Up Procedures: Using Spill Absorbent

- Pour spill absorbent around the edges of the spill to prevent it from spreading.
  - Do not pour absorbent directly on the spilled product.
- Using a firm circular motion, work absorbent into the spilled liquid with a broom.
- If the absorbent becomes gummy or if a liquid residue remains, add more absorbent and work it into the area.
- If the spill was caused by a broken or leaking container, pour the remaining contents from the container into the chemical bag and add enough spill absorbent to absorb the liquid.
- Remove and dispose of the spilled product by following the appropriate SOP listed below:
  - Hazardous Spill Cleanup SOP
  - Non-Hazardous Spill Cleanup SOP
  - Unknown Spill Cleanup SOP



# EXHIBIT S

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ARGELIA SOLITO,<br><br>Plaintiff,<br>v.<br><br>SAM'S EAST, INC., JOHN DOE 1-2, ABC CORP., and XYZ CORP.,<br><br>Defendants. | Case No. 1:23-cv-03438-MLB |

**<u>DECLARATION OF CODY SPECK</u>**

Pursuant to 28 U.S.C. § 1746, I, Cody Speck, do hereby declare under penalty of perjury that the following is true and correct:

1.

I, Cody Speck, am over the age of eighteen, of sound mind, am competent to give testimony to the matters stated in this Declaration. I give this Declaration based upon my personal knowledge.

2.

I am currently the General Manager of Sam's Club Store Number 8194. On August 5, 2021, I was the General Manager of Sam's Club Store Number 6409.

3.

I am personally familiar with the slip-and-fall incident that occurred on August 5, 2021involving Argelia Solito. Though I did not witness the fall, I arrived shortly after the incident while Ms. Solito was still on the floor.

4.

The surveillance footage attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibit "A"** is a true, accurate, and complete duplicate of the surveillance footage captured at or near the time of Ms. Solito's fall on August 5, 2021.

5.

The surveillance footage shows that Ms. Solito fell at 12:25:11 PM. At 12:25:19 PM, Crossmark employee Elizabeth Billingsley, who was handing out samples near the area where Ms. Solito fell, goes to Ms. Solito's side. Ms. Billingsley is not an employee of Sam's East, Inc.

6.

I appear on the video, along with former Market Manager Anthony Morreale, at 12:25:25 PM. (Exhibit A). Mr. Morreale and I rendered aid to Ms. Solito and observed the substance in which Ms. Solito had apparently slipped. Upon looking around the scene for the source of spill, I suspected that a package of "Member's

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product) had leaked onto the floor from another customer's shopping cart.

7.

This suspicion as to the source of the spill was confirmed when I watched the surveillance footage from the time of the subject incident and realized that at 12:20:12 PM, one of the women in the group of four customers I had seen directly in front of the area where Plaintiff slipped points to something in one of their shopping carts, and the man in the red shirt goes over to the cart and inspects the contents, eventually pulling out a rectangular package that matches the description of "Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad" (or another similar chafing fuel product). (Exhibit A, 12:20:12 PM to 12:20:28 PM).

8.

The man in the red shirt walks around the area of the Ms. Solito's fall with the package, inspecting the package and looking toward the floor as he does so, before eventually walking to the back of the store, where the chaffing fuel is kept. (Exhibit A, 12:20:28 PM to 12:21:03 PM). The man returns to the scene of the incident approximately three minutes later carrying what appears to be a new package of chaffing fuel, as the package in his hand also matches the description of Member's

Mark 6-Hour Safe Heat Chafing Fuel with PowerPad (or another similar chafing fuel product). (Exhibit A, 12:23:45 PM).

9.

At 12:28:54 PM, former Front-End Manager Keira Saffold arrives on screen and began to fill out the Customer Incident Report. At 12:32:38, Ms. Saffold can be seen taking photographs of the area where Plaintiff fell. (Exhibit A).

10.

Sam East, Inc. personnel regularly inspect and monitor the store for potential hazards as they walk through the store. They identify any repairs, maintenance, clean up, or other measures needed to address any issues potentially impacting customer safety. If an employee notices any hazard on the floor, the employee immediately calls for assistance and monitors the hazard until it is cleaned up. True, accurate, and complete copies of Sam's East, Inc.'s "Slip, Trip and Fall Guidelines" and Spill Clean Up Procedures," which detail these policies and were effective on the day of the subject incident, are attached to Sam's East, Inc.'s Brief in Support of its Motion for Summary Judgment as **Exhibits "E"** and **"F"**, respectively, and were made at or near the time by, or from information transmitted by, a person with knowledge.

11.

These records were kept in the course of Defendant Sam East, Inc.'s regularly conducted business activities, and it is Sam East, Inc.'s standard business practice to create and maintain such records.

Further declarant sayeth not.

Cody Speck
Declarant

5/31/24
Date

# EXHIBIT

# T

Prior to Plaintiff's slip and fall, at around 12:13 P.M. a man in a red shirt along with two women in a blue shirt and a pink shirt are first seen at the north end of the aisle.

08/05/2021 12:13:53 PM (EDT)

# EXHIBIT

# U

Employee wearing a yellow safety vest that says “Sam’s Club.”

sam's
club.

# EXHIBIT

# V

The Sam's Club store No. 6409 at 1940 Mountain Industrial Blvd. Tucker, Georgia 30084 has inventory of the Member's Mark 6-Hour Safe Heat Chafing Fuel with PowerPad and the aisle containing the product can be seen from the area where the man in the red shirt and the employee in the yellow safety vest were discussing.

Breakfast
Breakfast Bars
Peanut Butter/Jelly
Cereals

Restaurant Supplies
Bakeware
Sports Drink
42
MAXCOLD 150 QT.
CONTENTS: ONE (1) COOLER
MADE IN USA
FULL SIZE
STEAM TABLE LIDS

Cereals
Granola
41
Restaurant Supplies
Bakeware
Sports Drink
42
MAXCOLD 150 QT.
$10.96
$15.78
STEAM TABLE LIDS
FULL SIZE
STEAM TABLE PANS
18
PACK

FROSTED FLAKES
Cinnamon Toast Crunch
HALF-SIZE STEAM TABLE LIDS
STEAM TABLE LIDS
SAFE HEAT CHAFING FUEL

# EXHIBIT



Around 12:27 P.M. the Crossmark employee Elizabeth Billingsley brings from her work station a cleaning materials, including a spray bottle and what appears to be a cleaning cloth or paper towel.

08/05/2021 12:27:02 PM (EDT)

08/05/2021 12:27:14 PM (EDT)